## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NOVELTY, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:07-CV-00191 (RMU) |
| ) | |
| KAREN TANDY, in her official capacity; ) | |
| UNITED STATES DRUG ) | |
| ENFORCEMENT ADMINISTRATION; ) | |
| ALBERTO GONZALES, in his official ) | |
| capacity; UNITED STATES ) | |
| DEPARTMENT OF JUSTICE; and the ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendants. ) | |

## <u>MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT</u>

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ARTHUR R. GOLDBERG
Assistant Director
Federal Programs Branch

AMY E. POWELL
Attorney (NY Bar)
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W. Rm. 7322
Washington, D.C. 20530
Telephone: (202) 514-9836
Facsimile: (202) 616-8202
Email: amy.powell@usdoj.gov

TABLE OF CONTENTS

PAGE(S)

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY AND REGULATORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    I.    PLAINTIFF DOES NOT CHALLENGE A FINAL AGENCY
        ACTION WITHIN THE MEANING OF THE APA . . . . . . . . . . . . . . . . . . . . 11

        A.    Challenge to Non-Final Agency Action is Barred by
                Sovereign Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        B.    Plaintiff Challenges a General Agency Practice, Not a
                Final Agency Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        C.    If Plaintiff Intended to Challenge the Specific Refusal to
                Issue a LONO for Spirit Pharmaceuticals, Plaintiff still has
                not Challenged a Final Agency Action . . . . . . . . . . . . . . . . . . . . . . . . 17

                1.    A LONO Refusal Is Not Final Agency Action . . . . . . . . . . . . . 17

                2.    Pending Agency Actions in the Spirit Importation
                        Prove a Lack of Finality and Ripeness . . . . . . . . . . . . . . . . . . . 20

II.    IF PLAINTIFF CAN IDENTIFY A FINAL AGENCY ACTION,
      SECTION 877 DEPRIVES THIS COURT OF JURISDICTION . . . . . . . . . . . . . . . . 22

        A.    Section 877 Commits Review of Final Orders to the
                Exclusive Jurisdiction of the Courts of Appeals . . . . . . . . . . . . . . . . . . 22

        B.    Because Exclusive Jurisdiction over Final Actions has
                been Committed to the Court of Appeals, it Should
                Also Have Exclusive Jurisdiction Here . . . . . . . . . . . . . . . . . . . . . . . . 24

III.    THE APA DOES NOT REQUIRE NOTICE-AND-COMMENT
       RULEMAKING FOR LONO PROCEDURES . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        A.    The Court Should Defer to the Agency's Choice of
                Adjudication over Rulemaking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

B.      LONO Procedures are Exempt from Rulemaking
        Requirements Because they are Purely Procedural Rules  . . . . . . . . . . . . 29

C.      LONO Procedures are Exempt from Rulemaking
        Requirements Because they Involve a Foreign Relations Function . . . . . 30

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGES**

Abbott Labs. v. Gardner, 387 U.S. 136 (1967) ........................................................ 21

American Farm Bureau v. EPA,
    121 F. Supp. 2d 84 (D.D.C. 2000) ............................................................ 25, 26

American Hosp. Ass'n v. Bowen,
834 F.2d 1037 (D.C. Cir. 1987) ...................................................................... 29

American Meat Inst. v. Bergland,
    459 F. Supp. 1308 (D.D.C. 1978) ................................................................ 29

American Portland Cement Alliance v. EPA,
    101 F.3d 772 (D.C. Cir. 1996) ...................................................................... 18

Bennett v. Spear, 520 U.S. 154 (1997) ........................................................ 13, 15, 21

Camp v. Pitts, 411 U.S. 138 (1973) ...................................................................... 16

Center for Auto Safety v. National Highway Traffic
    Safety Admin., 452 F.3d 798 (DC Cir. 2006) ................................................ 16

Chelsea Condominium Unit Owners Ass'n v. 1815 A. St.,
    Condominium Group, LLC, 468 F. Supp. 2d 136
    (D.D.C. 2007) ................................................................................................ 12

Citizens to Preserve Overton Park, Inc. v. Volpe,
    401 U.S. 402 (1971) ...................................................................................... 17

City of San Diego v. Whitman, 242 F.3d 1097 (9th Cir. 2001) ................................ 18

Cmty. Nutrition Inst. v. Young, 818 F.2d 943 (D.C. Cir. 1987) ................................ 16

Consolidated Edison Co. of New York, Inc. v. Federal
    Power Commission, 512 F.2d 1332, clarified by 518 F.2d 448 (D.C. Cir. 1975) .......... 19

CropLife Am. v. EPA, 329 F.3d 876 (D.C. Cir. 2003) .............................................. 16

Cutler v. Hayes, 818 F.2d 879 (D.C. Cir. 1987) .................................................. 25, 26

Dist. Intown Prop. Ltd. P'ship v. Dist. of Columbia,
    198 F.3d 874 (D.C. Cir. 1999) ...................................................................... 12

Doe v. Gonzalez [sic], 2006 WL 1805685 (D.D.C. June 29, 2006) ................................... passim

FCC v. National Citizens Comm. for Broadcasting,
        436 U.S. 775 (1978) ...................................................................................... 28

FTC v. Standard Oil of Cal., 449 U.S. 232 (1980) ....................................................... 13

Florida Power & Light v. Lorion, 470 U.S. 729 (1985) ................................................. 16

Franklin v. Massachusetts, 508 U.S. 788 (1992) .......................................................... 13

Gen. Motors Corp. v. Envtl. Prot. Agency,
        363 F.3d 442 (D.C. Cir. 2004) ...................................................................... 11

Oregon v. Ashcroft, 368 F.3d 1118 (9th Cir. 2004), aff'd sub nom
        Gonzales v. Oregon, 546 U.S. 243 (2006) ................................................... 23

International Union, UMW v. FMSHA,
        920 F.2d 960 (D.C. Cir. 1990) ...................................................................... 28

International Union, United  Mine Workers of America v. U.S.
        Department of Labor, 358 F.3d 40 (D.C. Cir. 2004) ............................... 24, 25

Isenbarger v. Farmer, 463 F. Supp. 2d 13 (D.D.C. 2006) ............................................ 21

JEM Broadcasting Co. v. FCC, 22 F.3d 320 (D.C. Cir. 1994) .................................... 29

Jamison v. FTC, 628 F. Supp. 1548 (D.D.C. 1986) ...................................................... 25

Kokkonen v. Guardian Life Ins. Co. of Am.,
        511 U.S. 375 (1994) ...................................................................................... 11

Lincoln v. Vigil, 508 U.S. 182 (1993) ......................................................................... 27

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ................................................. 12

Mast Industries, Inc. v. Regan, 596 F.Supp. 1567 (CIT 1984) ............................... 30, 31

Molycorp, Inc. v. EPA, 197 F.3d 543 (D.C. Cir. 1999) ............................................. 16

Nat'l Ass'n of Home Builders v. Norton,
        415 F.3d 8 (D.C. Cir. 2005) .......................................................................... 12

Norton v. Southern Utah Wilderness Alliance,
        124 S. Ct. 2373 (2004) ........................................................................... 13, 15

PDK Labs, Inc. v. DEA,
    438 F.3d 1184 (D.C. Cir. 2006) ............................................................ passim

PDK Labs, Inc. v. DEA,
    362 F.3d 786 (D.C. Cir. 2004) ...................................................................... 3

PDK Labs, Inc. v. Ashcroft, 338 F. Supp. 2d 1, 8 (D.D.C. 2004) ............................. 19

PDK Labs, Inc. v. Reno, 134 F. Supp. 2d 24 (D.D.C. 2001) ........................... 3, 19, 23

Pfizer, Inc. v. Shalala, 182 F.3d 975 (D.C. Cir. 1999) ............................................. 21

Public Citizen v. U.S. Trade Representative,
    5 F.3d 549 (D.C. Cir. 1993) ....................................................................... 13

Reliable Automatic Sprinkler Co., Inc. v. Consumer
    Prod. Safety Comm'n, 324 F.3d 726 (D.C. Cir. 2003) .................................... 13

SEC v. Chenery Corp., 332 U.S. 194 (1947) ...................................................... 5, 27

Shalala v. Guernsey Memorial Hospital, 514 U.S. 87 (1995) .................................. 28

Southern Cal. Edison Co.,
    770 F.2d at 783 (internal quotations omitted) ............................................... 29

Steckman v. DEA, No. Civ. A.H-97-1334,
    1997 WL 588871 (S.D. Tex. Sept. 16, 1997) ................................................ 23

Telecommunications Research & Action Center v. FCC,
    750 F.2d 70 (D.C. Cir. 1984) ........................................................... 24, 25, 26

Toca Producers v. FERC, 411 F.3d 262 (D.C. Cir. 2005) ....................................... 21

United Prescription Services, Inc. v. Gonzales,
    2006 WL 3804728 (M.D. Fla. Dec. 22, 2006) ............................................... 18

United States v. Mitchell, 445 U.S. 535 (1980) ..................................................... 12

Vt. Yankee Nuclear Power Corp. v. NRDC,
    435 U.S. 519 (1978) .................................................................................. 30

Wilderness Soc'y v. Norton, 434 F.3d 584 (D.C. Cir. 2006) .................................... 16

## STATUTES AND REGULATIONS

Administrative Procedure Act, 5 U.S.C. § 701 et seq. ......................................................... passim

Chemical Diversion and Trafficking Act of 1988,
    Pub.L. No. 100-690, tit. VI, subtit. A, 102 Stat. 4312 ...................................................... 2

Combat Methamphetamine Epidemic Act of 2005,
    P.L. 109-177, tit. VII, 120 Stat. 256 (March 9, 2006) ................................................... 3, 4

Domestic Chemical Diversion Control Act of 1993,
    Pub. L. No. 103-200, 107 Stat  2333 ............................................................................... 2

5 U.S.C. § 551 ..................................................................................................... 12, 13, 14

5 U.S.C. § 553(b) ........................................................................................................ 29, 30

21 U.S.C. §§ 802 (34) 830(b), 971(d) ............................................................................. 2

21 U.S.C. § 871(a) .......................................................................................................... 4

21 U.S.C. §§ 877, 965 ............................................................................................. passim

21 U.S.C. § 960(d)(2) ..................................................................................................... 2

21 U.S.C. § 971(c)(1) ............................................................................................... passim

22 U.S.C. § 2291 ........................................................................................................... 6

Implementation of the Combat Methamphetamine Epidemic Act of 2005;
    Notice of Transfers Following Importation or Exportation,
    72 Fed. Reg. 17401 (April 9, 2007) ............................................................................... 4

21 C.F.R. § 1313.12, *et seq* ..................................................................................... passim

28 C.F.R. § 0.100(b) ...................................................................................................... 4

## LEGISLATIVE MATERIALS

175 Cong. Rec. 31383-31389, 31402-03, 31600 (November 21, 1989) ...................................... 6

## **MISCELLANEOUS**

Fed. R.Civ. P. 56(b) ................................................................................................... 12

Presidential Determination on the Major Methamphetamine
     Precursor Chemical Exporting and Importing Countries,
     No. 2007-14 ................................................................................................. passim

Att'y Gen.'s Manual on the APA 27 (1947) ................................................................ 30

**INTRODUCTION**

Congress has charged the Drug Enforcement Administration ("DEA") with administering a complex regulatory scheme designed to control the manufacture and distribution of controlled substances and their precursor chemicals, including ephedrine, a key ingredient in methamphetamine. Among other responsibilities, the DEA is authorized to suspend imports of listed chemicals, including ephedrine, upon finding that the chemical may be diverted to the illicit manufacture of a controlled substance. Under various treaty obligations, the DEA's regulation of imports of listed chemicals must be coordinated with a multitude of foreign legal regimes, including some which require the importing nation to approve each importation. The United States has negotiated bilateral agreements with several nations whereby the United States will issue letters of no objection, or "LONOs," regarding shipments that comply with applicable U.S. law. A LONO denial does not trigger any legal obligations unless the importer chooses to pursue the importation to a suspension order.

