# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NOVELTY, INC., )
)
     **Plaintiff,** )
)
v. )    **Case No. 1:07-cv-00191-RMU**
)
KAREN TANDY, Administrator, )
U.S. DRUG ENFORCEMENT )
ADMINISTRATION, )
et al., )
)
     **Defendants.** )

## PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT

Plaintiff Novelty, Inc. (Novelty), by counsel and pursuant to Fed.R.Civ.P. 56, hereby moves this Honorable Court for summary judgment on all causes of action presented in its Amended Complaint. Plaintiff has consolidated this motion with its memorandum in opposition to Defendants' motion to dismiss and motion for summary judgment.

For the reasons specified herein, Plaintiff respectfully requests that this Honorable Court grant Plaintiff's motion for summary judgment. There are no genuine issues of material fact, and a decision may be entered forthwith as a matter of law. Plaintiff seeks (1) a declaratory judgment (a) that DEA's refusal to grant Novelty an independent DEA hearing on that agency's denial of a Letter of No Objection (LONO) for Novelty's OTC ephedrine shipment violates the Due Process Clause of the Fifth Amendment and the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A); (b) that DEA's LONO process has been imposed in violation of the APA, 5 U.S.C. § 553, without required

notice and comment rulemaking; and (c) that DEA's *de facto* prohibition on LONOs for

the import of ephedrine destined for OTC convenience store sale has been imposed in

violation of the APA, 5 U.S.C. § 553, in an arbitrary and capricious manner, without

substantial evidence, and without required notice and comment rulemaking.  Plaintiffs

seek (2) an order from this Court (a) compelling DEA to hold a hearing for Novelty on

DEA's denial of a LONO for Novelty's ephedrine shipment and (b) prohibiting DEA

from imposing its LONO procedure and its *de facto* prohibition on LONOs for the import

of ephedrine destined for OTC convenience store sale until it has promulgated rules on

those matters following notice and comment rulemaking in accordance with the APA, 5

U.S.C. § 553.

<div style="margin-left: 40%;">

Respectfully submitted,

NOVELTY, INC.


By:_____
    Jonathan W. Emord (Bar No. 407414)
    Andrea G. Ferrenz (Bar No. 460512)

Its Counsel

</div>

Emord & Associates, P.C.
11808 Wolf Run Lane
Clifton, VA 20124
P: 202-466-6937
F: 202-466-6938
Email: jemord@emord.com

Dated: May 23, 2007

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NOVELTY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-CV-00191 (RMU) |
| | ) | |
| KAREN TANDY, Administrator, | ) | |
| UNITED STATES DRUG ENFORCEMENT | ) | |
| ADMINISTRATION; et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT

JONATHAN W. EMORD
ANDREA G. FERRENZ
Emord & Associates, P.C.
11808 Wolf Run Lane
Clifton, VA 20124
P: (202) 466-6937
F: (202) 466-6938
Email: jemord@emord.com

## TABLE OF CONTENTS

Table of Authorities .................................................................................... iv

SUMMARY ...................................................................................................1

I.   **MOTION TO DISMISS STANDARD AND MOTION FOR SUMMARY JUDGMENT STANDARD** ........................................................................5

II.  **STATUTORY BACKGROUND** ...............................................................7

     DEA'S LONO PROCEDURE .......................................................................9

III. **SUMMARY OF UNCONTESTED FACTS** ...........................................10

IV.  **ANALYSIS** ..............................................................................................14

     A.   THE DISTRICT COURT HAS JURISDICTION TO HEAR NOVELTY'S APA AND CONSTITUTIONAL CHALLENGES .........................................14

          *SECTION 877 OF THE CSA IS NOT CONTROLLING* ............................15

          *JUDICIAL POLICY DOES NOT PRECLUDE DISTRICT COURT JURISDICTION* ...........................................................................17

          *THE MATTERS BEFORE THE COURT ARE FINAL* ..............................19

     B.   DEA'S LONO PROCEDURE CONSTITUTES A LEGISLATIVE RULE THAT HAS BEEN IMPOSED IN VIOLATION OF THE APA WITHOUT NOTICE AND COMMENT RULEMAKING .................................................24

     C.   DEA'S DE FACTO LEGISLATIVE RULE AGAINST CONVENIENCE STORE-ASSOCIATED IMPORTS HAS BEEN IMPOSED IN VIOLATION OF THE APA WITHOUT NOTICE AND COMMENT RULEMAKING ....31

     D.   DEA'S DENIAL OF NOVELTY'S INDEPENDENT RIGHT TO A HEARING UNDER SECTION 971 VIOLATES THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT .....................................................31

     E.   DEA'S DENIAL OF NOVELTY'S INDEPENDENT RIGHT TO A HEARING UNDER SECTION 971 AND ITS DE FACTO RULE AGAINST CONVENIENCE STORE ASSOCIATED IMPORTS LACK SUBSTANTIAL EVIDENCE AND ARE ARBITRARY AND CAPRICIOUS AGENCY ACTION ................................................................34

V.     **CONCLUSION** ............................................................................................36

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

<u>Abbott Laboratories v. Gardner</u>, 387 U.S. 136 (1967) ...................................................................19

<u>American Farm Bureau v. EPA</u>, 121 F.Supp.2d 84 (D.D.C. 2000).............................................18

<u>American Federation of Government Emp. v. Block</u>, 655 F.2d 1153 (D.C. Cir. 1981)..........26, 29

<u>American Hosp. Ass'n v. Bowen</u>, 834 F.2d 1037 (D.C. Cir. 1987) ..............................................22

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986)...................................................................6

<u>Appalachian Power Co. v. EPA</u>, 208 F.3d 1015 (D.C. Cir. 2000) .............................26, 27, 28, 30

<u>Arbaugh v. Y&H Corp.</u>, 546 U.S. 514 (2006).............................................................................5, 6

<u>Ass'n of Nat'l Advertisers, Inc. v. Fed. Trade Comm'n</u>, 627 F.2d 1151 (D.C. Cir. 1981).............25

<u>Barry v. Barichi</u>, 443 U.S. 55 (1979).............................................................................................23

<u>Bennet v. Spear</u>, 520 U.S. 154 (1997) ..........................................................................................19

<u>Burlington Truck Lines, Inc. v. United States</u>, 371 U.S. 156 (1962) ...........................................34

<u>Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc</u>., 419 U.S. 281 (1974)....... 34

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986) ...............................................................................7

<u>Chamber of Commerce v. Reich</u>, 74 F.3d 1322 (D.C.Cir. 1996) ....................................................6

<u>Citizens to Preserve Overton Park v. Volpe</u>, 401 U.S. 402 (1971)................................................34

<u>Citizens to Save Spencer County v. United States EPA</u>, 600 F.2d 844 (D.C. Cir. 1981) .............26

<u>Clean Air Implementation Project v. EPA</u>, 150 F.3d 1200 (D.C. Cir. 1998) ................................28

<u>Cent. Tex. Tel. Coop. v. FCC</u>, 402 F.3d 205 (D.C. Cir. 2005 ......................................................30

<u>Covad Communications Co. v. Bell Atlantic Corp.</u>, 398 F.3d 666 (D.C.Cir. 2005) ......................6

<u>Cutler v. Hayes</u>, 818 F.2d 879 (D.C. Cir. 1987) ..........................................................................18

Da Silva v. Kinsho International Corp. , 229 F.3d 358, 361 (2d Cir. 2000)....................................5

Dalton v. Specter, 511 U.S. 462 (1994).............................................................19

Dennis v. United States, 384 U.S. 855 (1966) ....................................................13

Dickinson v. Wainright, 626 F.2d 1184 (5th Cir. 1980)...........................................13

Doe v. Gonzalez, 2006 U.S. Dist. LEXIS 44402 (D.D.C. 2006)...........................22,23,24

Franklin v. Massachusetts, 505 U.S. 788 (1992) ................................................19

Industrial Equipment Ass'n Inc. v. EPA, 837 F.2d 1115 (D.C. Cir. 1988). .................................32

International Union, United Mine Workers of America v. U.S. Department of Labor,
    38 F.3d 40 (D.C. Cir. 2004)................................................................18

Lachance v. Erickson, 522 U.S. 262 (1988) .......................................................13

Laningham v. United States Navy, 813 F.2d 1236 (D.C. Cir. 1987)...................................7

Marbury v. Madison, 5 U.S. 137 (1803).............................................................4

Mast Industries, Inc. v. Regan, 596 F.Supp. 1567 (1984) .......................................29

McNary v. Haitian Refugee Center, Inc., 498 U.S. 479 (1991).....................................13

Motor Vehicle Manufacturers Ass'n v. State Farm, 463 U.S. 29 (1983) .......................34

Nader v. EPA, 859 F.2d 747 (9th Cir. 1988) ......................................................18

Nat'l Family Planning and Reprod. Health Ass'n .v. Sullivan, 979 F.2d 227
    (D.C. Cir. 1992) .......................................................................26, 28, 29

Novelty Inc. v. Tandy, 2006 U.S. Dist. LEXIS 57270 (S.D.IN. Aug. 15, 2006). . . . . . . 11, 13, 15

Oregon v. Ashcroft, 192 F.Supp.2d 1077  (D.Or. 2002) aff'd in part and reversed in
    relevant part, 368 F.3d 1118 (9th Cir. 2004) aff'd on merits
    Gonzales v. Oregon, 546 U.S. 243 (2006).............................................16, 17

Paralyzed Veterans v. D.C. Arena, 117 F.3d 579 (D.C. Cir. 1997)............................29

PDK Labs v. Ashcroft, 338 F.Supp. 2d. 1 (2004)............................................9, 10, 28

PDK Labs v. Reno, 134 F.Supp.2d 24 (2001) ................................................ passim

PDK Laboratories Inc. v. DEA, 362 F.3d 786 (D.C. Cir. 2004) ......................................3,24,31,32

PDK Labs v. DEA, 438 F.3d 11184, 1191 (D.C.Cir. 2006) ...........................................................8

Pickus v. United States Bd. of Parole, 507 F.2d 1107 (D.C. Cir. 1974)........................................26

Ramirez de Arellano v. Weinberger, 745 F.2d 1500 (D.C. Cir. 1984)(en banc) vacated
    on other grounds 471 U.S. 1113 (1985)................................................................................3,9,30

SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) ........................................................................34

Sprint Corp. v. FCC, 315 F.3d 369 (D.C. Cir 2003).....................................................................29

Telecommunications Research & Action Center v. FCC, 750 F.2d 70 (D.C. Cir. 1984)..............17

Ticor Title Ins. Co. v. Fed. Trade Comm'n, 814 F.2d 731 (D.C. Cir. 1987) ...............................25

Trudeau v. FTC, 456 F.3d 178 (D.C.Cir. 2006) ........................................................................5, 15

U.S. ex rel. Bilokumsky v. Tod, 263 U.S. 149 (1923)...................................................................28

U.S. Telecom Ass'n v. FCC, 400 F.3d 29 (D.C. Cir. 2005)..............................................25, 29, 31

## Statutes and Regulations

5 U.S.C. §  553 ................................................................................................................ passim

5 U.S.C. §  706................................................................................................................. passim

5 U.S.C. § 703 ..........................................................................................................................2

15 U.S.C. § 451(c) ...................................................................................................................15

Controlled Substances Act, 21 U.S.C. § 801 et seq...............................................................2, 7

21 U.S.C. § 802.................................................................................................................7,8,35

21 U.S.C. § 877................................................................................................................ passim

21 U.S.C.. § 971 .............................................................................................................. passim

28 U.S.C. § 1331 ...................................................................................................................2, 15

28 U.S.C. § 2342(1) ................................................................................................................17

47 U.S.C. § 402(a) ....................................................................................................17

Fed. R. Civ. P. 11.....................................................................................................13

Fed. R. Civ. P. 12.......................................................................................................1

Fed. R. Civ. P. 56 ....................................................................................................1, 6

65 Fed. Reg. 31657 (August 15, 1989).......................................................................8

71 Fed. Reg. 61801 (Oct. 19, 2006)............................................................................7

21 C.F.R. Part 1313.......................................................................................7, 20, 27, 28

21 C.F.R. § 1313.41(a)................................................................................................8

21 C.F.R. § 1313.52....................................................................................................8

21 C.F.R. § 1313.54....................................................................................................8

21 C.F.R. § 1313.55....................................................................................................8

## Miscellaneous

U.S. Constitution, Fifth Amendment, Due Process Clause .................................... passim

1988 United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic
Substances (http://www.unodc.org/pdf/convention_1988_en.pdf) ................................................8

2 J. Moore et al, Moore's Federal Practice §12.30 (3d ed 2005)....................................5

5B C. Wright & Miller, Federal Practice & Procedure § 1350 (3d ed 2004) ................................6

**SUMMARY**

Plaintiff Novelty Inc. (hereinafter "Novelty"), by counsel and pursuant to Rules 12 and 56 of the Federal Rules of Civil Procedure (F.R.Civ.P.), hereby submits its opposition to Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment (hereinafter "Defendants' Motion") and its cross-motion for summary judgment. Novelty has attached (1) its Response to Defendants' statement of uncontested material facts and (2) its own statement of uncontested material facts in support of its cross-motion (hereinafter collectively referred to as "Novelty's Statement"). Appended to Novelty's Statement (and in support of the facts alleged therein) are the affidavits of Novelty's President and Founder Todd Green (Exhibit 1) and Novelty's Director of Category Management Mark Bledsoe (Exhibit 2).

Defendants' motion to dismiss challenges this court's subject matter jurisdiction and, in the alternative, seeks dismissal or summary judgment in its favor on Novelty's first cause of action in its original complaint (that the LONO process violates the Administrative Procedure Act's (APA's) notice and comment rulemaking requirement). Defendants did not make a substantive argument for summary judgment on Novelty's original second cause of action (challenging Defendants' policy of denying importation of list 1 chemicals destined for convenience stores). In this combined opposition and cross-motion, Novelty opposes each of Defendants' arguments, seeks summary judgment on them in Novelty's favor, and submits its own motion for summary judgment on its causes of action. In particular, Novelty seeks a declaratory judgment that: (1) DEA has violated the Fifth Amendment Due Process Clause and the APA, 5 U.S.C. § 706, by denying Novelty an independent hearing before the DEA on DEA's rejection of a LONO for Novelty's ephedrine shipment; (2) DEA has violated the APA, 5 U.S.C. § 553, by failing to promulgate its LONO policy through notice and comment rulemaking and by

adopting a de facto legislative rule without notice and comment rulemaking prohibiting LONOs for ephedrine shipments destined for OTC sale in convenience stores and (3) DEA has violated the APA by adopting a de facto rule denying LONOs for Ephedrine destined for OTC sale in convenience stores that is arbitrary, capricious, and not based on substantial evidence. Novelty seeks an order compelling DEA to hold a hearing for Novelty on DEA's LONO denial and to prohibit DEA from imposing its LONO procedure or its *de facto* ban on ephedrine import for OTC convenience store sale until it has adopted formal rules following notice and comment rulemaking in accordance with the APA, 5 U.S.C. § 553.

Novelty's original complaint presents two challenges:  (1) Defendants violated the Administrative Procedure Act (APA), 5 U.S.C. § 553, because Defendants did not promulgate their "letter of no objection" (LONO) process for the importation of list 1 chemicals and their ban on importation of Ephedrine destined for convenience store sale by notice and comment rulemaking and (2) Defendants violated the APA, 5 U.S.C. § 706, by establishing an arbitrary and capricious substantive rule categorically prohibiting import of ephedrine for OTC convenience store sale. That process and that rule are final agency actions. The claims in issue arise under the APA, not from violation of the Controlled Substances Act (CSA). Moreover, they do not arise from a decision by the DEA Administrator in an adjudicatory case.  Thus, contrary to Defendants' argument, 21 U.S.C. 877 is entirely inapplicable. The claims in issue are ones for which this court exercises jurisdiction under 28 U.S.C. § 1331 (see also 5 U.S.C. § 703).

In the summary judgment portion of Defendants' Motion, pages 27-31, Defendants challenge only the first cause of action, the lack of notice and comment rulemaking. They do not challenge Novelty's second cause of action.  Defendants argue that the LONO process is procedural and that it is established in fulfillment of DEA's periodic bilateral agreements with

certain foreign countries, but not in response to treaty obligations. No treaty to which the United

States is a party defines the content of Defendants' domestic LONO process. The LONO

process operates in this instance and in all analogous instances on the legal rights of American

citizens, domestic regulatees. It defines the legal rights of, and imposes legal obligations on,

those citizens. Although DEA's agreement to require LONOs for export and issue LONOs for

import is a foreign affairs function under 5 U.S.C. 553(a)(1), how the Defendants construe the

LONO policy to affect the liberty and property interests of American citizens is quintessentially

a domestic law issue. Moreover, DEA's discretion to enter into bilateral agreements is

constrained by its superior legal obligation to abide by the Constitution of the United States (in

this instance, the Due Process Clause of the Fifth Amendment); its own enabling statute (in this

instance, 21 U.S.C. § 971), and the APA. DEA has no authority to bind the United States other

than within the confines of its constitutional and statutory limits. DEA is constrained to act

within the limits of the law and to ensure that its implementation of the LONO process does not

violate the legal rights and interests of its regulatees. Ramirez de Arellano v. Wienberger, 745

F.2d 1500, 1515 (D.C.Cir. 1984) (en banc) vacated on other grounds, 471 U.S. 1113 (1985) ("the

Executive's power to conduct foreign relations free from the unwarranted supervision of the

Judiciary cannot give the Executive *carte blanche* to trample the …property rights of this

country's citizenry").

     In Defendants' Motion, they take the position for the first time and in direct violation of

PDK Labs v. Reno, 134 F.Supp.2d 24 (2001), and PDK Laboratories Inc. v. DEA, 362 F.3d 786,

791-795 (D.C.Cir. 2004), that Novelty has no independent right to a hearing on the LONO

denial.[1] Defendants argue that Novelty is limited to seeking permission to intervene, by leave of

---

[1] PDK is the rule of law. Defendants dislike it: "The defendant[s] . . . disagrees [sic] with the approach taken by
Judge Kennedy in PDK Labs Inc v. Reno, 134 F.Supp.2d 24 (D.D.C. 2001)." Defendants' Motion at 19. Their

the DEA, in an administrative hearing <u>if and only if</u> Spirit Pharmaceuticals, LLC seeks to pursue the LONO denial.  In other words, but for Spirit's prosecution of the denial, Novelty has no independent right to redress of its grievance.  Defendants denied Novelty an independent right as a regulated party to appeal the LONO denial and pursue a hearing under 21 U.S.C. § 971.  Novelty filed an Amended Complaint on May 18, 2007, adding two causes of action arising from those facts.  Denial of Novelty's LONO request and right to a hearing to contest that denial (1) violates Novelty's Fifth Amendment right of Due Process (see <u>PDK</u>, 134 F.Supp.2d 24 (2001)) and (2) lacks substantial evidence and is arbitrary and capricious action in violation of the APA, 5 U.S.C. §§ 553 and 706.

Novelty's cross-motion for summary judgment seeks judgment on: (1) the violation of Novelty's Fifth Amendment right of Due Process arising from the Defendants refusal to grant Novelty an independent hearing under section 971; (2) the violation of the APA, 5 U.S.C. § 553, stemming from the DEA's imposition without notice and comment rulemaking of the LONO process and of  a *de facto* legislative rule prohibiting LONOs for Ephedrine destined for OTC sale in convenience stores; and (3) the violation of the APA, 5 U.S.C. § 706(2)(A), resulting from Defendants arbitrary and capricious agency action, lacking substantial evidence, of denying Novelty's independent right to a hearing and of imposing its *de facto* rule prohibiting importation of Ephedrine destined for OTC sale in convenience stores.

---

dislike of the law is, however, no justification for their violation of it.  Defendants may not like this Court's command that they abide by the Fifth Amendment to the United States Constitution but they are duty bound to honor and follow that constitutional mandate, to the letter.  That they have not done so in this case reveals a contumacious disobeyance of the rule in <u>PDK</u> and heightens the need for this Court to correct Defendants' wayward course.  It is not for DEA to decide for itself the limits of the law, that is the duty and province of this Court.  See generally <u>Marbury v. Madison</u>, 5 U.S. 137, 178 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is″).  Defendants could resolve most of the contest before this Court simply by issuing a notice of suspension and scheduling a hearing for Novelty, as is Novelty's right under <u>PDK</u> and the Fifth Amendment Due Process Clause.

# I.    MOTION TO DISMISS STANDARD AND MOTION FOR SUMMARY JUDGMENT STANDARD

**Motion to Dismiss**

A court's subject matter jurisdiction is always in issue.  <u>Arbaugh v. Y&H Corp.</u>, 546 U.S. 500, 514 (2006).  The Supreme Court recently discussed at length the difference between subject matter jurisdiction challenges and dismissal challenges arising from the failure of a plaintiff to state a claim.  Those distinguishing principles apply to Defendants' Motion:

> On the subject-matter jurisdiction/ingredient-of-claim-for-relief dichotomy, this Court and others have been less than meticulous. "Subject matter jurisdiction in federal-question cases is sometimes erroneously conflated with a plaintiff's need and ability to prove the defendant bound by the federal law asserted as the predicate for relief -- a merits-related determination." 2 J. Moore et al., Moore's Federal Practice § 12.30[1], p. 12-36.1 (3d ed. 2005) (hereinafter Moore). Judicial opinions, the Second Circuit incisively observed, "often obscure the issue by stating that the court is dismissing 'for lack of jurisdiction' when some threshold fact has not been established, without explicitly considering whether the dismissal should be for lack of subject matter jurisdiction or for failure to state a claim. <u>Da Silva v. Kinsho Int'l Cor.</u>,, 229 F.3d 358, 361 (2d Cir. 2000). We have described such unrefined dispositions as "drive-by jurisdictional rulings" that should be accorded "  no precedential effect" on the question whether the federal court had authority to adjudicate the claim in suit. Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 91(1998).