Plaintiff, a downstream distributor of over-the-counter ephedrine products, does not challenge any specific DEA suspension order or LONO denial, but claims that the DEA has adopted an arbitrary and capricious rule denying LONOs to importers who sell to convenience store distributors, and that this alleged rule should be subject to notice-and-comment rulemaking. The problems with this challenge are multi-fold. First, under the Administrative Procedure Act ("APA"), a district court only has subject matter jurisdiction over challenges to final, discrete agency actions, and the plaintiff has failed to identify any such action. Moreover, even if plaintiff could identify a final agency action, the DEA's final actions are only reviewable in the court of appeals pursuant to a special statutory review provision. Finally, in no event could the DEA be required to undertake

1

notice-and-comment rulemaking to promulgate a procedure for notifying foreign governments of compliance with U.S. law, as required by international agreements.

## STATUTORY AND REGULATORY BACKGROUND

### The Chemical Diversion and Trafficking Act

Methamphetamine is "a powerful and highly addictive synthetic stimulant." *PDK Laboratories, Inc., v. DEA*, 438 F.3d 1184 (D.C. Cir. 2006) ("*PDK II*"). One of the principal ingredients is the chemical ephedrine, which is also used for, and can be obtained from, *inter alia*, prescription and nonprescription drugs. *Id. See also* Decl. of Darrell Meador, dated April 10, 2007, attached hereto as Exhibit A, ¶ 2 ("Meador Decl.").

The Chemical Diversion and Trafficking Act of 1988, Pub.L. No. 100-690, tit. VI, subtit. A, 102 Stat. 4312 ("the CDTA"), was the first comprehensive attempt to combat the growing methamphetamine problem. The CDTA, as amended, imposes extensive reporting requirements on companies doing business in "listed chemicals," including two critical methamphetamine ingredients, ephedrine and pseudoephedrine. *See id.*, codified at 21 U.S.C. §§ 802 (34)(C), (K) 830(b), 971(d). This statute also imposes criminal penalties on individuals who import a listed chemical with "reasonable cause to believe, that [it] will be used to manufacture a controlled substance." *See* 21 U.S.C. § 960(d)(2).

Most significant to this litigation, the CDTA authorizes the Drug Enforcement Administration ("DEA") to "order the suspension of any importation or exportation of a listed chemical . . . on the ground that the chemical may be diverted to the clandestine manufacture of a controlled substance." *See* 21 U.S.C. § 971(c)(1).[1] In order to allow the DEA to make a

---

[1]Subsequent enactments further restricted access to the chemicals used to manufacture methamphetamine by, *inter alia*, imposing additional reporting requirements on all transactions

2

determination as to whether or not it should exercise this power, Congress required that "[e]ach regulated person who imports . . . a listed chemical shall notify the Attorney General of the importation . . . not later than 15 days before the transaction is to take place." 21 U.S.C. § 971(a). In the 2006 amendments to the Act, Congress imposed more detailed notice requirements, *id.* § 971(d), (h), and clarified that the discretionary power to suspend shipments is "without regard to the form of the chemical that may be diverted, including the diversion of a finished drug product to be manufactured from bulk chemicals to be transferred," *id.* § 971(c)(1); *cf. PDK Laboratories, Inc. v. DEA*, 362 F.3d 786, 797-98 (D.C. Cir. 2004) ("*PDK I*") (finding ambiguity in earlier version of the statute). *See generally* The Combat Methamphetamine Epidemic Act of 2005, P.L. 109-177, tit. VII, 120 Stat. 256 (March 9, 2006) ("the CMEA").

The statute further provides that "a regulated person to whom [a suspension order] applies . . . is entitled to an agency hearing on the record." 21 U.S.C. § 971(c)(2). Judicial review of such decisions, as well as review of all other "final determinations, findings and conclusions of the Attorney General," is in the United States Court of Appeals for the District of Columbia or in the circuit where the plaintiff's principal place of business is located. *See* 21 U.S.C. §§ 877, 965; *see, e.g., Doe v. Gonzalez [sic]*, 2006 WL 1805685 (D.D.C. June 29, 2006).[2]

---

in drug products containing the listed chemicals and imposing stiffer penalties on violations. *See, e.g.*, Domestic Chemical Diversion Control Act of 1993, Pub. L. No. 103-200, 107 Stat. 2333; Combat Methamphetamine Epidemic Act of 2005, P.L. 109-177, tit. VII, 120 Stat. 256 (March 9, 2006).

[2]By its terms, section 877 applies only to decisions made under subchapter I of the Act. Section 965, however, renders section 877 (and other sections of part E of subchapter I) applicable to subchapter II as well. *See PDK Labs, Inc. v. Reno*, 134 F. Supp. 2d 24, 29 n.3 (D.D.C. 2001).

Importation Regulations

The Attorney General has delegated his regulatory authority to regulate controlled substances and listed chemicals to the DEA. *See* 21 U.S.C. § 871(a); 28 C.F.R. § 0.100(b). Section 821 authorizes the Attorney General to "promulgate rules and regulations . . . relating to the registration and control of the manufacture, distribution, and dispensing of controlled substances and to listed chemicals."

In accordance with this authority, the DEA has promulgated regulations on importation of listed chemicals that closely track the language of the statute. *See generally* 21 U.S.C. § 971; 21 C.F.R. § 1313.12, *et seq*. Subject to specific exceptions, a regulated person who imports a listed chemical must notify the DEA of the importation using DEA Form 486, not later than 15 days before the transaction is to take place. *See* 21 C.F.R. § 1313.12(a). All international transactions involving listed chemicals are subject to a notice requirement, and regulated persons are urged to provide advance notification as far in advance of the 15 days as possible "[i]n order to facilitate an international transaction." *Id.* § 1313.32-33. Regulations specify the contents and procedures of Form 486. *Id.* § 1313.13-14. An interim final rule published April 9, 2007 revises DEA Form 486 and amends the reporting requirements to comply with the Combat Methamphetamine Epidemic Act of 2005, P.L. 109-177, tit. VII, 120 Stat. 256 (March 9, 2006). *See Implementation of the Combat Methamphetamine Epidemic Act of 2005; Notice of Transfers Following Importation or Exportation*, 72 Fed. Reg. 17401 (April 9, 2007).

The DEA may "suspend any importation . . . of [any listed chemical] based on evidence that the chemical proposed to be imported . . . may be diverted to the clandestine manufacture of a controlled substance." 21 C.F.R. § 1313.41(a). The Administrator must provide "written notice of such suspension . . . contain[ing] a statement of the legal and factual basis for the order." *Id.* The

4

DEA has not promulgated detailed regulations on what constitutes a risk of diversion within the meaning of section 971(c)(1) or 21 C.F.R. § 1313.41(a). *See* Decl. of Darrell R. Meador, dated April 10, 2007, attached hereto as Exhibit A, ¶ 10 ("Meador Decl."). Instead, the agency has exercised its discretion to proceed on a case-by-case basis, applying a "totality of the circumstances" test and developing law within the context of the individual adjudications contemplated by section 971(c)(2), a practice previously upheld by the D.C. Circuit. *See id.*; *PDK II*, 438 F.3d at 1194-95; *see also SEC v. Chenery Corp.*, 332 U.S. 194, 202-03 (1947).

In applying this "totality of the circumstances" test, a "substantial and weighty"– indeed, often controlling – factor is the type of retail establishment that will ultimately distribute the List I chemical products to the public. *See* Meador Decl. ¶¶ 10-15. Numerous DEA investigations and adjudications in a variety of contexts have determined that convenience stores and gas stations constitute the non-traditional retail or "gray market" for both legitimate and illegitimate consumers of ephedrine products. *See id.* ¶ 13. The products sold there are typically stronger than those found in the traditional market, are often sold for off-label uses, and are disproportionately represented in lab seizures. *Id.* Non-traditional retailers are also more likely to sell large quantities to so-called "smurfers," individuals who work for methamphetamine traffickers and buy large quantities of over-the counter drug products. *See id.* ¶¶ 14-15.

If a regulated person to whom an order applies wishes to challenge the import suspension of a listed chemical, he or she must file a written request for a hearing within 30 days. *See* 21 C.F.R. §§ 1313.41(b), 1313.54. The purpose of the hearing is "to receiv[e] factual evidence regarding the suspension of shipments." *Id.* § 1313.52. The hearing is a formal adjudication governed by the Administrative Procedure Act, the CDTA, and the procedures for administrative hearings under the Controlled Substances Act in 21 C.F.R. §§ 1316.41-67. *See* 21 C.F.R. § 1313.51.

Letters of No Objection

The 1988 U.N. Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances requires that parties to the convention "take the measures they deem appropriate to prevent diversion of [listed substances, including ephedrine,] used for the purpose illicit manufacture of narcotic drugs or psychotropic substances, and . . . cooperate with one another to this end." U.N. Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, opened for signature Dec. 20, 1988, Art. 12, ¶ 1, 28 I.L.M. 493 (1989). Parties to the 1988 Convention are further obligated to "[e]stablish and maintain a system to monitor international trade in [listed chemicals] in order to facilitate the identification of suspicious transactions." *Id.* at ¶ 9(a). Parties are also obligated to notify the "competent authorities and services of the Parties concerned if there is reason to believe that the import, export or transit of a [listed chemical] is destined for the illicit manufacture of narcotic drugs or psychotropic substance." *Id.* at ¶ 9 (c). The Senate provided its advice and consent on November 21, 1989, 175 Cong. Rec. 31383-31389, 31402-03, 31600, the president signed it on February 13, 1990, and the United States formally ratified the treaty on February 20, 1990. Congress has explicitly incorporated the convention into legislation; a congressional statement of policy states that "International narcotics control programs should include, as priority goals, the suppression of the illicit manufacture of and trafficking in narcotic and psychotropic drugs . . . and precursor chemical diversion." *See* 22 U.S.C. § 2291.

Although a permit system for importing and exporting such substances is not explicitly required by the Convention, many countries have developed a system which requires approval by the importing country before allowing the export. *See* Decl. of Darrell R. Meador, dated April 10, 2007, attached hereto as Exhibit A, ¶ 8 ("Meador Decl."); *see also Presidential Determination on the Major Methamphetamine Precursor Chemical Exporting and Importing Countries*, No. 2007-14,

available at www.state.gov/p/inl/rls/rpt/81222.htm (February 28, 2007) (describing international efforts to control precursor chemicals in major ephedrine-exporting countries, including that China and India both require approval from the importing country). Accordingly, some exporting countries now require that the importing country approve an importation before they will issue an export permit. *Id.* The United States does not issue import permits *per se*, but has negotiated bilateral agreements whereby the DEA instead provides importers and the exporting nation with a "letter of no objection," or LONO, when it elects not to suspend a shipment from one of these nations. Meador Decl. ¶¶ 7-8. The exporting nation is obligated not to permit the export without a LONO, and the U.S. is obligated to to refuse to issue a LONO if it finds that the chemicals may be diverted for the purpose of illicit manufacture of methamphetamine. *Id.*

Several nations have requested the issuance of such letters, including India, China and the Czech Republic. Meador Decl. ¶¶ 7-8; *see also Presidential Determination on the Major Methamphetamine Precursor Chemical Exporting and Importing Countries*, No. 2007-14, available at www.state.gov/p/inl/rls/rpt/81222.htm (February 28, 2007). "India has a system of letters of no objection for the export of pseudoephedrine and ephedrine and will not authorize exports until the receiving government approves the import." *Presidential Determination on the Major Methamphetamine Precursor Chemical Exporting and Importing Countries*, No. 2007-14, available at www.state.gov/p/inl/rls/rpt/81222.htm (February 28, 2007).