<u>Arbaugh,</u> 546 U.S. at 511.  Finality, or lack thereof, under the APA is a threshold matter that must be established in order to state a claim.  <u>Trudeau v. FTC</u>, 456 F.3d 178, 185 (D.C.Cir. 2006).  APA finality under 5 U.S.C. § 704 is not an issue of subject matter jurisdiction.  Thus, APA's finality element to a claim is not comparable to subject matter jurisdiction statutory limitations, as Defendants' erroneously argue.  Defendants' Motion at 20.  Moreover, there can be no doubt that the APA provides the necessary waiver of sovereign immunity in 5 U.S.C. § 702 for claims seeking relief other than money damages and that its waiver "applies to any suit

whether under the APA or not." Trudeau, 456 F.3d at 186 (citing Chamber of Commerce v. Reich, 74 F.3d 1322, 1328 (D.C.Cir. 1996).

On a defendant's motion to dismiss for failure to state a claim, a court must take all well-pled facts as true and draw all reasonable inferences in the plaintiff's favor. Covad Communications Co. v. Bell Atlantic Corp., 398 F.3d 666, 671 (D.C.Cir. 2005). The court may dismiss the complaint only if it "it appears beyond doubt that the plaintiff can prove no set of **facts** in support of his claim which would entitle him to relief." Id. (citing Caribbean Broad. Sys. Ltd v Cable & Wireless PLC, 148 F.3d 1080, 1086 (D.C.Cir. 1998)). The "issue presented by a motion to dismiss is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Id.

On issues of subject matter jurisdiction, the court may also look beyond the jurisdictional allegations in the complaint and weigh conflicting evidence. Arbaugh, 546 U.S. at 514 (citing 5B C.Wright & A. Miller, Federal Practice and Procedure, § 1350, p. 243-249 (3d. ed 2004)).

**Summary Judgment**

Fed. R. Civ. P. 56 states that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits show that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; see also PDK Labs, 338 F.Supp.2d at 5-6. Material facts are facts "that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255. The non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that

there is a genuine issue for trial. Fed. R. Civ. P. 56(e); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317

(1986). The non-moving party is "required to provide evidence that would permit a reasonable

jury to find" in its favor. <u>Laningham v. United States Navy</u>, 813 F.2d 1236, 1242 (D.C.Cir.

1987). If the evidence is "merely colorable" or "not significantly probative," summary judgment

may be granted for the moving party. <u>Anderson</u>, 477 U.S. at 249-50.

## II.    STATUTORY BACKGROUND

Ephedrine and pseudoephedrine are ingredients in OTC cough and cold remedies.  21

C.F.R. §§ 341.16 and 341.20.  Ephedrine is a bronchodilator (it opens the bronchioli in the lungs

for ease of breathing).  Exhibit 3 at 2 (report, "The Evaluation of Medical Need for Ephedrine in

the United States" by Michael P. Pacin, M.D., submitted to DEA Docket No. DEA-300P on

December 4, 2006 in support of Novelty's comments on DEA's Notice of Proposed Year 2007

Assessment of Annual Needs).  Pseudoephedrine is a nasal dilator (it opens the nasal passages).

21 C.F.R. § 341.20.   Both are also used as precursor chemicals in the illicit manufacture of

methamphetamine.  They are list 1 chemicals under the Controlled Substances Act (21 U.S.C.

801 et seq.).  21 U.S.C. 802 (34) (C and K).  Of the two, pseudoephedrine is more widely sold in

the United States.  "Assessment of Annual Needs for the List 1 Chemicals Ephedrine,

Pseudoephedrine, and Phenylpropanolamine for 2007, Proposed," 71 Fed. Reg. 61801, 61802

(Oct. 19, 2006).

The Controlled Substances Act (21 U.S.C. 801 et seq.) governs the import of List 1

chemicals, including ephedrine and pseudoephedrine (hereinafter collectively "Ephedrine").  <u>See</u>

21 U.S.C. § 971 (2006) (enacted in "Chemical Diversion and Trafficking Act of 1988," Pub. L.

100-690 (1988) amending the CSA); <u>see also</u> 21 CFR Part 1313 (the implementing regulation

promulgated by notice and comment rule-making in "Records, Reports, Imports, and Exports of

Precursor and Essential Chemicals, Tableting Machines and Encapsulating Machines," 65 Fed. Reg. 31657 (August 15, 1989)). Section 971 states in pertinent part: "Each regulated person who imports or exports a listed chemical shall notify the Attorney General of the importation or exportation not later than 15 days before the transaction is to take place." 21 U.S.C. 971(a).

If within 15 days of receipt of a 486 DEA finds that the shipment "may be diverted to the clandestine manufacture of a controlled substance," the agency may issue a notice of suspension of importation. 21 U.S.C. § 971(c)(1) (2006); 21 C.F.R. § 1313.41(a) (2006). The written notice must include "a statement of the legal and factual basis for the order." 21 U.S.C. § 971(c)(1) (2006); 21 C.F.R. § 1313.41(a) (2006). "From and after the time when the Attorney General provides written notice of the order . . . to the regulated person, the regulated person may not carry out the transaction." Id. Within thirty days of service of the suspension notice, the "regulated person" may file a written request for a hearing. See 21 C.F.R. § 1313.41(b) (2006); 21 C.F.R. § 1313.54 (2006). If requested, the hearing must take place within 45 days of the request unless the importer seeks an extension of time.[2] 21 C.F.R. § 1313.52 (2006). A "regulated person" is defined as "a person who manufactures, distributes, imports, or exports a listed chemical, a tableting machine, or an encapsulating machine or who acts as a broker or trader for an international transaction involving a listed chemical, a tableting machine, or an encapsulating machine." 21 U.S.C. 802(38). As a distributor of listed chemicals, Novelty is a regulated person under the CSA. Novelty's Statement at ¶21.

---

[2] At the hearing, the burden of proof rests with DEA to prove that ephedrine shipments "may be diverted to the clandestine manufacture of a controlled substance." See 21 C.F.R. § 1313.55. The agency must "amass substantial evidence to support the inference that [ephedrine shipments] may be diverted." PDK Labs v. DEA, 438 F.3d 1184, 1191 (D.C. Cir. 2006). The agency employs a totality of the circumstances test, which the D.C. Circuit upheld last year. Id. at 1195 (quoting Pearson v. Shalala, 164 F.3d 650, 660 (1999)).

DEA's LONO Procedure

The 1988 United Nations Convention Against Illicit Traffic in Narcotic Drugs and

Psychotropic Substances ("1988 U.N. Convention")

(http://www.unodc.org/pdf/convention_1988_en.pdf) (May 21, 2007), requires parties to take a

number of measures designed to prevent diversion of substances used for the manufacture of

illicit substances.  See id at Art. 12 ¶¶ 1 and 9.  It does not require a letter of no objection be

issued by the importing country for the exporting country.  See id; see also Defendants' Meador

Affidavit at ¶5.  Through non-treaty, periodic bilateral agreements the DEA has agreed to

require, prior to permitting the export of a List 1 chemical to and/or through the United States,

that the United States first issue a LONO.  Defendants have failed to provide citations to public

authorities for or copies of those agreements.  Defendants' Meador Affidavit at ¶8.

Nevertheless, such agreements entered into by agencies of the United States government are

themselves constrained by the limits of United States law, including the Constitution of the

United States (and, in particular here, the Fifth Amendment Due Process Clause); DEA's

enabling statute (for present purposes, 21 U.S.C. § 971); and the APA.  See Ramirez de Arellano,

745 F.2d at 1515

The LONO procedure is not authorized by any statute or regulation.  See PDK Labs v.

Ashcroft, 338 F.Supp. 2d. 1, 4 (2004) ("DEA maintains that the LONO process is standardized

and consistent with law but concedes that it is not explicitly authorized in any statute or

regulation"); see also Meador Affidavit at ¶¶ 6-7.  Rather, "the LONO is an outgrowth of a 1994

international initiative among several nations, including the United States . . . and the

International Narcotics Control Board ("INCB"), a United Nations-based entity."  Id.

Participating countries will not "permit the export of listed chemicals until they have received a [LONO] acknowledging that the importer's government does not object to the shipment." PDK Labs v. Ashcroft, 338 F. Supp. 2d at 4. "Upon request for a LONO, DEA will either issue one, in which case the transaction proceeds, or decline to do so because it perceives a threat of downstream diversion for illicit purposes." PDK Labs, 388 F. Supp. 2d at 4; see also Complaint Exhibit B (October 10, 2007 DEA letter denying LONO request because shipment "may be subject to diversion to the illicit market by downstream distribution system…"). Importantly, when the United States refuses to issue a LONO, it does not issue a notice of suspension in accordance with 21 U.S.C. § 971(c). Instead, it issues a LONO denial letter that does not contain the justificatory facts and circumstances that are the basis for the denial (those facts and circumstances do appear in the notice of suspension). Meador Affidavit at ¶9. Moreover, the option to appeal the denial and subsequently receive the notice of suspension, well after 15 days following the filing of the 486, is made by DEA only to the importer, despite the statutory use of the term "regulated party" (which makes it incumbent upon DEA to serve notice to all regulates, not just importers). Defendants' Motion at 21 and Meador Affidavit at ¶9; see also 21 U.S.C. § 971.

### III.    SUMMARY OF UNCONTESTED MATERIAL FACTS

Novelty was created in 1980 by Todd Green, then an enterprising high school student. Novelty's Statement at ¶1. From humble origins in his parents' garage, Mr. Green's company, Novelty, Inc., now employs approximately 500 people in the United States, operates a factory in China, and has direct licensing agreements with leading international entertainment and consumer goods companies, including, but not limited to, Disney, Chevrolet, NBA, Universal, Warner Brothers, and college sports teams. Id. at ¶¶3-4. Mr. Green's genius in well-designed

and controlled manufacture and closed system distribution are the subject of acclaim by

organizations that rate entrepreneurs. See id. at ¶6 (noting that Mr. Green is the recipient of the

Ernst & Young Entrepeneur of the Year award and the "40 under 40" award). Exhibit 1 at ¶8.

DEA's refusal to permit Novelty to import OTC ephedrine for convenience store sales threatens

the viability of Novelty's existing business. Novelty's Statement at ¶¶12-14. The LONO denial

will deprive Novelty of between 10 to 15% of its annual revenues, forcing the company to

terminate an estimated 25-50 employees, end certain employee benefits, and fundamentally alter

its heretofore successful closed system of distribution. See id at ¶¶13-14.

Novelty currently sells to about 12,000 customers (individual convenience stores).

including the major convenience store chains of Speedway, Circle K, Village Pantry and The

Pantry. Id. at ¶5. 700-800 of its items are the trend, novelty items that are the core of its

innovative business and product development. Id. at ¶2. About 300 of its items ("Stock Keeping

Units" or "SKUs") are non-trend based items with stable sales that Novelty sells year after year,

including its OTC cold and cough remedies. Id. Novelty's cold and cough remedies contain a

combination of ephedrine and guaifenesin (an expectorant) and are sold under Novelty's private

label. Exhibit 2 at ¶¶10, 11.

Novelty has registered with DEA every year since 1996 as a distributor of list 1 chemical

products. Novelty's Statement at ¶¶7-9. Since first distributing list 1 products, Novelty has

developed secure, well-monitored, audited, comprehensive anti-diversion inventory, shipping,

and documentation procedures for those products that vastly exceed federal and state

requirements. Id. at ¶¶15-19. Contrary to the Defendants' unsubstantiated allegations, Novelty

is not a downstream distributor of list 1 products because Novelty has no upstream distributor of

its private label products. Id. at ¶21. Novelty contracts directly with its manufacturer for the

creation of Novelty's branded OTC products, and Novelty distributes those products to its customers through its own closed distribution system, using its own fleet of trucks and security trained drivers.  Id.

Contrary to Defendants' stereotyping about convenience store sales in Meador Affidavit ¶¶ 13 and 14, Novelty does not market its products for 'off label uses,' such as for weight loss or staying awake.[3]  Id. at ¶26.  Novelty's products do not pass through multiple layers of distribution.  Id. at ¶27.  Novelty has a closed system of distribution, obtains the finished product from its contract manufacturer, warehouses the product in its own secure, locked, and 24 hour-monitored facilities, and ships the product in its own trucks and under the care of its own, security trained drivers.  Id.  Novelty's products are not stronger than those found in the traditional market.  Id.  Novelty strictly complies with the dosage limitations of state and federal authorities.  Id.  Novelty's dosage amounts are the same as those found in products sold in pharmacies, grocery stores, or "big box" stores such as Wal-Mart.  Id.  Novelty has never been notified that its products were found in clandestine lab seizures.  Id.  Novelty's distribution and sales system prevents its customers from purchasing large quantities of chemical products and prevents its customers from selling large quantities of chemical products to retail customers. Id.

In its 11 year history of selling OTC list 1 chemical products, Novelty has never been informed by law enforcement that its products were found in illicit drug manufacturing.  Id. at ¶23.  DEA has never denied Novelty a registration renewal.  Id. at ¶8.  Novelty was granted a

---

[3] The false and misleading prejudicial stereotyping contained in the Meador affidavit appears to be part of a larger Defendants' culture.  In assessing chemical suppliers of pseudoephedrine, Defendants write: "Persons tracing their national and ethnic roots to the Middle East have been disproportionately represented among the ranks of 'rogue' chemical company executives, brokers, and smugglers of illicit pseudoephedrine from Canada to the United States."  Office of National Drug Control Policy, "National Synthetic Drugs Action Plan" at 74, n. 76 (2004)( www. whitehousedrugpolicy.gov/publications/national_synth_drugs/national_synth_drugs.pdf) (May 22, 2007),

renewal on September 20, 2006, just before Novelty's importer submitted its LONO request for the shipment at issue. Id. at ¶9.

Novelty management and legal counsel closely monitor all current federal and state limitations on the dosage, form, packaging, and sale limitations for list 1 chemical products. Novelty's Statement at ¶25; Exhibit 2 at ¶50. Novelty's list 1 chemical products include different dosages (25 mg and 12.5 mg) and different forms (gel capsules and tablets) to ensure federal and state by state compliance. Id. at ¶24. Novelty's comprehensive protocols, including its electronic automated ordering and inventory system, prevent the sale of forms and dosages of its list 1 chemical products to convenience stores in states where such forms and dosages are not permitted. Id. at ¶27-28. Defendants make the repeated and utterly false charge that Novelty sells a prohibited tablet form of list 1 chemical in Kentucky and Tennessee, two states where that form is a criminal offense. Defendants Motion at 9; Meador Affidavit at ¶17. See Tennessee Code § 39-17-431 (2007) (violation is a misdemeanor); Kentucky Revised Statutes §§ 218A.1446 and 218A.1438 (2007) (violation is a felony). That charge, alleged to have come to light from an "investigation" and submitted to this Court under oath by DEA Staff Coordinator Darrell R. Meador, is entirely fabricated. Novelty has never violated Kentucky or Tennessee law by selling the tablet form in either of those states. See Novelty's Statement at ¶¶28-30. [4]

---

[4] False statements made under penalty of perjury by federal government employees alleging criminality by party opponents are serious offenses that must not be allowed to pass without consequence. The making of such statements in affidavits supporting motions filed with the Court constitutes perjury and carries severe consequences under apposite precedent. See 28 U.S.C. §§ 1621 and 1746; Dickinson v. Wainright, 626 F.2d 1184 (5th Cir. 1980)(perjury when false statement made in an affidavit under 28 U.S.C. § 1746); see also Lachance v. Erickson, 522 U.S. 262, 266-267 (1988)(listing different ways of committing perjury in court proceedings)(citing Dennis v. United States, 384 U.S. 855 (1966)). Under Federal Rule of Civil Procedure 11, government counsel are required to discern the validity of charges of criminality by party opponents before they affix their signatures to pleadings that contain them. See Fed. R. Civ. Pro. 11(b)(2-3). Novelty respectfully submits that the false charge of criminality made against Novelty is reckless and wanton and asks the Court in its decision on the Defendants' motion to take whatever action it deems necessary and proper to deter a recurrence of the offense, including, but not limited to, striking the Meador affidavit from Defendants' motion and imposing sanctions against government counsel under Rule 11 for the submission of a false affidavit. See id at (c)(1)(B) and (c)(2) (specifying as permissible sanctions, "directives of a nonmonetary natures, an order to pay a penalty into court or [payment of attorneys fees]").

On September 25, 2007, Novelty's contract manufacturer AAA Pharmaceuticals Inc. ("AAA") placed an order with an importer, Spirit Pharmaceuticals LLC ("Spirit"), for 2000 kg of ephedrine to manufacture Novelty's OTC tablet products.  Id. at ¶31.  Spirit sent a DEA form 486 and request for a LONO by fax that same day, along with a request for another shipment for another AAA customer.  Id. at ¶32.  On October 10, 2006 DEA rejected by the same letter both requests for a LONO without identifying justificatory facts and circumstances for each shipment's denial, stating only the conclusory charge that the agency "had grounds to believe that the proposed importation may be subject to diversion to the illicit market by the downstream distribution system and, as such is declining to sign a LONO for this importation."  Id. at 33.

On November 2, 2006 Novelty submitted a letter to DEA expressing its desire to pursue importation.  Novelty requested that DEA quickly issue a notice of suspension so that Novelty could pursue its right to a hearing.  DEA never responded to that letter.[5]  Id. at ¶34.  Novelty filed its complaint on January 29, 2007.  On April 10, 2007, DEA sent a letter to Spirit at the same time it filed its motion to dismiss stating that it was "re-contacting [Spirit] to make certain that your intent is that you do not wish to pursue the import requests."  Id. at 41; Exhibit 2's Attachment E.  It also stated that Spirit could "indicate in writing, within five (5) days from the date of this notice, your desire to pursue the importation further."  "If you elect this option or fail to respond to this notice within five (5) days, DEA will order the suspension of the shipment pursuant to Title 21, United States Code, Section 971(c)(1)."  Id. (emphasis added).  Spirit has

---

[5] Defendants argue that when Novelty filed its complaint, Novelty's November 2, 2006 letter was "still pending." Motion at 10 (misstating the date for filing the Complaint).  It is axiomatic that importation to satisfy customer demand is a time-sensitive issue.  Failing to respond for three months is in this circumstance the functional equivalent of a denial.  An agency cannot reasonably avoid responsibility for its refusal to act by referring to the matter as "still pending," particularly when there is no justification for delay in the issuance of a decision and there is a statutory requirement of action no later than 15 days before the scheduled import.  See 21 U.S.C. § 971.

not responded.  Exhibit 2's Attachment F.  As of the date of this filing, neither Novelty or Spirit

has not received a notice of suspension.

<div align="center">

**IV.    ANALYSIS**

</div>

**A.    THE DISTRICT COURT HAS JURISDICTION TO HEAR NOVELTY'S APA
AND CONSTITUTIONAL CHALLENGES**

This court has federal question jurisdiction under 28 U.S.C. § 1331 as Novelty has raised

constitutional claim and federal statutory claims under the APA.  PDK Labs v. Reno, 134

F.Supp.2d 24 (D.D.C. 2001); see also Novelty Inc. v. Tandy, 2006 U.S. Dist. LEXIS 57270, *43

(S.D.IN. Aug. 15, 2006).  The D.C. Circuit has recently held in a party's challenge to an FTC

action that the plaintiff's APA claim, his nonstatutory action, and his First Amendment claims

were all properly brought in the District Court pursuant to 28 U.S.C. § 1331.  Trudeau, 456 F.3d

at 185  (finding that it had subject matter jurisdiction but dismissed the action because the party

failed to state a claim based on facts alleged in the complaint).[6]

This is not a challenge to a final decision of the Administrator under 21 U.S.C. § 877.

Defendants spend significant effort (pages 17-22) arguing in response to the original complaint

that the agency's denial of Spirit's LONO request on Novelty's behalf is not a final agency

action.  Because that was not the issue in the original complaint, the extensive discussion is both

misleading and superfluous.  To be sure, once the Defendants argued in their motion that

Novelty lacked an independent right to a hearing on the LONO denial under Section 971 and was

limited to seeking permission to intervene in an appeal, if any, by Spirit that created finality and

standing to challenge the denial of the right to an independent hearing.