The LONO process, however, adds no legal rights or obligations to section 971, which only allows the DEA to suspend shipments if it finds a risk of diversion. Meador Decl. ¶ 8. Normally, the LONO consists of a short letter which describes the requested transaction and states that "the DEA has no objection to the proposed shipment at this time." *Id.* The standard for refusing to issue

a LONO is the same as the standard for suspending a shipment. *Id.* DEA issues LONOs in order to comply with its treaty obligations by cooperating with other signatories and providing assurance to the exporting nation that U.S. law is not being violated. *Id.* ¶¶ 6-8.

Accordingly, when persons wish to import a listed chemical from one of these nations, they submit a DEA Form 486 and request a LONO. *See* Meador Decl. ¶ 9. If the DEA finds no problems with the importation, it issues a LONO and the importation goes forward. If the DEA finds that there is a risk of diversion, it is statutorily authorized to suspend the shipment with no further action or investigation, subject to a post-suspension hearing if the importer requests it. *See* 21 U.S.C. § 971; 21 C.F.R. § 1313.41(a). Generally, however, the DEA first refuses to issue a LONO in order to give the importer a chance to withdraw the request. Meador Decl. ¶ 9. An importer is then free to pursue the request and risk an order of suspension. *Id.* When the DEA refuses to issue a LONO before issuing a suspension order, the importer is still free to pursue the importation in the same manner contemplated by section 971(c); it need only inform the DEA that it wishes to do so. *Id.* The LONO refusal adds no substantive obligations or rights to the importer's obligations under section 971. *Id.*

Procedural Background

Novelty, Inc. ("Novelty") is an Indiana corporation that distributes commercial goods, including over-the-counter pharmaceuticals, to convenience stores throughout the United States. Compl. ¶ 1. As such, Novelty is the sort of nontraditional retailer that the DEA has found to be at risk of ephedrine diversion in many contexts. *See* Meador Decl. ¶¶ 12-18. In September 2006, an importer called Spirit Pharmaceuticals, LLC ("Spirit") submitted two DEA Forms 486 and requested a LONO for two shipments of ephedrine from India. *See* Compl. ¶¶ 18-19; Meador Decl. ¶ 16. This shipment was intended for sale to AAA Pharmaceuticals, Inc., a drug manufacturer. *See* Compl.

¶¶ 18-19; Meador Decl. ¶ 16.    AAA Pharmaceuticals intended to resell some portion of these products to Novelty. *See* Compl. ¶¶ 18-19; Meador Decl. ¶ 16.

The DEA investigated the type of drug being manufactured and the customer lists of both AAA and Novelty. Meador Decl. ¶¶ 17-18. Based on these factors, the DEA determined that there was a risk of diversion because "solid dosage" products were being sold to gray market retailers, including retailers in those states where it is illegal for non-pharmacies to sell such products. *Id.* On October 10, 2006, the DEA declined to issue the LONO for this shipment. Compl. ¶ 18 and attachments. By letter to Spirit Pharmaceuticals, DEA stated that it had "thoroughly reviewed the proposed utilization of the planned Listed Chemical importation," and found that "the proposed importation may be subject to diversion to the illicit market by the downstream distribution system." Compl. ¶ 18 and attachments. That letter did not include an order of suspension. Instead, the DEA informed Spirit of its options: that it was free to pursue the importation, but that if the importer did not contact the DEA, the notification would be considered withdrawn. Compl. ¶ 18 and attachments; Meador Decl. ¶ 18. Spirit took no action, and the DEA considered its request withdrawn. Meador Decl. ¶ 18. Therefore, no suspension order was issued. *Id.*

On April 10, 2007, DEA contacted Spirit Pharmaceuticals again in order to make certain that Spirit had a full opportunity to pursue the importation. *See* Meador Decl. ¶ 19. Spirit Pharmaceuticals was told that it must now take affirmative action to withdraw the application or the DEA would issue a suspension order. *Id.* In the April 10 letter, Spirit was given five days to respond.

Prior to filing this lawsuit, Novelty requested the opportunity to pursue Spirit's importation and then requested a hearing, apparently under 21 U.S.C. § 971(c)(2), which allows a "person to

whom an order applies" to request a hearing to challenge the denial of a suspension order. *See* Meador Decl. ¶ 20. That request is still pending because Novelty is not a registered importer and because currently no suspension order has been issued under 971(c)(1). The decision on whether to grant Plaintiff a hearing is pending based on Spirit's response to the second DEA letter. The DEA will notify Plaintiff as soon as it determines whether Spirit intends to pursue the importation *Id.* It is unclear whether Spirit will seek a hearing in which Novelty could intervene or whether, under applicable precedent, Novelty is a person to whom a suspension order applies and could request a hearing in its own right.

On February 8, 2007, while its request for a hearing was still pending, Novelty filed this Complaint. Although the Complaint is somewhat vague, it appears that plaintiff does not purport to challenge the refusal to issue a LONO to Spirit Pharmaceuticals; nor does it challenge the denial of a hearing to Novelty under section 971(c)(2). Although the Complaint mentions the denial of a LONO to Spirit Pharmaceuticals, *see* ¶ 18, the allegedly unlawful actions are "DEA's LONO procedure and criteria," *see* ¶¶ 24-36; moreover, the relief sought does not relate to that specific importation. *See* ¶¶ 37-38. The Complaint alleges that DEA has "adopted the requirement of a LONO as a condition precedent for lawful import of Ephedrine to the United States without following the familiar notice-and-comment rule-making procedures specified in the Administrative Procedure Act." ¶ 14. In Count I, plaintiff alleges that "DEA's LONO procedure and criteria are legislative rules that define Novelty's, and all similarly situated parties', rights to import, and obligations concerning import of, Ephedrine." Plaintiff further alleges that DEA violated the APA by "imposing the LONO procedure and criteria against Novelty" and by "denying importation of all

10

Ephedrine destined for sale in convenience stores serviced by Novelty," without compliance with the notice-and-comment procedures" of the APA. ¶¶ 31-32.

Count II alleges that "DEA violated the APA by establishing an arbitrary and capricious substantive rule categorically prohibiting import of [over-the-counter] ephedrine for convenience store sales." According to plaintiff, "DEA refuses to issues LONO's for any importer whose OTC Ephedrine containing products are to be sold through convenience stores but issues LONO's to importers whose OTC Ephedrine products are to be sold through pharmacies and grocery stores." ¶ 35.

The Complaint seeks declaratory relief, including a declaration that "the LONO procedure and criteria for Ephedrine imports are legislative rules DEA failed to adopt pursuant to notice-and-comment rule-making as required by the APA" and that "DEA's allowance of LONO's for pharmacy and grocery store sale of OTC Ephedrine and disallowance of LONO's for convenience store sale of OTC Ephedrine are arbitrary and capricious agency actions in violation of the Administrative Procedure Act." ¶ 37. It further seeks an injunction against "enforc[ement of] the LONO procedure and criteria for Ephedrine imports." ¶ 38.

## ARGUMENT

I.    PLAINTIFF DOES NOT CHALLENGE A FINAL AGENCY ACTION WITHIN THE MEANING OF THE APA

Plaintiff has failed to challenge a final agency action, a fundamental prerequisite to the waiver of sovereign immunity contained in the APA. Federal courts are courts of limited jurisdiction, and the law presumes that "a cause lies outside this limited jurisdiction." *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *Gen. Motors Corp. v. Envtl. Prot.*

11

*Agency*, 363 F.3d 442, 448 (D.C. Cir. 2004); *Chelsea Condominium Unit Owners Ass'n v. 1815 A.*

*St., Condominium Group, LLC*, 468 F. Supp. 2d 136, 140 (D.D.C. 2007). On a motion to dismiss

for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of

establishing that the court has subject-matter jurisdiction. *See Lujan v. Defenders of Wildlife*, 504

U.S. 555, 561 (1992).[3]

A.    Challenge to Non-Final Agency Action is Barred by Sovereign Immunity

"The United States, as sovereign, is immune from suit save as it consents to be sued . . . and

the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit."

*United States v. Mitchell*, 445 U.S. 535, 538 (1980), quoting *United States v. Sherwood*, 312 U.S.

584, 586 (1941). The APA does not subject to judicial review every act of an agency, but rather

limits its waiver of sovereign immunity to review of "[a]gency action made reviewable by statute and

final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *see also*

*id.* § 702 ("A person suffering legal wrong because of agency action . . . is entitled to judicial review

thereof."); *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 13 (D.C. Cir. 2005) (noting that the

APA "bars review prior to final agency action"). Agency action is defined as "the whole or a part

of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."

*Id.* § 551(13); *see also id.* § 701(b)(2) (expressly adopting the definition of "agency action" in section

551 for purposes of sections 701–706 of the APA). The categories of agency action, moreover, are

---

[3]To the extent that the Court finds it necessary to rely upon factual materials outside the
Complaint, including the Declaration of Darrell Meador, Exhibit A, defendants request, in the
alternative, that the Court consider this motion as one for summary judgment. Motions for
summary judgment should be granted when "there is no genuine issue as to any material fact,"
and the defendant is "entitled to judgment as a matter of law." *See* Fed. R.Civ. P. 56(b); *Dist.
Intown Prop. Ltd. P'ship v. Dist. of Columbia*, 198 F.3d 874, 878 (D.C. Cir. 1999).

not amorphous—they are specifically defined and involve "circumscribed, discrete" acts. *Norton*

*v. Southern Utah Wilderness Alliance*, 124 S. Ct. 2373, 2378 (2004) ("*SUWA*"); *see* 5 U.S.C. §

551(4), (6), (8), (10), (11) (defining "rule," "order," "license," "sanction," and "relief").

In addition, it is well-established that for agency action to be "final" such that it may be

reviewed under the APA, it must "mark the consummation of the agency's decision-making

process—it must not be of a merely tentative or interlocutory nature," and the action "must be one

by which rights or obligations have been determined, or from which legal consequences will flow."

*Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks and citations omitted); *see also*

*Franklin v. Massachusetts*, 508 U.S. 788, 796–97 (1992) (for agency action to be final, its impact

must be "sufficiently direct and immediate" and not "tentative"); *FTC v. Standard Oil of Cal.*, 449

U.S. 232, 239 (1980) (agency action is deemed final if it is "definitive" and has a "direct and

immediate" effect on the party challenging the action) (internal quotation marks omitted); *Reliable*

*Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003)

("Agency action is considered final to the extent it imposes an obligation, denies a right, or fixes

some legal relationship."); *Public Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir.

1993) (finding that agency's failure to prepare an Environmental Impact Statement independently

required by statute was not final agency action).[4]

---

[4] This limitation on the waiver of sovereign immunity applies regardless of the type of claim
brought. Thus, it is well settled that even an APA claim challenging "unreasonable delay"
pursuant to 5 U.S.C. § 706(1), "can proceed only where a plaintiff asserts that an agency failed to
take a discrete agency action that it is required to take." *Norton v. Southern Utah Wilderness
Alliance ("SUWA")*, 124 S.Ct. 2373, 2379 (2004), *cert. granted and cause remanded*, 124 S.Ct.
2870 (2004) (emphasis in original). The *SUWA* Court made clear that the only enforceable
"agency actions" are those that fit within the meaning of APA Section 551(13), 5 U.S.C. §
551(13), which "includes the whole or a part of an agency rule, order, license, sanction, relief, or
the equivalent or denial thereof, or failure to act. . . ." *SUWA*, 124 S.Ct. at 2378. The *SUWA*
Court further held that "[t]he final term in the definition, 'failure to act,' is in our view properly

13

B.     Plaintiff Challenges a General Agency Practice, Not a Final Agency Action

Although the Complaint mentions the October 10, 2006 refusal to issue a LONO regarding

Spirit Pharmaceuticals' planned importation, *see* Compl. ¶ 18, the plaintiff does not purport to be

challenging that refusal; nor has plaintiff identified a suspension order which it intends to challenge.