***Section 877 of the CSA Is Not Controlling***

---

[6] Like the CSA, the Federal Trade Commission Act has a statutory provision designating the U.S. Courts of Appeal
as the appropriate venue for appeal of certain agency actions, but not all.  15 U.S.C. § 45(c)

Defendants argue that jurisdiction is improper because 21 U.S.C. § 877 provides exclusive jurisdiction for final decisions in the U.S. courts of appeal, but this case does not arise under Section 877.  The controlling law is squarely against Defendants.  In PDK Labs., Inc. v. Reno, the District Court found the plain language of section 877[7] inapplicable, applying only to decisions under the CDTA.  134 F.Supp.2d 24, 29 (D.D.C. 2001).  DEA's refusal in that case to follow section 971 was deemed not a final determination under section 877.  Id.    Thus, the U.S. District Court has previously considered and squarely rejected DEA's exclusive appellate jurisdiction argument.  The issues before this court are even more removed from a final determination under section 877 than in PDK.  Novelty challenges (1) the process DEA created by which it would issue (or reject) LONOs (original complaint claim); (2) DEA's refusal to allow the importation of list 1 chemicals for convenience store sale (original complaint claim); and (3) DEA's refusal to grant Novelty a right to a hearing under section 971 in connection with its LONO denial.

Moreover, the question of whether a district court has jurisdiction to hear a challenge against the DEA, not the product of a final determination under section 877, has been confronted by these same parties less than a year ago, yet Defendants conveniently make no mention of that on point case in their brief.  See Novelty v. Tandy, 2006 U.S. Dist. LEXIS 57270 (S.D.IN. Aug. 15 2006).  Novelty found determinative the fact that section 877's "final determinations, findings, and conclusions" were "tied to other specific statutory provisions that establish formal procedures that provide an opportunity to develop a record of agency decision-making and an

---

[7] Section 877 states:
> All final determinations, findings, and conclusions of the Attorney General under this title shall be final and conclusive decisions of the matters involved, except that any person aggrieved by a final decision of the Attorney General may obtain review of the decision in the United States Court of Appeals for the District of Columbia or for the circuit in which his principal place of business is located upon petition filed with the court…"

opportunity for judicial review of that record." Id. at *10. The court relied on a decision post-dating the PDK 2001 district court decision which also found that section 877 "applied to 'situations where the Attorney General makes a quasi-judicial determination that resolves disputed facts in a specific case after some level of administrative proceedings,' [citing sections of the CSA]." Id. at *11 (citing Oregon v. Ashcroft, 192 F.Supp.2d 1077, 1085 (D.Or. 2002), aff'd in part and reversed in relevant part, 368 F.3d 1118 (9th Cir. 2004); aff'd on merits, Gonzales v. Oregon, 546 U.S. 243 (2006)). Where, as here, there is "no administrative record pertaining to the directive, and where the only record regarding the determination was being produced in the district court, the district court found that it had jurisdiction, citing McNary v. Haitian Refugee Center, Inc., 498 U.S. 479 [] (1991). Oregon v. Ashcroft, 192 F.Supp.2d at 1086." Novelty, at *12.

Defendants cite (Defendants' Motion at 23) the appellate decision in Oregon v. Ashcroft, 368 F.3d 1118 (9th Cir. 2004) for the proposition that exclusive court of appeals' jurisdiction is "well-established." The appellate court's logic in Oregon v. Ashcroft is inapplicable. Unlike in Ashcroft, there is here no public record of factual or legal development for the LONO process; for the policy to deny all convenience store-related imports of list 1 chemicals; and for the decision to deny Novelty's independent right to a hearing concerning its shipment. Thus section 877 is inapplicable. The question is not whether a rule promulgated complies with the CSA. The question here is more basic: Has DEA taken actions prohibited by the Constitution and the APA?

### Judicial Policy Does Not Preclude District Court Jurisdiction

Defendants rely on inapposite precedent to support their argument that jurisdiction lies exclusively in the U.S. courts of appeal. In Telecommunications Research & Action Center v.

FCC, 750 F.2d 70 (D.C.Cir. 1984)("TRAC") the FCC statutory language giving exclusive jurisdiction to the courts of appeal was far broader than that delegating appellate authority in the CSA. Compare 21 U.S.C. § 877 (all final determinations, findings, and conclusions) to 28 U.S.C. § 2342(1) (all final orders) and 47 U.S.C. § 402(a) (any proceeding to enjoin, set aside, annul or suspend any order).[8]  The issue in TRAC (and in International Union, United Mine Workers of America v. U.S. Department of Labor, 38 F.3d 40, 42 (D.C.Cir. 2004)) was an agency's failure to take action required by its enabling statute.  Here Novelty is not arguing that DEA has failed to take some action required by its enabling statute.  To the contrary, Novelty argues that DEA has acted in a way that violates the APA and, with the statements revealed in Defendants' Motion, that violates the Due Process Clause of the U.S. Constitution.

Applying the two part test Defendants cite on page 25 of their motion, the answer to the first part is that the CSA does not commit all DEA agency action to the review of the courts of appeal.  21 U.S.C. § 877.  Where the Attorney General has made no findings and conclusions in a final determination (where there is no administrative record), then section 877 does not apply. Novelty, supra, at *26-27.  Defendants couch their evaluation of the second part as if this were a case of agency inaction (Defendants' Motion at 26).  That is incorrect.  Defendants have acted, without a doubt, but in such a way as to violate statutory strictures on federal agency power in the APA and in the Constitution. Defendants actions were taken outside of the statutory bounds of the CSA and without a "single overarching provision governing judicial review."   Indeed, on

---

[8] Comparing the general appellate authority granted in FCC's statutory language to other federal agency statutes, as Defendants have done here, has been repeatedly rejected by the courts, including in cases cited by Defendants. American Farm Bureau v. EPA, 121 F.Supp.2d 84, 93 (D.D.C. 2000).  Where a statute has "'no single, overarching provision governing judicial review' courts have repeatedly cautioned against reliance on the TRAC analysis.  Id. at 93 (citing Nader v. EPA, 859 F.2d 747, 755 (9th Cir. 1988).  Courts are not "at liberty simply to apply the Court's reading of one statute to a separate dissimilar statute." American Farm Barau at 93 (citing Nader, 859 F.2d at 754.)

the matters here in issue, the CSA is "silent as to appellate review," leaving jurisdiction to the

District Courts.  See Cutler v. Hayes, 818 F.2d 879, 888 n. 61 (D.C.Cir. 1987).

Defendants argue that the subject of the second cause of action, the "alleged rule

preventing the importation of ephedrine for eventual sale in convenience stores," was "developed

in the context of individual agency investigations and adjudications."  Defendants' Motion at 26.

That is incorrect.  The agency's policy has been applied in individual agency adjudications (and

applied consistently without exception).  The consistent and repeated application shows that this

is an agency policy developed outside of adjudication, a kind of profiling that stereotypes all

parties associated with convenience store sales, based on old, incomplete data and without regard

for the specific facts of each case (such as Novelty's closed system of distribution which has

yielded no diversion of its products in over 11 years of selling them to convenience stores).

***The Matters Before the Court Are Final***

The Supreme Court has instructed in Abbott Laboratories v. Gardner, 387 U.S. 136, 149-

50 (1967), a federal court should apply the finality requirement in a "flexible" and "pragmatic"

way.  Two conditions must be satisfied for agency action to be "final:"  "First, the action must

mark the 'consummation' of the agency's decision-making process…it must not be of a merely

tentative or interlocutory nature."  And second, "the action must be one by which 'rights or

obligations have been determined,' or from which 'legal consequences will flow.'"  Bennet v.

Spear, 520 U.S. 154, 177-178 (1997) (citations omitted).  Central to a determination of APA

finality is whether the agency action has "direct consequences" and is "binding."  Id. at 178

(citing and distinguishing Franklin v. Massachusetts, 505 U.S. 788, 798 (1992) (not final agency

action because it was a tentative recommendation without direct consequences) and Dalton v.

Specter, 511 U.S. 462, 478 (1994)).

The LONO process is binding. Parties that wish to import list 1 chemicals must request a LONO and must follow DEA's LONO process. That process is not tentative or interlocutory but has been established by DEA for some time. Failure to abide by the LONO process has direct legal consequences. A party cannot lawfully import its shipment from LONO-participating countries into the U.S. Moreover, a party that has received a denial of its LONO request cannot lawfully import its shipment. Thus, direct legal and financial consequences flow from the LONO process. It is a final agency action.

Defendants obfuscate the issues. Novelty does not seek a rule concerning what constitutes a risk of diversion. Defendants' Motion at 14. Novelty contends that the process DEA imposes on importers, requesting a LONO and appealing a LONO denial in order to receive a notice of suspension, is an agency action that has immediate legal and financial consequences, ones that the regulated class cannot lawfully be forced to bear without notice and comment rulemaking in compliance with the APA.

The risk of diversion analysis that DEA applies in that LONO process is not at issue in the first cause of action in the original complaint. The action that Novelty challenges is, for purposes of the APA, a legislative rule adopted without notice and comment in violation of the APA.[9]

Defendants argue that the "LONO process is simply a procedural part of the risk of diversion decision made under section 971." That is incorrect. Section 971 is merely a notice requirement. Under section 971 if DEA decides to take affirmative action and prohibit a

---

[9] Ironically Defendants argue that lack of finality is further supported by the lack of an agency record concerning the matters in the complaint. Defendants' Motion at 16, n.5. Novelty's first claim is that the rule at issue, the LONO process required to be followed, should have been promulgated by notice and comment rulemaking. If it had then there would be an administrative record. Since it was not, there is no administrative record. Novelty's second claim is that there is an arbitrary and capricious, de facto rule against convenience store product importation (also not promulgated by notice and comment). Finally, Novelty's newly added cause of action concerns DEA's refusal to grant Novelty a hearing, a hearing that would create an administrative record.

shipment it must issue a notice of suspension which informs parties (at the time of the suspension) of the facts and legal bases for the conclusion that there is a risk of diversion. Tellingly, all regulations in connection with section 971 were promulgated by notice and comment rulemaking. 21 U.S.C. Part 1313. By contrast, the LONO process that DEA has created delays the 971 notification but is not the product of notice and comment rulemaking. Indeed, that process functionally suspends the notification, sometimes (as in the case of regulatees who are non-importers like Novelty) indefinitely. If an importer fails to affirmatively challenge the LONO denial, then the LONO request is automatically withdrawn and the importer and all other adversely affected regulatees are left without ever knowing the substantive reason why DEA opposed importation.

DEA's policy of prohibiting importation for all convenience store sales, the substance of Novelty's second cause of action in the complaint, is arbitrary and capricious agency action. While Novelty challenges the qualifications, accuracy and scope of the Meador affidavit submitted to support Defendants' Motion (See Novelty's Statement at 1), the Meador affidavit's extensive discussion concerning convenience stores plainly reveals that DEA does indeed have a de facto rule in place that, without the benefit of credible proof, deems all convenience store sales of list 1 chemical products at risk of diversion and, thus, prohibited. For example, instead of assessing Novelty's actual distribution system (or, for that matter, any specific germane facts), Meador based his decision of likely diversion solely on the existence of convenience store sales (along with his false charge of criminal sale in Kentucky and Tennessee). Novelty's Statement at 1-2 and 16-22 (Response to Defendants' Statement at 12). See discussion supra at 13. DEA has, in Defendants' words (p.15), "adopted a *de facto* rule refusing to issue LONOs for importers that sell to convenience stores" and that action is a decidedly final rule under the APA subject to

review by this Court.  Defendants assert that before their rule can be challenged, Novelty must identify a "discrete, concrete agency action that it is challenging."  Id.  Novelty has done that.  It is challenging the "*de facto* rule."  That rule is a prejudicial, unthinking, knee-jerk denial of all list 1 chemical imports for OTC convenience store sale and is in and of itself a final agency action.  The fact that in individual cases regulated parties could appeal the denials ignores the definitive nature of the denial in the first instance.  But for the denial, import would proceed unencumbered.  Denial is a discrete and determinative legal action that affects a party's rights and establishes legal obligations.  The Defendants' argument to the contrary presumes the denial to have no significance when it is abundantly clear that it does; clear indeed to the Courts.  See PDK Labs, 134 F.Supp.2d at 29-30.

Defendants ask this court to ignore the controlling PDK District Court 2001 decision, arguing ambiguously that two subsequent decisions "erode the basis of the district court's approach."  Defendants' Motion at 19.  The first decision, PDK on appeal, concerns other aspects of the case.  Undaunted, Defendants argue that the absence of an appellate court ruling on unchallenged subject matter jurisdiction has legal significance--contributes to "erosion" of the PDK District Court decision.  The argument is specious.  It ignores the fact that the appellate court's decision directly recount's the district court's holding, ordering DEA to hold a hearing for the manufacturer.  That acknowledgment, without criticism of the district court's subject matter jurisdiction, cannot logically be viewed as "eroding" the district court's decision.  The second decision that supposedly "erodes" the PDK 2001 decision is a 2006 district court case, Doe v. Gonzalez, 2006 U.S. Dist. LEXIS 44402 (D.D.C. June 29, 2006), but Doe is inapposite.  That court's decision rested on the fact that it was "clear that Plaintiff's claims arise under the Controlled Substances Act . . . , *see, e. g.*, Pl.'s Reply at 11, 12, 13, 15, as Plaintiff is challenging

the DEA's decision that the product it seeks to import is properly classified as a Schedule I - rather than Schedule III - controlled substance." Id. at 55. In this case, Novelty's claims do not arise under the CSA. The agency actions at issue were not taken under the authority of the CSA. DEA has acted independently of its CSA authority (1) implementing a process that creates legal obligations and imposes consequences on regulatees without a rulemaking; (2) implementing a policy of enforcement that is arbitrary and capricious; and (3) refusing to permit Novelty to avail itself of its independent due process right to a hearing. All of the precedent cited by Doe for its decision to refuse district court subject matter jurisdiction mimic Doe's factual basis for liability, arising from a specific grant or denial of license or registration under the CSA, id. at 57-58, unlike Novelty's case before this Court which is challenging denial of Novelty's rights, DEA's refusal to abide by the APA's limitations on its power, and DEA's arbitrary and capricious enforcement policy. Thus, Doe is inapposite.

Defendants refer to Novelty's November 2, 2006 letter as "a pending request to participate in the Spirit matter." It is not. It is a request for a hearing for Novelty and Novelty alone. Defendants' failure to respond to that request for the three months prior to the filing of this complaint and the two and half months prior to the filing of its Motion cannot reasonably be called a "pending" response. It is (in the context of an imminent and urgent import demand and a statutory provision requiring action within15 days, 21 U.S.C. § 971) a *de facto* denial. E.g., Barry v. Barichi, 443 U.S. 55, 66 (1979).

The disingenuous *post hoc* characterization of the letter by Defendants as "pending" is belied further by Defendants' statements in their motion that Novelty has no independent right to appeal the LONO denial but must seek leave to intervene in the administrative action if and only if Spirit first chooses to appeal. Defendants' Motion at 21. Having considered Spirit to have

waived its right to appeal for failing to respond to the October 10, 2006 letter denying the

LONO, having ignored Novelty's November 2, 2006 letter until faced with this litigation,

Defendants have now manufactured a "pending agency action" argument.  Stating that it was

acting "out of an abundance of caution" (caution that comes <u>six</u> <u>months</u> after its original letter

rejecting Spirit and Novelty's LONO request and after Novelty filed suit) Defendants gave Spirit

a five day window of opportunity to state for *a second time* whether it wished to appeal the

denial.  Exhibit 2's Attachment E; see also Defendants' Motion at 20-21.  If Spirit fails to

respond (which it has) to that April 10th letter in that five day window then DEA says it will issue

the notice of suspension.  <u>Id.</u>  DEA has not issued the notice of suspension.  These frenzied acts

of procedural leger-demain are but transparent attempts by DEA to skirt the legal obligation

imposed on it by this Court and the Court of Appeals in <u>PDK</u>.  DEA should be required to end its

contumacious disregard for the Fifth Amendment right of Due Process and accept its

constitutional duty to grant regulatees like Novelty a timely and independent hearing on the

merits.

Novelty's two causes of action in its amended complaint allege violations of the Due

Process clause and the APA arising from Defendants statements in their Motion (p. 21) limiting

Novelty to "petition[ing] the Administrative Law Judge for the opportunity to participate [if

Spirit actually wants to pursue the importation and the agency holds a formal hearing pursuant to

section 971(c)(2)]."  Directly contrary to the prudential and Article III standing found in <u>PDK v.</u>

<u>Reno</u> in the District Court and reiterated by the Court of Appeals in <u>PDK Labs v. DEA</u>, 362 F.3d

786, 794 (D.C.Cir. 2004), DEA is denying Novelty an independent right to a hearing.  DEA has

made that position quite clear, meeting the finality requirements for this court to have subject

matter jurisdiction.[10]

## B.    DEA'S LONO PROCEDURE CONSTITUTES A LEGISLATIVE RULE THAT HAS BEEN IMPOSED IN VIOLATION OF THE APA WITHOUT NOTICE AND COMMENT RULEMAKING

DEA's LONO procedure is a legislative rule because it amends and supplements the §

971 procedure, adding the legal obligation that the regulated party not merely notify DEA of an

import but request and receive a LONO prior to import.  Importation in the face of a LONO

denial is an illegal act.  Exhibit 2's Attachment C; PDK, 134 F.Supp.2d at 27-28.  In addition, the

LONO denial does not tell the regulated party the particular facts and circumstances for DEA's

refusal to permit import.  By contrast, under section 971(c) if a party's shipment was suspended

by DEA then the party would immediately receive a notice of suspension that provides the

justificatory facts and circumstances for the denial.  Under the LONO process, the party, upon

receipt of the LONO denial, must take further affirmative steps to pursue the importation or face

an administrative withdrawal of the action by default.  Only after that additional affirmative

steps, made without knowing the specific reasons for the denial, will the party receive, after

further delay, the notice of suspension.  In fact, unlike section 971 which requires the notice of

suspension within 15 days prior to scheduled importation, there is no specific time within which

a party whose LONO request has been denied can expect to receive a notice of suspension from

DEA.  Exhibit 2's Attachment C.  Thus, the LONO process violates the Section 971 time limits

on action, replacing a 15 day pre-import action deadline with no deadline at all, an indefinite cue.

---

[10] Defendants' statements in its motion are sufficient to create a reviewable agency action even if finality is not present.  "Review of nonfinal agency action is available in 'the most exceptional circumstances,'" and the "classic and oft-quoted formulation" of that standard comes from Judge Leventhal in Ass'n of Nat'l Advertisers, Inc. v. Fed. Trade Comm'n, 627 F.2d 1151, 1180 (D.C. Cir. 1981), stating that a federal court may take jurisdiction before final agency action in a case of "clear right," such as "outright violation of a clear statutory provision" or "violation of basic rights established by a structural flaw, and not requiring in any way a consideration of interrelated aspects of the merits."  Ticor Title Ins. Co. v. Fed. Trade Comm'n, 814 F.2d 731, 749 (D.C. Cir. 1987) (Williams, J., concurring); see also, Doe, at 38, n.5..

Legislative rules, which are also called "binding" or "substantive" rules, require notice and comment pursuant to the Administrative Procedure Act (APA), 5 U.S.C. § 553.  <u>See</u> 5 U.S.C. § 553 (2006); <u>see also</u> <u>U.S. Telecom Ass'n v. FCC</u>, 400 F.3d 29, 34 (D.C. Cir. 2005)(challenged order was legislative rule but since there was notice and comment on similar proposal the error was harmless).  Section 553(b) provides limited exceptions to the notice and comment requirement for "(1) interpretive rules, (2) general statements of policy or (3) rules of agency organization, procedure, or practice."[11]  5 U.S.C. § 553(b) (numbering added).  "[A]ll exceptions to the notice and comment requirement [are] to be narrowly construed and only 'reluctantly countenanced.'"  <u>Amer. Fed. Gov. Employees v. Block,</u> 655 F.2d 1153, 1156 (D.C.Cir. 1981)(emergency regulations were reasonable but must be followed by detailed regulations promulgated through notice and comment).

A rule is legislative if it has the "force of law" or "legal effect."  <u>See e.g., Chamber of Commerce of the U.S. v. OSHA</u>, 636 F.2d 464, 468 (D.D.C.1980)(rule was legislative because issued pursuant to legislatively delegated power to have the force of law); <u>Nat'l Family Planning and Reprod. Health Ass'n. .v. Sullivan</u>, 979 F.2d 227, 236 (D.C.Cir. 1992)(implementation of statute by binding regulations that substantially amend and in part repudiate original regulation must be created by notice and comment).  Exercises of power that amend existing legislative rules or supplement statutory law, rather than construe statutes, are legislative rules that have legal force.  <u>See</u> <u>U.S. Telecom Ass'n</u>, 400 F.3d at 35-36; <u>Appalachian Power Co. v. EPA</u>, 208 F.3d 1015, 1024 (D.C.Cir. 2000); <u>Nat'l Family Planning & Reprod. Health Ass'n</u>, 979 F.2d at 235; <u>American Hosp. Ass'n v. Bowen</u>, 834 F.2d 1037, 1049-1050 (D.C. Cir. 1987) (manual

---

[11] Section 553(b) provides another exception, which is not applicable here.  The additional exception applies "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefore in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b) (parenthetical present in original).

providing procedures for Peer Review Organizations were "not interpretations of any explicit statutory provisions," and "[did] not merely elucidate HHS's official position") (internal citations omitted); Pickus v. United States Bd. of Parole, 507 F.2d 1107, 113 (D.C. Cir. 1974) ("[Parole eligibility guidelines] are not interpretations of a statute's meaning. Rather they are self imposed controls over the manner and circumstances in which the agency will exercise its plenary power"); Citizens to Save Spencer County, 600 F.2d 844, 237 (1979) ("by no stretch of the imagination could [the rules at issue] be derived by mere 'interpretation' of the instructions of Congress").