*See* Compl. ¶¶ 24-36.  Indeed, plaintiff has not challenged any other "rule, order, license, sanction,

[or] relief." *See* 5 U.S.C. § 551(13).  Instead, plaintiff claims that there is a general practice by which

DEA refuses to issue LONOs for certain importations and unilaterally labels this practice a "rule."

*See* Compl. ¶¶ 13-14, 25, 36.  The DEA, however, has not issued a formal rule defining what

constitutes a risk of diversion; instead the DEA makes an individualized determination on every

suspension order based upon a totality of the circumstances. Meador Decl. ¶ 10.  Plaintiff does not

attempt to challenge every single LONO decision ever made (nor would plaintiff have standing to

do so); instead, plaintiff has reached its own conclusion about what constitutes a risk of diversion

under 21 C.F.R. § 1313.41(a) and challenges that so-called "rule."

The problems with this approach are at least twofold.  First, there is no such rule, and

plaintiffs cannot realistically maintain otherwise.  The LONO process is simply a procedural part of

the risk-of-diversion decision made under section 971(c). Meador Decl. ¶ 9.  There is no formal rule

governing the myriad circumstances which could create a "risk of diversion;" instead, the DEA

proceeds in adjudications using a totality of the circumstances test. *Id.* ¶ 10.  Although convenience

stores are certainly considered to be a greater risk, there is currently no hard-and-fast rule that would

---

understood as a failure to take an agency action–that is, a failure to take one of the agency actions
(including their equivalents) earlier defined in § 551(13). *Id.* at 2379. Thus, reviewable agency
actions do not include an agency's day-to-day operations or agency implementation of general
mandates. *Id.* at 2380.

prohibit importation for sale in convenience stores. *Id.* This approach is also documented in other caselaw on the issue, including *PDK II*, where the Circuit Court exercised exclusive jurisdiction over a petition for review of a final DEA decision on a suspension order. *See PDK II*, 438 F.3d at 1194-95 ("an agency is not necessarily required to define [an open-ended] term in its initial general regulation-or indeed . . . obliged to issue a comprehensive definition all at once. Rather, in fleshing out the contours of vague statutory terms, agencies are entitled to proceed case by case.") (internal citations omitted). Certainly, one weighty factor taken into account in these adjudications is whether the ephedrine products will be sold in stores and locations with a high risk of diversion. *See* Meador Decl. ¶¶ 12-15.    Although the DEA may apply such broad principles in any given specific adjudication, each individual adjudication applies a multifactor test. *Id.* ¶ 10. The DEA is not bound by such findings in the future if the totality of the circumstances test yields a reason to depart from such principles. These adjudications mark the consummation of the agency decisionmaking process and set legal rights, *see Bennett v. Spear*, 520 U.S. at 178; thus only specific, circumscribed, and discrete adjudications may be challenged. *See SUWA*, 124 S. Ct. at 2378.

Second, even if plaintiff's generalization were entirely correct and the DEA has adopted a *de facto* rule refusing to issue LONOs for importers that sell to convenience stores, plaintiff still has not identified a discrete, concrete agency action that it is challenging. Plaintiff's ability to generalize about agency decisions refusing to issue LONOs does not in itself render those decisions a *de facto* agency "rule" subject to APA review.    Such decisions are not final, nor do any "rights and obligations" flow from the plaintiff's interpretation of a collection of such decisions. *See Bennett v. Spear*, 520 U.S. at 178.   The actual adjudications on suspension orders determine the rights of the

15

parties, *see* Meador Decl. ¶ 9; 21 C.F.R. § 1313.54, but plaintiff has not challenged any specific, final adjudication, only what the plaintiff believes is the general agency practice in issuing LONOs.

In a handful of cases, the D.C. Circuit has found policy statements and other expressions of agency policy to constitute *de facto* rules and therefore final agency action reviewable under the APA:

> "In determining whether an agency has issued a binding norm or merely" an unreviewable "statement of policy, we are guided by two lines of inquiry." *See Wilderness Soc'y v. Norton*, 434 F.3d 584, 595 (D.C. Cir. 2006). One line of analysis considers the effects of an agency's action, inquiring whether the agency has "(1) impose[d] any rights and obligations, or (2) genuinely [left] the agency and its decisionmakers free to exercise discretion." *CropLife Am. v. EPA*, 329 F.3d 876, 883 (D.C. Cir. 2003) (citation and internal quotation marks omitted). The language used by an agency is an important consideration in such determinations. *See Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987) (per curiam). The second line of analysis looks to the agency's expressed intentions. *CropLife Am.*, 329 F.3d at 883. This entails a consideration of three factors: "(1) the [a]gency's own characterization of the action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency." *Molycorp, Inc. v. EPA*, 197 F.3d 543, 545 (D.C. Cir. 1999).

*Center for Auto Safety v. National Highway Traffic Safety Admin.*, 452 F.3d 798, 806-07 (D.C. Cir. 2006). In those cases, however, it is clear that the plaintiffs were challenging some explicit statement of policy, not a rule deduced by an erstwhile litigant from the agency's collected interlocutory letters. Simply put, the Complaint points to no action whereby the agency intends to impose any rights or obligations.[5]

---

[5]The impropriety of the plaintiff's approach is underscored by its failure to challenge an action for which a record could readily be compiled. Review under the APA is ordinarily limited to the administrative record. 5 U.S.C. § 706; *see Florida Power & Light v. Lorion*, 470 U.S. 729, 743-44 (1985) (a reviewing court's task is to apply the appropriate APA standard of review to the agency decision "based on the record the agency presents to the reviewing court"); *Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"). *See also*

C.    If Plaintiff Intended to Challenge the Specific Refusal to Issue a LONO for Spirit
      Pharmaceuticals, Plaintiff still has not Challenged a Final Agency Action

If plaintiff intends to challenge the specific decision refusing to issue a LONO for Spirit

Pharmaceuticals, plaintiff still has not challenged a final agency action for at least two reasons. First,

denial of a LONO is never final agency action that fixes legal obligations, and second, in the present

case, there is still pending agency action.

1.    A LONO Refusal Is Not Final Agency Action

Plaintiff's Complaint incorrectly and insupportably characterizes the LONO process as an

independent requirement for the importation of ephedrine. In fact, the refusal of a LONO does not

affect any entity's legal rights and obligations under section 971(c); it is not a substantive legal

requirement at all. *See* Meador Decl. ¶¶ 8-9. The process of requesting a LONO is identical to the

process by which one notifies the DEA of an importation under section 971. *See* Meador Decl. ¶ 9.

The only intermediate step added by the LONO process is that the DEA can refuse to issue the

LONO before suspending a shipment and give the importer a chance to withdraw the notice of

importation. *Id.* In such cases, the notice is deemed withdrawn in the absence of further action by

the importer. *Id.* Such a procedural device is of no moment in determining whether or not the

LONO refusal has legal effect. The importer's rights and obligations are identical before and after

the refusal notice is sent except for the requirement that the importer contact the DEA again to keep

its notice in place. *Id.*

---

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (the Court should not
"substitute its judgment for that of the agency"). If the Court finds that the plaintiff can
challenge the alleged "rule" in this case, it will be necessary to compile an administrative record
for an amorphous rule that has developed over time in many individual adjudications, *see, e.g.*,
Meador Decl. ¶¶ 12-15 (collecting cases), a difficult proposition at best.

The original LONO refusal sent to Spirit Pharmaceuticals comports with this model. *See* Compl. and attachments; Meador Decl. ¶18. The DEA notified Spirit that it would need to take an additional procedural step in order to pursue its importation; specifically, Spirit would have to "indicate in writing, within the 30 days, [its] desire to pursue the importation further." *Id.* This procedural step of notifying the DEA that it wishes to pursue the importation is not an "appeal" as the plaintiff claims. *See* Compl. ¶ 12. The standard for suspending a shipment is the same as for refusing to issue the LONO, and the DEA form is still the basis for decisionmaking. *See* Meador Decl. ¶ 9. An agency's characterization of its own actions, although not dispositive, is entitled to some deference. *See American Portland Cement Alliance v. EPA*, 101 F.3d 772, 776 (D.C. Cir. 1996). The DEA here did not indicate that the LONO refusal was a final action triggering any substantive rights. Although the DEA indicated that it would in fact suspend the shipment if Spirit chose to pursue the shipment, it is the suspension, not the LONO denial, that triggers legal obligations. *See* 21 U.S.C. § 971(c); Meador Decl. ¶ 9.

At worst, the requirement of re-contacting the DEA amounts to administrative jawboning prior to taking any coercive action. Such jawboning is permissible and does not amount to final agency action if no legal rights or obligations are triggered. *See City of San Diego v. Whitman*, 242 F.3d 1097, 1102 (9th Cir. 2001) (holding that agency letter encouraging action did not "fix some legal relationship" between the parties); *United Prescription Services, Inc. v. Gonzales*, 2006 WL 3804728, *4-*7 (M.D. Fla. Dec. 22, 2006) (unpublished) (DEA's "armtwisting" did not amount to agency action when DEA discouraged distributors from selling to plaintiffs through informal means).

18

*See also Consolidated Edison Co. of New York, Inc. v. Federal Power Commission*, 512 F.2d 1332, 1341-42, clarified by 518 F.2d 448 (D.C. Cir. 1975).[6]

The defendant therefore respectfully disagrees with the approach taken by Judge Kennedy in *PDK Labs, Inc. v. Reno*, 134 F. Supp.2d 24 (D.D.C. 2001). In one of the early decisions in that complex case, the district court exercised jurisdiction over a challenge to the refusal of a LONO and the denial of a hearing thereon, finding that the decision was NOT final for the purposes of the exclusive jurisdiction of the Courts of Appeal, *see* 21 U.S.C. § 877, stating that "[a]t best, DEA's letter is considered as its final interpretation of § 971(c), as a opposed to a final action under the CDTA," *id.* at 29, but nonetheless exercising jurisdiction under the APA.[7]

There is ample reason to depart from this approach. The *PDK* Court seems not to have considered the argument that if the letter was non-final for the purposes of section 877, it was also non-final for the purposes of the APA. The letter sent to PDK (denying it a hearing on the LONO decision) also stated that it was a final decision, thus creating a stronger argument in that case than in this one that it was a final action of some sort. *See id.* Moreover, in *PDK,* there was no pending agency action likely to result in a final decision, whereas here the agency has explicitly taken steps to determine if a final action is necessary. *See* Part I.C.2 *infra.* Finally, subsequent decisions have eroded the basis of the district court's approach in *PDK.* The D.C. Circuit never directly reviewed

---

[6]In a later phase of *PDK*, the district court held that advice given to potential domestic suppliers to not do business with PDK constituted final agency action because that advice was "final and binding" and "threaten[ed] the existence" of PDK. *See PDK Labs, Inc. v. Ashcroft*, 338 F. Supp. 2d 1, 8 (D.D.C. 2004). Here, there is no support for the proposition that a LONO denial is binding on anyone.