In Appalachian Power Co., 208 F.3d 1015, industry members challenged a Guidance that EPA claimed merely interpreted an existing Clean Air Act regulation. The federal regulation, 40 C.F.R. § 70.6, which EPA claimed to interpret, imposed certain periodic monitoring requirements on industry *only if* applicable State or federal standards either provided no testing requirements or provided only an annual testing requirement. Appalachian Power Co., 208 F.3d at 1017-1020, 1024-1025. The Guidance, however, directed States to require periodic testing whenever an applicable standard's testing requirements "do[] not provide the necessary assurance of compliance." Id. at 1025 (internal citations omitted). The Court held "there is no doubt that [the original rule] is much narrower than the Guidance issued." Id. The EPA Guidance was a legislative rule because it broadened the scope of an existing federal regulation. Id. at 1028 ("In sum, we are convinced that the elements of the Guidance—those elements petitioners challenge—significantly broadened the 1992 rule. The more expansive reading of the rule, unveiled in the Guidance, cannot stand").

In this case, the LONO procedure, likewise, is a legislative rule because it significantly broadens the scope of 21 U.S.C. § 971 and 21 C.F.R. Part 1313. Section 971 and the part 1313

regulations provide DEA only one remedy against shippers if DEA determines shipments "may be diverted to the clandestine manufacture of a controlled substance."  21 U.S.C. § 971(c)(1) (2006); see also 21 C.F.R. § 1313.41(a) (2006).  Under section 971 and the part 1313 regulations, DEA may, within 15 days, issue a notice of suspension of importation and provide a hearing.  Id.  The LONO procedure and criteria effectively suspend shipments deemed by DEA to be at risk of diversion and delay, perhaps indefinitely, the hearing that is to follow the section 971 notice.  The LONO procedure and criteria dispense with the statute's required notice, hearing, and prescribed time limits, each of which provides procedural protections for regulatees.  DEA significantly broadens its power by expanding the terms of section 971 and the part 1313 regulations.

There is no doubt that section 971 and the part 1313 regulations are much narrower than DEA's LONO procedure and criteria.  The LONO procedure is so broad that DEA even admits that the procedure cannot be considered explicitly authorized by section 971 or any other statute or regulation.  PDK Labs v. Ashcroft, 388 F. Supp. 2d 1, 4 (2004) ("DEA maintains that the LONO process is standardized and consistent with law but concedes that it is not explicitly authorized in any statute or regulation").  The "more expansive reading" of section 971 and the part 1313 regulations "cannot stand."  Appalachian Power Co., 208 F.3d at 1028; cf. U.S. ex rel. Bilokumsky v. Tod, 263 U.S. 149, 155 (1923) (agencies are bound by existing legislation until such legislation is amended or revoked; "[i]t may be assumed that one under investigation of deportation is legally entitled to insist upon the observance of rules promulgated by the Secretary pursuant to law").

Rules that substantially amend existing laws and regulations are legislative rules.  See Nat'l Family Planning & Reprod. Health Ass'n, 979 F.2d at 240 ("In sum, the Directives do not

simply explain or clarify the 1988 regulation or confirm requirements under that regulation. Instead, based on new concerns . . .HHS is substantially amending . . . its original regulation"); see also Appalachian Power Co., 208 F.3d at 1026 (citing Clean Air Implementation Project v. EPA, 150 F.3d 1200. 1203-1204 (D.C. Cir. 1998) ("One would suppose . . . that if federal regulations proved inadequate for one reason or another, [the relevant agency] would have to conduct a rulemaking to amend them")).

"It is well-established that an agency may not escape the notice and comment requirements by . . . labeling a major substantive *legal addition* to a rule a mere interpretation." Appalachian Power Co., 208 F.3d at 1024 (emphasis added)(citing Paralyzed Veterans v. D.C. Arena, 117 F.3d 579, 588 (D.C. Cir. 1997)). "A rule is legislative if it attempts 'to *supplement* [a statute], not simply to construe it.'" Nat'l Family Planning & Reprod. Health Ass'n, 979 F.2d at 235 (emphasis added) (citations omitted). "[F]idelity to the rulemaking requirements of the APA bars courts from permitting agencies to avoid those requirements by calling a substantive regulatory change an interpretive rule." U.S. Telecom Ass'n, 400 F.3d at 35. "[A]n amendment to a legislative rule must itself be a legislative rule." Sprint Corp. v. FCC, 315 F.3d 369, 374 (D.C. Cir 2003); see also Nat'l Family Planning & Reprod. Health Ass'n, 979 F.2d at 235.

As stated above, "any claim of exemption from APA rulemaking requirements 'will be narrowly construed and only reluctantly countenanced." American Federation of Government Emp., 655 F.2d at 1156 (citations omitted).  Section 553(a)(1) of the APA exempts foreign affairs from the notice and comment requirements.  That section is not, however, the blank check that Defendants claim it to be.  "The exception applies 'only to the extent that the excepted subject matter is clearly and directly involved' in a 'foreign affairs function.'" Mast Industries, Inc. v. Regan, 596 F.Supp. 1567, 231 (1984) (citing Legislative History at 275 (House Report)).

The periodic bilateral agreements entered into by DEA cannot infringe the constitutional rights of American citizens, cannot violate DEA's governing statute, and cannot violate the APA's limits on agency discretion. Moreover, DEA's agreement with foreign countries does not displace DEA's statutory obligation in section 971 to issue a notice of suspension within 15 days of receipt of the form 486, stating the justificatory facts and circumstances for the denial. That is the due process required to protect the substantive rights at stake. "The 'Executive's power to conduct foreign relations free from the unwarranted supervision of the Judiciary cannot give the Executive carte blanche to trample the…property rights of this country's citizenry.'" Ramirez de Arellano, 745 F.2d at 1515.

The effects on regulated entities are not dispositive of whether a rule is legislative or interpretive. Cent. Tex. Tel. Coop., 402 F.3d 205, 214 (D.C.Cir. 2005)(conduct-altering effects are not dispositive; "substantial effects" is no longer the test in D.C.). However, courts nonetheless consider rules' effects. See e.g., Appalachian Power Co., 208 F.3d at 1028. In addition to violating Novelty's § 971 rights, DEA's extra-legislative LONO procedure and criteria impose significant costs by delaying Novelty's ability to manufacture Novelty's OTC cold and cough remedies for sale. See Appalachian Power Co., 208 F.3d at 1028 ("In addition [to expanding obligations], monitoring [which may result from the expanded obligations] impose costs. Petitioners represent that a single stack test can 'cost tens of thousands of dollars, and take a day or more to complete . . . no one could seriously maintain that this was something other than a substantive change'"). Normally, the distribution of OTC pharmaceuticals, including ephedrine products, accounts for approximately 10% to 15% of Novelty's annual revenue. Novelty's Statement at ¶10. Thus, preventing Novelty's ability to sell its list 1 chemical

products imposes significant costs on the company and alters its business to the company's competitive detriment.  See id. at ¶¶11-14.

For the foregoing reasons, Defendants' motion for summary judgment on this cause of action should be denied, and Novelty's cross-motion for summary judgment granted.

## C.    DEA'S DE FACTO LEGISLATIVE RULE AGAINST CONVENIENCE STORE SALES HAS BEEN IMPOSED IN VIOLATION OF THE APA WITHOUT NOTICE AND COMMENT RULEMAKING

In his affidavit, Meador makes clear that DEA finds two principal grounds for denying the LONO: (1) the intention to sell the list 1 chemicals in OTC convenience stores and (2) his erroneous and false charges of illegal sale in Kentucky and Tennessee and of grey marketing. Meador Affidavit at ¶17.  The first of these constitutes an admission that DEA has in place a de facto rule against convenience store sale of OTC list 1 chemicals.  That rule has legal force and effect, determines the rights, and creates obligations for all regulatees who seek to import ephedrine for OTC convenience store sale; as such, it is a legislative rule.  See Am. Mining Cong., 995 F.2d at 1109.  DEA's action  is not statutory construction but, rather, statutory supplementation.  The CSA makes no distinction among regulatees for purposes of diversion analysis.  U.S. Telecom Ass'n, 400 F.3d at 35-36; see also 21 U.S.C. § 971.  As a legislative rule, the de facto rule against convenience store sale is unlawful and unenforceable because it has not been adopted pursuant to notice and comment rulemaking in accordance with the APA.  See U.S. Telecom Ass'n, 400 F.3d at 34.  Consequently, this Court should declare the rule null and void.  See 5 U.S.C. § 553.

**D.     DEA'S DENIAL OF NOVELTY'S INDEPENDENT RIGHT TO A HEARING UNDER SECTION 971 VIOLATES THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT**

Denying Novelty's independent right to hearing is a violation of Novelty's liberty and property interests under the Due Process Clause of the Fifth Amendment.  The D.C. Circuit's decision in PDK Laboratories Inc., 362 F.3d at 791-794 is controlling precedent.  Defendants tempt fate by ignoring that precedent.  Defendants argue that only if Spirit, Novelty's contract importer, appeals the LONO denial and pursues an administrative hearing, can Novelty "seek leave" (no mention of intervention of right is made) to intervene in that hearing.  Defendants' Motion at 21.  Thus Defendants do not recognize what PDK ordered them to implement, the right, not subject to discretion or dependent on leave, of a non-importer regulatee to an independent hearing on the merits.  The Circuit Court's decision directly addresses the right of a non-importer that is injured by a denial having the right to appeal the denial.  362 F.3d at 791-794.  The PDK District Court decision finding in favor of the plaintiff on its motion for preliminary injunction (predating the Circuit Court decision) is also controlling precedent on this issue.  See 134 F.Supp.2d 24.

To succeed in a due process claim Novelty must show (1) it has a protected interest; (2) the government deprived it of that interest; and (3) the deprivation occurred without proper procedural protections.  Industrial Equipment Ass'n Inc. v. EPA, 837 F.2d 1115 (D.C.Cir. 1988).  As a manufacturer PDK had a recognized liberty interest in "avoiding the damage to its reputation and business caused by a stigmatizing suspension" and that interest was harmed when PDK was "labeled not worthy of being trusted with common chemicals" and when PDK was "largely precluded from pursuing its core business activities."  Novelty is a distributor that sells

to convenience stores nationwide.  Sale of its list 1 chemical containing products comprises 10-15% of Novelty's annual revenue.  Like PDK, Novelty has a liberty interest in avoiding damage to its reputation as a trusted and reliable source of cough and cold remedies containing list 1 chemicals that will result from the stigmatizing suspension DEA creates by its effective import ban.  That interest is harmed when DEA deems Novelty not worthy of being trusted with convenience store distribution of the list 1 chemicals.  The distribution of those chemicals through Novelty's closed system of distribution is a core business activity of Novelty.  Novelty's Statement at ¶¶2, 10.  DEA's denial of the LONO effectively precludes Novelty from pursuing that core business activity.  Id. at ¶¶11-12.

Novelty's business reputation would suffer the stigmatizing effects of being labeled "not worthy of being trusted" with list 1 chemicals, and Novelty would be largely precluded from obtaining 10-15% of its revenue if DEA succeeds in preventing Novelty from importing the list 1 chemicals.  Novelty Statement at ¶¶10-14.  That loss of revenue will force Novelty to lay-off 25-50 employees, end certain employee benefits, and alter its closed system of distribution.  Procedural protections to guard against those effects are available in section 971.  DEA has denied Novelty the independent right to those procedural protections (Defendants' Motion at 21) despite the fact that all of the alleged facts upon which DEA has denied the LONO request solely concern Novelty, not its importer Spirit.

In PDK the court did not find a property interest because section 971 granted discretion to restrict importation so there was no per se entitlement to the import chemicals.  134 F.Supp. 2d at 32-33.  That discretion, however, arises when DEA has "grounds to believe that a shipment may be diverted."  Id. at 33.  If there are no credible grounds to believe that a shipment may be diverted then DEA has no discretion to deny the importation.  Despite the assumptions and

erroneous conclusions in the Meador Affidavit (¶¶17-18), Novelty has shown in its Statement

that there are no credible grounds to suspect that Novelty's shipment may be diverted.  See

Novelty Statement ¶¶15-20, 23-30; see also Exhibit 1; see Exhibit 2 at ¶¶ 7-68.  Thus, unlike the

PDK case, Novelty has a cognizable property interest in the list 1 chemicals.  Novelty's property

interest is being denied without the proper procedural protections of section 971.  Novelty,

therefore, has shown, that its Fifth Amendment right to due process has been violated, that it is

entitled to a hearing under section 971, and that its cross-motion for summary judgment on this

cause of action should be granted.

## D.    DEA'S DENIAL OF NOVELTY'S INDEPENDENT RIGHT TO A HEARING UNDER SECTION 971 AND ITS DE FACTO RULE AGAINST CONVENIENCE STORE ASSOCIATED IMPORTS LACK SUBSTANTIAL EVIDENCE AND ARE ARBITRARY AND CAPRICIOUS AGENCY ACTION

Defendants' denial of Novelty's right to a hearing and its refusal to recognize Novelty's

standing to pursue denial of the LONO for its shipment of List 1 chemicals are arbitrary and

capricious agency actions in violation of the APA, 5 U.S.C. § 706.  In addition, DEA's de facto

rule against import of Ephedrine destined for OTC convenience store sale is arbitrary and

capricious and is not based on substantial evidence.

The scope of review under the "arbitrary and capricious" standard is narrow and a court is

not to substitute its judgment for that of the agency.  Motor Vehicle Manufacturers Ass'n v. State

Farm, 463 U.S. 29, 42-43 (1983)(agency presented an inadequate basis and explanation).

Nevertheless, the agency is legally obliged to examine the relevant data and articulate a

satisfactory explanation for its action including a "rational connection between the facts found

and the choice made." Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168

(1962)(agency made no findings and no analysis to justify the choice made thus there was no

indication of the basis for decision). In reviewing that explanation, courts must "consider

whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285 (1974)(agency order not arbitrary and capricious); Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971)(judicial review on agency litigation affidavits was inadequate although formal findings by agency are not required).  "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the rule] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." State Farm, 463 U.S. at 43.  The reviewing court should not attempt to make up for such deficiencies; it may not supply a reasoned basis for the agency's action that the agency itself has not given. SEC v. Chenery Corp., 332 U.S. 194, 196 (1947)(agency action was based on substantial evidence and was consistent with Congressionally granted authority).  Moreover, *post hoc* rationalizations to justify agency action are prohibited in an agency review action.  Citizens to Preserve Overton Park, 401 U.S. at 419.

In Novelty's case, DEA failed to take any action on Novelty's November 2, 2006 letter.  In Defendants' Motion, without explanation for their position or provision of supporting legal authority, Defendants stated that Novelty could only seek to intervene in a hearing if Spirit chose to pursue one.  That position is arbitrary and capricious, irrational and contrary to section 971 and in violation of Novelty's Fifth Amendment right to due process.

In addition, DEA has created, and applies, a series of assumptions of illegality against all regulatees who supply list 1 OTC products to convenience stores.  Meador Affidavit at ¶¶12-14.  Those assumptions do not apply to Novelty and are based on incomplete, out-dated or

misleading information about the convenience store industry (particular concerning its legitimate sales of OTC products). Novelty's Response to Defendants' Statement at ¶4 (Novelty's Statement at page 14). The Combat Methamphetamine Epidemic Act of 2005 applies documentation and other restrictions to all retailers, regardless of type. See Pub. L. No. 109-177 (Mar 9, 2006), 120 Stat. 256 et seq.; ("the term 'regulated seller' means a retail distributor (including a pharmacy or a mobile retail vendor), except that such term does not include an employee or agent of such distributor")(21 U.S.C. § 802(46)). A seller's adherence to the Act's requirements are designed to eliminate the risk of diversion. DEA's categorical prohibition on Ephedrine imports by all regulatees who intend the product for ultimate sale OTC through convenience stores is an irrational, one-size fits all prejudice that treats pillars of closed-system, secure distribution, like Novelty, in precisely the same manner as "smurfers." Meador Affidavit at ¶14. That irrational categorical condemnation of all regulatees is wholly arbitrary and capricious and not based on substantial evidence. It must therefore be declared null and void under the APA. See 5 U.S.C. § 706.

# V.     CONCLUSION

For the foregoing reasons, Novelty respectfully requests that this Honorable Court deny Defendants' motion in its entirety and grant Novelty's cross-motion for summary judgment. In particular, Novelty requests (1) a declaratory judgment that (a) DEA has violated the Fifth Amendment Due Process Clause and the APA, 5 U.S.C. § 706, by denying Novelty an independent hearing before DEA on DEA's rejection of a LONO for Novelty's ephedrine shipment; (b) DEA has violated the APA, 553, by imposing its LONO procedure for ephedrine imports without notice and comment rulemaking; and (c) DEA has violated the APA, 5 U.S.C. §§ 553 and 706, by imposing an arbitrary and capricious de facto legislative rule prohibiting LONOs for ephedrine shipments destined for OTC sale in convenience stores without notice and comment rulemaking and without substantial evidence to support its prohibition.  Novelty seeks (2) an order (a) compelling DEA to hold a hearing for Novelty on DEA's LONO denial and (b) holding DEA's LONO procedure and its de facto legislative rule against ephedrine import when destined for OTC sale in convenience stores unlawful, null, and void until such time as DEA has adopted formal rules on both matters following notice and comment rulemaking in accordance with the APA, 5 U.S.C. § 553.

Respectfully submitted,

NOVELTY, INC.,


_____/s/_____

By:     Jonathan W. Emord (DC Bar 407414)
        Andrea G. Ferrenz (DC Bar 460512)
        Attorneys for Plaintiff

Emord & Associates, P.C.
11808 Wolf Run Lane
Reston, VA 20191
Phone: (202) 466-6937
Fax: (202) 466-6938
jemord@emord.com

Date submitted:     May 23, 2007

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NOVELTY, INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 1:07-cv-00191-RMU** |
| | ) | |
| KAREN TANDY, Administrator, | ) | |
| U.S. Drug Enforcement Administration, | ) | |
| et al., | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S STATEMENT OF UNCONTESTED MATERIAL FACTS AND
RESPONSE TO DEFENDANTS' STATEMENT OF
UNCONTESTED MATERIAL FACTS**

Plaintiff, by counsel and pursuant to Federal Rule of Civil Procedure (Fed.R.Civ.P.) 56 and Local Rule 7(h), hereby submits its statement of material facts as to which there is no genuine issue.  It also submits its Response to Defendants' statement, revealing that statement to contain false statements, including an entirely false and perjurious accusation that Plaintiff has violated the criminal laws of two states.  See Defendants' Statement Exhibit A, Meador Affidavit at ¶ 17.  The Defendants' Statement also violates Fed.R.Civ.P. 56(e) by intermixing legal argument with factual recitation.

Defendants rely principally upon an affidavit from DEA employee Darrell Meador.  See Defendants Statement at ¶1, 3, 4, 6-16.  That affidavit represents under penalty of perjury that Plaintiff sells list 1 chemicals in a form that violates the criminal laws of Kentucky and Tennessee.  The charge, said to be the product of an "investigation," is utterly and completely fabricated.  Compare Meador Affidavit at ¶13, 14, and 17 to Novelty's Statement below at ¶¶ 27-29 and Response to Defendants' Statement below at ¶¶4, 10, 12.  The false charge of criminality comes amidst additional misrepresentations in the same affidavit at ¶ 14.  There Meador links

Plaintiff to activities that increase the risk of diversion to the illicit methamphetamine trade when not a one of the activities listed are engaged in by Plaintiff. Compare Meador Affidavit at ¶¶ 13, 14 to Novelty's Statement Below at ¶¶24-26 and Plaintiff's Exhibit 2 at ¶¶17, 18. Indeed, the linkage misleads exceedingly because Plaintiff maintains a model anti-diversion program replete with, inter alia, a closed system of distribution; employees specially trained to prevent diversion; purchasers screened to ensure lawful sale; and a close, high-tech monitoring of product from the point of manufacture to the point of sale. Those extensive controls and checks surpass every known legal requirement and have prevent any of Plaintiff's list 1 products from being found in the illicit manufacture of methamphetamines. See below, Novelty's Statement at ¶¶15-20, 23.

Defendants use the Meador Affidavit not only as support for certain falsefactual allegations (see id at ¶4, 9-16) but also, improperly, in violation of Federal Rule of Civil Procedure 56(e), to present legal argument and interpretations of law (see id at ¶1, 3, 4, 6-8). It also contains incompetent (for one not a lawyer) constructions of national and international law from one not qualified as a legal expert. See id. at ¶1, 3,4, 6-8.

Defendants have made certain factual allegations concerning evidence they allegedly have in their possession (see id. at ¶17) concerning Novelty but have not supplied that evidence in their motion, thereby denying Plaintiff and the Court an opportunity to inspect the documents to determine whether Defendants' characterizations of them are accurate—the need for which is even more profound in light of the false and misleading representations in the Meador affidavit.