[7]The Court ultimately found that PDK, a drug manufacturer, was entitled to a hearing and remanded to the agency for that purpose. *PDK Labs, Inc. v. Reno*, 134 F. Supp.2d at 29; *see also PDK Labs, Inc. v. Ashcroft*, 338 F. Supp. 2d 1, 8 (D.D.C. 2004) (converting preliminary injunction into summary judgment). That holding is not directly implicated by the Complaint.

the question of the district court's jurisdiction, but later exercised its exclusive jurisdiction over a petition for review in the same case after further (and final) agency action. *See generally PDK II*, 438 F.3d 1184.  More recently, another D.C. district court decision noted that "[d]espite the seemingly clear language and intent of section 877, district courts have occasionally struggled with actions that do not necessarily appear to be 'final determinations, findings, and conclusions' of the DEA," citing *PDK* as an example. *See Doe v. Gonzalez [sic]*, 2006 WL 1805685, *18 (D.D.C. June 29, 2006).  Judge Kollar-Kotelly ultimately rejected the approach taken in *PDK*.  The Court declined to explicitly decide whether the import permit denial at issue in that case (similar in some ways to a LONO refusal) was a final agency action but held that "if the DEA's . . . determination meets the standards necessary to satisfy the 'final agency action' requirement under the APA, 5 U.S.C. § 704, . . . it seems certain to meet the 'final determinations, findings and conclusions' criteria of 21 U.S.C. § 877, thereby triggering the United States Court of Appeals for the District of Columbia's exclusive jurisdiction over Plaintiff's CSA-based claims." *Id.* at *19.  Thus, the *PDK* approach, in which some agency action may be final for the purposes of the APA but not final for the purposes of § 877, is, at best, suspect, and most likely, incorrect.

>    2.    Pending Agency Actions in the Spirit Importation Prove a Lack of Finality and Ripeness

The original LONO refusal sent to Spirit Pharmaceuticals does not constitute final agency action for two additional reasons.  First, it has been superseded by subsequent agency action.  Second, the plaintiff has a pending request to participate in the Spirit matter.  Out of "an abundance of caution," the DEA elected to make certain that Spirit actually intended to withdraw its notice of importation and request for a LONO.  *See* Meador Decl. ¶ 19.  Accordingly, the DEA has recontacted Spirit, which now has five days to decide whether to affirmatively withdraw the

20

application or receive a suspension order. *Id.* If Spirit affirmatively withdraws its request for a LONO, the DEA has no further authority to act on the notice of importation. If Spirit chooses to pursue the importation or again declines to act, the DEA will issue a suspension order under section 971, and a hearing will be available to Spirit. *See* Meador Decl. ¶ 19. If Spirit pursues the matter to a hearing, the outcome of that adjudication is clearly a "final decision" reviewable only in the Courts of Appeals. *See* 21 U.S.C. § 877.

It is therefore clear that the original LONO refusal was not intended to be final agency action. *See* Meador Decl. ¶ 19. It was indeed "merely tentative or interlocutory in nature" and not intended to set anyone's legal rights. *See Bennett v. Spear*, 520 U.S. at 178. The recent notification to Spirit ensures that the LONO refusal itself is treated by the agency as an interlocutory measure, and that the agency exercises all due care in the exercise of its authority under section 971.

Moreover, "a final agency action can nonetheless be unripe for judicial review if further proceedings affecting the agency action take place or judicial consideration of the issue would benefit greatly from a more concrete setting." *See Isenbarger v. Farmer*, 463 F. Supp. 2d 13, 20 (D.D.C. 2006) (internal quotation marks omitted); *see also Toca Producers v. FERC*, 411 F.3d 262, 266 (D.C. Cir. 2005) (declining to review a final agency action because pending agency proceedings could provide relief to petitioners)*; Pfizer, Inc. v. Shalala*, 182 F.3d 975, 980 (D.C. Cir. 1999); *see generally Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). This is precisely such a case. If Spirit actually wants to pursue the importation, the agency will hold a formal hearing pursuant to 971(c)(2), and Novelty may petition the Administrative Law Judge for the opportunity to participate. Plaintiff could thus seek relief from the challenged action. The gravamen of the plaintiff's Complaint, whether the sale of ephedrine products in Novelty stores constitutes a risk of diversion, is a question

that the agency should have a full opportunity to consider and rule upon based on the facts before it. Judicial resources are conserved if either plaintiff is afforded relief or if Spirit affirmatively withdraws its request.

Accordingly, the Complaint should be dismissed for lack of subject matter jurisdiction because it fails to challenge a final agency action within the meaning of the APA.

II.     IF PLAINTIFF CAN IDENTIFY A FINAL AGENCY ACTION, SECTION 877
        DEPRIVES THIS COURT OF JURISDICTION

Even assuming that plaintiff has challenged a final agency action within the meaning of the APA, 21 U.S.C. § 877 vests the courts of appeals with exclusive jurisdiction over any challenge to a final agency decision. Longstanding D.C. Circuit doctrine holds further that the Circuit Court should also have jurisdiction over any non-final action that might affect the future jurisdiction of the court. These two prongs of analysis ensure that any final decision arguably at issue in this case is reviewable only in the Court of Appeals.

A.     Section 877 Commits Review of Final Orders to the Exclusive Jurisdiction of the Courts
        of Appeals

The Controlled Substance Act ("CSA") provides courts of appeals with exclusive jurisdiction over disputes arising under it:

> All final determinations, findings, and conclusions of the Attorney General under this subchapter shall be final and conclusive decisions of the matters involved, except that any person aggrieved by a final decision of the Attorney General may obtain review of the decision in the United States Court of Appeals for the District of Columbia or for the circuit in which his principal place of business is located upon petition filed with the court and delivered to the Attorney General within thirty days after notice of the decision. Findings of fact by the Attorney General, if supported by substantial evidence, shall be conclusive.

22

21 U.S.C. § 877. While the language of Section 877 references Subchapter I of the CSA, this Section is incorporated into Subchapter II as well, which includes section 971. 21 U.S.C. § 965.

The exclusive jurisdiction of the courts of appeals over such disputes is well-established. *See Oregon v. Ashcroft*, 368 F.3d 1118, 1120 (9th Cir. 2004) (finding court of appeals had original jurisdiction over challenge to interpretive rule issued by Attorney General) *aff'd sub nom Gonzales v. Oregon*, 546 U.S. 243 (2006); *Steckman v. DEA*, No. Civ. A.H-97-1334, 1997 WL 588871 at *1-2 (S.D. Tex. Sept. 16, 1997) (finding that district court had no subject matter jurisdiction over CSA-related claim because the only proper forum was in the court of appeals). In a recent opinion, Judge Kollar-Kotelly performed a lengthy analysis of Section 877 and concluded that "Section 877 . . . seems to explicitly vest exclusive jurisdiction in the courts of appeals over any CSA-based agency determination that could properly be before a federal court." *Doe v. Gonzalez [sic]*, No. 06-966, 2006 WL 1805685 at *22 (D.D.C. June 29, 2006).

Insofar as Novelty challenges any final acts, they are necessarily final acts under section 971. Section 971 is the basis for the DEA's authority to suspend shipments. *See* 21 U.S.C. § 971; Meador Decl. ¶¶ 8-9. The general rule that Novelty alleges to exist has been developed as an important factor in evaluating the risk of diversion within the context of agency decisionmaking under the CSA and the CDTA. *See* Meador Decl. ¶¶ 10-15.[8] Although the *PDK* decision described above held that a letter denying PDK a hearing on a LONO denial was not a final action under the CDTA, that decision is suspect for the same reasons described above. *Compare PDK Labs, Inc.*, 134 F. Supp.2d

---

[8]Although the Vienna Convention and bilateral agreements may confer an additional mandate to create LONO procedures, the LONO procedures are implemented exclusively within the context of the CDTA because that is the basis of the DEA's enforcement authority. *See id.* ¶¶ 8-9.

at 29 *with Doe v. Gonzalez*, 2006 WL 1805685 at *22. (holding that any action sufficiently final for

the purposes of the APA was also a final action for the purposes of 877).

      B.      Because Exclusive Jurisdiction over Final Actions has been Committed to the Court of Appeals, it Should Also Have Exclusive Jurisdiction Here

Plaintiff seeks to avoid the exclusive jurisdiction of the circuit court by framing the

challenged action as a something other than a "final decision" of the DEA. Longstanding D.C.

Circuit doctrine, however, precludes jurisdiction in the district court over actions that would affect

the future jurisdiction of the circuit court. Thus, even assuming that plaintiff is correct that DEA has

informally adopted a general rule in violation of the APA, the propriety of such an action should only

be reviewed in the court of appeals because its formal adoption in an adjudication or rulemaking

would clearly fall within the jurisdiction of the court of appeals. *See International Union, United*

*Mine Workers of America v. U.S. Department of Labor*, 358 F.3d 40, 42 (D.C. Cir. 2004) ("[W]e

have the authority to compel agency action unreasonably withheld or delayed if the putative agency

action, once forthcoming, would be reviewable in this Court.").

In *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70 (D.C. Cir. 1984)

("*TRAC*"), the D.C. Circuit held that where the Communications Act committed exclusive

jurisdiction to review final FCC action to the court of appeals, a petition alleging unreasonable delay

and seeking a writ of mandamus to compel FCC action was also subject to its exclusive jurisdiction.

750 F.2d at 78-79. Because unreasonable agency delay could, as a practical matter, defeat appellate

review of final agency orders, the *TRAC* court reasoned that the court of appeals had exclusive

jurisdiction to hear suits seeking relief that might affect the circuit court's future jurisdiction, even

where the agency had not issued a final order. *Id.* at 76. The *TRAC* court determined that the district

court lacked concurrent jurisdiction to hear the petition for mandamus based upon the well-

established principle that where Congress by statute vests jurisdiction with a particular court, it cuts off original jurisdiction in other courts in all cases covered by the statute. *Id.* at 77.

Cases decided after *TRAC* have utilized a two-part test to determine whether jurisdiction to review agency action lies in the district court or in the court of appeals: (1) does the statute commit review of agency action to the court of appeals and (2) does the action seek relief that might affect the circuit court's jurisdiction? *See, e.g., American Farm Bureau v. EPA*, 121 F. Supp. 2d 84, 91 (D.D.C. 2000); *Jamison v. FTC*, 628 F. Supp. 1548, 1550 (D.D.C. 1986) (holding that *TRAC* governed request for injunction where the statute committed review of FTC action to the appellate court and future review was implicated); *see also International Union, United Mine Workers of America v. U.S. Department of Labor*, 358 F.3d at 42-43. The second prong is broadly construed to favor appellate review. *Id.* However, where a statute contains no "single, overarching provision governing judicial review," but instead subjects "discrete agency actions" to specialized review provisions, actions taken under sections silent as to appellate review are "directly reviewable in a district court . . . , for courts of appeals have only such jurisdiction as Congress has chosen to confer upon them." *Cutler v. Hayes*, 818 F.2d 879, 888 n. 61 (D.C. Cir. 1987) (holding that district court had jurisdiction to review alleged FDA inaction in the implementation of new drug regulations pursuant to FFDCA § 355 because no statutory provision committed direct review to the court of appeals).

Section 877 clearly meets the first requirement. It is framed in as broad terms as possible, applying to all "final determinations, findings, and conclusions of the Attorney General" and then describing that category of review in the next sentence as "final decisions." Section 965 ensures that this language applies to all "administrative and judicial proceedings" of Subchapter II (including the

CDTA) to the same extent as Subchapter I. This is clearly not a list of "discrete agency actions" to be reviewed in the court of appeals but broad language intended to confer broad jurisdiction over agency action on the court of appeals. *See Cutler*, 818 F.2d at 888 n.61.