In their statement of uncontested material facts and in their Meador affidavit, Defendants have alleged facts concerning perceived generalized risks of diversion that they then attribute to Novelty without apparent cognizance of Novelty's closed system of distribution and extensive security measures that guard against diversion. Compare Meador Affidavit at ¶¶13, 14 to

Novelty's Statement at ¶¶15-20, 23-26.  Those alleged facts are the only bases Defendants offer for the LONO denial.  They thus reveal the denial to be predicated on a series of falsehoods and false assumptions (making it abundantly clear that DEA's LONO review, at least in Novelty's case, is incompetent and shallow dependent not upon an objective investigation of relevant facts but but on prejudicial stereotyping of an entire class of business).

The facts reveal Novelty, not its importer Spirit Pharmaceuticals LLC, to be the real party in interest.  See PDK Labs, Inc. v. Reno, 134 F.Supp.2d 24, 31 (2001) (court granted manufacturer, not importer, standing to pursue LONO denial because manufacturer was the intended beneficiary and DEA's objection to the import related to alleged problems with the manufacturer, not the importer); see also PDK Labs v. DEA, 362 F.3d 786, 792 (D.C.Cir. 2004). Under the governing law of this circuit, plainly not followed by DEA, Novelty has an independent Due Process right to a DEA hearing on the merits to rebut those allegations of fact following the issuance of a notice of suspension pursuant to 21 U.S.C. § 971.  To the extent that Defendants seek to use this action to charge Novelty with a risk of diversion without granting Novelty its right to a hearing on that issue, Defendants have overstepped the bounds of their enabling statute and have violated Novelty's Due Process Rights.

## NOVELTY'S STATEMENT OF UNCONTESTED MATERIAL FACTS

### Novelty Business Overview

1.      Novelty was formed in 1980 by an enterprising high school student, Todd Green. Exhibit 1(Green affidavit) at ¶1-2.

2.      Novelty now sells to approximately 12,000 convenience stores across America 700-800 innovative products annually, responding to popular trends in the consumer marketplace.  Id. at ¶¶4, 7.  Product development is an essential part of Novelty's business.  Id. at

¶4. About 300 of Novelty's products (or "Stock Keeping Units," aka "SKUs") are standard items that are sold for a number of years.  Id.

3.      Novelty has licensing agreements to create and sell merchandise with many of the top internationally branded entertainment and consumer organizations, including, but not limited to, Disney, Chevrolet, Dodge, NBA, Warner, Universal, Miller Brewing, and college sports teams.  Id. at ¶5.

4.      Novelty has built a thriving business that employs approximately 500 people around the world.  Its headquarters is in Greenfield, Indiana with five additional offices, one factory in China, 2 distribution centers in the U.S. .and sales, production development, operations and marketing departments.  Exhibit 1 at ¶5.  An estimated 25 to 50 of these employees will lose their jobs if Novelty is unable to import ephedrine for OTC convenience store sale, and certain employee benefits will also have to be forfeited.  Id. at ¶14.

5.      Novelty has approximately 12,000 customers, each an individual store.  Id. at ¶7. Those stores include large, well-managed convenience store chains such as Circle K, The Pantry, Village Pantry, and Speedway.  Id.

6.      In 1999 Ernst & Young named Novelty's President and Founder Todd Green Entrepreneur of the Year.  Id. ¶8.  Indiana Business Journal named Mr. Green in its "40 under 40" list in 1999.  Id..

**Novelty's Registration**

7.      In approximately 1996 Novelty applied for and received a registration to distribute list 1 chemicals from the DEA.  Id. at ¶9; see also Exhibit 2 (Bledsoe Affidavit) at ¶7.

8.      Every year after 1996 to the present Novelty renewed its registration to distribute List 1 chemicals with DEA.  Id. at ¶8.

9.      Novelty's current registration was awarded on September 20, 2006 and is valid through October 31, 2007.  Id. at ¶9.

### List 1 Chemical Products

10.      Currently the sale of list 1 chemical OTC cough and cold remedies produce 10-15% of Novelty's total annual revenue, i.e., approximately $17 million dollars.  Exhibit 1 at ¶10.

11.      If DEA continues to prevent Novelty from importing ephedrine for its OTC cough and cold remedies, Novelty will be unable to meet the legitimate retail supply needs of its customers.  Id. at ¶11.

12.      If Novelty is unable to satisfy its retail customers' demand for the OTC products, those customers will fill their retail shelves with the List 1 chemical OTC products of Novelty's competitors, causing Novelty to suffer irreparable loss of market share and revenues.  Id. at ¶12.

13.      A loss of up to 15% of Novelty's total revenue will result in significant changes in Novelty's business, likely forcing Novelty to lay-off at least 25-50 employees and, inter alia, to sacrifice certain of its remaining employee benefits.  Id. at ¶13.

14.      A loss of up to 15% of Novelty's total revenue will alter fundamentally Novelty's business by forcing the company to revise its overall product offerings, quantities of product in inventory, distribution methods, and compensation plans because revenues derived from the company's sale of OTC products help sustain each of the foregoing operations.  Id. at ¶14.

### Novelty's List 1 Chemical Sales Policies

15.      Because ephedrine is identified as a List 1 chemical by the Drug Enforcement Administration, Novelty, Inc. enforces a company-wide policy for all employees and associates concerning the handling of ephedrine products.  Exhibit 2 at ¶22.

16.     The policy's formal objective is to ensure that the List 1 chemicals held and distributed by Novelty, Inc. are guarded against risk of diversion at every point along the distribution chain up to, and including, the ultimate consumer sale.  Id. at ¶23.

17.     Novelty, Inc.'s policy mandates that all employees who handle or have access to List 1 products be personally responsible for their actions in compliance.  Each must read and sign Novelty's anti-diversion policy document acknowledging that he or she understands the provisions of the policy and will abide by the policy in its entirety.  Id. at ¶24.

18.     In order to preserve the integrity of the inventory retained at Novelty, Inc.'s warehouses, all warehouse personnel with access to List 1 chemical products are specially trained to guard against diversion risks, must display employee ID badges indicating their specific position and security level (i.e., OTC access authorization), and are subject to a zero tolerance policy for any act of non-compliance.  Id. at ¶25.

19.     Prior to being hired, Novelty, Inc. conducts extensive criminal background checks and performs standard drug testing for all of its personnel, warehouse human resources, and contract drivers.  Id. at ¶26.

20.     Novelty has a meticulously detailed storage, record-keeping, auditing, accounting, and sales procedure and sales limitation policy for all of its List 1 chemical products.  Id. at ¶¶28-58.  It also has extensive security measures to guard against diversion of its List 1 chemical products.  Id. at ¶¶ 59-67.

**Novelty's Customers and Products**

21.     Novelty distributes List 1 products to convenience stores exclusively through use of its own trucks and its own, trained drivers.  It does not sell to distributors.  Id. at ¶11.   It sells directly to the stores and has established relationships with each store.  Id..   Its products are

6

created by a contract manufacturer, AAA Pharmaceuticals, at Novelty's request and under

Novelty's private label.  Novelty transports and sells those products directly to its retail

customers without any middle men, one of the critical elements in its risk reduction program.  Id.

Novelty's manufacture and distribution of its products is a "closed system" that meets all of

DEA's documentation requirements and regulatory limitations to minimize the risk of diversion.

Id..

22.     Novelty's List 1 product customers include many of the nation's largest and most

well-respected store chains such as Circle K, The Pantry, Village Pantry, and Speedway.  Id. at

¶12.

23.     Novelty has _never_ received a DEA Warning Letter advising Novelty that any of

its products have been found in or associated with clandestine manufacturing of illegal

substances.  Id. at ¶13.

24.     Novelty sells List 1 chemical products in some states that limit ephedrine content

to 12.5 mg tablet form, in some states that limit ephedrine content to 25 mg tablet form, in some

states that limit ephedrine content to 12.5 mg gel capsule form, and in some states that limit

ephedrine content to 25 mg gel capsule form.  Id. at ¶14.

25.     Novelty ensures that the ephedrine form and content sold in a state complies with

that state's requirements.  Id. at ¶¶15, 50.

26.     Novelty does not sell its List 1 chemical products, and has never sold those

products, with any "off label" claims (such as for weight loss or staying awake).  Id. at ¶17.

27.     Novelty's products do not pass through multiple layers of distribution.  Novelty

has a closed system of distribution, obtains the finished product from its contract manufacturer,

warehouses the product in its own facilities, and ships the product in its own trucks and under the

care of its own, security trained drivers.  Id. at ¶18.  Novelty's products are not stronger than those found in the traditional market.  Novelty strictly complies with the dosage limitations of state and federal authorities.  Novelty's dosage amounts are the same as those found in products sold in pharmacies, grocery stores, or "big box" stores such as Wal-Mart.  Id.  Novelty has never been notified that its products were found in clandestine lab seizures.  Id.  Novelty's distribution and sales system prevents its customers from purchasing large quantities of chemical products and strictly prohibits its customers from selling large quantities of chemical products to retail customers.  Id.

28.     Some of the stores to which Novelty sells its List 1 chemical products are located in Kentucky and Tennessee.  Id. at ¶19.   Those states allow the <u>tablet</u> <u>form</u> of ephedrine to be sold only in pharmacies.  Id.  The laws of those states permit the gel capsule form of List 1 chemicals to be sold in convenience stores, within dosage limitations.  Id.   Novelty sells only its gel capsule form products in those states, and it does so in strict compliance with the laws of those states.  Id.   The contrary statement made in the affidavit of Darrell Meador attached to the Defendants' Motion to Dismiss or in the alternative for Summary Judgment is utterly false.  Id. From the date Kentucky and Tennessee first adopted laws prohibiting the tablet form of ephedrine to be sold in convenience stores, Novelty has never sold that form in those states.   Id.

29.     Novelty submitted to DEA a customer list at DEA's request.  Id. ¶20.   The list does not distinguish (and was not required to distinguish) which form or dose amount of its List 1 products (tablets versus gel caps and 12.5 mg per dose versus 25 mg per dose) is sold by which customers on that list.  Id.   DEA has never requested that Novelty identify which products are sold by which customers. Id.   All prior customer lists given to DEA when Novelty sought a LONO likewise did not distinguish tablet states from gel capsule states.  Id.   Nonetheless

Novelty has consistently adhered to the legal requirements in each state where its products are sold.  Id.

30.     On or about February 3, 2006, Novelty's Director of Category Management, Mark Bledsoe, spoke with DEA employee Lisa R. Barnhill concerning Novelty's customer list for its List 1 chemical products.  Id. at ¶22.  She asked for an explanation of the stores and chains listed which had locations in states where sales in convenience stores were prohibited or restricted for these products.  Id.  Mr. Bledsoe explained that the list does not identify which product forms are sold to which customers' locations or, in the case of some chains, does not identify individual stores in states where sales by convenience stores are prohibited.  Id. Novelty's sales policies and procedures prevent sales of products in states where those products are prohibited and prevent sales of forms of products in states where they are restricted.  Id.  Mr. Bledsoe informed her of Novelty's policy on List 1 chemicals and sent her a copy of it via email, highlighting the sections describing our weekly monitoring of sales by product by State.  Exhibit 2's Exhibit A.  Consequently, DEA was on direct notice that Novelty did not violate the laws of any state.

### September 25, 2006 Order

31.     On September 25, 2006, Novelty, through its manufacturer AAA Pharmaceutical, Inc. ("AAA"), ordered 2,000 kilograms of ephedrine from its importer Spirit Pharmaceuticals LLC ("Spirit").  Exhibit 2 at ¶69.

32.     Spirit submitted a DEA Form 486 along with the purchase order from AAA and AAA's registration number.  It also identified AAA's customer, Novelty.  It requested a letter of no objection (LONO).  Exhibit 2's Attachment B.

33.     On or about October 10, 2006, Spirit received DEA's letter dated October 10, 2006, rejecting Spirit's request for a letter of no objection (LONO) for the two AAA purchase orders from September 25, 2006.  Bledsoe Exhibit 2's Attachment C.  Spirit faxed that document to AAA.

34.     Upon receipt of a copy of DEA's October 10, 2006 letter from Spirit, Novelty, by counsel, filed with DEA on November 2, 2006 a letter stating its intention to pursue the rejection and seek a hearing.  Exhibit 2's Attachment D.  Novelty appealed both shipments, not realizing that one shipment was for another AAA customer.  Exhibit 2 at .

35.     Novelty first learned that the October 10, 2006 letter from DEA rejecting the LONO request included a shipment to AAA intended for another AAA customer on April 16, 2007.  Id. at ¶¶72-74.

36.     Novelty does not seek to contest the LONO denial for AAA's other customer.  Id. at ¶74.

37.     Novelty's products to be manufactured from its September 25, 2006 Form 486 would restock its tablet product supplies.  Id. at ¶75.

38.     Novelty will not sell the ephedrine intended for tablet production that is the subject of the September 25, 2006 Form 486 to any customer in a state where tablet sales through convenience stores are prohibited.  Id. at ¶76.

39.     Novelty's electronic order filling system does not permit orders to be filled for List 1 chemical forms in dosages or forms in states where those dosages or forms cannot be lawfully sold by convenience stores.  Id. at ¶77.

40.     Novelty does not sell List 1 chemicals to a customer in a state where state law does not permit sale of that form by that customer.  Id. at ¶79.

41.    Spirit received DEA's letter dated April 10, 2006.  Exhibit 2's Attachment E.  In that letter DEA reiterated its rejection of the LONO and gave three options for a response. Novelty informed Spirit that Novelty was pursuing the rejection of the hearing request and asked, in accordance with the letter's options, that Spirit do nothing so that DEA would issue the notice of suspension.  Exhibit 2 at ¶80.

## NOVELTY'S REPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS

1.    Novelty objects to the first sentence of paragraph 1.  No documentation or other evidence is cited in support of it although it purports to be a quote.  Novelty objects to the second sentence because it is a misstatement of fact.  Ephedrine is a precursor chemical for methamphetamine but pseudoephedrine is the most frequently used source for methamphetamine production.  See Arvanitis, J. Asst. Special Agent in Charge, Detroit Division Office, DEA, before the U.S. House of Representatives, April 20, 2004 "Northern Ice: Stopping Methamphetamine Precursor Chemical Smuggling Across the U.S.-Canada Border; Executive Summary" (hereinafter Arvantis 2004 Speech")www.usdoj.gov/dea/pubs/cngrtest/ct042004.html (5/16/2007).  See also 71 Fed. Reg. 61801 (pseudoephedrine, a nasal dilator, is more widely available for legitimate use than ephedrine, a bronchodilator).  Limiting access to "wholesale amounts of pseudoephedrine" is the focus of targeting precursor traffickers.  Arvantis 2004 Speech.  Furthermore, Novelty objects to Meador's affidavit as evidence to support any of the statements in this paragraph.  Mr. Meador is not by education, training, or experience qualified to offer an opinion on the physiological characteristics of methamphetamine.  Moreover, he is not qualified to testify to the manufacturing processes for methamphetamine.

2.      Novelty objects to the inclusion of this statement in the Defendants' statement of uncontested material facts. It is a statement of law. The Chemical Diversion and Trafficking Act's content may be verified by publicly available copies.

3.      Novelty has no objection to the facts alleged in this paragraph. Novelty objects to all legal argument presented because it is forbidden by Fed. R.Civ. P. 56(e). Novelty objects to Meador's testimony being offered as support for the first sentence. That is outside the scope of Meador's personal knowledge, and regulatory policy making is outside the scope of his job description.

4.      Novelty objects to Meador's testimony being offered as evidence for this paragraph. Both statements are a matter of regulatory policy and outside the scope of his job description. He is not qualified to represent all of DEA. Meador's Declaration in paragraphs 10-15 is replete with misleading information and allegations inapplicable to Novelty. All of the cases cited in Meador's affidavit at ¶13-15 concern facts that predate the Combat Methamphetamine Act and its requirements and limitations on the distribution of precursor chemicals. Title VII of Pub. L. 109-177 (amending the Controlled Substances Act)(enacted on March 9, 2006). The extensive anti-diversion controls Novelty has instituted as part of its distribution system exceed all legal requirements. The cases cited by Meador are not reflective of the current risk assessment of retail sales of precursor chemicals. Even if those cases were reflective of current risks, Novelty through its closed, highly regulated distribution system, is distinguishable from each of the parties in the cases, none of which had in place a system of controls remotely comparable to Novelty's. Exhibit 2 at ¶¶17-18, 28-68. Meador's allegation in paragraph 13 of his affidavit is utterly false. Novelty does not market its products for "off-label" uses. Exhibit 2 at ¶17. Meador's allegations in paragraph 14 are likewise false. Novelty's

products are not passed through multiple layers of distribution (id. at ¶18) and are not of greater

dosage strength than those found in the traditional market (id). In addition, Novelty products

have not been found in any clandestine lab seizure in the United States, contrary to the

implication in Meador's paragraph 14. Id. Novelty's rigorous documentation and purchasing

controls that it imposes on its retail customers prevent its retail customers from "knowingly

sell[ing] large quantities of List 1 chemical products," contrary to Meador's allegation in

paragraph 14 of his affidavit. Id. at ¶¶28-68. Paragraph 15 of Meador's affidavit, that law

enforcement seizures and clean ups are dominated by small capacity clandestine labs, is

contradicted by multiple DEA documents. In 2006 DEA Administrator Karen Tandy stated to

the National Methamphetamine Chemicals Initiative Conference that in the past year "mom and

pop" meth labs had been slashed 40% nationally and were expected to continue in a downward

trend "between new state laws and the passage of the Combat Meth Act." See

www.usdoj.gov/dea/speeches/s051806.html (5/17/2007); see also

http://www.usdoj.gov/dea/concern/map_lab_seizures.html (5/18/2007) (maps showing annual

totals of law enforcement meth lab incidents from 1999 to 2006 revealing a precipitous drop in

the total number of incidents in 2005 and 2006 by half of each preceding year's totals). Overall,

Administrator Tandy cited 40% fewer small toxic labs and 87% fewer superlabs in the US and

that DEA lab teams were not only seeking out labs but also "investigating and shutting down the

US meth transportation and distribution cells." Id. The enforcement success in the United States

has caused a shift in illegal manufacturing activity to other countries, Mexico in particular, where

it is then imported as meth into the U.S., according to the testimony of DEA Assistant Special

Agent in Charge, Detroit Division Office John Arvanitis. See

www.usdoj.gov/dea/pubs/cngrtest/ct042004.html (5/16/2007). The contrary proposition in the

Meador affidavit is a position of convenience in this litigation, contradicted by fact and by

above-cited representations of Meador's superiors, including the DEA Administrator.

Moreover, the second sentence in paragraph 4 of Defendants' statement is misleading.

DEA has repeatedly relied on a single statistician's report and testimony, sometimes merely his

declaration, prepared using incomplete data sets and improper analytical methods.  DEA has

relied on that flawed assessment and same witness repeatedly in DEA administrative cases.  E.g.,

In re Branex Inc., 69 Fed. Reg. 8682, 8691 (Feb. 25, 2004)(testimony of Jonathan Robbin); In re

Express Wholesale, 69 Fed. Reg. 62086, 62088 (October 22, 2004)(citing Robbin testimony);

Tri-County Bait Distributors, 71 Fed. Reg. 52160, 52161 (Sept. 1, 2006)(citing Robbin

testimony); D&S Sales, 71 Fed. Reg. 37607, 37609-37610 (June 30, 2006).  Moreover, the

phrase "gray market" is misleading and does not apply to Novelty's closed system of distribution

and reputable, pre-screened (by Novelty) customers.  There is a legitimate purpose and need for

the sale of OTC cough and cold remedies in convenience stores.  See Exhibit 3: Affidavit

Michael Pacin, M.D., concerning the medical need for ephedrine in the United States (submitted

as an attachment to Novelty's comments on DEA's proposed importation quota for 2007 for

ephedrine).

5.      This paragraph is not a statement of fact but a quotation of select excerpts from

the U.N. Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances.  That

document is publicly available.

6.      Novelty objects to Meador's testimony in support of this paragraph.  He is not

qualified to testify on international law and DEA international policy.  It is beyond the scope of

his personal knowledge.  Moreover, he has no background that would qualify him as an expert in

the field of international law pertaining to controlled substances.

14

7.      This statement is not material to this action.  The issue before the court is DEA's failure to promulgate the LONO process by notice and comment rulemaking.  The case does not concern which countries require a letter from the importing country confirming legality. Moreover, Meador is not qualified to offer testimony on that matter of law.

8.      Novelty objects to the first sentence of this paragraph.  The first sentence is a matter of law, one that is at the heart of this case.  It is not a statement of fact.  Moreover, Meador is not qualified to offer testimony on that matter of law.  The second sentence is misleading and immaterial.  The content of a LONO, when issued, does not determine whether the LONO process is one that should have been promulgated by notice and comment rulemaking.