Furthermore, the plaintiff's claims could affect the future jurisdiction of the court of appeals. In particular, agency inaction in rulemaking, as alleged in Count I of the Complaint, could defeat the future jurisdiction of the court (like unreasonable delay). *See* Compl. ¶¶ 24-32; *see TRAC*, 750 F.2d at 76. As in *TRAC*, there is no final order or action at issue and any such order could be indefinitely defeated if the agency truly is withholding action unreasonably. *Id.*

Less obviously, Count II falls within the *TRAC* rationale as well. It alleges that the agency has adopted an arbitrary *de facto* rule preventing importation of ephedrine for eventual sale in convenience stores. This alleged rule, such as it is, was developed in the context of individual agency investigations and adjudications, *see* Meador Decl. ¶¶ 10-15, the final orders of which are clearly subject to the jurisdiction of the court of appeals. *See, e.g., PDK II*, 438 F.3d at 1186. Were this Court to rule upon the merits of such a "rule," it would be making precisely the same decision reserved for the court of appeals in individual adjudications. An injunction preventing its application, as requested by the plaintiff, Compl. ¶ 38, would prevent the court of appeals from reviewing its application in any particular case. Therefore, a ruling in this case would "affect the future jurisdiction" of the court of appeals. *See American Farm Bureau*, 121 F.Supp.2d at 91.

Accordingly, even if plaintiff has challenged a final agency action, the Complaint should be dismissed because the court of appeals has exclusive subject matter jurisdiction over this action.

III.    THE APA DOES NOT REQUIRE NOTICE-AND-COMMENT RULEMAKING FOR
LONO PROCEDURES

The plaintiff contends that formal notice-and-comment rulemaking is required for the criteria

for the issuance of LONOs.  This position is apparently premised on the erroneous belief that the

LONO procedure constitutes a "legislative rule[]" subject to the rulemaking requirements of the

APA. *See* Compl. ¶ 25.  Even if plaintiff is correct, the Court should defer to the agency's decision

to proceed through individual adjudications rather than rulemaking.  Moreover, the agency is allowed

to adopt even formal rules without the rulemaking process when the rule falls within one of the APA

exceptions.

A.    The Court Should Defer to the Agency's Choice of Adjudication over Rulemaking

Under section 553 of the APA, an agency is required to provide notice of a proposed

rulemaking in the Federal Register and an opportunity to comment on the proposed rule.  *Lincoln*

*v. Vigil*, 508 U.S. 182, 195 (1993).  However, an agency is almost never required to undertake rule-

making where another form of decisionmaking is available.  Justice Murphy's decision in *SEC v.*

*Chenery Corp.*, 332 U.S. 194 (1947), contains the classic articulation of the rationale behind this rule

of judicial deference to the agency's choice of appropriate procedural tools:

> Not every principle essential to the effective administration of a statute can
> or should be cast immediately into the mold of a general rule.
>
> * * *
>
> . . . problems may arise in a case which the administrative agency could not
> reasonably foresee, problems which must be solved despite the absence of a relevant
> general rule.  Or the agency may not have had sufficient experience with a particular
> problem to warrant rigidifying its tentative judgment into a hard and fast rule.  Or the
> problem may be so specialized and varying in nature as to be impossible of capture
> within the boundaries of a general rule.  In those situations, the agency must retain
> power to deal with the problems on a case-to-case basis if the administrative process
> is to be effective.

27

* * *

> . . . the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency.

*Id.* at 202-03. Subject to due process constraints on imposing new law on parties to an adjudication, which are not relevant here, this principle has been consistently reaffirmed by the courts. *See, e.g., FCC v. National Citizens Comm. for Broadcasting*, 436 U.S. 775, 808-09 n. 29 (1978) ("The Commission has substantial discretion as to whether to proceed by rulemaking or adjudication . . . ."); *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87 (1995); *International Union, UMW v. FMSHA*, 920 F.2d 960, 964 (D.C. Cir. 1990).

This is precisely a situation where the agency has chosen to proceed through individual adjudications. In making the determination of risk of diversion, the DEA offers formal hearings to any importer to whom an order of suspension applies. The determination of whether a risk of diversion exists is made using a "totality of the circumstances" test previously upheld by the D.C. Circuit in *PDK II*, 438 F.3d at 1194-95. The plaintiff purports to challenge only the LONO procedures, as though these determinations were somehow separate and distinct from the section 971 process. They are not. The LONO simply certifies for the benefit of the exporting nation that the importation appears to comply with U.S. law, *i.e.*, the DEA does not plan to suspend it under section 971. *See* Meador Decl. ¶¶ 8-9. Accordingly, the LONO can be refused if and only if the standard for suspending a shipment is met. *Id.* Although the LONO is sometimes refused prior to a formal suspension, it does not affect any party's legal rights or obligations regarding imports of ephedrine; only an actual suspension order does. *Id.* Because a LONO decision, simply one procedural part of

the 971 decision, is made in the context of an individual adjudication, the court should defer to the agency's choice of procedural tools.

B.    LONO Procedures are Exempt from Rulemaking Requirements Because they are Purely Procedural Rules.

The APA exempts "rules of agency organization, procedure, or practice" from its notice and comment requirement.  5 U.S.C. § 553(b)(A).  The purpose of the procedural rule exemption "is to ensure that agencies retain latitude in organizing their internal operations." *American Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1047 (D.C. Cir. 1987) (internal quotations omitted). The exception applies to "technical regulation of the form of agency action and proceedings," *Southern Cal. Edison Co. v. FERC*, 770 F.2d 779, 783 (9th Cir. 1985) (internal quotations omitted), and matters that "relate to and deal with methods of operation." *American Meat Inst. v. Bergland*, 459 F. Supp. 1308, 1314 (D.D.C. 1978). The "critical feature" of the exception "is that it covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency." *JEM Broadcasting Co. v. FCC*, 22 F.3d 320, 326 (D.C. Cir. 1994) (internal quotations omitted); *see also Fl. Power & Light Co. v. EPA*, 145 F.3d 1414, 1420 (D.C. Cir. 1998).

The LONO procedure easily meets this test.  The LONO procedure is simply a method of informing the exporting nation whether a substantive standard has been met; it is not a substantive standard itself.  *See* Meador Decl. ¶¶ 8-9.  The DEA issues a LONO if it is not planning on suspending a shipment.  The DEA refuses to issue a LONO if it is planning on suspending the shipment if the shipment goes forward.  *Id.*  This refusal triggers no legal obligations whatsoever other than an obligation to contact the agency if the importer wishes to pursue the importation.  *Id.* This is precisely a situation where the only effect of the rule is to "alter the manner in which the

29

parties present themselves or their viewpoints to the agency." *See JEM Broadcasting Co.*, 22 F.3d at 326.

C.  LONO Procedures are Exempt from Rulemaking Requirements Because they Involve a Foreign Relations Function

Even if the Court deems the LONO procedure to be a substantive requirement, it is exempt from notice and comment under the APA because it involves foreign relations functions of the United States. The APA provides an exception to notice-and-comment rulemaking for rules involving a "foreign affairs function of the United States." 5 U.S.C. § 553(a)(1). The foreign affairs exception applies to cases, such as this one, involving the implementation of the President's foreign policy. It appears in the original version of the APA, passed in 1946. *See* 60 Stat. 238 (1946). In interpreting the APA, the Supreme Court has relied on the Attorney General's Manual on the APA. *See Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 546 (1978) (recognizing the manual as "a contemporaneous interpretation . . . given some deference by this Court because of the role played by the Department of Justice in drafting the legislation.") The Manual states that "[i]t is clear that . . . the [foreign affairs exception] is not limited to strictly diplomatic functions, because the phrase 'diplomatic function' was employed in [a] January 6, 1945 draft . . . and was discarded in favor of the broader and more generic phrase 'foreign affairs function.'" *Att'y Gen.'s Manual on the APA* 27 (1947). In *Mast Industries, Inc. v. Regan*, 596 F. Supp. 1567, 1583 (CIT 1984), for example, the Court held that interim regulations defining limitations in bilateral trade agreements or unilaterally imposed restrictions on textile imports "clearly and directly involve a foreign affairs function and are exempt from the prior notice and comment provisions of the APA" because such regulations "go directly to the purpose of the trade agreements."

30

The LONO procedure is the implementation of international agreements, including the 1988 Vienna Convention and the informal bilateral agreements negotiated with exporting nations. *See* Meador Decl. ¶¶ 7-9; *Presidential Determination on the Major Methamphetamine Precursor Chemical Exporting and Importing Countries*, No. 2007-14, available at www.state.gov/p/inl/rls/rpt/81222.htm (February 28, 2007). The purpose of the LONO is to comply with the Vienna Convention by providing assurance to the exporting nation, and the use of LONOs was specifically negotiated with the competent authorities in the exporting nations to accommodate differences in the legal systems. *Id.* This is even more clearly a foreign affairs function than the unilateral import quotas at issue in *Mast Industries. See* 596 F.Supp. at 1583. Judicial intervention to modify the process could render the United States in breach of such agreements or incapable of enforcing its obligations under the Vienna Convention. As a practical matter, it is necessary for the United States to have some process whereby it notifies countries that require such notice that a shipment is in compliance with U.S. law. *See* Meador Decl. ¶ 8-9. Without such a procedure in place, it would be illegal under, for example, Indian law, to export ephedrine to the United States. *Presidential Determination on the Major Methamphetamine Precursor Chemical Exporting and Importing Countries*, No. 2007-14, available at www.state.gov/p/inl/rls/rpt/81222.htm (February 28, 2007). The LONO procedure is clearly and directly a foreign affairs function of the United States.

## CONCLUSION

For the foregoing reasons, Defendants request that the Complaint be dismissed in its entirety.

Dated: April 10, 2007                                Respectfully Submitted,

                                                     PETER D. KEISLER
                                                     Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ARTHUR R. GOLDBERG
Assistant Director
Federal Programs Branch


/s
AMY E. POWELL
Attorney (NY Bar)
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W. Rm. 7322
Washington, D.C. 20530
Telephone: (202) 514-9836
Facsimile: (202) 616-8202
Email: amy.powell@usdoj.gov

*Attorneys for Defendant*

32

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NOVELTY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07-CV-00191 |
| | ) | (RMU) |
| | ) | |
| KAREN TANDY, in her official capacity; | ) | |
| UNITED STATES DRUG | ) | |
| ENFORCEMENT ADMINISTRATION; | ) | |
| ALBERTO GONZALES, in his official | ) | |
| capacity; UNITED STATES | ) | |
| DEPARTMENT OF JUSTICE; and the | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF DARRELL R. MEADOR

I, DARRELL R. MEADOR, pursuant to 28 U.S.C. § 1746, declare and say:

1.    I am a Staff Coordinator the Office of Enforcement Operations, Dangerous Drugs and Chemicals Section, at DEA Headquarters. My responsibilities include the prevention, detection, and investigation of the diversion of listed chemicals from legitimate channels under the Controlled Substances Act. This includes reviewing DEA Forms 486 (Import/Export Declarations) and answering questions from DEA field offices. I have served in my current capacity at DEA headquarters since July 2004, and have been a Diversion Investigator since February 1986. I was hired by DEA as a Diversion Investigator in February 1986 and attended the Basic Diversion Investigator

School at the FBI Academy in Quantico, Virginia. I have also received additional training at numerous classes administered both by the DEA and by non-DEA entities between 1989 and 2005. These courses familiarized me with matters involving chemical diversion to the illicit manufacture of methamphetamine, and the adverse environmental impact that results from this process. Prior to my current position, I was a Diversion Investigator assigned to the Nashville, Tennessee District Office. As part of my duties I conducted regulatory investigations involving manufacturers, distributors, pharmacies, practitioners, and other handlers of controlled substances. I was primarily responsible for preventing, detecting and investigating the diversion of controlled substances from legitimate channels to illicit traffic. I have conducted similar investigations related to manufacturers, distributors, importers and exporters of list I chemicals. I have also provided investigative assistance in criminal and civil actions involving the diversion of imported list I chemicals and chemicals diverted to the illicit market. The primary emphasis of most of these investigations has involved pseudoephedrine and ephedrine products. I have also worked in the regulatory process of List I chemical handlers to include pre-registrant investigations, regulatory investigations, and administrative actions taken against regulated firms.