9.      This paragraph is misleading.  Defendants misleadingly cite statutory and regulatory sections for the LONO process. Those are not authorities for the LONO process. Moreover, the Defendants misstate the statutory language concerning the right to appeal a notice of suspension, a key issue in this case. 21 U.S.C. § 971 states that "a regulated person to whom an order [of suspension] applies under paragraph (1) is entitled to an agency hearing on the record…"  The statute does not limit the right to a hearing to importers.  21 U.S.C. § 971(c); see PDK Laboratories, Inc. v. Reno, 134 F.Supp.2d 24, 31 (D.D.C. 2001); see also, PDK Labs v. DEA, 362 F.3d 786, 792 (D.C.Cir. 2004).   The fourth sentence is an admission that the Defendants do not follow the statute when issuing a suspension of the shipment.  The LONO denial does not explain the factual and legal basis for the rejection, stating "DEA has grounds to believe that the proposed importation may be subject to diversion to the illicit market by the downstream distribution…"  Exhibit 2's Attachment C.  Sentences 4-6 all refer only to the

"importer" as having the right to appeal and pursue a LONO denial, contrary to the statutory language in section 971 that refers to a "regulated person" having the right to appeal.

10.    Novelty has no objection to the first sentence of paragraph 10.  Novelty objects to the second sentence of paragraph 10 in its entirety and objects to the sufficiency of the Meador affidavit on this point.  Novelty is not a retailer.   Exhibit 1 at ¶¶4-9; Exhibit 2 at ¶11.  Novelty is a closed system distributor.  Id.  Novelty has a strict system of anti-diversion controls that uses multiple, redundant security measures and that permits Novelty to track all list 1 chemical inventory at every point throughout the system.  Id. at ¶¶28-68.

11.    Novelty has no objection to the first sentence in this paragraph.  The second sentence in this paragraph is incomplete and misleading.  AAA Pharmaceuticals is a contract manufacturer for Novelty.  AAA Pharmaceuticals does not manufacture its own labeled product for Novelty to resell.  Moreover, this paragraph is misleading because it does not state what kind of products and manufacturing AAA Pharmaceuticals engages in for Novelty: the manufacture of Novelty's OTC cough and cold products.  The third sentence in this paragraph is incorrect and is not supported by the paragraphs in the Complaint cited.  Of the two shipments of ephedrine for AAA Pharmaceuticals, one shipment, in its entirety, was intended for AAA Pharmaceutical's manufacture of Novelty's product.  Exhibit 2 at ¶¶72-74.

12.    Novelty objects to the factual inaccuracy of the Meador affidavit cited to substantiate the first sentence.  Novelty's products are not "gray market" products.  Exhibit 2 at ¶¶17-18.  Novelty's customer list does not reflect which customers order which type of products.  Id. at ¶¶19-22.  Despite the penalty of perjury, Meador falsely states in paragraphs 17 and 18 that, based on his own "investigation," Novelty intends to sell tablet products to retailers in states where that sale is illegal.  The lie is bald faced.  See  Exhibit 2 at ¶¶19-22.  Defendants mislead

the Court into believing that they possess photos taken in Kentucky and Tennessee of Novelty OTC cough and cold remedies that are in a form prohibited in those states. The photos, <u>not supplied</u>, are in fact not ones taken in Kentucky and Tennessee. Novelty does not sell tablet form list 1 chemicals in those states and has an automated system that prevents such sales. Exhibit 2 at ¶¶19, 28-59 Meador's affidavit fails to identify who took the photographs alleged, when the photographs were taken, where the photographs were taken, and the subject of the photographs. Meador affidavit at ¶17. Meador's affidavit does not include the photographs as an exhibit. Id. Novelty does not object to the second through fourth sentences in this paragraph.

13. Novelty objects to this paragraph. The LONO application was not withdrawn by default. Novelty was a regulated party on whose behalf Spirit sought to import the shipment at issue. Exhibit 2 at ¶¶69-70. Upon receipt of the notice Novelty filed with DEA on November 2, 2006, a letter seeking to pursue the denial.

14. Novelty objects to this paragraph. The actual letter to which Defendants refer but do not supply contradicts the second sentence of this paragraph. We supply the letter as Attachment E to Exhibit 2 hereto. That letter states that if Spirit fails to respond in the specified time frame that DEA will issue a notice of suspension. <u>Id.</u> DEA has not issued any further notice to Spirit. Novelty objects to this paragraph. It mischaracterizes the facts and Novelty's November 2, 2006 letter. Attachment C to Exhibit 2. It omits the material fact that DEA has failed to respond to Novelty's November 2, 2006 letter. Defendants failed to include a copy of Novelty's November 2, 2006, letter to the Court. Novelty objects to Meador's summary of that letter because the summary is inaccurate. Meador's testimony concerning Novelty's alleged limited right to intervene only if Spirit seeks a hearing is an inaccurate statement of the law, and he is unqualified to offer testimony on legal interpretation.

17

15.    This paragraph is misleading.  Novelty is a registered distributor.  Exhibit 2 at ¶7-9, 11.  Spirit is Novelty's importer.  Id. at ¶69.  Novelty is a regulated party.  It is not material or relevant that Novelty is not a registered importer.

Respectfully submitted,

NOVELTY, INC.


By:    ___/s/_____
       Its Counsel
       Jonathan W. Emord
       Andrea G. Ferrenz

Emord & Associates, P.C.
11808 Wolf Run Lane
Clifton VA 20124
Phone: (202) 466-6937
Fax: (202) 466-6938
jemord@emord.com

Date submitted:      May 23, 2007

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NOVELTY, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 1:07-cv-00191-RMU** |
| ) | |
| **KAREN TANDY, Administrator,** ) | |
| **U.S. DRUG ENFORCEMENT** ) | |
| **ADMINISTRATION,** ) | |
| **et al.,** ) | |
| ) | |
| **Defendants.** ) | |

### EXHIBIT 1 TO

### PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT
### AND MEMORANDUM IN OPPOSITION TO
### DEFENDANTS' MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NOVELTY, INC.,                                    )
                                                 )
        Plaintiff,                               )
                                                 )
v.                                               )    Case No. 1:07-cv-00191-RBW
                                                 )    Judge Reggie B. Watson
KAREN TANDY, Administrator,                      )
U.S. Drug Enforcement Administration,            )
et al.,                                          )
                                                 )
        Defendants.                              )

**AFFIDAVIT OF NOVELTY PRESIDENT TODD GREEN IN SUPPORT OF
NOVELTY'S OPPOSITION TO DEFENDANTS' MOTION AND NOVELTY'S CROSS
MOTION FOR SUMMARY JUDGMENT**

I, Todd Green, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information and belief:

1. I am the President and founder of Novelty, Inc. (hereinafter "Novelty"). I directly manage the day to day operations of the company. I also manage future business planning and product development.

2. I formed Novelty in the early 80's while I was in high school, storing products in my father's garage and selling them to local convenience stores in Indiana.

3. I named the company based on the type of products that we sell, i.e., novelty items, that are primarily trend products designed to be impulse purchases.

**Business Overview**

4. We introduce 700-800 new products annually, responding to popular trends in the consumer marketplace. Thus, product development is an essential part of our business. About 300 of our products (or "Stock Keeping Units," aka "SKUs") are

standard items that are sold for a number of years, not part of our annual rotation of new items.

5.    We have licensing agreements to create and sell merchandise with many of the top international branded entertainment and consumer organizations such as Disney, Chevrolet, Dodge, NBA, Warner, Universal, Miller Brewing, and college sports teams.

6.    I have built Novelty in to a business employing approximately 500 employees around the world.  Working from our headquarters in Greenfield, I manage 5 offices and 1 factory in China, 2 distribution centers in the US, and sales, product development, operations and marketing departments.

7.    Novelty has approximately 12,000 customers, each an individual store, in the United States and Canada.  Those stores include major convenience store chains such as Circle K, The Pantry, Village Pantry, and Speedway.

8.    In 1999 Ernst & Young named me Entrepreneur of the Year.  Indiana Business Journal named me in its "40 under 40" list.

## List 1 Chemical Products

9.    Novelty began selling over-the-counter (OTC) products containing List 1 chemicals (either ephedrine or pseudoephedrine) in approximately 1996.

10.    Currently the sale of those OTC products produce 10-15% of Novelty's total annual revenue, approximately $17 million dollars.

11.    Novelty has previously attempted to find a domestic source of quality ephedrine to use in manufacturing its OTC products at a commercially reasonable rate and found none.

12.    If DEA continues to prevent Novelty from importing ephedrine for its OTC products, Novelty will be unable to meet the legitimate supply needs of its retail customers.

13.    If Novelty is unable to satisfy its retail customers' demand for the OTC products, those customers will fill their retail shelves with the List 1 chemical OTC products of Novelty's competitors, causing Novelty to suffer irreparable loss of market share and revenues.

14.    A loss of up to 15% of Novelty's total revenue will result in significant changes in Novelty's business, likely forcing Novelty to lay-off at least 25-50 employees domestically and to sacrifice certain of its remaining employee benefits.

15.    A loss of up to 15% of Novelty's total revenue would alter fundamentally Novelty's business by forcing the company to revise its overall product offerings, quantities of product in inventory, distribution methods, and compensation plans because revenues derived from the company's sale of OTC products help sustain each of the foregoing operations.

Todd Green

5-22-07

Date

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NOVELTY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-cv-00191-RMU |
| | ) | |
| KAREN TANDY, Administrator, | ) | |
| U.S. DRUG ENFORCEMENT | ) | |
| ADMINISTRATION, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

### EXHIBIT 2 TO

### PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT
### AND MEMORANDUM IN OPPOSITION TO
### DEFENDANTS' MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NOVELTY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:07-CV-00191 (RMU) |
| | ) | |
| KAREN TANDY, Administrator, | ) | |
| U.S. Drug Enforcement Administration, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**AFFIDAVIT OF MARK BLEDSOE IN SUPPORT OF NOVELTY'S OPPOSITION TO DEFENDANTS' MOTION AND NOVELTY'S CROSS MOTION**

I, Mark Bledsoe, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am the Director of Category Management for Novelty, Inc., located at 351 West Muskegon Drive, Greenfield, IN 46140 (hereinafter "Novelty").

2. I have been employed with Novelty, Inc. since February 1998. I have been the Director of Category Management for Novelty since June 2004.

3. Prior to being employed with Novelty I was employed as a Merchandiser for Sunoco for eight years, as a buyer for Stop N Go for six years, and as a District Manager for King Kwik for six years.

4. I have over 20 years of experience in the convenience store industry in the operations and marketing aspects of the business practice.

5. During the course of my employment in the convenience store industry, my operational responsibilities have included day to day supervision of eight to twelve convenience stores, category management for products and inventory, pricing negotiation with

vendors, recruitment of new product concepts and vendors, and development of store layouts and displays.

6. In my current position I am responsible for buying "standard" stock items for our inventory, negotiating prices with vendors, sourcing new vendors, and monitoring Novelty compliance with state and federal regulations governing List 1 products.    I also monitor the sales of List 1 products by dosage strength and formulation in compliance with state-specific List 1 product regulations.

## Novelty's Registration

7. In approximately 1996 Novelty applied for and received a registration to distribute list 1 chemicals from the DEA.

8. Every year after 1996 to the present Novelty renewed its registration to distribute List 1 chemicals with DEA.

9. Novelty's current registration was awarded on September 20, 2006 and is valid through October 31, 2007.

10. Novelty, Inc. has sold over-the-counter products containing a combination of ephedrine and  guaifenesin (an expectorant) to convenience store retail locations in the United States.

## Novelty's Customers and Products

11. Novelty distributes List 1 products to convenience stores exclusively.  It does not sell to distributors.  It sells directly to stores and has established relationships with each store. Its products are created by a contract manufacturer AAA Pharmaceuticals at Novelty's request and under Novelty's private label.  Novelty then transports and sells those products directly to its retail customers without any middle men, one of the critical

elements in its risk reduction program. Novelty's manufacture and distribution of its products is a "closed system" that meets all of DEA's documentation requirements and regulatory limitations to minimize the risk of diversion.

12. Novelty's List 1 product customers include many of the nation's largest and most well-respected store chains such as Circle K, The Pantry, Village Pantry, and Speedway.

13. Novelty has <u>never</u> received a DEA Warning Letter advising Novelty that any of its products have ever been found in or associated with clandestine manufacturing of illegal substances.

14. Novelty sells List 1 chemical products in some states that limit ephedrine content to 12.5 mg tablet form, in some states that limit ephedrine content to 25 mg tablet form, in some states that limit ephedrine content to 12.5 mg gel capsule form, and in some states that limit ephedrine content to 25 mg gel capsule form.

15. Novelty ensures that the ephedrine form and content sold in a state complies with that state's requirements.

16. Novelty does not manufacture List 1 chemical products for sale in a state that exceeds that state's allowable limits on dosage.

17. Novelty does not sell its List 1 chemical products, and has never sold those products, with any "off label" claims (such as for weight loss or staying awake).

18. In his affidavit, DEA witness Darrell Meador defines several types of conduct that he says create a risk of ephedrine diversion to the illicit methamphetamine trade and suggests that Novelty engages in that conduct. Meador Affidavit at ¶¶ 13-14. Those statements, as applied to Novelty, are false:

3

- Products are labeled as cough/cold relief medications but are "marketed for 'off label' uses, such as weight loss or staying awake." Meador Affidavit at ¶13. Novelty does not market its products for 'off label uses,' such as for weight loss or staying awake.

- "Products pass through multiple layers of distribution." Meador Affidavit at ¶14. This is false. Novelty's products do not pass through multiple layers of distribution. Novelty has a closed system of distribution, obtains the finished product from its contract manufacturer, warehouses the product in its own facilities, and ships the product by its own trucks and under the care of its own, security trained drivers.

- "Products sold are typically stronger than those found in the traditional market." Meador Affidavit at ¶14. Novelty's products are not stronger than those found in the traditional market. Novelty strictly complies with the dosage limitations of state and federal authorities. Novelty's dosage amounts are the same as those found in products sold in pharmacies, grocery stores, or "big box" stores such as Wal-Mart.

- "Products...have been disproportionately represented in clandestine lab seizures around the United States involving listed chemical products." Meador Affidavit at ¶14. Novelty has never been notified that its products were found in clandestine lab seizures.

- "Non-traditional retailers tend to knowingly sell large quantities of List 1 chemical products to 'smurfers,' methamphetamine traffickers and/or individuals who work for methamphetamine traffickers who attempt to buy

4

out a store's entire stock of List 1 chemical products by going to the store at different times or on different days." Meador Affidavit at ¶14. Novelty's distribution and sales system prevents its customers from purchasing large quantities of chemical products. Novelty enforces its policy regarding sales by the retailer to the consumer, this policy states; "no more than 2 packages per transaction and 1 transaction per day". This policy is far more stringent than the limit set in the Combat Methamphetamine Epidemic Act of 2005. (CMEA) (Limits ephedrine sales to 3.6 grams per day) Every display case containing Novelty's ephedrine products displays this policy, every log book provided to Novelty's retailers contains this policy on every page of the log book. (Novelty provides these log books to it's customers free of charge) Every training manual (Training required by the CMEA) provided to its customers contains this policy. (Novelty provides these training manuals to it's customers free of charge) .

19. Some of the stores to which Novelty sells its List 1 chemical products are located in Kentucky and Tennessee. Those states allow the tablet form of List 1 chemicals to be sold only in pharmacies. The laws of those states permit the gel capsule form of ephedrine to be sold in convenience stores, within dosage limitations. Novelty sells only its gel capsule form products in those states, and it does so in strict accordance with the laws of those states. The contrary statement made in the affidavit of Darrell Meador attached to the Defendants' Motion to Dismiss or in the alternative for Summary Judgment is utterly false. From the date Kentucky and Tennessee first adopted laws

prohibiting the tablet form of ephedrine to be sold in convenience stores, Novelty has never sold that form in those states.

20. Novelty submitted to DEA a customer list at DEA's request. The list does not distinguish (and was not required to distinguish) which form or dose amount of its List 1 products (tablets versus gel caps and 12.5 mg per dose versus 25 mg per dose) are sold by which customers on that list. DEA has never requested that Novelty identify which products are sold by which customers. All prior customer lists given to DEA when Novelty sought a LONO likewise did not distinguish tablet States from gel capsule states and were not required to distinguish in that way. Novelty has consistently adhered to the legal requirements in each state where its products are sold.

21. Some of our List 1 customers operate stores in several states. In some cases they have stores in states that do not permit List 1 products to be sold in convenience stores (such as Iowa). In some cases they have stores located in states that permit ephedrine in 25 mg tablet form (such as Indiana). In some cases they have stores located in states that permit ephedrine in 12.5 mg tablet form (such as Michigan). In some cases they have stores located in states that permit ephedrine in 25 mg gel capsule form (such as Kentucky). In some cases they have stores located in states that permit ephedrine sold in 12.5 mg gel capsule form (such as Texas). The LONO requested on September 25, 2006 included those customers. If Novelty had excluded Circle K from that customer list because they have stores in Ohio that by law cannot sell ephedrine, or because they have stores in Kentucky that by law must sell ephedrine in a gel capsule form, then the customer list would have been misleading, since it was Novelty's intent to sell 25 mg ephedrine tablets to Circle K's Indiana stores and to sell 12.5 mg tablets to its Michigan stores.

6

22. On or about February 3, 2006, I spoke with DEA employee Lisa R. Barnhill concerning our List 1 chemicals' products customer list. She asked for an explanation of the store or chains listed which had locations in states where sales in convenience stores were prohibited or restricted. I explained that the list does not identify which forms are sold to which customers or, in the case of some chains, does not identify by individual stores in states where sales by convenience stores are prohibited. I informed her of our policy on List 1 chemicals and sent her a copy of it via email, highlighting the sections describing our weekly monitoring of sales by product by State. Attachment A.

### List I Chemical Sales History

23. Because ephedrine is identified as a List 1 chemical by the Drug Enforcement Administration, Novelty, Inc. enforces a strict company-wide policy for all employees and associates governing the handling of ephedrine products.

24. The policy's formal objective is to ensure that the List 1 products held and distributed by Novelty, Inc. are guarded against risk of diversion at every point along the distribution chain up to, and including, the ultimate consumer sale.

25. Novelty, Inc.'s policy mandates that all associates who handle or have access to List 1 products be personally responsible for their actions in compliance. Each must read and sign the policy document acknowledging that he or she understands the provisions of the policy and will abide by the policy in its entirety.

26. In order to preserve the integrity of the inventory stock retained at Novelty, Inc.'s warehouses, all warehouse personnel with access to List 1 products are specially trained, must display employee ID badges indicating their specific position and security level

(i.e., OTC access authorization), and are subject to a zero tolerance policy for any act of non-compliance.

27. Prior to being hired, Novelty, Inc. conducts extensive criminal background checks and performs standard drug testing for all of its personnel, warehouse human resources, and contract drivers.

### List I Chemical Storage and Sales Procedures

28. The List 1 products area contained within the Novelty, Inc. warehouse is protected by a floor to ceiling chain link fence with two entry/exit gates, and a security system that electronically monitors all parts of the warehouse.

29. The warehouse is monitored by an ADT Focus® Fire & Security system twenty-four hours a day, employing motion detectors throughout the facility. The motion detectors are linked to automatic reporting devices that record the time and location of any potential security breach at the warehouses. Novelty personnel monitor the facility twenty-four hours a day and can be dispatched to the warehouse along with law enforcement on a moment's notice.

30. On receipt of a List 1 product shipment, Novelty, Inc.'s Receiver (B. Cheney) is responsible for checking the Bill of Lading and the Packing List to ensure that all of the information contained within, as well as the physical shipment, perfectly agrees with Novelty, Inc.'s Purchase Order.

31. The Receiver also checks to ensure that all documentation associated with the purchase and shipment of List 1 products contains both Novelty, Inc.'s and the supplier's DEA numbers.

32. If any of the receiving process components do not agree, the shipment is rejected in its entirety.

33. If the Receiver discovers  a concealed shortage of a List 1 product, she will then assemble the following documentation and forward it to the Novelty, Inc. Compliance Officer, the Buyer, and Novelty, Inc.'s General Counsel:

    a.  Name of the manufacturer;

    b.  Item number and description;

    c.  Name of the carrier;

    d.  Condition of shrink wrap at time of delivery for pallet/box with shortage;

    e.  Purchase Order Number

    f.  Lot Number

    g.  All markings and identifiers on the box that contains a shortage of a List 1 product;

    h.  Photographs of all sides of the box that contains the shortage;

    i.  Condition of the box and its packaging at the time it was received;

    j.  Condition and arrangement of the product inside the box;

    k.  Photographs of the inside of the box (displaying contents);

    l.  Method of shortage detection;

    m.  Whether any/all of the other cases in the same shipment were checked for shortages.

34. The Novelty Receiving Supervisor (B. Cheney) must date-stamp the Packing Slip upon receipt of shipment, notes any discrepancies in the Vendor's paperwork, and sign to acknowledge compliance with all of the receiving requirements.

35. If the List 1 product shipment is accepted by the Receiver, it is immediately placed in the enclosed warehouse OTC area for sorting and labeling.

36. List 1 products are sorted according to the lot number assigned to each product and prepared for storage. This activity is conducted under the aforementioned surveillance.

37. All List 1 products must bear the following information:

- A barcoded license plate that contains the Lot Number, Item Number, and Case Pack;
- A Green label with the Item Number and the Lot Number;
- The expiration date of the product.

38. Once a List 1 product is received by the warehouse, it is entered into the Novelty computer tracking system with the information listed above. The product is then tagged and enclosed in the OTC area of the warehouse where it can only be accessed by authorized personnel bearing the appropriate clearance badges.