The following information is based on my personal knowledge and/or information gained in the course of my official duties.

2.    List I chemicals are legitimate chemicals that also may be used in the illicit manufacture of a controlled substance in violation of the Controlled Substances

Act, 21 U.S.C. § 802 (34), 21 CFR § 1310.02(a).  Ephedrine and pseudoephedrine are

List I chemicals which are commonly used to illegally manufacture methamphetamine, a

Schedule II controlled substance.  These chemicals have been specifically designated by

the Administrator of the Drug Enforcement Administration (DEA Administrator) as two

of the listed chemicals subject to the provisions of 21 CFR §§ 1309 and 1313.  See 21

CFR  § 1310.02 (a).

3.      Pursuant to 21 U.S.C. § 971 (c) and 21 CFR § 1313.41 (a), the DEA

Administrator has the authority to suspend any importation or exportation of ephedrine or

pseudoephedrine based on evidence that the chemical proposed to be imported or

exported may be diverted to the clandestine manufacture of a controlled substance.

4.      Additionally, the 1988 United Nations Convention Against Illicit Traffic

in Narcotic Drugs and Psychotropic Substances ("1988 U.N. Convention") requires that

parties to the convention "take the measures they deem appropriate to prevent diversion

of [listed substances, including ephedrine] used for the purpose of illicit manufacture of

narcotic drugs to psychotropic substances, and shall co-operate with one another to this

end."

5.      The 1988 U.N. Convention further states that parties "[c]ontrol all persons

and enterprises engaged in the distribution of [listed chemicals], license such distributors,

and "[r]equire that licensees obtain a permit for conducting [manufacture and

distribution]."  Art. 12, ¶ 8(b).  Parties to the 1988 Convention are further obligated to

"[e]stablish and maintain a system to monitor international trade in [listed chemical] in order to facilitate the identification of suspicious transactions." Id. at ¶ 9(a). Parties are also obligated to notify the "competent authorities and services of the Parties concerned if there is reason to believe that the import, export or transit of a [listed chemical] is destined for the illicit manufacture of narcotic drugs or psychotropic substance." Id. at ¶ 9 (c). Though the 1988 U.N. Convention does not specifically mandate that parties adopt a permit system with respect to imports of listed chemicals, parties are obligated to cooperate to prevent diversion of listed chemicals used for the purpose of illicit manufacture of narcotic drugs or psychotropic substance.

6.    The United States has implemented a system by which every regulated person who imports a listed chemical that meets or exceeds the threshold quantities or is a listed chemical for which no threshold has been established, is required to notify the DEA Administrator of the importation not later than 15 days before the importation is to take place. *See* 21 CFR § 1313.12 (a). Unless the notice requirement is waived, the regulated person must complete a DEA Form 486 and deliver it to DEA not later than 15 days prior to the importation. *See* 21 U.S.C. § 971 (a); 21 CFR § 1313.12 (b). The DEA Form 486 must include, among other things, name and address information about the chemical importer and/or broker, the name and description of each listed chemical, the amount of chemical to be shipped, the proposed import date, the foreign port of exportation, and the United States Customs Port of Entry. *See* 21 CFR § 1313.13 (c).

7.    In addition to the declaration system described above, the United States has negotiated bilateral agreements with several countries which are the chief sources of bulk listed chemicals.  In the early 1990's, large shipments of ephedrine and pseudoephedrine, bound for a fictitious company in Mexico, had been seized by U.S. Customs agents at the Dallas/Fort Worth Airport on or before 1994.  The United States subsequently learned that other large shipments of ephedrine and pseudoephedrine were being shipped to this same fictitious company by companies located in the People's Republic of China, India, and the Czech Republic.  In an effort to control these shipments and prevent the chemicals from being diverted for the purpose of illicit manufacture of methamphetamine, the United States and the competent authorities in these countries developed a procedure for authorizing the exportation of List I chemicals to and through the United States.  This became known as the "LONO" process.

8.    Under the "LONO" process, the competent authorities of China, India, and the Czech Republic ("exporting nations") require that, prior to permitting the export of a List I chemical to and/or through the United States (and issuing a permit to the exporter), the United States must first issue a "LONO," or Letter of No Objection, to the competent authority of the exporting nation.  Normally, the LONO consists of a short letter which lists the (1) U.S. importer; (2) exporter; (3) the shipment's DEA control number; (4) name of chemical and quantity to be shipped; and (5) the importer reference number. The LONO further states that "the DEA has no objection to the proposed shipment at this time."  The LONO is sent to the competent authority of the exporting country and a copy is sent to the importer.  Pursuant to the terms and spirit of the 1988 U.N. Convention, the United States is required, prior to issuing the LONO, to investigate the intended

destination and uses of List I chemicals which are imported into and through the United

States. If, after investigating, the United States determines that the List I chemicals may

be diverted for the purpose of illicit manufacture of methamphetamine, under the terms

and spirit of the U.N. Convention, it is obligated to deny the LONO request based on the

same ground stated in 21 U.S.C. § 971 (c). *See* 1988 U.N. Convention, Art. 12, ¶¶ 1 and

8 (b). If the United States issues the LONO, the LONO serves to notify the exporting

country that, based on the evidence possessed by DEA at the time the LONO is issued,

that the shipment or export complies with 21 U.S.C. § 971.


9.      If, after receiving the completed DEA Form 486 and conducting its

investigation, DEA determines that the LONO will be denied, DEA will so notify the

regulated person seeking to import the listed chemical. At this point, DEA will provide

the regulated person with the option of either withdrawing or pursuing the importation. If

the regulated person elects to pursue the importation, DEA may suspend the importation

based on evidence that the chemical proposed to be imported may be diverted to the

clandestine manufacture of a controlled substance. *See* 21 U.S.C. § 971 (c); 21 CFR §

1313.41 (a). However, if the regulated person withdraws the LONO request, DEA will

take no further action. The denial of the LONO itself triggers no legal obligation except

to require the importer to contact DEA if it elects to pursue the importation.


10.     Currently, there is no statutory definition of "evidence that the chemical

proposed to be imported may be diverted to the clandestine manufacture of a controlled

substance." However, through prior adjudication, DEA and the courts have approved the

use of a "totality-of-the-circumstances test" to decide whether substantial evidence exists

to suspend an importation of List I chemicals. *See PDK Laboratories, Inc. v. United*

*States Drug Enforcement Administration*, 438 F.3d 1184, 1194 (D.C. Cir. 2006); *Indace,*

*Inc., Suspension of Shipments*, 69 Fed. Reg. 67,951, 67,959 (Nov. 22, 2004).


11.    Moreover, the Attorney General considers the following factors to

determine whether a regulated person, such as the Plaintiff, shall receive a registration to

distribute List I chemicals. *See* 21 U.S.C. § 823 (h) which provides that the "Attorney

General shall consider--

(1)    maintenance by the applicant of effective controls against diversion of

listed chemicals into other than legitimate channels;

(2)    compliance by the applicant with applicable Federal, State, and local law;

(3)    any prior conviction record of the applicant under Federal or State laws

relating to controlled substances or to chemicals controlled under Federal or State law;

(4)    any past experience of the applicant in the manufacture and distribution of

chemicals; and

(5)    such other factors as are relevant to and consistent with the public health

and safety."


12.    In considering whether "the chemical proposed to be imported may be

diverted to the clandestine manufacture of a controlled substance," the Attorney General

may consider the importer's "downstream" customers.  This includes the person to whom

the bulk chemicals are shipped and any other persons who may receive the chemicals

either in bulk or manufactured form. The type of retail establishment that will ultimately

distribute the List I chemical products to member of the public is a substantial and

weighty factor in determining the risk of diversion to clandestine manufacture.

13.    Numerous DEA orders have established that convenience stores and gas

stations constitute the non-traditional retail or "gray market" for legitimate consumers of

ephedrine products. *Wild West Wholesale*, 72 FR 4042, 4044 (2007); *Tri-County Bait*

*Distributors*, 71 FR 52160, 52161 (2006); *D & S Sales*, 71 FR 37607, 37609 2006);

*Branex, Inc.*, 69 FR 8682, 8690-92 (2004). Gray market products, which are labeled as

asthma/cough/cold/allergy relief medications, are often marketed for "off-label" uses,

such as weight loss or staying awake and are not typically found in most supermarkets

and drug stores. DEA has found that there is a substantial risk of diversion of List I

chemicals into the illicit manufacture of methamphetamine when these products are sold

by non-traditional retailers. *Joy's Ideas*, 70 FR 33195, 33199 (2005) (finding that risk of

diversion was "real, substantial and compelling"); *Jay Enterprises*, 70 FR 24620, 24621

(2005) (noting "heightened risk of diversion" should application be granted). DEA has

adjudicated numerous cases in which it has determined that gray market retailers, such as

gas stations and convenience stores, are "sources for the diversion of listed chemical

products." *See Joey Enterprises*, 70 FR 76866, 76867 (2005); *TNT Distributors*, 70 FR

12729, 12730 (2005); *OTC Distribution Co.*, 68 FR 70538, 70541 (2003); *MDI*

*Pharmaceuticals*, 68 FR 4233, 4236 (2003).

14.    DEA has determined that products sold in the non-traditional market pass through multiple layers of distribution.  The products sold are typically stronger than those found in the traditional market and "have been disproportionately represented in clandestine lab seizures around the United States involving listed chemical products." DEA has also determined that many non-traditional retailers tend to knowingly sell large quantities of List I chemical products to "smurfers," methamphetamine traffickers and/or individuals who work for methamphetamine traffickers who attempt to buy out a store's entire stock of List I chemical products by going to the store at different times or on different days.  *T. Young Associates*, 71 FR 60567, 60568 (2006); *K.V.M. Enterprises*, 67 FR 70968, 70969 (2002).

15.    Small capacity clandestine labs continue to dominate law enforcement seizures and environmental cleanups.  Many small illicit laboratories operate with listed chemical products often procured legally or illegally, from non-traditional retailers of over-the-counter drug products, such as gas stations and small retail markets.  Some retailers acquire product from multiple distributors to mask their acquisition of large amounts of listed chemicals.  *SPA Dynamic Wholesalers*, 68 FR 61466, 61467 (2003).

16.    On September 25, 2006, DEA received two completed DEA Forms 486 from Spirit Pharmaceuticals, LLC ("Spirit").  On the forms, Spirit declared it intended to import two shipments of ephedrine hydrochloride ("ephedrine HCl"), with a net weight of 2200 kilograms.  Spirit further requested that DEA issue a LONO to the competent authority of India in order to permit the import to take place and attached two purchase

orders from AAA Pharmaceutical, Inc. ("AAA"), the company to whom Spirit intended to transfer the ephedrine.

17.     After receiving the DEA Forms 486, Spirit's request for a LONO, and the AAA purchase orders, DEA determined that AAA intended to use the ephedrine HCl to manufacture "solid-dosage" or tablet form over-the-counter (OTC) pharmaceuticals for sale to the Plaintiff and one other company.  DEA obtained photographs of labels of these OTC pharmaceuticals and determined them to be "gray market" items.  DEA further obtained a list of Plaintiff's customers and determined that some of them (i.e. gas stations and convenience stores) were venues in states where the sale of these items is prohibited by state law.  For instance, according to the "Meth-Free Tennessee Act of 2005," which took effect in April 2005, "any immediate methamphetamine precursor may be dispensed only by a licensed pharmacy."  Tenn. Code Ann. § 39-17-431.  Kentucky has passed a similar measure which provides that "[a]ny nonprescription compound, mixture, or preparation contained any detectable quantity of ephedrine … [its] salts or optical isomers … shall be dispensed, sold, or distributed only by a registered pharmacist, a pharmacy intern, or a pharmacy technician."  Ky. Rev. Stat. § 218A.1446.  These states exempt "gel-caps" and liquids from the type of products that must be sold only in pharmacies.  However, the products proposed to be manufactured by AAA and sold by Plaintiff are in tablet form.