39. List 1 products are always kept separate from hazardous materials.

40. When a full case List 1 product is ordered by a Novelty salesperson, Novelty, Inc.'s Order Selector (C. Book) fills the order according to quantity ordered and applies a shipping label bearing the information of the route number.

41. The Order Selector records the date, the amount ordered, Lot number of the products shipped, and the route number to which the product is assigned.

42. The Shipping Auditor checks to ensure that all List 1 product cases  are properly sealed, labeled, and sorted for route shipping and delivery.

43. The information regarding the status of the List 1 inventory in the Lot Track book is reported to Inventory Control at the end of each week.

44. Route Sales Professionals ("RSPs") receive the weekly load shipments of List 1 products to distribute to retail stores on their route. .

45. All delivery/route trucks must be secured and locked when not unloading for delivery.

46. All retail stores who purchase List 1 products from Novelty, Inc. also purchase other types of products stocked by Novelty, Inc.

47. Novelty, Inc. delivers all of its product inventory directly to the retail stores on Novelty trucks. Novelty's trained drivers ensure that all drop-off locations are legitimate business enterprises operating in a retail capacity and that the delivered cases are properly secured, locked, and kept behind the sales counters.

48. All purchasing transactions executed by Novelty, Inc. are recorded by an invoice filing system, with invoices signed by the purchaser. Payment is accepted either via invoice or upon delivery of the product.

49. Payment for purchases of List 1 products is never accepted in cash.

### Sales Limitations Policies

50. Novelty, Inc. requires that Novelty employees who negotiate the purchase of List 1 products obtain and maintain appropriate licensure, permits, and documents required to sell the products, including appropriate documentation required by FDA, DEA, and the State Boards of Pharmacy.

51. Novelty's employees who negotiate for manufacture of its List 1 chemical products are required to contract only with manufacturers licensed by DEA and all orders must be placed with the manufacturer through Novelty, Inc.'s Purchase Order System.

52. To ensure the validity and security of all List 1 product transactions, all Purchase Orders of List 1 products contain the DEA numbers of both the supplier and Novelty, Inc.

11

53. Novelty, Inc. only delivers List 1 products to retail vendors that have been screened and verified for compliance with federal and state registration and record keeping requirements.

54. Each List 1 product sale must be registered and verified in the Novelty, Inc. invoice system, which includes the listing of the business name, address, item(s), and quantity of product sold.

55. Novelty, Inc. does not sell any List 1 products to individuals or to vendors who are not established and verified Novelty, Inc. customers.

56. Because the states have enacted different legislation regulating the sale of List 1 products, all RSPs are required to review a memo explaining the different regulatory provisions pertaining to List 1 products in individual states and to sign the memo confirming that the RSP has read and understands the provisions.

57. In addition, all newly hired Novelty, Inc. employees are required to read and sign the same memo and participate in state specific training as part of their orientation.

58. Novelty, Inc. does not permit RSPs to sell more than one (1) full case of List 1 product type (brand and count) per transaction to any retail customer outlet. There are no exceptions to this rule.

59. Any RSP violation of Novelty, Inc.'s List 1 product policy is documented by one written warning. RSPs are terminated for any subsequent violations committed after the receipt of a written warning.

### Auditing and Other Security Measures

60. Novelty, Inc. conducts regular self audits for List 1 product inventories to ensure the security and accuracy of all Novelty warehouse stock.

61. JR Merlau is the Compliance Officer for Novelty, Inc. and is in charge of enforcing the List 1 products policy.

62. As part of standard Novelty, Inc. policy, the Compliance Officer does not have access to change inventory transactions.

63. The Compliance Officer's duties include monitoring and reporting all sales, transactions, or inventory inconsistencies resulting from possible diversion to senior management.

64. In order to avoid potential conflicts of interest, the Compliance Officer does not report to management in the Sales, Warehouse, or Inventory Control departments.

65. The Compliance Officer's duties also include monitoring and updating Novelty, Inc. staff and associates on all state laws and regulatory restrictions relating to List 1 products.

66. These regulatory updates and notices are communicated to the Sales and Delivery teams through memos and other Novelty, Inc. publications, including "Novelty News" and Novelty's "Order Guide."

67. The Compliance Officer is also responsible for reporting all deviations, suspicious transactions, and potential diversion risks to the Novelty, Inc. General Counsel if they are not resolved.

68. The General Counsel, in turn, is required to report all thefts and suspicious sales to the appropriate governmental agencies.

### September 25, 2006 Order

69. On September 25, 2006, Novelty, through its manufacturer AAA Pharmaceutical, Inc. ("AAA"), ordered 2,000 kilograms of ephedrine from its importer Spirit Pharmaceuticals LLC ("Spirit"). Attachment B. I authorized that purchase order on behalf of Novelty.

13

70. Spirit submitted a DEA Form 486 along with the purchase order from AAA and AAA's registration number. It also identified AAA's customer, Novelty. It requested a letter of no objection (LONO). Attachment B.

71. DEA responded on October 10, 2006 with a letter rejecting the LONO request for the two purchase orders. It did not identify the AAA customers in the letter. Attachment C..

72. Upon receipt of a copy of DEA's October 10, 2006 letter from Spirit via AAA, Novelty, by counsel, filed with DEA on November 2, 2006 a letter stating its intention to pursue the rejection and seek a hearing. Attachment D. Novelty appealed both shipments, not realizing that one shipment was for another AAA customer. I informed Spirit of the appeal.

73. I first learned that the October 10, 2006 letter from DEA rejecting the LONO request included a shipment to AAA intended for another AAA customer on April 16, 2007.

74. Novelty does not seek to contest the LONO denial for AAA's other customer's shipment of ephedrine.

75. Novelty's products to be manufactured from its September 25, 2006 Form 486 would restock its tablet product supplies.

76. Novelty will not sell the ephedrine intended for tablet production that is the subject of the September 25, 2006 Form 486 to any customer in a state where tablet sales through convenience stores are prohibited.

77. Novelty's electronic order filling system does not allow orders to be filled for List 1 chemicals in dosages or forms for states where those dosages or forms cannot be sold by convenience stores.

78. I am responsible for monitoring state laws and updating the order filling system with any changes.

79. Novelty does not sell List 1 chemicals to a customer in a state where state law does not permit sale of that form by that customer.

80. Spirit received DEA's letter dated April 10, 2006. Attachment E. In that letter DEA reiterated its rejection of the LONO and gave three options for a response. Id. Novelty informed Spirit that Novelty was pursuing the rejection of the hearing request and asked, in accordance with the letter's options, that Spirit do nothing so that DEA would issue the notice of suspension. Attachment F.

_Mark B. Bledsoe_
Mark Bledsoe

_5 · 2 2 · 0 7_
Date

15

# EXHIBIT 2'S ATTACHMENT A

Novelty

**Andrea Ferrenz**

| | |
|---|---|
| **From:** | Mark Bledsoe [Mbledsoe@noveltyinc.com] |
| **Sent:** | Friday, February 03, 2006 1:46 PM |
| **To:** | lisa.r.barnhill@usdoj.gov |
| **Cc:** | Tejash Sheth |
| **Subject:** | Novelty |
| **Attachments:** | 9-7-05.doc |

Lisa,

It was a pleasure speaking with you today. I have attached our policy on List 1 chemicals and highlighted the area describing our weekly monitoring of sales by product by State. If I can be of further assistance please call.

<<9-7-05.doc>>

Mark Bledsoe

Director of Category Management

Novelty Inc.

(317) 462-3121

mbledsoe@noveltyinc.com

# EXHIBIT 2'S
# ATTACHMENT B

# SPIRIT PHARMACEUTICALS, LLC.

225 LINCOLN HIGHWAY, Suite 179, FAIRLESS HILLS, PA 19030
PH.# (215)943 4000  FAX.#(215)943 4039

## FACSIMILE TRANSMITTAL SHEET

To: Harry McFadden

From: *ARUN HEBLE*

DEA

Fax No.: 202-307-4792 (7503)

Tel.No. 202-307-4761

Date: 9,25-06

Pages: 1+5=6

Re: Ephedrine HCl
cc: AAA Pharmaceuticals - PO# 22773 for 2000 kg
    - PO# 22774 for 200 kg

( ) Urgent   ( ) For Review   ◆ Please Comment   ◆ Please Reply   ◆ Please Recycle

Dear Harry,

We are faxing you the following documents to request a LONO for the above captioned listed chemical.

1. Completed DEA Form 486

2. Purchase order from the customer: AAA Pharmaceuticals Inc
   Contact: Mr. Tej Shah
   Tel: 856-423-2700 x202

3. DEA registration of the customer.

Please call me if you have any questions.

Best regards,

Sincerely,

Arun R. Heble
Cell# 215-869-2493

IMPORT/EXPORT DECLARATION
Precursor and Essential Chemicals

U.S. Department of Justice
Drug Enforcement Administration

OMB Approval
No. 1117-0023

SEE REVERSE FOR INSTRUCTIONS AND PRIVACY ACT.

U.S. CUSTOMS CERTIFICATION

Date of Departure/Arrival

1. CHECK ONE    [✓] IMPORT DECLARATION    [ ] EXPORT DECLARATION

1a. IMPORTER/EXPORTER (Name, Address, Telephone No. to include Area Code, Telex No. and where available FAX No.)

SPIRIT PHARMACEUTICALS, LLC.
225 LINCOLN HWY. SUITE 179
FAIRLESS HILLS, PA 19030
PH.# 215-943-4000  DEA # 006065SRX

1b. BROKER OR FORWARDING AGENT IF USED (Name, Address, Telephone No. to include Area Code, Telex No. and where available FAX No.)

EXPEDITORS INTERNATIONAL, INC.
870 ASHLAND AVE.
FOLCROFT, PA 19032
PH.# 610-534-2590

Name of Carrier/Vessel

Date of Certification

Signature of Customs Official

1c. I CERTIFY THAT THE 15-DAY ADVANCE NOTICE REQUIREMENT HAS BEEN WAIVED    [ ] Check if applicable

2. LISTED CHEMICALS TO BE IMPORTED/EXPORTED

| 2a. Marks and Description of Chemical appearing on label or container | 2b. Name of Chemical as designated by T.16 21 C.F.R 1310.02 | 2c. Number of containers, size, net weight of each chemical (KG) | 2d. Gross Weight of each item (KG.) |
| --- | --- | --- | --- |
| EPHEDRINE HCl | EPHEDRINE HCl | 25X80=2000KGS NET WT. | 27.5X80=2200KGS GROSS WT. |

P.O. # 22773
AAA PHARMACEUTICAL, INC

3a. [✓] FOREIGN  [ ] DOMESTIC PORT OF EXPORTATION (last U.S. Customs Port) AND APPROX. DEPARTURE DATE

MUMBAI, INDIA    OCTOBER 25, 2006

3b. [ ] FOREIGN  [✓] DOMESTIC PORT OF IMPORTATION (first U.S. Customs Port) AND APPROX. ARRIVAL DATE

PHILADELPHIA, PA    OCTOBER 28, 2006

4a. MODE OF TRANSPORT; NAME OF VESSEL, CARRIER

BY AIR

4b. NAME OF ALL INTERMEDIATE CARRIERS

5a. NAME, ADDRESS, TELEPHONE, TELEX, and where available FAX No. OF FOREIGN CONSIGNEE/CONSIGNOR

EMMELLEN BIOTECH PHARMACEUTICALS LTD.
501 SENTINEL, 5th FLOOR, CENTRAL AVE.RD.
MIRNANDANI GARDENS, POWAI, MUMBAI-400 076
PH # 011-91-22-56797200

5b. NAME, ADDRESS, TELEPHONE, TELEX, and where available FAX No. OF ALL INTERMEDIATE CONSIGNEES

SIGNATURE OF AUTHORIZED INDIVIDUAL ( Print or Type Name below Signature)

(ARUN R. HEBLE)

DATE
09.25.06

NAME OF FIRM
SPIRIT PHARMACEUTICALS, LLC.
DEA # 006065SRX

Copy 1

DEA FORM — 486



Ordered By:
AAA Pharmaceutical, Inc.
157-160 West Jefferson Street
P.O. Box 22
Paulsboro, NJ 08066-0022

Phone: (856) 423-2700          Fax: (856) 423-2699

# PURCHASE ORDER

Purchase Order Number:
22773

Date Issued:
Sep 25, 2006

Page:
1

To:    SPIRC001

Spirit Pharmaceuticals, LLC
225 Lincoln Highway
Suite #179
Fairless Hills, PA  19030
DEA 006065SRX
Phone: (215) 943-4000        Fax: (215) 943-4030

Ship to:
157-160 West Jefferson Street
P.O. Box 22
Paulsboro, NJ  08066-0022

| Account No. | Terms |
|---|---|
| | 1% 10, Net 30 Days |

Ship Via

FOB Delivered

| Item | Description | Units | Quantity | Unit Price | Extension |
|---|---|---|---|---|---|
| RAW01000 | L-Ephedrine Hydrochloride, USP | Kg | 2,000.00 | | |

FOR ALL SHIPMENTS:        Double-Stacked Pallets Will Be Returned at Seller's Expense.

FOR PHARMACEUTICAL      Items Shipped from Multiple Lots will be Returned at Seller's Expense; Items
RAW MATERIALS:            Must All be from the Same Lot.  A Valid Certificate of Analysis for Each Raw
                          Material Must Accompany Shipment.

TOTAL

Authorized Signature

AAA PHARMACEUTICAL, INC
157-160 WEST JEFFERSON STREET

PAULSBORO          N.J      08066 - 0000



DOMESTIC CHEMICAL DIVERSION CONTROL REGISTRATION CERTIFICATE
UNITED STATES DEPARTMENT OF JUSTICE
DRUG ENFORCEMENT ADMINISTRATION
WASHINGTON, D.C. 20537

| DEA REGISTRATION NUMBER | THIS REGISTRATION EXPIRES | FEE PAID |
|---|---|---|
| 001253AAW | 06-30-2007 | PAID |

| BUSINESS ACTIVITY | | ISSUE DATE |
|---|---|---|
| CHEMICAL MANUFACTURER | | 06-06-2006 |

AAA PHARMACEUTICAL, INC
157-160 WEST JEFFERSON STREET

PAULSBORO          N.J          08066-0000

Sections 304 and 1008 of the Controlled Substances Act
of 1970, as amended, provide that the Attorney General
may revoke or suspend a registration to manufacture,
distribute, import or export a List 1 chemical.

THIS CERTIFICATE IS NOT TRANSFERABLE ON CHANGE OF OWNERSHIP, CONTROL, LOCATION, OR BUSINESS ACTIVITY,
AND IT IS NOT VALID AFTER THE EXPIRATION DATE.

Form DEA-511 (7/05)

# EXHIBIT 2'S ATTACHMENT C



**U. S. Department of Justice**
Drug Enforcement Administration

---

*www.dea.gov*                     Washington, D.C. 20537

Mr. Arun R. Heble
Spirit Pharmaceuticals, LLC                     OCT 1 0 2006
225 Lincoln Hwy, Suite 179
Fairless Hills, PA 19030

Dear Mr. Heble:

Reference is made to your request for the Drug Enforcement Administration (DEA) to issue a Letter of No-Objection (LONO) to the competent authority in the country of export for the following proposed importations:

|  |  |
|---|---|
| Date of DEA-486 | September 25, 2006 |
| Listed Chemical | Ephedrine  2000 Kg |
| Date of proposed importation | October 28, 2006 |
| DEA Control # | 5042393 |
| PO # | 22773 |

|  |  |
|---|---|
| Date of DEA-486 | September 25, 2006 |
| Listed Chemical | Ephedrine  200 Kg |
| Date of proposed importation | October 28, 2006 |
| DEA Control # | 5042394 |
| PO # | 22774 |

This letter is written confirmation that it is DEA's intent not to issue a LONO in the referenced importation matter. DEA has thoroughly reviewed the proposed utilization of the planned Listed Chemical importation. DEA has grounds to believe that the proposed importation may be subject to diversion to the illicit market by the downstream distribution system and, as such is declining to sign a LONO for this importation.

There are three options available to you as the registered importer:

1. withdraw the request for a LONO and cancel the Import Declaration (DEA Form 486) by FAXING the request to OED at (202)307-7464;

2. take no action, and 30 days from the date of this notice DEA will deem your lack of further contact as a request to withdraw the Import Declaration and LONO request;

3. indicate in writing, within the 30 days, your desire to pursue the importation further.

If you desire to pursue the importation further, DEA will order the suspension of the shipment pursuant to Title 21, United States Code, Section 971 (c)(1). DEA will send you a notice of the suspension. The notice of suspension will list the legal and factual basis supporting the suspension. Upon ordering the suspension of shipment, in accordance with Title 21, United States Code, Section 971 (c)(2), an administrative hearing will be held as long as you request the hearing, in writing within 30 days from the day you are served with the notice of suspension. If you request a hearing, it will be held not later that 45 days after your request is made, unless you specifically request the hearing be held at a later time.

If you have any questions, please feel free to contact Staff Coordinator Darrell Meador, Office of Enforcement Operations, Dangerous Drugs and Chemicals Section, at (202) 307-4948.

Sincerely.

Alan G. Santos, Chief
Office of Enforcement Operations
Dangerous Drugs and Chemicals Section

cc: DEA Philadelphia Division
    Attn: DPM Ann Carter

# EXHIBIT 2'S ATTACHMENT D

 & Associates, P.C.

1800 ALEXANDER BELL DRIVE, SUITE 200
RESTON, VA 20191
1050 SEVENTEENTH STREET, N.W., SUITE 600
WASHINGTON, DC 20036
202.466.6937 • FAX 202.466.6938
www.emord.com

November 2, 2006

**VIA UPS**
Alan G. Santos
Office of Enforcement Operations, Dangerous Drugs and Chemicals Section
Drug Enforcement Administration
U.S. Department of Justice
950 Pennsylvania Ave.
Washington, D.C. 20530-0001

Linden Barber
Office of the Chief Counsel
Drug Enforcement Administration
2401 Jefferson Davis Highway
Alexandria, VA 22301

*Re: PO # 2273 and PO # 22774*

Dear Mr. Santos and Mr. Barber:

Our client, Novelty Inc. ("Novelty") intends to pursue the following importations:

| | |
|---|---|
| Date of DEA-486 | September 25, 2006 |
| Listed Chemical | Ephedrine 2000 Kg |
| Date of proposed importation | October 28, 2006 |
| DEA Control # | 5042393 |
| PO # | 22773 |

| | |
|---|---|
| Date of DEA-486 | September 25, 2006 |
| Listed Chemical | Ephedrine 200 Kg |
| Date of proposed importation | October 28, 2006 |
| DEA Control # | 5042393 |
| PO # | 22774 |

In an October 10, 2006 letter to Spirit Pharmaceuticals, LLC ("Spirit"), DEA stated that "it is [the agency]'s intent not to issue a LONO" in the above importations. Novelty is an eventual purchaser for the above importations and a party adversely affected and aggrieved by the LONO rejection. Pursuant to option three in the October 10, 2006 letter, Novelty is providing notice of its intent to pursue importation.

We ask that DEA proceed quickly in issuing a suspension notice for the above importations. The importation refusals are causing Novelty to suffer substantial economic damages.

Sincerely,

Jonathan W. Emord
Andrea G. Ferrenz
Katie Bond

# EXHIBIT 2'S ATTACHMENT E



**U. S. Department of Justice**
Drug Enforcement Administration

---

*www.dea.gov*

Washington, D.C. 20537

Mr. Arun R. Heble
Spirit Pharmaceuticals, LLC
225 Lincoln Hwy, Suite 179
Fairless Hills, PA 19030

APR 1 0 2007

Dear Mr. Heble:

Reference is made to your request for the Drug Enforcement Administration (DEA) to issue a Letter of No-Objection (LONO) to the competent authority in the country of export for the following proposed importations:

| | |
|---|---|
| Date of DEA-486 | September 25, 2006 |
| Listed Chemical | Ephedrine 2000 Kg |
| Date of proposed importation | October 28, 2006 |
| DEA Control # | 5042393 |
| PO # | 22773 |

| | |
|---|---|
| Date of DEA-486 | September 25, 2006 |
| Listed Chemical | Ephedrine 200 Kg |
| Date of proposed importation | October 28, 2006 |
| DEA Control # | 5042394 |
| PO # | 22774 |

This letter is written confirmation that it is DEA's intent not to issue a LONO in the referenced importation matter. DEA has thoroughly reviewed the proposed utilization of the planned Listed Chemical importation. DEA has grounds to believe that the proposed importation may be subject to diversion to the illicit market by the downstream distribution systems and, as such, is declining to sign a LONO for this importation. We previously contacted you by letter dated October 10, 2006. At that time, you were informed that in order to pursue the requested importation, you would have to contact the agency. Because we received no correspondence within the required 30 days, we have considered your request to be withdrawn. At this time, however, we are re-contacting you to make certain that your intent is that you do not wish to pursue the import requests. There are now two options available to you as the registered importer:

1. Within five (5) days of receiving this notice, affirmatively withdraw the request for a LONO and cancel the planned importation by notifying DEA in writing of your intent to cancel the proposed importation. Send the letter via facsimile to OED at 202-307-7464;

2. Indicate in writing, within five (5) days from the date of this notice, your desire to pursue the

importation further. If you elect this option or fail to respond to this notice within five (5) days, DEA will order the suspension of the shipment pursuant to Title 21, United States Code, Section 971 (c)(1).