18.     Based on Plaintiff's own customer list, which indicates an intention to violate state law, and Plaintiff's intention to sell to "gray market" retailers, DEA

determined that authorizing the importation of ephedrine by Spirit constitutes a risk of diversion to the clandestine manufacture of a controlled substance. For those reasons, the LONO request was denied and Spirit was so notified by letter dated October 10, 2006. Spirit was informed that if it neglected to pursue to importation, its request would be considered withdrawn. Spirit did not respond to DEA's notification. Therefore, DEA has considered the matter to be withdrawn.

19.    In an abundance of caution, by letter dated April 10, 2007, DEA has notified Spirit a second time of its right to pursue the importation and/or to affirmatively withdraw the request for a LONO. If Spirit elects to pursue the request, DEA will order the suspension of the shipments pursuant to 21 U.S.C. § 971 (c) (1) and afford Spirit the opportunity for a hearing. If Spirit withdraws its importation request, DEA has no authority to act any further on the request. However, if Spirit elects to pursue the importation and requests a hearing, Plaintiff will have an opportunity at that point to petition the Administrative Judge for an opportunity to participate and/or intervene in the proceeding in accordance with the hearing procedures in subchapter II of chapter 5 of Title 5.

20.    DEA is aware that, by letter dated November 2, 2006, Plaintiff has sought to pursue Spirit's importation and has since requested a hearing on the denial of Spirit's LONO request. Unlike Spirit, Novelty is not a registered importer pursuant to 21 U.S.C. § 958 (c), and cannot import ephedrine itself. However, the decision on whether to grant Plaintiff a hearing is pending, based on Spirit's response to the second DEA letter. DEA

11

will notify Plaintiff as soon as it determines whether Spirit intends to pursue the importation.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that I have read the foregoing declaration and that the same is true and correct.

Darrell R. Meador
Staff Coordinator
Office of Enforcement Operations,
Dangerous Drugs and Chemicals
Section

Executed this _10_ day of April 2007 at Arlington, Virginia.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NOVELTY, INC.,                ) | |
|             ) | |
|       Plaintiff,    ) | |
|             ) | |
|    v.          ) | Civil Action No. 1:07-CV-00191 (RMU) |

NOVELTY, INC.,

           Plaintiff,

     v.

KAREN TANDY, in her official capacity;
UNITED STATES DRUG
ENFORCEMENT ADMINISTRATION;
ALBERTO GONZALES, in his official
capacity; UNITED STATES
DEPARTMENT OF JUSTICE; and the
UNITED STATES OF AMERICA,

           Defendants.

Civil Action No. 1:07-CV-00191 (RMU)

## LOCAL RULE 7(h) STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

      Pursuant to Local Rule 7(h), defendants hereby submit the following statement of facts as to which there is no genuine issue:

### Background

1.     Methamphetamine is "a powerful and highly addictive synthetic stimulant." One of the principal ingredients is the chemical ephedrine, which is also used for, and can be obtained from, *inter alia*, prescription and nonprescription drugs. *PDK Laboratories, Inc., v. DEA*, 438 F.3d 1184 (D.C. Cir. 2006); *See* Decl. of Darrell Meador, dated April 10, 2007, ¶ 2 ("Meador Decl.")

2.     The Chemical Diversion and Trafficking Act of 1988, Pub.L. No. 100-690, tit. VI, subtit. A, 102 Stat. 4312, authorizes the Drug Enforcement Agency ("DEA") to "order the suspension

of any importation or exportation of a listed chemical . . . on the ground that the chemical may be diverted to the clandestine manufacture of a controlled substance." *See* 21 U.S.C. § 971(c)(1); *see also* 21 C.F.R. § 1313.12 *et seq.*

3. The DEA has not promulgated detailed regulations on what constitutes a risk of diversion within the meaning of section 971(c)(1) or 21 C.F.R. § 1313.41(a). Meador Decl. ¶ 10. Instead, the agency has exercised its discretion to proceed on a case-by-case basis, applying a "totality of the circumstances" test and developing law within the context of the individual adjudications contemplated by section 971(c)(2), a practice previously upheld by the D.C. Circuit. *See id.*; *PDK II*, 438 F.3d at 1194-95.

4. In applying this "totality of the circumstances" test, a "substantial and weighty" factor is the type of retail establishment that will ultimately distribute the List I chemical products to the public. *See* Meador Decl. ¶¶ 10-15. Numerous DEA investigations and adjudications in a variety of contexts have determined that convenience stores and gas stations constitute the non-traditional retail or "gray market" for both legitimate and illegitimate consumers of ephedrine products. *See id.*

5. The 1988 U.N. Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances requires that parties to the convention "take the measures they deem appropriate to prevent diversion of [listed substances, including ephedrine,] used for the purpose illicit manufacture of narcotic drugs or psychotropic substances, and . . . cooperate with one another to this end." U.N. Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, opened for signature Dec. 20, 1988, Art. 12, ¶ 1, 28 I.L.M. 493 (1989). Parties to the 1988 Convention are further obligated to "[e]stablish and maintain a system to monitor international trade in [listed chemical] in order to facilitate the

identification of suspicious transactions." *Id*. at ¶ 9(a). Parties are also obligated to notify the "competent authorities and services of the Parties concerned if there is reason to believe that the import, export or transit of a [listed chemical] is destined for the illicit manufacture of narcotic drugs or psychotropic substance." *Id*. at ¶ 9 (c).

6.  Although a permit system for importing and exporting such substances is not explicitly required by the Convention, many countries have developed a system which requires approval by the importing country before allowing the export. *See* Decl. of Darrell Meador, dated April 10, 2007, ¶ 8 ("Meador Decl."); *see also Presidential Determination on the Major Methamphetamine Precursor Chemical Exporting and Importing Countries*, No. 2007-14, available at www.state.gov/p/inl/rls/rpt/81222.htm (February 28, 2007) (describing international efforts to control precursor chemical in major ephedrine-exporting countries, including that China and India both require approval from the importing country). Accordingly, some exporting countries now require that the importing country approve an importation before they will issue an export permit. *Id*. The United States does not issue import permits *per se*, but has negotiated bilateral agreements whereby the DEA instead provides importers and the exporting nation with a "letter of no objection," or LONO, when it elects not to suspend a shipment from one of these nations. Meador Decl. ¶ 8. The exporting nation is obligated not to permit the export without a LONO, and the U.S. is obligated to deny the LONO if it finds that the chemicals may be diverted for the purpose of illicit manufacture of methamphetamine. *Id*.

7.  Several nations have requested the issuance of such letters, including India, China and the Czech Republic. Meador Decl. ¶ 8; *see also Presidential Determination on the Major Methamphetamine Precursor Chemical Exporting and Importing Countries*, No. 2007-14,

available at www.state.gov/p/inl/rls/rpt/81222.htm (February 28, 2007).

8.   The LONO process, however, adds no legal rights or obligations to section 971, which only

allows the DEA to suspend shipments if it finds a risk of diversion.  Meador Decl. ¶ 8.

Normally, the LONO consists of a short letter which describes the requested transaction and

states that "the DEA has no objection to the proposed shipment at this time." *Id*.

9.   Accordingly, when persons wish to import a listed chemical from one of these nations, they

submit DEA Form 486 and request a LONO.  *See* Meador Decl. ¶ 9.  If the DEA finds no

problems with the importation, the DEA issues a LONO and the import goes forward.  If

DEA believes that there is a risk of diversion, the DEA is statutorily authorized to simply

suspend the shipment with no further action or investigation, subject to a post-suspension

hearing if the importer requests it.  *See* 21 U.S.C. § 971; 21 C.F.R. § 1313.41(a).  Generally,

however, the DEA simply refuses to issue the LONO and gives the importer a chance to

withdraw the request.  Meador Decl. ¶ 9.  An importer is then free to pursue the request and

risk an order of suspension.  *Id*.  The importer is still free to pursue the importation in the

same manner contemplated by section 971(c); it need only inform the DEA that it wishes to

do so.  *Id*.

**Novelty and Spirit Pharmaceuticals**

10.  Novelty, Inc. is an Indiana corporation that distributes commercial goods, including over-the-

counter pharmaceuticals, to convenience stores throughout the United States.  Compl. ¶ 1.

As such, Novelty is the sort of nontraditional retailer that the DEA has found to be at risk of

ephedrine diversion in many contexts.  *See* Meador Decl. ¶¶ 12-18.

11.  In September 2006, an importer called Spirit Pharmaceuticals, LLC submitted two DEA

Forms 486 and requested a LONO for two shipments of ephedrine from India.  *See* Compl.

¶¶ 18-19; Meador Decl. ¶ 16.  This shipment was intended for sale to AAA Pharmaceuticals, Inc., a drug manufacturer.  *See* Compl. ¶¶ 18-19; Meador Decl. ¶ 16.  AAA Pharmaceuticals intended to resell a portion of these products to Novelty.  *See* Compl. ¶¶ 18-19; Meador Decl. ¶ 16.

12.    The DEA investigated the type of drug being manufactured and the customer lists of both AAA and Novelty.  Meador Decl. ¶¶ 17-18.  On October 10, 2006, the DEA declined to issue the LONO for this shipment.   Compl. ¶ 18 and attachments.   By letter to Spirit Pharmaceuticals, DEA stated that it had "thoroughly reviewed the proposed utilization of the planned Listed Chemical importation," and found that "the proposed importation may be subject to diversion to the illicit market by the downstream distribution system."  Compl. ¶ 18 and attachments.  The letter did not include an order of suspension.  Instead, the DEA informed Spirit of its options: that it was free to pursue the importation, but that if the importer did not contact the DEA, the notification would be considered withdrawn.  Compl. ¶ 18 and attachments; Meador Decl. ¶ 18.

13.    Spirit withdrew its application by default.  Meador Decl. ¶ 18.   No suspension order was issued.

14.    On April 10, 2007, DEA contacted Spirit Pharmaceuticals in order to make certain that Spirit had a full opportunity to pursue the importation.  *See* Meador Decl. ¶ 19.   Spirit Pharmaceuticals was told that it must now take affirmative action to withdraw the application or the DEA would issue a suspension order.  *Id.*  Spirit was given five days to respond.

15.    Novelty has requested to be allowed to pursue Spirit's importation and has since requested at hearing.  Meador Decl. ¶ 20.  The DEA has not ruled on this request.  If Spirit pursues the importation and requests a hearing, Novelty may then seek to intervene in that hearing.  *Id.*

16.    Novelty is not a registered importer.  Meador Decl. ¶ 20.


Dated: April 10, 2007                        Respectfully Submitted,

                                             PETER D. KEISLER
                                             Assistant Attorney General

                                             JEFFREY A. TAYLOR
                                             United States Attorney

                                             ARTHUR R. GOLDBERG
                                             Assistant Director
                                             Federal Programs Branch


                                             /s_____
                                             AMY E. POWELL
                                             Attorney (NY Bar)
                                             U.S. Department of Justice
                                             Civil Division, Federal Programs Branch
                                             20 Massachusetts Avenue, N.W. Rm. 7322
                                             Washington, D.C. 20530
                                             Telephone: (202) 514-9836
                                             Facsimile: (202) 616-8202
                                             Email: amy.powell@usdoj.gov

                                             *Attorneys for Defendant*