In the event DEA orders the suspension of the shipment, DEA will send you a notice of the suspension. The notice of the suspension will list the legal and factual basis supporting the suspension. Upon ordering the suspension of shipment, in accordance with Title 21, United States Code, Section 971 (c)(2), an administration hearing will be held as long as you request the hearing, in writing within 30 days from the day you are served with the notice of suspension. If you request a hearing, it will be held not later than 45 days after your request is made, unless you specifically request the hearing be held at a later time.

If you have any questions, please feel free to contact Staff Coordinator Darrell Meador, Office of Enforcement Operations, Dangerous Drugs and Chemicals Section, at (202) 307-4948.

Sincerely,

Alan G. Santos, Chief
Office of Enforcement Operations
Dangerous Drugs and Chemicals Section


cc:    DEA Philadephia Divison
Attn: Acting DPM Kurt Dittmer

# EXHIBIT 2'S
# ATTACHMENT F



Emord & Associates, P.C.

11808 WOLF RUN LANE
CLIFTON VA 20124

1050 SEVENTEENTH STREET, N.W., SUITE 600
WASHINGTON, D.C. 20036
202.466.6937 • FAX 202.466.6938
www.emord.com

May 22, 2007

**VIA EMAIL**
Arun Heble
Spirit Pharmaceuticals, LLC
225 Lincoln Highway
Suite 179
Fairless Hills PA 19030

Re: Novelty, Inc.

Dear Mr. Heble:

We represent Novelty, Inc. before the DEA concerning Novelty's September 25, 2006 request for import of ephedrine. We understand that an agent from DEA contacted you yesterday and stated that DEA would not process Novelty's most recent request for a LONO, made through your company, until Spirit responded in writing to DEA's April 10, 2007 letter.

Under applicable precedent, Novelty is the party aggrieved by DEA's denial and the one entitled to a hearing on the merits. DEA has not responded to Novelty's November 2, 2006 letter to DEA stating its intention to pursue the LONO denial of October 10, 2006 and requesting a speedy issuance of the notice of suspension.

In its April 10, 2007 letter DEA stated that if Spirit "elected [to indicate in writing its desire to pursue the importation] or fail[ed] to respond to [DEA's] notice within five (5) days, DEA w[ould] order the suspension of the shipment pursuant to Title 21, United States Code, Section 971 (c)(1)." We understand that Spirit did not respond within five days of that letter. Consequently, one would have expected DEA to issue the notice of suspension. Our client informs us that DEA has not issued the suspension order.

Novelty requests that Spirit not seek a hearing for itself for this LONO denial. Novelty is the party aggrieved by the denial and is seeking an independent hearing on the merits, as is its right under the Due Process clause of the Fifth Amendment. Please feel free to share this letter with DEA.

Best regards,

Jonathan W. Emord
Andrea G. Ferrenz

Cc:    Mark Bledsoe
       Novelty, Inc.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NOVELTY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-cv-00191-RMU |
| | ) | |
| KAREN TANDY, Administrator, | ) | |
| U.S. DRUG ENFORCEMENT | ) | |
| ADMINISTRATION, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**EXHIBIT 3 TO**

**PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT
AND MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT**

# THE EVALUATION OF MEDICAL NEED FOR EPHEDRINE IN THE UNITED STATES

Michael P. Pacin, MD

Florida Center for Allergy and Asthma Care

## Introduction

Ephedrine is a drug that has been a mainstay for the treatment of bronchial constriction over the years. Constriction of the bronchial tubes is a symptom of many diseases, asthma, bronchitis, chronic bronchitis, emphysema, upper respiratory tract infections, pneumonia, influenza, and has been known throughout history, actually dating back 5000 years in China in beverages made from the ephedra plant. At that time, there was no understanding of the mechanism of action. Ancient Chinese physicians would prescribe ephedra pills and tea for breathing problems such as coughs and asthma. All they knew was that it was a bronchial dilator and helped relieve symptoms. As time went by, medications became available and an understanding developed of how it worked.

## Bronchial Constriction

Bronchial constriction, which is a symptom exhibited in many diseases, is usually manifest by coughing, wheezing, and the production of mucus. When this occurs membranes lining the bronchial tubes become swollen and edematous and the muscles surrounding the bronchial tubes constrict. Both of these factors cause a narrowing of the airways. These factors, along with increased mucus production, lead to coughing, wheezing, and sputum production. Diseases such as asthma, reactive airway disease, bronchitis, chronic bronchitis, emphysema, COPD, and pneumonia all have symptoms that can include bronchial constriction.

2

**Asthma**

Asthma is a disease, often called reactive airway disease as a euphemism, which is frequently due to allergy. It is characterized by coughing, wheezing, tightness in the chest and shortness of breath. Asthma is usually hereditary. However, it can occur in anyone at any age. The number of people estimated to have asthma in 2004 is 9.9% of the population, roughly 30 million people in today's terms. Centers for Disease Control and Prevention, National Center for Health Statistics, *Asthma, Summary Health Statistics for U.S. Adults: NationalHealthInterview Survey, 2004.* Available at http://www.cdc.gov/nchs/fastats/asthma.htm (last visited Nov. 26, 2006).

**COPD**

COPD (chronic obstructive pulmonary disease) represents 2 diseases, chronic bronchitis and emphysema. Chronic bronchitis is frequently the result of smoking and is characterized by coughing, shortness of breath, and the production of copious amounts of secretions from the lungs. Emphysema, which can be hereditary in a small percentage of people, is characterized by shortness of breath, coughing, and the inability to expel air from the lungs. The estimates in 2004 for emphysema are 1.7% and for chronic bronchitis are 4.2% which would extrapolate to 17.6 million people today. Centers for Disease Control and Prevention, National Center for Health Statistics, Chronic Obstructive Pulmonary Disease (COPD), *Summary Health Statistics for U.S. Adults: National Health Interview Survey, 2004.* Available at http://www.cdc.gov/nchs/fastats/copd.htm (last visited Nov. 26, 2006).

3

# BRONCHITIS

Bronchitis is an inflammation and/or an infection of the bronchial tubes often accompanied by sinusitis. It can mimic asthma as the symptoms can include coughing, wheezing, tightness in the chest, and shortness of breath. There can be sputum production that is often discolored. Approximately 14% of the population was diagnosed with sinusitis in 2004. This would be approximately 420 million people each year. Centers for Disease Control and Prevention, National Center for Health Statistics, Chronic Chronic Sinusitis, *Summary Health Statistics for U.S. Adults, 2004.* Available at http://www.cdc.gov/nchs/fastats/sinuses.htm (last visited Nov. 26, 2006).

## TREATMENT OF BRONCHIAL CONSTRICTION

The treatment of bronchial constriction has evolved over the years. Ephedrine has been available as an over-the-counter (OTC) drug since the 1920's. During the 1970's and early 1980's, both physicians and lay people thought that asthma was caused by emotional factors. We now know that emotions only play a role in exacerbating the existing disease, but cannot be the cause of the disease. Only a small fraction of asthmatics seek medical help. Most of them self-medicate with OTC drugs.

### Medications

Besides ephedra/ephedrine before the 1970's there were primitive inhalers that looked like old-fashioned perfume spray bottles. They were atomizers with a rubber bulb usually filled with a drug called Isuprel. This

was before the newer drugs for quick relief came along: 1st Alupent, then Albuteral and most recently Xopenex.

At that time, the only oral medications available were ephedrine and theophylline. They were frequently sold as combinations of those drugs: Tedral, which contained ephedrine, thophylline and Phenobarbital, and Marax, which contained ephedrine, theophylline and Atarax. Ephedrine worked directly as a bronchial dilator, relaxing the muscles surrounding the bronchial tubes, decreasing the mucosal edema and decreasing the excess production of mucus. Theophyline worked more slowly and by a different mechanism but achieved the same results.

With the advent of inhaled corticosteroids in the 1970's, first outside the United States and later in the United States, the treatment of asthma changed completely for those patients who were able to obtain and afford regular medical care for their asthma.

## General Considerations

Other diseases that cause coughing which may or may not cause bronchial constriction, like that seen in asthma, bronchitis, chronic bronchitis, emphysema, are a myriad of respiratory tract infections (from the common cold to influenza to pneumonia). Co-morbidity may exist when these infections occur in the same patients with asthma and COPD.

Some of these illnesses occur seasonally, such as viral upper respiratory tract infections (URI's/common colds) with 2004 estimates of 1 billion per year and seasonal exacerbations of allergic asthma, which may also be called asthmatic bronchitis. National Institute of Allergy and Infectious Diseases, National Institutes of Health, *Common Cold*, Available

5

at http://www3.niaid.nih.gov/healthscience/healthtopics/colds/overview.htm (last visited Nov. 26, 2006). Other infections, such as influenza, only occur seasonally and can occur as a sporadic outbreak or in epidemic or pandemic fashions. The CDC estimates that 5-20% of the population, or 15 to 60 million persons contract influenza annually. Department of Health and Human Services, Centers for Disease Control and Prevention, *Key Facts about Influenza and the Influenza Vaccine*, available at http://www.cdc.gov/flu/keyfacts.htm (last visited Nov. 26, 2006). It was estimated that 1.3 million people were discharged from the hospital with pneumonia in 2004. Centers for Disease Control and Prevention, National Center for Health Statistics, *Pneumonia, 2004 National Hospital Discharge Survey*, available at http://www.cdc.gov/nchs/fastats/pneumonia.htm (last visited Nov. 26, 2006).

As stated above treatment for these patients occurs in a variable pattern. Those who are lucky enough to live in an urban setting, have health insurance, and have a physician who knows how to treat these patients or can refer them to the proper specialist who will likely obtain the modern medications that are used to treat bronchial constriction. Those who are not so lucky don't have insurance, and live in a more rural setting, may just go to their local convenience store buy an OTC products for a cough. Such products contain ephedrine, guaifenesin and/or dextromethorphan. Those who are aware that they have bronchial constriction may pick up a product such as Primatene, Primatene Mist, or a product that contains ephedrine.

6

## Conclusion

It becomes obvious that the need for drugs such as ephedrine cannot be measured in yearly increments and then dosed out on a monthly basis. The occurrence of these diseases tend to have peaks and valleys. For example, there are asthma exacerbations at the start of the school year when URI's are more prominent. Further, there are a whole host of viral infections, especially in children, that occur at different times of the year. Another factor is the mobility of our population. Even people who have physicians, sometimes travel, lose contact with their physicians, and rely on OTC products.

Ephedrine is a useful product especially for those patients who do not have the primary care physician or the specialist to fall back on. A patient may have an immediate need to prevent an emergency room visit or a chronic need just to go on with their regular lives dealing with a chronic respiratory problem such as an asthma attack or an exacerbation of their chronic bronchitis.

It is important given the enormous population affected by bronchial constriction (approximately 1 billion annually) to have what may be lifesaving medication easily accessible, for particularly travelers, who can self administer medication based on symptoms they have experienced in the past without having to go to a physician. Some people may even feel they have to modify their work schedule or travel plans if they can't find easily available medications that they are accustomed to using. If OTC ephedrine – containing medications are not ubiquitous in the market and readily available, such as in convenience stores, there will likely be increased emergency room visits, hospital admissions and possibly worse.

7

Michael P. Pacin, MD
December 1, 2006
Copy of current CV attached

Michael P. Pacin, MD

December 1, 2006

Copy of current CV attached

9

# MICHAEL P. PACIN, MD

### Office

Florida Center for Allergy & Asthma Care and Research
8970 SW 87th Court, Suite 101
Miami, FL 33176
Phone: (305) 273-2988
Fax: 305-357-5481
Email:mikepacin@aol.com

### Home

13645 Deering Bay Drive #133
Coral Gables, Florida 33158
Phone: 305-259-9399
Fax: 305-259-9398

| | |
|---|---|
| **UNDERGRADUATE EDUCATION** | **A.B.,** Washington University St. Louis, MO 1965<br>Magna Cum Laude<br>Phi Beta Kappa |
| **MEDICAL SCHOOL** | **M.D.,** Washington University Medical School 1969<br>St. Louis, MO |
| **INTERNSHIP INTERNAL MEDICINE** | Barnes/Jewish Hospital of St. Louis 1969-1970<br>Washington University Medical School<br>St. Louis, MO |
| **RESIDENCY INTERNAL MEDICINE** | Barnes/Jewish Hospital of St. Louis 1970-1971<br>Washington University Medical School<br>St. Louis, MO<br><br>Jackson Memorial Hospital 1971-1972<br>University of Miami Medical School<br>Miami, FL |
| **FELLOWSHIP ALLERGY/IMMUNOLOGY** | Veterans Administration Hospital 1972-1974<br>University of California Irvine, Long Beach, CA |
| **BOARD CERTIFICATION** | Internal Medicine 1974<br>Allergy and Immunology 1979 |

**FACULTY APPOINTMENTS**

Washington University Medical School 1969-1971
Assistant in Medicine

University of Miami Medical School 1974-1984
Assistant Professor of Family Medicine

**MEDICAL
EMPLOYMENT**

**Florida Center for Allergy & Asthma Care**
Private Practice, Adult and Pediatric Allergy
Founder of solo practice 1974 and builder to present
group practice of 14 offices with 14 physicians

**Florida Center for Allergy & Asthma Research**
Founder and Principal Investigator 1974-present

**Florida Agency for Health Care Administration**
Medical Expert for legal and licensure issues
1984-present

**HOSPITAL PRIVILAGES**

Baptist Hospital
Jackson South Community Hospital
South Miami Hospital
West Boca Medical Center
Aventura Hospital

**PROFESSIONAL SOCIETIES**

Florida Allergy, Asthma and Immunology Society
American College of Allergy Asthma and
Immunology
American Academy of Allergy, Asthma and
Immunology
Joint Council of Allergy, Asthma and Immunology
American Association of Certified Allergists
Dade County Medical Association
Florida Medical Association

**MEDICAL LICENSES**

Florida
California

**LEGAL CONSULTING & EXPERT**
**WITNESS TESTIMONY – 30 years experience**

Medical Malpractice – Testimony for either plaintiff
or defense
IME's
Civil
Matrimonial
Case Reviews for Agency for Health Care
Administration
Malpractice issues
Licensure issues

**CLINICAL TRIALS**
**RESEARCH EXPERIENCE**

2005     **Glaxo,** Adult Asthma, Phase IIB, Principle Investigator
2005     **Wyeth,** Adult Asthma, Phase II, Sub-Investigator
2005     **Astellas,** Adult Asthma, Phase II, Sub-Investigator
2005     **Glaxo,** Pediatric SAR, Phase IIB, Principle Investigator
2005     **Glaxo,** Adult PAR, Phase IIB, Principle Investigator
2004     **Altana,** Adult Asthma, Phase III, Principle Investigator
2004     **Glaxo,** Pediatric Exercise Induced Asthma, Phase IV, Principle
Investigator
2004     **Glaxo,** Adult Asthma, Phase IV, Principle Investigator
2004     **Genentech,** Asthma Observational, Outcomes, Sub-Investigator
2004     **Merck,** Adult SAR, Phase IV, Sub-Investigator
2003     **AstraZeneca,** Adult Asthma, Phase IIB, Sub-Investigator
2003     **Altana,** Adult Asthma, Phase III, Investigator
2003     **Scherring,** Allergic Rhinitis, Phase IV, Investigator
2002     **Sepracor,** Adult Asthma, Phase III, Sub-Investigator
2002     **AstraZeneca,** Adult Asthma, Phase III, Sub-Investigator
2002     **Novartis,** Adult Asthma, Phase III, Sub-Investigator
2002     **Protein Design Labs,** Adult Asthma, Phase II, Sub-Investigator
2002     **Glaxo,** Adult Asthma, Phase III, Sub-Investigator
2002     **Altana,** Adult Asthma, Phase III, Sub-Investigator
2002     **Genentech,** Adult Asthma, Phase III, Sub-Investigator
2001     **Glaxo,** Pediatric Asthma, Phase III, Sub-Investigator
2001     **Whitehall Robins,** Allergic Rhinits, Phase IV, Principal Investigator
2001     **Schering Plough,** adult Asthma, Phase III, Sub-Investigator
2001     **Glaxo,** Pediatric Asthma, Phase III, Sub-Investigator
2001     **Merck,** Exercise Induced Asthma, Phase III, Sub-Investigator
2001     **Genentech,** Asthma Observation, Outcomes, Sub-Investigator
2000     **Merck,** Asthma, Phase V, Sub-Investigator
2000     **Glaxo,** Pediatric Allergic Rhinitis, Phase III, Sub-Investigator

2000 **Glaxo,** Asthma, Phase IV, Sub-Investigator
1999 **Zeneca,** Asthma, Phase III, Sub-Investigator
1999 **Pharmacia Upjohn,** Pediatric Allergic Rhinitis, Phase III, Principal Investigator
1999 **Tap Holding Inc.,** Acute Sinusitis, Phase III, Principal Investigator
1999 **Merck,** Asthma, Phase IIA, Sub-Investigator
1999 **Scherring Plough,** Pediatric Asthma, Phase III, Principal Investigator
1999 **Scherring Plough,** Allergic Rhinitis/Asthma, Phase IV, Principal Investigator
1998 **Hoechst Marion Roussell,** Acute Sinusitis, Phase III, Principal Investigator
1998 **Scherring Plough,** Allergic Rhinitis-Phase II, Sub-Investigator
1998 **Merck,** Pediatric Asthma-Phase V, Sub-Investigator
1998 **Zeneca,** Pediatric Asthma-Phase III, Principal Investigator
1997 **Pfizer,** Pediatric Allergic Rhinitis-Phase IV, Sub-Investigator
1997 **Abbott,** Asthma-Phase III, Sub-Investigator
1997 **Zeneca,** Asthma-Phase II, Principal Investigator
1997 **Zeneca,** Asthma-Phase IV, Principal Investigator
1997 **Allen & Hanbury,** Asthma-Phase IV, Principal Investigator
1996 **Ciba-Geigy,** Asthma-Phase II, Principal Investigator
1995 **SmithKline Beecham,** Asthma-Phase III, Sub-Investigator
1994 **Abbott,** Asthma-Phase III, Sub-Investigator
1992 **Rhone Poulenc Rorer,** Asthma-Phase IV, Principal Investigator
1991 **Rhone Poulenc Rorer,** Asthma-Phase II, Principal Investigator
1989 **Parke-Davis,** Asthma-Phase III, Principal Investigator
1986 **Rorer,** Asthma-Phase IV, Principal Investigator
1984 **Burroughs/Welcome,** Allergic Rhinitis-Phase III, Principal Investigator
1976 **Boeringer/Ingleheim,** Asthma-Phase III, Principal Investigator
**1976** **Sandoz,** Allergic Rhinitis-Phase III, Principal Investigator

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **NOVELTY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:07-cv-00191-RMU** |
| | ) | |
| **KAREN TANDY, Administrator,** | ) | |
| **U.S. DRUG ENFORCEMENT** | ) | |
| **ADMINISTRATION,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

ORDER

Following the Court's consideration of the Defendants' Motion to Dismiss or, in the

Alternative, Motion for Summary Judgment and all exhibits thereto and consideration of the

Plaintiff's Cross-Motion for Summary Judgment and Opposition to Motion to Dismiss or, in the

Alternative, Motion for Summary Judgment and all exhibits thereto, the Court **HEREBY**

**ENTERS THE FOLLOWING JUDGMENT ON THE MERITS**.  The Court **DECLARES**

THAT:

1. By failing to grant Plaintiff a DEA hearing on the merits of the DEA's denial of a

   Letter of No Objection (LONO) for Plaintiff's ephedrine shipment, Defendants

   violated Plaintiff's Fifth Amendment right of due process and acted in an arbitrary

   and capricious manner in violation of the Administrative Procedure Act (APA), 5

   U.S.C. § 706(2)(A);

2. By imposing its LONO procedure without notice and comment rulemaking,

   Defendants have violated the APA, 5 U.S.C. § 553 ; and

3. By imposing a de facto legislative rule against issuance of a LONO for ephedrine import when the ephedrine is destined for OTC convenience store sale, Defendants have acted in an arbitrary and capricious manner without substantial evidence and without notice and comment rulemaking in violation of the APA, 5 U.S.C. §§ 553 and 706(2)(A).

The Court FURTHER ORDERS THAT:

1. DEA without further delay shall grant Plaintiff a hearing on the merits of DEA's denial of a Letter of No Objection (LONO) for Plaintiff's ephedrine shipment;

2. Cease and desist imposition of its LONO procedure until the matter has been the subject of notice and comment rulemaking in accordance with the APA, 5 U.S.C. § 553; and

3. Cease and desist imposition of its de facto legislative rule against issuance of a LONO for ephedrine import when the ephedrine is destined for OTC convenience store sale until the matter has been the subject of notice and comment rulemaking in accordance with the APA, 5 U.S.C. § 553.

IT IS SO ORDERED this _____ day of _____, 200__

_____
RICARDO M. URBINA
UNITED STATES DISTRICT
COURT JUDGE