## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NOVELTY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-CV-00191 (RMU) |
| | ) | |
| KAREN TANDY, Administrator, | ) | |
| UNITED STATES DRUG ENFORCEMENT | ) | |
| ADMINISTRATION; et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Novelty, Inc. (hereinafter "Novelty"), by counsel and pursuant to Federal

Rule of Civil Procedure (FRCivP) 65, hereby requests issuance of a preliminary

injunction requiring Defendant Drug Enforcement Administration (DEA) to serve upon

Novelty a Notice of Suspension pursuant to 21 U.S.C. § 971 on the September 25, 2006

request for a Letter of No Objection (LONO) no later than fifteen (15) days after court's

order on this motion; and that Defendants shall hold an administrative hearing no later

than forty-five (45) days after the notice of suspension is issued, or at another date

mutually agreed upon by the parties consistent with 21 U.S.C. § 971, thereby granting

Novelty its statutory and due process right to pursue its September 25, 2006 request for a

Letter of No Objection (LONO).  A memorandum of points and authorities is attached

along with a draft order.

Respectfully submitted,

NOVELTY, INC.

By:  ____/s/_____

Its counsel
Jonathan W. Emord (DC Bar 407414)
Andrea G. Ferrenz (DC Bar 460512)


Emord & Associates, P.C.
11808 Wolf Run Lane
Clifton, VA 20124
P: (202) 466-6937
F: (202) 466-6938
Email: jemord@emord.com

Date submitted:  June 12, 2007

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NOVELTY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-CV-00191 (RMU) |
| | ) | |
| KAREN TANDY, Administrator, | ) | |
| UNITED STATES DRUG ENFORCEMENT | ) | |
| ADMINISTRATION; et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

Jonathan W. Emord (DC Bar 407414)
Andrea G. Ferrenz (DC Bar 460512)
Emord & Associates, P.C.
11808 Wolf Run Lane
Reston, VA 20191
Phone: (202) 466-6937
Fax: (202) 466-6938
jemord@emord.com

TABLE OF CONTENTS

Table of Authorities ......................................................................................................... iii

I.      SUMMARY ...........................................................................................................1

II.     APPLICABLE FACTS ..........................................................................................3

III.    PRELIMINARY INJUNCTION STANDARD........................................................7

IV.     ANALYSIS.............................................................................................................9

        A.     Novelty Has Established a Likelihood of Success on the Merits of its Fifth
               Amendment Due Process Claim ..................................................................9

        B.     Novelty Has Established a Likelihood of Success on the merits of its APA
               Arbitrary and Capricious Agency Action Claim .......................................13

        C.     Plaintiff Will Suffer Irreparable Harm Without the Requested Preliminary
               Relief........................................................................................................15

        D.     Issuance of the Notice of Suspension and Conduct of an Administrative
               Hearing Would Not Harm Any Other Parties............................................16

        E.     Plaintiff's Requested Preliminary Relief Serves the Public Interest .........16

V.      CONCLUSION....................................................................................................17

Exhibit 1      Green Affidavit

Exhibit 2      Bledsoe Affidavit

Exhibit 3      Meador Affidavit

Exhibit 4      Excerpts of Defendants' April 10, 2007 Motion to Dismiss or, in the Alternative,
               for Summary Judgment

# TABLE OF AUTHORITIES

*Cases*

*American Civil Liberties Union of Florida Inc. v. Miami-Dade County
School Board*, 439 F.Supp.2d 1242 (S.D.Fl. 2006) ............................................2, 8, 15, 16

*Ashland Oil, Inc. v. FTC,* 409 F. Supp. 297 (D.D.C. 1976), *aff'd,* 548 F.2d 977
(D.C. Cir. 1976) ................................................................................................8

*Barton v. Dist. of Columbia,* 131 F. Supp. 2d 236 (D.D.C. 2001).................................8

*Benten v. Kessler,* 505 U.S. 1084 (1992) ...........................................................8

*Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281
(1974)............................................................................................................13

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ...............................13

*Chemicals for Research and Industry v. Thornburgh*, 762 F.Supp 1394
(N.D.Ca. 1991)...........................................................................................11, 15

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971)............................13, 14

*CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738
(D.C. Cir. 1995) ................................................................................................7

*Cronin v. Dept. of Agriculture*, 919 F.2d 439 (7th Cir. 1990) ...........................................16

*Dorfmann v. Boozer*, 414 F.2d 1168 (D.C. Cir. 1969) ......................................................7

*Humane Society of United States v. Kempthorne*, 2006 U.S. Dist LEXIS
95708 (D.D.C. Aug. 9, 2006)................................................................................8

*Industrial Equipment Ass'n Inc. v. EPA*, 837 F.2d 1115 (D.C.Cir. 1988).........................9

*Jane Does I through III v. District of Columbia*, 374 F.Supp. 2d 107 (D.D.C. 2005) ......16

*Mitchum, DVA Book Mart v. Foster*, 407 U.S. 225 (1971) ................................................2

*Motor Vehicle Manufacturers Ass'n v. State Farm*, 463 U.S. 29 (1983) ...................13, 14

*Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060 (D.C. Cir. 1998)......................................7

*Murphree v. Winter*, 589 F.Supp. 374 (S.D.Miss. 1984)..................................................16

*O'Donnell v. Barry*, 148 F.3d 1126 (D.C.Cir. 1998).......................................................11

*PDK Laboratories Inc. v. DEA*, 362 F.3d 786 (2004) ...........................................................9

*PDK Labs v. Reno*, 134 F.Supp.2d 24 (D.D.C. 2001) .............................................. passim

*Sampson v. Murray,* 415 U.S. 61 (1974) .............................................................................8

*SEC v. Chenery Corp.,* 332 U.S. 194 (1947) ....................................................................12

*Serono Lab. v. Shalala,* 158 F.3d 1313 (D.C. Cir. 1998) ....................................................7

*Wisconsin v. Constantineau* 400 U.S. 433 (1971) .......................................................10, 11

*Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n,* 758 F.2d 669
(D.C. Cir. 1985) ...................................................................................................................8

## *Statutes*

Due Process Clause of the Fifth Amendment, U.S. Constitution ............................. passim

The Combat Methamphetamine Act of 2005, Pub. L. No. 109-177 (Mar 9, 2006), 120 Stat. 256
et seq. 21 U.S.C. § 802(46) ............................................................................................... passim

Administrative Procedure Act, 5 U.S.C. § 706(2)(A) ............................................... passim

21 U.S.C. § 971 ................................................................................................................. passim

28 U.S.C. § 2680 .................................................................................................................15

## *Other Authorities*

Federal Rule of Civil Procedure 11 ....................................................................................5

# I.     SUMMARY

On April 10, 2007, in their Motion to Dismiss or, in the Alternative, for Summary Judgment (Defendants' Motion), Defendants took the position that Novelty has no independent right to a hearing on the merits of DEA's denial of Novelty's September 25, 2006 request for a Letter of No Objection (LONO); Exhibit 4 at 10, 21.  Novelty seeks a LONO from DEA to permit the lawful import of ephedrine its inclusion in Novelty over-the-counter (OTC) cold and cough products.  DEA takes the position that Novelty may be afforded a hearing if and only if Spirit Pharmaceutical Inc. (Novelty's contractual importer and agent) demands a hearing for itself.  Defendants' Motion to Dismiss or in the Alternative for Summary Judgment filed April 10, 2007 and subsequently withdrawn (hereinafter "Defendants' Motion")(attached as Exhibit 4) at 10, 21.  Thus, DEA is not granting Novelty, the real party in interest aggrieved by the LONO denial, an independent right to a hearing as required by 21 U.S.C. 971 and by this Court's decision in *PDK Labs Inc. v. Reno*, 134 F.Supp.2d 24 (D.D.C. 2001).     Moreover, in its Motion, DEA took the position that even if Spirit were to request a hearing, Novelty's right to participate in the hearing is not absolute but would be permitted only if leave were granted by the assigned administrative law judge.  See Defendants' Motion, Exhibit 4 at 21.

Perceiving Fifth Amendment Due Process; Controlled Substances Act, 21 USC 971; and APA, 5 U.S.C. § 706(2)(A), violations resulting from Defendants' refusal to allow Novelty a hearing on the merits (a position first articulated in Defendants' Motion[1]), Novelty filed an Amended Complaint, including those causes of action.  Novelty also filed its opposition to Defendants' Motion and Novelty's cross motion for summary judgment on all claims including the hearing denial.   In response, Defendants withdrew Defendants' Motion, and the Court

---

[1] In a letter dated November 2, 2006, Novelty requested that DEA grant it an immediate hearing in accordance with 21 USC 971.  DEA has never responded to that letter.  The first articulation of a position germane to Novelty's request came in the Defendants' ill-fated Motion on April 10, 2007.

established a new briefing schedule for the filing of a new round of pleadings. See May 29, 2007 Order entered in this case.

Because Defendants' Motion reveals no intent to afford Novelty the immediate hearing on the merits that is Plaintiff's due under the Fifth Amendment Due Process Clause, 21 USC § 971, and the APA, Plaintiff now moves for issuance of a preliminary injunction from this Court to order that hearing forthwith.

As explained in detail herein, deprivation of Novelty's constitutional right to a hearing constitutes irreparable harm. *See e.g., Mitchum, DVA Book Mart v. Foster*, 407 U.S. 225, 242 (1971)(federal injunctive relief against state court proceedings may be essential to prevent great, immediate, and irreparable loss of a person's constitutional rights); *American Civil Liberties Union of Florida Inc. v. Miami-Dade County School Board*, 439 F.Supp.2d 1242, 1293 (S.D.Fl. 2006) (removal of books without following school board procedures violated First and Fourteenth Amendments).

Novelty is likely to succeed on the merits of its claim because 21 USC § 971, the Due Process Clause of the Fifth Amendment, the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), and applicable precedent (*e.g., PDK Labs v. Reno*, 134 F.supp.2d 24, 33 (D.D.C. 2001)) all require that Novelty be granted an administrative hearing to contest the LONO denial.

No other parties would be harmed by granting Novelty its statutory right to a hearing because Novelty seeks nothing more than is required of DEA by its own enabling statute, by the APA, and by the Due Process Clause of the Fifth Amendment. In this motion, Novelty is not asking the Court to order allowance of the import that underlies the LONO request. Instead, Novelty asks this Court to require Defendants to honor and observe the statutory process required by 21 USC 971.

The preliminary injunction serves the public interest because Defendants are not above the law but must be compelled to conform their conduct to the requirements of the DEA statute, 21 U.S.C. § 971, to the controlling precedent of this Court, *PDK Labs v. Reno*, to the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), and to the Due Process limits prescribed by the Fifth Amendment.

## II.     APPLICABLE FACTS

Novelty was created in 1980 by Todd Green, then an enterprising high school student. Exhibit 1 at ¶1.  From humble origins in his parents' garage, Mr. Green's company now employs approximately 500 people in the United States, operates a factory in China, and has direct licensing agreements with leading international entertainment and consumer goods companies, including, but not limited to, Disney, Chevrolet, NBA, Universal, Warner Brothers, and college sports teams.  *Id.* at ¶¶5, 14.  Mr. Green's genius in well-designed and controlled manufacture and closed system distribution are the subject of acclaim by organizations that rate entrepreneurs. *See  id.* at ¶8 (noting that Mr. Green is the recipient of the Ernst & Young Entrepeneur of the Year award and the  "40 under 40" award).  DEA's refusal to permit Novelty to import OTC ephedrine for convenience store sales threatens the viability of Novelty's existing business. Exhibit 1 at ¶¶12-14.  The LONO denial deprives Novelty of 10 to 15% of its annual revenues (approximately $17 million dollars), forcing the company to terminate an estimated 25-50 employees, end certain employee benefits, and fundamentally alter its heretofore successful closed system of distribution.  *See id* at ¶¶13-14.

Novelty currently sells its products to about 12,000 customers (individual convenience stores). including the major convenience store chains of Speedway, Circle K, Village Pantry and The Pantry.  *Id.* at ¶7.  700-800 of its items are trend items that are the core of its innovative

business and product development. *Id.* at ¶¶ 4,7. About 300 of its items ("Stock Keeping Units" or "SKUs") are non-trend based with stable sales that Novelty depends upon year after year, including its OTC cold and cough remedies. *Id.* at ¶4. Novelty's cold and cough remedies contain a combination of ephedrine and guaifenesin (an expectorant) and are sold under Novelty's private label. Exhibit 2 at ¶¶10, 11.

Novelty has registered with DEA every year since 1996 as a distributor of list 1 chemical products. Exhibit 2 at ¶¶7-9. Since first distributing list 1 products, Novelty has developed secure, well-monitored, audited, comprehensive anti-diversion inventory, shipping, and documentation procedures for those products that vastly exceed federal and state requirements. *Id.* at ¶¶22-67. Contrary to the Defendants' unsubstantiated allegations, Novelty is <u>not</u> a downstream distributor of list 1 products because Novelty has no upstream distributor of its private label products. Exhibit 2 at ¶11. Novelty contracts directly with its manufacturer for the creation of Novelty's branded OTC products, and Novelty distributes those products to its customers through its own closed distribution system. *Id.*

In Defendants' Motion and in the affidavit of DEA Staff Coordinator Darrell Meador appended thereto (and attached as Exhibit 3), Defendants charge Novelty with violation of state criminal laws. In particular, they charge Novelty with violating the laws of Kentucky (a felony) and Tennessee (a misdemeanor) by selling ephedrine in tablet form within those states. *Id* at ¶¶17 and 18. Defendants charge is false. Novelty has never sold ephedrine in a form that violates those states laws (or in a form or dosage strength that violates any other states' laws for that matter). See Exhibit 2 at ¶¶19-22. Indeed, Novelty's automated system for order fulfillment prevents consummation of a sale involving a product form or dosage that violates a state's laws.

See Exhibit 2 at ¶¶19-22, 28-68.  The charge is thus entirely void of merit—the result of, at best,

Defendants' reckless disregard of the facts or, at worst, Defendants' knowing falsity.[2]

The Affidavit of DEA Staff Coordinator Darrell Meador (Exhibit 3) reveals additional

factual ignorance and naiveté.  Contrary to Meador's assertions, Novelty does not market its

products for 'off label uses,' such as for weight loss or staying awake.  Compare Exhibit 3 at ¶¶

13 and 14 to Exhibit 2 at ¶17.  Contrary to his assertions, Novelty's products do not pass through

multiple layers of distribution.  Compare Exhibit 3 at ¶14 with Exhibit 2 at ¶18.  Novelty has a

closed system of distribution, obtains the finished product from its contract manufacturer,

warehouses the product in its own secure, locked, and 24 hour-monitored facilities, and ships the

product in its own trucks and under the care of its own, security trained drivers.  Exhibit 2 at ¶18.

Contrary to Meador's assertions, Novelty's products are not stronger than those found in the

traditional market.  Compare Exhibit 3 at ¶14 with Exhibit 2 at ¶18.  Novelty strictly complies

with the dosage limits of state and federal authorities.  *Id.*  Novelty's dosage amounts are the

same as those found in products sold in pharmacies, grocery stores, or "big box" stores such as

Wal-Mart.  *Id.*  Novelty has never been notified that its products were found in clandestine lab

seizures.  *Id.*  Novelty's distribution and sales system prevents its customers from purchasing

large quantities of chemical products.  *Id.*

In its 11 year history of selling OTC list 1 chemical products, Novelty has <u>never</u> received

a warning letter concerning its products being diverted for illicit drug manufacturing.  *Id.* at ¶13.

DEA has never denied Novelty a registration renewal.  *Id.* at ¶8-9.  Novelty was granted a

---

[2] In his affidavit, DEA Staff Coordinator Darrell Meador indicates that his charge of criminality arises from an "investigation" of Novelty.  See Exhibit 3 at ¶17.  His representation that he performed an investigation is belied by the fact that the slightest inquiry into Novelty's operation would reveal that it does not permit sale of unlawful product forms or dosages in any state.  Novelty is meticulous in its adherence to the law, making the charge glaring and obviously false.  Had the Defendants not withdrawn their motion, Plaintiffs would have filed a Rule 11 motion on this point

renewal on September 20, 2006, just before Novelty's importer submitted its LONO request for the shipment at issue. *Id.* at ¶9.

Novelty management and legal counsel closely monitor all current federal and state limitations on the dosage, form, packaging, and sale limitations for list 1 chemical products. Exhibit 2 at ¶¶15, 50. Novelty's list 1 chemical products include different dosages (25 mg and 12.5 mg) and different forms (gel capsules and tablets) to ensure federal and state by state compliance. *Id.* at ¶14. Novelty's comprehensive protocols, including its electronic automated ordering and inventory system, prevent the sale of forms and dosages of its list 1 chemical products to convenience stores in states where such forms and dosages are not permitted. *Id.* at ¶¶15, 19, 50.

On September 25, 2007, Novelty's contract manufacturer AAA Pharmaceuticals Inc. ("AAA") placed an order with an importer, Spirit Pharmaceuticals LLC ("Spirit"), for 2000 kg of ephedrine to manufacture Novelty's OTC tablet products. Exhibit 2 at ¶69. Spirit sent a DEA form 486 and request for a LONO by fax that same day, along with a request for another shipment for another AAA customer. Exhibit 2's Attachment B. On October 10, 2006 DEA rejected by the same letter both requests for a LONO without presenting justificatory facts and circumstances for the denials, stating only the conclusory charge that the agency "had grounds to believe that the proposed importation may be subject to diversion to the illicit market by the downstream distribution system and, as such is declining to sign a LONO for this importation." Exhibit 2's Attachment C.

On November 2, 2006 Novelty submitted a letter to DEA expressing its desire to pursue importation. Novelty requested that DEA quickly issue a notice of suspension so that Novelty could pursue its right to a hearing. Despite a statutory requirement for a DEA response within 15

days of the hearing request, DEA never responded to the letter.[3]  See Exhibit 2's Attachment D.

Novelty then filed its original complaint on January 29, 2007.  Three months thereafter, on April

10, 2007, DEA sent a letter to Spirit about the same time it filed Defendants' Motion, stating in

unprecedented fashion that DEA was "re-contacting [Spirit] to make certain that your intent is

that you do not wish to pursue the import requests."  Exhibit 2's Attachment E.  It also stated that

Spirit could "indicate in writing, within five (5) days from the date of this notice, your desire to

pursue the importation further."  DEA wrote: "If you elect this option <u>or fail to respond to this</u>

<u>notice within five (5) days</u>, DEA will order the suspension of the shipment pursuant to Title 21,

United States Code, Section 971(c)(1)."  <u>Id.</u> (emphasis added).  Spirit has not responded.  Exhibit

2's Attachment F.  As of the date of this filing, neither Novelty nor Spirit has received a notice of

suspension.

### III.     PRELIMINARY INJUNCTION STANDARD

In assessing whether to grant preliminary injunctive relief, which is considered an

extraordinary remedy, *see Dorfmann v. Boozer,* 414 F.2d 1168, 1173 (D.C. Cir. 1969), a court

must balance four factors: (1) whether the movant is substantially likely to succeed on the merits;

(2) whether the movant would suffer irreparable injury if the injunction were not granted; (3)

whether an injunction would substantially injure other interested parties; and (4) whether the

public interest would be furthered by the injunction. *See Mova Pharm. Corp. v. Shalala,* 140

F.3d 1060, 1066 (D.C. Cir. 1998) (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision,* 58

F.3d 738, 746 (D.C. Cir. 1995)); *Serono Lab. v. Shalala,* 158 F.3d 1313, 1317-18 (D.C. Cir.

---

[3] Defendants argue that when Novelty filed its complaint, Novelty's November 2, 2006 letter was "still pending." Exhibit 4 at 10 (misstating the date for filing the Complaint).  It is axiomatic that importation to satisfy customer demand is a time-sensitive issue.  Failing to respond for three months is in this circumstance the functional equivalent of a denial.  An agency cannot reasonably avoid responsibility for its refusal to act by referring to the matter as "still pending," particularly when there is no justification for delay in the issuance of a decision and there is a statutory requirement of action no later than 15 days before the scheduled import.  See 21 U.S.C. § 971.

1998). "These factors interrelate on a sliding scale and must be balanced against each other. 'If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in the other areas are rather weak.'" *Serono Lab.* 158 F.3d at 1318 (quoting *CityFed Fin. Corp.,* 58 F.3d at 746).

"[A]n injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *CityFed Fin. Corp.,* 58 F.3d at 747. "[I]t is particularly important for the [movant] to demonstrate a substantial likelihood of success on the merits." *Barton v. Dist. of Columbia,* 131 F. Supp. 2d 236, 242 (D.D.C. 2001) (citing *Benten v. Kessler,* 505 U.S. 1084, 1085 (1992)).

In addition, a party seeking preliminary injunctive relief must demonstrate at least some irreparable injury because "the basis for injunctive relief in the federal courts has always been irreparable harm." *CityFed Fin.,* 58 F.3d at 747 (quoting *Sampson v. Murray,* 415 U.S. 61, 88, 94 S. Ct. 937, 39 L. Ed. 2d 166 (1974)) (alterations omitted). In order to establish irreparable injury, the movant "must establish injury that is great, certain, and actual, not merely theoretical." *Humane Society of United States v. Kempthorne*, 2006 U.S. Dist LEXIS 95708, *16 (D.D.C. Aug. 9, 2006). (citing *Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n,* 244 U.S. App. D.C. 349, 758 F.2d 669, 674 (D.C. Cir. 1985)). "'The injury complained of [must be] of such *imminence* that there is a "clear and present" need for equitable relief to prevent irreparable harm.'" *Wisconsin Gas*, 758 F.2d at 674 (quoting *Ashland Oil, Inc. v. FTC,* 409 F. Supp. 297, 307 (D.D.C. 1976), *aff'd,* 548 F.2d 977 (D.C. Cir. 1976)) (emphasis in original). Violation of a constitutional right, such as the right to Due Process, is an irreparable injury by operation of law. It satisfies the injunction standard injury requirement. *See, e.g., ACLU of Florida*, 439 F.Supp. 2d at 1293; *see also PDK Labs*, 134 F.Supp. 2d at 36-37 (the denial of the LONO request

directly threatened PDK's business reputation, jeopardized its customer base and compromised its ability to remain fully operational).

**IV.    ANALYSIS**

**A.  NOVELTY HAS ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS FIFTH AMENDMENT DUE PROCESS CLAIM**

Defendants' denial of Novelty's right to a hearing under 21 USC 971 is a violation of Novelty's liberty and property interests under the Due Process Clause of the Fifth Amendment. The D.C. Circuit's decision in *PDK Laboratories Inc. v. DEA*, 362 F.3d 786, 791-794 (2004)(manufacturer has prudential and Article III standing to appeal denial of LONO request made by manufacturer's importer), is controlling.  Defendants tempt fate by ignoring that precedent.  Defendants indicate that if Spirit, Novelty's contract importer, elects not to appeal the LONO denial (a LONO Spirit has sought solely as an agent of Novelty), Novelty will be given no recourse.  See Defendants' Motion at 10 (excerpted here as Exhibit 4).  Defendants indicate that if Spirit chooses to appeal the LONO denial, Novelty (the real party in interest) will not automatically be a party to that appeal but must "seek leave" to intervene, grant of which is entirely within the discretion of DEA's Administrative Law judge.  See Defendants' Motion at10 (excerpted here as Exhibit 4).  Thus Defendants reject what *PDK* ordered them to accept, the right (not subject to discretion or dependent on leave) of a non-importer regulatee to an independent hearing on the merits.  See *PDK,* 362 F.3d at 791-794("PDK has Article III standing…it is a 'person aggrieved'….and is entitled to prosecute its case in court"); *see also* 134 F.Supp.2d 24(PDK district court decision ordering DEA to hold a hearing under section 971).

To succeed in a Fifth Amendment Due Process claim Novelty must show (1) it has a protected interest; (2) the government deprived it of that interest; and (3) the deprivation

9

occurred without proper procedural protections. *Industrial Equipment Ass'n Inc. v. EPA*, 837 F.2d 1115 (D.C.Cir. 1988). PDK involved a Due Process challenge analogous to the present challenge. As a manufacturer PDK had a recognized liberty interest in "avoiding the damage to its reputation and business caused by a stigmatizing suspension" and that interest was harmed when PDK was "labeled not worthy of being trusted with common chemicals" and when PDK was "largely precluded from pursuing its core business activities." 134 F.Supp.2d at 33. Novelty is similarly situated. Novelty is a distributor that sells ephedrine to convenience stores nationwide. Sale of its list 1 chemical containing products comprises 10%-15% of Novelty's annual revenue. Like PDK, Novelty has a liberty interest in avoiding damage to its reputation among its 12,000 convenience stores purchasers[4] as a legal, trusted and reliable source of cough and cold remedies containing list 1 chemicals. The consequence of DEA's import denial is to destroy that reputation,  Thus, as in *PDK*, so too here, DEA's summary import ban predicated on a presumed risk of diversion to the illicit drug trade has a stigmatizing effect on PDK's business, ruinous to Novelty's business reputation and business. That liberty interest is harmed when DEA deems Novelty not worthy of being trusted with convenience store distribution of the list 1 chemicals and when it prevents continuation of that business. The distribution of list 1 chemicals through Novelty's closed system of distribution is a core business activity of Novelty. DEA's denial of the LONO effectively precludes Novelty from pursuing its core business activity.

Novelty's business reputation would suffer the stigmatizing effects of being labeled "not worthy of being trusted" with the reliable supply of legal list 1 chemicals  The principles in *Wisconsin v. Constantineau* have been applied in other DEA cases and are instructive here. 400 U.S. 433 (1971)(state law violated due process when without notice or hearing the law allowed

---

[4] Not all of Novelty's 12,000 customers purchase its list 1 chemical products.

posting of a notice to suppliers that sales to Plaintiff were forbidden for one year); *see PDK Labs Inc. v. Reno*, 134 F.Supp.2d 24 (Preliminary injunction granted where DEA ignored statutory process for notice of suspension and hearing when manufacturer challenged denial of LONO request); *see also Chemicals for Research and Industry v. Thornburgh*, 762 F.Supp 1394, 1398 (N.D.Ca. 1991)(Preliminary injunction granted when DEA notified five of plaintiff's suppliers that they could no longer sell chemicals to the plaintiff because plaintiffs' chemical products were suspected of diversion). "Where the state attaches a 'badge of infamy' to [a] citizen, due process comes into play." *Constantineau*, 400 U.S. at 437 (citing *Wieman v. Updegraff*, 344 U.S. 183, 191 (1952)). "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Constantineau*, 400 U.S. at 437. This court has required that the harm to reputation be "in conjunction with or stem from 'some tangible change in status.'" *PDK*, 134 F.Supp. 2d at 33 (citing *O'Donnell v. Barry*, 148 F.3d 1126, 1141 (D.C.Cir. 1998)). Citing *Chemicals for Research and Industry*, this court reiterated that a company 'labeled not worthy of being trusted with common chemicals…is severely stigmatized and…would appear to be entitled to some sort of notice and hearing." *PDK*, 134 F.Supp.2d at 33 (citing 762 F.Supp. at 1398). Largely precluding the plaintiff from pursing a core business (in this case a stable part of its business that accounts for 15% of its total annual revenue) was sufficient to constitute a tangible change in status. *PDK*, 134 F.Supp.2d at 33.

Novelty would be largely precluded from obtaining 10% to 15% of its revenue (up to seventeen million dollars) if DEA succeeds in preventing Novelty from importing the list 1 chemicals. That loss of revenue will force Novelty to lay-off 25-50 employees, end certain employee benefits, and alter its closed system of distribution. See Exhibit 1 at ¶¶14-15.

Procedural protections to guard against those effects are contained in 21 USC 971.  DEA has denied Novelty its independent right to those procedural protections despite the fact that all of the alleged facts upon which DEA relies to support LONO denial purportedly concern Novelty, not its importer Spirit.  Novelty is, thus, the real party in interest.

In *PDK* the court found a liberty interest sufficient to invoke the Due Process Clause and compel a hearing but did not find a property interest because 21 USC 971 granted DEA discretion to restrict importation, so there was no per se entitlement to the import chemicals.  134 F.Supp. 2d at 32-33.  That discretion, however, arises when DEA has "grounds to believe that a shipment may be diverted."  Id. at 33.  If there are no credible grounds to believe that a shipment may be diverted, as in the present case (indeed, there are ample factual grounds to believe the shipment will not be diverted, arising from Novelty's extraordinary security measures and closed system of distribution), then DEA has no discretion to deny the importation.  Despite the assumptions and erroneous conclusions in the Meador Affidavit appended to the Defendants' Motion, Novelty has shown in the affidavits attached hereto (Exhibits 1 and 2) that numerous and redundant steps have been taken to ensure that diversion does not take place and there exists no evidence known to Novelty that any of its products has ever been diverted to the illicit drug trade.  See Exhibit 2 at ¶¶22-67.  Thus, unlike in *PDK*, Novelty has a cognizable property interest in the list 1 chemicals.  Novelty's property interest is being denied without the proper procedural protections of 21 USC 971.  Novelty, therefore, has shown, that its Fifth Amendment right to Due Process of law has been violated as a result of DEA's unilateral deprivation of its liberty and property interests without affording Novelty an independent hearing on the merits and that a hearing under 21 USC 971 must be granted forthwith to end the constitutional violation.

**B**.    **NOVELTY HAS ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS APA ARBITRARY AND CAPRICIOUS AGENCY ACTION CLAIM**

Defendants' denial of Novelty's right to an independent hearing pursuant to 21 USC 971 and their refusal to recognize Novelty's standing to pursue denial of the LONO for its shipment of List 1 chemicals are arbitrary and capricious agency actions in violation of the APA, 5 U.S.C. § 706.

The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. *Motor Vehicle Manufacturers Ass'n v. State Farm*, 463 U.S. 29, 42-43 (1983)(agency presented an inadequate basis and explanation). Nevertheless, the agency is legally obliged to examine relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)(agency made no findings and no analysis to justify the choice made thus there was no indication of the basis for decision).  Here by not affording Novelty a hearing on the LONO denial, DEA refuses to receive relevant data necessary to determine the merits.  It stands on a cursory (as we see from the Meador Affidavit, factually erroneous) predicate for its supposition that all ephedrine sales to convenience stores are inextricably destined for the illicit drug trade.  In reviewing an agency's explanation, courts must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285 (1974)(agency order not arbitrary and capricious); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)(judicial review on agency litigation affidavits was inadequate although formal findings by agency are not required).  Here, DEA refuses to consider the relevant factors by denying the real party in interest the opportunity to present those factors, basing its decision instead on a rather obvious

lack of willingness to wrangle with the behemoth agency by a mere import agent of Novelty, i.e.,
Spirit Pharmaceuticals. "Normally, an agency rule would be arbitrary and capricious if the
agency has relied on factors which Congress has not intended it to consider, entirely failed to
consider an important aspect of the problem, offered an explanation for its decision that runs
counter to the evidence before the agency, or [the rule] is so implausible that it could not be
ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.
Here DEA ignores 21 USC 971 and *PDK*, the controlling law, which would have it grant
Novelty its rightful hearing; without that hearing, there is no factual record for agency decision,
just the raw exertion of unbridled agency power to condemn in a conclusory fashion every
attempt by Novelty to import ephedrine.  This raw exertion of power occurs without any
effective redress, save for this Court's order to compel a hearing and to review the DEA's
ultimate conclusion if it persists in its denial.  The reviewing court may not supply a reasoned
basis for the agency's action that the agency itself has not given. *SEC v. Chenery Corp.*, 332 U.S.
194, 196 (1947)(agency action was based on substantial evidence and was consistent with
Congressionally granted authority).  Moreover, *post hoc* rationalizations to justify agency action
are prohibited by the federal courts.  *Citizens to Preserve Overton Park*, 401 U.S. at 419.

        In Novelty's case, DEA failed to take any action on Novelty's November 2, 2006 letter.
In Defendants' Motion, without explanation for their position or provision of supporting legal
authority, Defendants stated that Novelty could only seek to intervene in a hearing if Spirit chose
to pursue one and then only if leave were granted by DEA's ALJ.  That position is arbitrary and
capricious, irrational and contrary to the plain requirements of 21 USC 971, the D.C. Circuit's
PDK decision, and the Fifth Amendment Due Process clause.

### C.    PLAINTIFF WILL SUFFER IRREPARABLE HARM WITHOUT THE REQUESTED PRELIMINARY RELIEF

Without the requested injunctive relief, Novelty will suffer immediate and irreparable harm to its business reputation, to its core business in list 1 chemical sales, to its work force (with the loss of 25 to 50 employees), to its existing panoply of employee benefits which will have to be reduced in number and scope, and to its revenue base (resulting in a loss of $17,000,000 in annual revenues).  Ongoing deprivation of Novelty's Fifth Amendment Due Process right to a hearing on the merits of the LONO denial is itself an irreparable harm satisfying the injunction requirement.  *ALCU of Florida*, 439 F.Supp.2d at 1293.

The harm to Novelty's reputation and goodwill, its liberty interest, would be irreparable. "One who is labeled not worthy of being trusted with common chemicals that house both legitimate and illegitimate uses is severely stigmatized."  *Chemicals for Research and Industry v. Thornburgh,* 762 F.Supp 1394, 1398 (N.D.Ca. 1991).  That stigma is "extreme—arguably tantamount to the stigma of being criminally prosecuted."  *Id.* at 1399; *see also PDK Labs Inc. v. Reno,* 134 F.Supp.2d at 33.

Novelty's loss of its reputation for the reliable sale of legal list 1 chemicals cannot be translated into monetary damages; its loss of market placement for its list 1 chemical products yields damages beyond those capable of reasonable estimation.  Indeed, even the directly identifiable financial losses it will suffer are ones that cannot be cured through monetary damages, because claims for monetary damages of that kind are typically barred by sovereign immunity.  28 U.S.C. § 2680.  Thus, the harms to Novelty, even without consideration of the presumed injury that arises from the Fifth Amendment violation, are not capable of being recompensed and are thus irreparable.

**D.    ISSUANCE OF THE NOTICE OF SUSPENSION AND CONDUCT OF AN ADMINISTRATIVE HEARING WOULD NOT HARM ANY OTHER PARTIES**

"When denial of a preliminary injunction would threaten a plaintiff with serious injury, while granting the injunction would only impose a slight burden upon the defendant, the court properly grants the injunction." *Jane Does I through III v. District of Columbia*, 374 F.Supp.2d 107, 118 (D.D.C. 2005)(citing *Cronin v. Dept. of Agriculture*, 919 F.2d 439, 445 (7th Cir. 1990)). In addition, "'mere administrative inconvenience can never justify denial' of a constitutional or civil right, the balance of hardships clearly favors plaintiffs." *Jane Does*, 374 Supp.2d at 118 (citing *Murphree v. Winter*, 589 F.Supp. 374, 382 (S.D.Miss. 1984)).  Holding a hearing that the courts have determined is DEA's statutory duty under 21 USC 971 poses no harm to Defendants' legitimate interests, let alone one that rises to the level of infringement of constitutional rights. *ACLU of Florida*, 439 F.Supp.2d at 1293.

**E.    PLAINTIFF'S REQUESTED PRELIMINARY RELIEF SERVES THE PUBLIC INTEREST**

The public interest is best served when the agencies of the federal government abide by the requirements of their enabling statutes, the orders of this Court, and the Constitution of the United States.  There is no legitimate public interest in maintaining a regime that contravenes each of those, as does the FTC's refusal to grant a hearing to a regulatee adversely affected by its denial of a LONO.  It has long been held in the public interest to protect constitutional rights. *E.g. id.*at 1294.  Moreover, "the public also has an interest in requiring agencies to operate within their statutory and regulatory mandates." *PDK v. Reno*, 134 F.Supp.2d at 37.  Thus an injunction in this case serves the public interest and the absence of an injunction disserves that interest.

16

## V.    CONCLUSION

For the foregoing reasons, Novelty respectfully requests that this Court issue a preliminary injunction compelling Defendant DEA (1) to issue a Notice of Suspension pursuant to 21 U.S.C. § 971 to Plaintiff on the September 25, 2006 request for a Letter of No Objection (LONO) no later than fifteen (15) days after court's order on this motion; and (2) to hold an administrative hearing no later than forty-five (45) days after the notice of suspension is issued, or at another date mutually agreed upon by the parties consistent with the requirements of 21 U.S.C. § 971, thereby enabling Novelty to pursue its rightful appeal of DEA's denial of Novelty's September 25, 2006 request for a LONO.


Respectfully submitted,

NOVELTY, INC.,


_____/s/_____
By:    Jonathan W. Emord (DC Bar 407414)
       Andrea G. Ferrenz (DC Bar 460512)
       Attorneys for Plaintiff


Emord & Associates, P.C.
11808 Wolf Run Lane
Reston, VA 20191
Phone: (202) 466-6937
Fax: (202) 466-6938
jemord@emord.com

Date submitted:  June 12, 2007

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NOVELTY, INC., | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-cv-00191-RMU |
| | ) | |
| KAREN TANDY, Administrator, | ) | |
| U.S. DRUG ENFORCEMENT | ) | |
| ADMINISTRATION, | ) | |
| et al., | ) | |
| | ) | |
|     Defendants. | ) | |

<u>**EXHIBIT 1 TO**</u>

<u>**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NOVELTY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-cv-00191-RBW |
| | ) | Judge Reggie B. Watson |
| KAREN TANDY, Administrator, | ) | |
| U.S. Drug Enforcement Administration, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**AFFIDAVIT OF NOVELTY PRESIDENT TODD GREEN IN SUPPORT OF**
**NOVELTY'S OPPOSITION TO DEFENDANTS' MOTION AND NOVELTY'S CROSS**
**MOTION FOR SUMMARY JUDGMENT**

I, Todd Green, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information and belief:

1.    I am the President and founder of Novelty, Inc. (hereinafter "Novelty"). I directly manage the day to day operations of the company. I also manage future business planning and product development.

2.    I formed Novelty in the early 80's while I was in high school, storing products in my father's garage and selling them to local convenience stores in Indiana.

3.    I named the company based on the type of products that we sell, i.e., novelty items, that are primarily trend products designed to be impulse purchases.

**Business Overview**

4.    We introduce 700-800 new products annually, responding to popular trends in the consumer marketplace. Thus, product development is an essential part of our business. About 300 of our products (or "Stock Keeping Units," aka "SKUs") are

standard items that are sold for a number of years, not part of our annual rotation of new items.

5.    We have licensing agreements to create and sell merchandise with many of the top international branded entertainment and consumer organizations such as Disney, Chevrolet, Dodge, NBA, Warner, Universal, Miller Brewing, and college sports teams.

6.    I have built Novelty in to a business employing approximately 500 employees around the world.  Working from our headquarters in Greenfield, I manage 5 offices and 1 factory in China, 2 distribution centers in the US, and sales, product development, operations and marketing departments.

7.    Novelty has approximately 12,000 customers, each an individual store, in the United States and Canada.  Those stores include major convenience store chains such as Circle K, The Pantry, Village Pantry, and Speedway.

8.    In 1999 Ernst & Young named me Entrepreneur of the Year.  Indiana Business Journal named me in its "40 under 40" list.

### List 1 Chemical Products

9.    Novelty began selling over-the-counter (OTC) products containing List 1 chemicals (either ephedrine or pseudoephedrine) in approximately 1996.

10.   Currently the sale of those OTC products produce 10-15% of Novelty's total annual revenue, approximately $17 million dollars.

11.   Novelty has previously attempted to find a domestic source of quality ephedrine to use in manufacturing its OTC products at a commercially reasonable rate and found none.

12. If DEA continues to prevent Novelty from importing ephedrine for its OTC products, Novelty will be unable to meet the legitimate supply needs of its retail customers.

13. If Novelty is unable to satisfy its retail customers' demand for the OTC products, those customers will fill their retail shelves with the List 1 chemical OTC products of Novelty's competitors, causing Novelty to suffer irreparable loss of market share and revenues.

14. A loss of up to 15% of Novelty's total revenue will result in significant changes in Novelty's business, likely forcing Novelty to lay-off at least 25-50 employees domestically and to sacrifice certain of its remaining employee benefits.

15. A loss of up to 15% of Novelty's total revenue would alter fundamentally Novelty's business by forcing the company to revise its overall product offerings, quantities of product in inventory, distribution methods, and compensation plans because revenues derived from the company's sale of OTC products help sustain each of the foregoing operations.

Todd Green

5-22-07

Date

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NOVELTY, INC.,                                    )
                                                 )
       Plaintiff,                             )
                                                 )
v.                                               )     Case No. 1:07-cv-00191-RMU
                                                 )
KAREN TANDY, Administrator,                      )
U.S. DRUG ENFORCEMENT                             )
ADMINISTRATION,                                  )
et al.,                                          )
                                                 )
       Defendants.                            )

**<u>EXHIBIT 2 TO</u>**

**<u>PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NOVELTY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:07-CV-00191 (RMU) |
| | ) | |
| KAREN TANDY, Administrator, | ) | |
| U.S. Drug Enforcement Administration, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**AFFIDAVIT OF MARK BLEDSOE IN SUPPORT OF NOVELTY'S OPPOSITION TO
DEFENDANTS' MOTION AND NOVELTY'S CROSS MOTION**

I, Mark Bledsoe, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.  I am the Director of Category Management for Novelty, Inc., located at 351 West Muskegon Drive, Greenfield, IN 46140 (hereinafter "Novelty").

2.  I have been employed with Novelty, Inc. since February 1998. I have been the Director of Category Management for Novelty since June 2004.

3.  Prior to being employed with Novelty I was employed as a Merchandiser for Sunoco for eight years, as a buyer for Stop N Go for six years, and as a District Manager for King Kwik for six years.

4.  I have over 20 years of experience in the convenience store industry in the operations and marketing aspects of the business practice.

5.  During the course of my employment in the convenience store industry, my operational responsibilities have included day to day supervision of eight to twelve convenience stores, category management for products and inventory, pricing negotiation with

vendors, recruitment of new product concepts and vendors, and development of store layouts and displays.

6. In my current position I am responsible for buying "standard" stock items for our inventory, negotiating prices with vendors, sourcing new vendors, and monitoring Novelty compliance with state and federal regulations governing List 1 products.    I also monitor the sales of List 1 products by dosage strength and formulation in compliance with state-specific List 1 product regulations.

## Novelty's Registration

7. In approximately 1996 Novelty applied for and received a registration to distribute list 1 chemicals from the DEA.

8. Every year after 1996 to the present Novelty renewed its registration to distribute List 1 chemicals with DEA.

9. Novelty's current registration was awarded on September 20, 2006 and is valid through October 31, 2007.

10. Novelty, Inc. has sold over-the-counter products containing a combination of ephedrine and  guaifenesin (an expectorant) to convenience store retail locations in the United States.

## Novelty's Customers and Products

11. Novelty distributes List 1 products to convenience stores exclusively.  It does not sell to distributors.  It sells directly to stores and has established relationships with each store. Its products are created by a contract manufacturer AAA Pharmaceuticals at Novelty's request and under Novelty's private label.  Novelty then transports and sells those products directly to its retail customers without any middle men, one of the critical

2

elements in its risk reduction program. Novelty's manufacture and distribution of its products is a "closed system" that meets all of DEA's documentation requirements and regulatory limitations to minimize the risk of diversion.

12. Novelty's List 1 product customers include many of the nation's largest and most well-respected store chains such as Circle K, The Pantry, Village Pantry, and Speedway.

13. Novelty has <u>never</u> received a DEA Warning Letter advising Novelty that any of its products have ever been found in or associated with clandestine manufacturing of illegal substances.

14. Novelty sells List 1 chemical products in some states that limit ephedrine content to 12.5 mg tablet form, in some states that limit ephedrine content to 25 mg tablet form, in some states that limit ephedrine content to 12.5 mg gel capsule form, and in some states that limit ephedrine content to 25 mg gel capsule form.

15. Novelty ensures that the ephedrine form and content sold in a state complies with that state's requirements.

16. Novelty does not manufacture List 1 chemical products for sale in a state that exceeds that state's allowable limits on dosage.

17. Novelty does not sell its List 1 chemical products, and has never sold those products, with any "off label" claims (such as for weight loss or staying awake).

18. In his affidavit, DEA witness Darrell Meador defines several types of conduct that he says create a risk of ephedrine diversion to the illicit methamphetamine trade and suggests that Novelty engages in that conduct. Meador Affidavit at ¶¶ 13-14. Those statements, as applied to Novelty, are false:

3

- Products are labeled as cough/cold relief medications but are "marketed for 'off label' uses, such as weight loss or staying awake." Meador Affidavit at ¶13. Novelty does not market its products for 'off label uses,' such as for weight loss or staying awake.

- "Products pass through multiple layers of distribution." Meador Affidavit at ¶14. This is false. Novelty's products do not pass through multiple layers of distribution. Novelty has a closed system of distribution, obtains the finished product from its contract manufacturer, warehouses the product in its own facilities, and ships the product by its own trucks and under the care of its own, security trained drivers.

- "Products sold are typically stronger than those found in the traditional market." Meador Affidavit at ¶14. Novelty's products are not stronger than those found in the traditional market. Novelty strictly complies with the dosage limitations of state and federal authorities. Novelty's dosage amounts are the same as those found in products sold in pharmacies, grocery stores, or "big box" stores such as Wal-Mart.

- "Products…have been disproportionately represented in clandestine lab seizures around the United States involving listed chemical products." Meador Affidavit at ¶14. Novelty has never been notified that its products were found in clandestine lab seizures.

- "Non-traditional retailers tend to knowingly sell large quantities of List 1 chemical products to 'smurfers,' methamphetamine traffickers and/or individuals who work for methamphetamine traffickers who attempt to buy

4

out a store's entire stock of List 1 chemical products by going to the store at different times or on different days." Meador Affidavit at ¶14. Novelty's distribution and sales system prevents its customers from purchasing large quantities of chemical products. Novelty enforces its policy regarding sales by the retailer to the consumer, this policy states; "no more than 2 packages per transaction and 1 transaction per day". This policy is far more stringent than the limit set in the Combat Methamphetamine Epidemic Act of 2005. (CMEA) (Limits ephedrine sales to 3.6 grams per day) Every display case containing Novelty's ephedrine products displays this policy, every log book provided to Novelty's retailers contains this policy on every page of the log book. (Novelty provides these log books to it's customers free of charge) Every training manual (Training required by the CMEA) provided to its customers contains this policy. (Novelty provides these training manuals to it's customers free of charge) .

19. Some of the stores to which Novelty sells its List 1 chemical products are located in Kentucky and Tennessee. Those states allow the tablet form of List 1 chemicals to be sold only in pharmacies. The laws of those states permit the gel capsule form of ephedrine to be sold in convenience stores, within dosage limitations. Novelty sells only its gel capsule form products in those states, and it does so in strict accordance with the laws of those states. The contrary statement made in the affidavit of Darrell Meador attached to the Defendants' Motion to Dismiss or in the alternative for Summary Judgment is utterly false. From the date Kentucky and Tennessee first adopted laws

prohibiting the tablet form of ephedrine to be sold in convenience stores, Novelty has never sold that form in those states.

20. Novelty submitted to DEA a customer list at DEA's request. The list does not distinguish (and was not required to distinguish) which form or dose amount of its List 1 products (tablets versus gel caps and 12.5 mg per dose versus 25 mg per dose) are sold by which customers on that list. DEA has never requested that Novelty identify which products are sold by which customers. All prior customer lists given to DEA when Novelty sought a LONO likewise did not distinguish tablet States from gel capsule states and were not required to distinguish in that way. Novelty has consistently adhered to the legal requirements in each state where its products are sold.

21. Some of our List 1 customers operate stores in several states. In some cases they have stores in states that do not permit List 1 products to be sold in convenience stores (such as Iowa). In some cases they have stores located in states that permit ephedrine in 25 mg tablet form (such as Indiana). In some cases they have stores located in states that permit ephedrine in 12.5 mg tablet form (such as Michigan). In some cases they have stores located in states that permit ephedrine in 25 mg gel capsule form (such as Kentucky). In some cases they have stores located in states that permit ephedrine sold in 12.5 mg gel capsule form (such as Texas). The LONO requested on September 25, 2006 included those customers. If Novelty had excluded Circle K from that customer list because they have stores in Ohio that by law cannot sell ephedrine, or because they have stores in Kentucky that by law must sell ephedrine in a gel capsule form, then the customer list would have been misleading, since it was Novelty's intent to sell 25 mg ephedrine tablets to Circle K's Indiana stores and to sell 12.5 mg tablets to its Michigan stores.

6

22. On or about February 3, 2006, I spoke with DEA employee Lisa R. Barnhill concerning our List 1 chemicals' products customer list. She asked for an explanation of the store or chains listed which had locations in states where sales in convenience stores were prohibited or restricted. I explained that the list does not identify which forms are sold to which customers or, in the case of some chains, does not identify by individual stores in states where sales by convenience stores are prohibited. I informed her of our policy on List 1 chemicals and sent her a copy of it via email, highlighting the sections describing our weekly monitoring of sales by product by State. Attachment A.

### List I Chemical Sales History

23. Because ephedrine is identified as a List 1 chemical by the Drug Enforcement Administration, Novelty, Inc. enforces a strict company-wide policy for all employees and associates governing the handling of ephedrine products.

24. The policy's formal objective is to ensure that the List 1 products held and distributed by Novelty, Inc. are guarded against risk of diversion at every point along the distribution chain up to, and including, the ultimate consumer sale.

25. Novelty, Inc.'s policy mandates that all associates who handle or have access to List 1 products be personally responsible for their actions in compliance. Each must read and sign the policy document acknowledging that he or she understands the provisions of the policy and will abide by the policy in its entirety.

26. In order to preserve the integrity of the inventory stock retained at Novelty, Inc.'s warehouses, all warehouse personnel with access to List 1 products are specially trained, must display employee ID badges indicating their specific position and security level

7

(i.e., OTC access authorization), and are subject to a zero tolerance policy for any act of non-compliance.

27. Prior to being hired, Novelty, Inc. conducts extensive criminal background checks and performs standard drug testing for all of its personnel, warehouse human resources, and contract drivers.

### List I Chemical Storage and Sales Procedures

28. The List 1 products area contained within the Novelty, Inc. warehouse is protected by a floor to ceiling chain link fence with two entry/exit gates, and a security system that electronically monitors all parts of the warehouse.

29. The warehouse is monitored by an ADT Focus® Fire & Security system twenty-four hours a day, employing motion detectors throughout the facility. The motion detectors are linked to automatic reporting devices that record the time and location of any potential security breach at the warehouses. Novelty personnel monitor the facility twenty-four hours a day and can be dispatched to the warehouse along with law enforcement on a moment's notice.

30. On receipt of a List 1 product shipment, Novelty, Inc.'s Receiver (B. Cheney) is responsible for checking the Bill of Lading and the Packing List to ensure that all of the information contained within, as well as the physical shipment, perfectly agrees with Novelty, Inc.'s Purchase Order.

31. The Receiver also checks to ensure that all documentation associated with the purchase and shipment of List 1 products contains both Novelty, Inc.'s and the supplier's DEA numbers.

8

32. If any of the receiving process components do not agree, the shipment is rejected in its entirety.

33. If the Receiver discovers a concealed shortage of a List 1 product, she will then assemble the following documentation and forward it to the Novelty, Inc. Compliance Officer, the Buyer, and Novelty, Inc.'s General Counsel:

    a.  Name of the manufacturer;

    b.  Item number and description;

    c.  Name of the carrier;

    d.  Condition of shrink wrap at time of delivery for pallet/box with shortage;

    e.  Purchase Order Number

    f.  Lot Number

    g.  All markings and identifiers on the box that contains a shortage of a List 1 product;

    h.  Photographs of all sides of the box that contains the shortage;

    i.  Condition of the box and its packaging at the time it was received;

    j.  Condition and arrangement of the product inside the box;

    k.  Photographs of the inside of the box (displaying contents);

    l.  Method of shortage detection;

    m.  Whether any/all of the other cases in the same shipment were checked for shortages.

34. The Novelty Receiving Supervisor (B. Cheney) must date-stamp the Packing Slip upon receipt of shipment, notes any discrepancies in the Vendor's paperwork, and sign to acknowledge compliance with all of the receiving requirements.

35. If the List 1 product shipment is accepted by the Receiver, it is immediately placed in the enclosed warehouse OTC area for sorting and labeling.

36. List 1 products are sorted according to the lot number assigned to each product and prepared for storage. This activity is conducted under the aforementioned surveillance.

37. All List 1 products must bear the following information:

- A barcoded license plate that contains the Lot Number, Item Number, and Case Pack;

- A Green label with the Item Number and the Lot Number;

- The expiration date of the product.

38. Once a List 1 product is received by the warehouse, it is entered into the Novelty computer tracking system with the information listed above. The product is then tagged and enclosed in the OTC area of the warehouse where it can only be accessed by authorized personnel bearing the appropriate clearance badges.

39. List 1 products are always kept separate from hazardous materials.

40. When a full case List 1 product is ordered by a Novelty salesperson, Novelty, Inc.'s Order Selector (C. Book) fills the order according to quantity ordered and applies a shipping label bearing the information of the route number.

41. The Order Selector records the date, the amount ordered, Lot number of the products shipped, and the route number to which the product is assigned.

42. The Shipping Auditor checks to ensure that all List 1 product cases are properly sealed, labeled, and sorted for route shipping and delivery.

43. The information regarding the status of the List 1 inventory in the Lot Track book is reported to Inventory Control at the end of each week.

44. Route Sales Professionals ("RSPs") receive the weekly load shipments of List 1 products to distribute to retail stores on their route. .

45. All delivery/route trucks must be secured and locked when not unloading for delivery.

46. All retail stores who purchase List 1 products from Novelty, Inc. also purchase other types of products stocked by Novelty, Inc.

47. Novelty, Inc. delivers all of its product inventory directly to the retail stores on Novelty trucks. Novelty's trained drivers ensure that all drop-off locations are legitimate business enterprises operating in a retail capacity and that the delivered cases are properly secured, locked, and kept behind the sales counters.

48. All purchasing transactions executed by Novelty, Inc. are recorded by an invoice filing system, with invoices signed by the purchaser. Payment is accepted either via invoice or upon delivery of the product.

49. Payment for purchases of List 1 products is never accepted in cash.

### Sales Limitations Policies

50. Novelty, Inc. requires that Novelty employees who negotiate the purchase of List 1 products obtain and maintain appropriate licensure, permits, and documents required to sell the products, including appropriate documentation required by FDA, DEA, and the State Boards of Pharmacy.

51. Novelty's employees who negotiate for manufacture of its List 1 chemical products are required to contract only with manufacturers licensed by DEA and all orders must be placed with the manufacturer through Novelty, Inc.'s Purchase Order System.

52. To ensure the validity and security of all List 1 product transactions, all Purchase Orders of List 1 products contain the DEA numbers of both the supplier and Novelty, Inc.

11

53. Novelty, Inc. only delivers List 1 products to retail vendors that have been screened and verified for compliance with federal and state registration and record keeping requirements.

54. Each List 1 product sale must be registered and verified in the Novelty, Inc. invoice system, which includes the listing of the business name, address, item(s), and quantity of product sold.

55. Novelty, Inc. does not sell any List 1 products to individuals or to vendors who are not established and verified Novelty, Inc. customers.

56. Because the states have enacted different legislation regulating the sale of List 1 products, all RSPs are required to review a memo explaining the different regulatory provisions pertaining to List 1 products in individual states and to sign the memo confirming that the RSP has read and understands the provisions.

57. In addition, all newly hired Novelty, Inc. employees are required to read and sign the same memo and participate in state specific training as part of their orientation.

58. Novelty, Inc. does not permit RSPs to sell more than one (1) full case of List 1 product type (brand and count) per transaction to any retail customer outlet. There are no exceptions to this rule.

59. Any RSP violation of Novelty, Inc.'s List 1 product policy is documented by one written warning. RSPs are terminated for any subsequent violations committed after the receipt of a written warning.

### Auditing and Other Security Measures

60. Novelty, Inc. conducts regular self audits for List 1 product inventories to ensure the security and accuracy of all Novelty warehouse stock.

61. JR Merlau is the Compliance Officer for Novelty, Inc. and is in charge of enforcing the List 1 products policy.

62. As part of standard Novelty, Inc. policy, the Compliance Officer does not have access to change inventory transactions.

63. The Compliance Officer's duties include monitoring and reporting all sales, transactions, or inventory inconsistencies resulting from possible diversion to senior management.

64. In order to avoid potential conflicts of interest, the Compliance Officer does not report to management in the Sales, Warehouse, or Inventory Control departments.

65. The Compliance Officer's duties also include monitoring and updating Novelty, Inc. staff and associates on all state laws and regulatory restrictions relating to List 1 products.

66. These regulatory updates and notices are communicated to the Sales and Delivery teams through memos and other Novelty, Inc. publications, including "Novelty News" and Novelty's "Order Guide."

67. The Compliance Officer is also responsible for reporting all deviations, suspicious transactions, and potential diversion risks to the Novelty, Inc. General Counsel if they are not resolved.

68. The General Counsel, in turn, is required to report all thefts and suspicious sales to the appropriate governmental agencies.

### September 25, 2006 Order

69. On September 25, 2006, Novelty, through its manufacturer AAA Pharmaceutical, Inc. ("AAA"), ordered 2,000 kilograms of ephedrine from its importer Spirit Pharmaceuticals LLC ("Spirit"). Attachment B. I authorized that purchase order on behalf of Novelty.

70. Spirit submitted a DEA Form 486 along with the purchase order from AAA and AAA's registration number. It also identified AAA's customer, Novelty. It requested a letter of no objection (LONO). Attachment B.

71. DEA responded on October 10, 2006 with a letter rejecting the LONO request for the two purchase orders. It did not identify the AAA customers in the letter. Attachment C..

72. Upon receipt of a copy of DEA's October 10, 2006 letter from Spirit via AAA, Novelty, by counsel, filed with DEA on November 2, 2006 a letter stating its intention to pursue the rejection and seek a hearing. Attachment D. Novelty appealed both shipments, not realizing that one shipment was for another AAA customer. I informed Spirit of the appeal.

73. I first learned that the October 10, 2006 letter from DEA rejecting the LONO request included a shipment to AAA intended for another AAA customer on April 16, 2007.

74. Novelty does not seek to contest the LONO denial for AAA's other customer's shipment of ephedrine.

75. Novelty's products to be manufactured from its September 25, 2006 Form 486 would restock its tablet product supplies.

76. Novelty will not sell the ephedrine intended for tablet production that is the subject of the September 25, 2006 Form 486 to any customer in a state where tablet sales through convenience stores are prohibited.

77. Novelty's electronic order filling system does not allow orders to be filled for List 1 chemicals in dosages or forms for states where those dosages or forms cannot be sold by convenience stores.

78. I am responsible for monitoring state laws and updating the order filling system with any changes.

79. Novelty does not sell List 1 chemicals to a customer in a state where state law does not permit sale of that form by that customer.

80. Spirit received DEA's letter dated April 10, 2006.  Attachment E.  In that letter DEA reiterated its rejection of the LONO and gave three options for a response. Id.  Novelty informed Spirit that Novelty was pursuing the rejection of the hearing request and asked, in accordance with the letter's options, that Spirit do nothing so that DEA would issue the notice of suspension.  Attachment F.

_Mark Bledsoe_
Mark Bledsoe

_5·22·07_
Date

15

# EXHIBIT 2'S ATTACHMENT A

**Andrea Ferrenz**

| | |
|---|---|
| **From:** | Mark Bledsoe [Mbledsoe@noveltyinc.com] |
| **Sent:** | Friday, February 03, 2006 1:46 PM |
| **To:** | lisa.r.barnhill@usdoj.gov |
| **Cc:** | Tejash Sheth |
| **Subject:** | Novelty |
| **Attachments:** | 9-7-05.doc |

Lisa,

It was a pleasure speaking with you today. I have attached our policy on List 1 chemicals and highlighted the area describing our weekly monitoring of sales by product by State. If I can be of further assistance please call.

<<9-7-05.doc>>

Mark Bledsoe

Director of Category Management

Novelty Inc.

(317) 462-3121

mbledsoe@noveltyinc.com

# EXHIBIT 2'S
# ATTACHMENT B

# SPIRIT PHARMACEUTICALS, LLC.

225 LINCOLN HIGHWAY, Suite 179, FAIRLESS HILLS, PA 19030
PH.# (215)943 4000  FAX.#(215)943 4039

## FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| To:  Harry McFadden | Fax No.:202-307-4792  (7503) |
| | Tel.No.  202-307-4761 |
| DEA | |
| From:  ARUN HEBLE | Date:  9.25-06 |
| Re: Ephedrine HCl | Pages:  145=6 |
| cc. AAA Pharmaceuticals | — PO# 22773 for 2000 Kg |
| | — PO# 22774 for 200 Kg |

○ Urgent  ● For Review  ◆ Please Comment  ◆ Please Reply  ◆ Please Recycle

Dear Harry,

We are faxing you the following documents to request

a LONG for the above captioned listed chemical.

1. Completed DEA Form 486

2. Purchase order from the customer: A AA Pharmaceuticals Inc
Contact: Mr Tej Sheth
Tel: 856-423-2700 X202

3. DEA registration of the customer.

Please call me if you have any questions.

Best regards,

Sincerely,

Arun R. Heble

Cell# 215-869-2493

**IMPORT/EXPORT DECLARATION**
Precursor and Essential Chemicals

U.S. Department of Justice
Drug Enforcement Administration

OMB Approval
No. 1117-0023

SEE REVERSE FOR INSTRUCTIONS AND PRIVACY ACT.

**U.S. CUSTOMS CERTIFICATION**

Date of Departure/Arrival

1. CHECK ONE    [✓] IMPORT DECLARATION    [ ] EXPORT DECLARATION

Name of Carrier/Vessel

1a. IMPORTER/EXPORTER (Name, Address, Telephone No. to include Area Code, Telex No. and where available FAX No.)

SPIRIT PHARMACEUTICALS, LLC.
225 LINCOLN HWY. SUITE 179
FAIRLESS HILLS, PA 19030
PH.# 215-943-4000   DEA # 006065SRX

1b. BROKER OR FORWARDING AGENT, IF USED (Name, Address, Telephone No. to include Area Code, Telex No. and where available FAX No.)

EXPEDITORS INTERNATIONAL, INC.
870 ASHLAND AVE.
FOLCROFT, PA 19032
PH.# 610-534-2500

Date of Certification

Signature of Customs Official

1c. I CERTIFY THAT THE 15-DAY ADVANCE NOTICE REQUIREMENT HAS BEEN WAIVED    [ ] Check if applicable

| 2. LISTED CHEMICALS TO BE IMPORTED/EXPORTED | | 2c. Number of containers, size, net weight of each chemical (KG) | 2d. Gross Weight of each item (KG.) |
|---|---|---|---|
| 2a. Name and Description of Chemical appearing on label or container | 2b. Name of Chemical as designated by Title 21 C.F.R. 1310.02 | | |
| EPHEDRINE HCl | EPHEDRINE HCl | 25X80=2000KGS NET WT. | 27.5X80=2200KGS GROSS WT. |
| | P.O.# 22773 AAA PHARMACEUTICAL, INC | | |

3a. [✓] FOREIGN  [ ] DOMESTIC PORT OF EXPORTATION (last U.S. Customs Port) AND APPROX. DEPARTURE DATE

MUMBAI, INDIA          OCTOBER 25, 2006

4a. MODE OF TRANSPORT; NAME OF VESSEL, CARRIER

BY AIR

3b. [ ] FOREIGN  [✓] DOMESTIC PORT OF IMPORTATION (first U.S. Customs Port) AND APPROX. ARRIVAL DATE

PHILADELPHIA, PA      OCTOBER 28, 2006

4b. NAME OF ALL INTERMEDIATE CARRIERS

5a. NAME, ADDRESS, TELEPHONE, TELEX, and where available FAX NO. OF FOREIGN CONSIGNEE/CONSIGNOR

EMMELLEN BIOTECH PHARMACEUTICALS LTD.
501 SENTINEL, 5th FLOOR, CENTRAL AVE.RD.
HIRNANDANI GARDENS, POWAI, MUMBAI-400 076
PH.# 011-91-22-56797200

5b. NAME, ADDRESS, TELEPHONE, TELEX, and where available FAX NO. OF ALL INTERMEDIATE CONSIGNEES

SIGNATURE OF AUTHORIZED INDIVIDUAL ( Print or Type Name below Signature)

(ARUN R. HEBLE)

DATE
09.25.06

NAME OF FIRM
SPIRIT PHARMACEUTICALS, LLC.
DEA # 006065SRX

Copy 1

DEA FORM — 486

**PURCHASE ORDER**

Ordered By:
AAA Pharmaceutical, Inc.
157-160 West Jefferson Street
P.O. Box 22
Paulsboro, NJ 08066-0022

Phone: (856) 423-2700    Fax: (856) 423-2699

Purchase Order Number:
22773

Date Issued:
Sep 25, 2006

Page:
1

To:
SPIR001

Spirit Pharmaceuticals, LLC
225 Lincoln Highway
Suite #179
Fairless Hills, PA 19030
DEA 006065SRX
Phone: (215) 943-4000    Fax: (215) 943-4030

Ship to:
157-160 West Jefferson Street
P.O. Box 22
Paulsboro, NJ 08066-0022

| Account No. | Terms |
|---|---|
| | 1% 10, Net 30 Days |

Ship Via
FOB Delivered

| Item | Description | Units | Quantity | Unit Price | Extension |
|---|---|---|---|---|---|
| RAW01000 | L-Ephedrine Hydrochloride, USP | Kg | 2,000.00 | | |

**FOR ALL SHIPMENTS:** Double-Stacked Pallets Will Be Returned at Seller's Expense.

**FOR PHARMACEUTICAL RAW MATERIALS:** Items Shipped from Multiple Lots will be Returned at Seller's Expense; Items Must All be from the Same Lot. A Valid Certificate of Analysis for Each Raw Material Must Accompany Shipment.

TOTAL

Authorized Signature

AAA PHARMACEUTICAL, INC
157-160 WEST JEFFERSON STREET

PAULSBORO          NJ     08066 - 0000



# EXHIBIT 2'S ATTACHMENT C



**U. S. Department of Justice**
Drug Enforcement Administration

---

*www.dea.gov*                              Washington, D.C.  20537

Mr. Arun R. Heble
Spirit Pharmaceuticals, LLC                    OCT 1 0 2006
225 Lincoln Hwy, Suite 179
Fairless Hills, PA 19030

Dear Mr. Heble:

Reference is made to your request for the Drug Enforcement Administration (DEA) to issue a Letter of No-Objection (LONO) to the competent authority in the country of export for the following proposed importations:

|  |  |
|---|---|
| Date of DEA-486 | September 25, 2006 |
| Listed Chemical | Ephedrine  2000 Kg |
| Date of proposed importation | October 28, 2006 |
| DEA Control # | 5042393 |
| PO # | 22773 |

|  |  |
|---|---|
| Date of DEA-486 | September 25, 2006 |
| Listed Chemical | Ephedrine  200 Kg |
| Date of proposed importation | October 28, 2006 |
| DEA Control # | 5042394 |
| PO # | 22774 |

This letter is written confirmation that it is DEA's intent not to issue a LONO in the referenced importation matter.  DEA has thoroughly reviewed the proposed utilization of the planned Listed Chemical importation.  DEA has grounds to believe that the proposed importation may be subject to diversion to the illicit market by the downstream distribution system and, as such is declining to sign a LONO for this importation.

There are three options available to you as the registered importer:

1. withdraw the request for a LONO and cancel the Import Declaration (DEA Form 486) by FAXING the request to OED at (202)307-7464;

2. take no action, and 30 days from the date of this notice DEA will deem your lack of further contact as a request to withdraw the Import Declaration and LONO request;

3. indicate in writing, within the 30 days, your desire to pursue the importation further.

If you desire to pursue the importation further, DEA will order the suspension of the shipment pursuant to Title 21, United States Code, Section 971 (c)(1). DEA will send you a notice of the suspension. The notice of suspension will list the legal and factual basis supporting the suspension. Upon ordering the suspension of shipment, in accordance with Title 21, United States Code, Section 971 (c)(2), an administrative hearing will be held as long as you request the hearing, in writing within 30 days from the day you are served with the notice of suspension. If you request a hearing, it will be held not later that 45 days after your request is made, unless you specifically request the hearing be held at a later time.

If you have any questions, please feel free to contact Staff Coordinator Darrell Meador, Office of Enforcement Operations, Dangerous Drugs and Chemicals Section, at (202) 307-4948.

Sincerely,

Alan G. Santos, Chief
Office of Enforcement Operations
Dangerous Drugs and Chemicals Section

cc: DEA Philadelphia Division
   Attn: DPM Ann Carter

# EXHIBIT 2'S ATTACHMENT D

 & Associates, P.C.

1800 Alexander Bell Drive, Suite 200
Reston, VA 20191
1050 Seventeenth Street, N.W., Suite 600
Washington, DC 20036
202.466.6937 • Fax 202.466.6938
www.emord.com

November 2, 2006

**VIA UPS**
Alan G. Santos
Office of Enforcement Operations, Dangerous Drugs and Chemicals Section
Drug Enforcement Administration
U.S. Department of Justice
950 Pennsylvania Ave.
Washington, D.C. 20530-0001

Linden Barber
Office of the Chief Counsel
Drug Enforcement Administration
2401 Jefferson Davis Highway
Alexandria, VA 22301

*Re: PO # 2273 and PO # 22774*

Dear Mr. Santos and Mr. Barber:

Our client, Novelty Inc. ("Novelty") intends to pursue the following importations:

| | |
|---|---|
| Date of DEA-486 | September 25, 2006 |
| Listed Chemical | Ephedrine 2000 Kg |
| Date of proposed importation | October 28, 2006 |
| DEA Control # | 5042393 |
| PO # | 22773 |

| | |
|---|---|
| Date of DEA-486 | September 25, 2006 |
| Listed Chemical | Ephedrine 200 Kg |
| Date of proposed importation | October 28, 2006 |
| DEA Control # | 5042393 |
| PO # | 22774 |

In an October 10, 2006 letter to Spirit Pharmaceuticals, LLC ("Spirit"), DEA stated that "it is [the agency]'s intent not to issue a LONO" in the above importations. Novelty is an eventual purchaser for the above importations and a party adversely affected and aggrieved by the LONO rejection. Pursuant to option three in the October 10, 2006 letter, Novelty is providing notice of its intent to pursue importation.

We ask that DEA proceed quickly in issuing a suspension notice for the above importations. The importation refusals are causing Novelty to suffer substantial economic damages.

Sincerely,

Jonathan W. Emord
Andrea G. Ferrenz
Katie Bond

# EXHIBIT 2'S ATTACHMENT E



**U. S. Department of Justice**
Drug Enforcement Administration

---

*www.dea.gov*

Washington, D.C. 20537

Mr. Arun R. Heble
Spirit Pharmaceuticals, LLC
225 Lincoln Hwy, Suite 179
Fairless Hills, PA 19030

APR 1 0 2007

Dear Mr. Heble:

Reference is made to your request for the Drug Enforcement Administration (DEA) to issue a Letter of No-Objection (LONO) to the competent authority in the country of export for the following proposed importations:

| | |
|---|---|
| Date of DEA-486 | September 25, 2006 |
| Listed Chemical | Ephedrine 2000 Kg |
| Date of proposed importation | October 28, 2006 |
| DEA Control # | 5042393 |
| PO # | 22773 |

| | |
|---|---|
| Date of DEA-486 | September 25, 2006 |
| Listed Chemical | Ephedrine 200 Kg |
| Date of proposed importation | October 28, 2006 |
| DEA Control # | 5042394 |
| PO # | 22774 |

This letter is written confirmation that it is DEA's intent not to issue a LONO in the referenced importation matter. DEA has thoroughly reviewed the proposed utilization of the planned Listed Chemical importation. DEA has grounds to believe that the proposed importation may be subject to diversion to the illicit market by the downstream distribution systems and, as such is declining to sign a LONO for this importation. We previously contacted you by letter dated October 10, 2006. At that time, you were informed that in order to pursue the requested importation, you would have to contact the agency. Because we received no correspondence within the required 30 days, we have considered your request to be withdrawn. At this time, however, we are re-contacting you to make certain that your intent is that you do not wish to pursue the import requests. There are now two options available to you as the registered importer:

1.  Within five (5) days of receiving this notice, affirmatively withdraw the request for a LONO and cancel the planned importation by notifying DEA in writing of your intent to cancel the proposed importation. Send the letter via facsimile to OED at 202-307-7464;

2.  Indicate in writing, within five (5) days from the date of this notice, your desire to pursue the

importation further. If you elect this option or fail to respond to this notice within five (5) days, DEA will order the suspension of the shipment pursuant to Title 21, United States Code, Section 971 (c)(1).

In the event DEA orders the suspension of the shipment, DEA will send you a notice of the suspension. The notice of the suspension will list the legal and factual basis supporting the suspension. Upon ordering the suspension of shipment, in accordance with Title 21, United States Code, Section 971 (c)(2), an administration hearing will be held as long as you request the hearing, in writing within 30 days from the day you are served with the notice of suspension. If you request a hearing, it will be held not later than 45 days after your request is made, unless you specifically request the hearing be held at a later time.

If you have any questions, please feel free to contact Staff Coordinator Darrell Meador, Office of Enforcement Operations, Dangerous Drugs and Chemicals Section, at (202) 307-4948.

Sincerely,

Alan G. Santos, Chief
Office of Enforcement Operations
Dangerous Drugs and Chemicals Section


cc:    DEA Philadephia Divison
Attn: Acting DPM Kurt Dittmer

# EXHIBIT 2'S
# ATTACHMENT F

 & Associates, P.C.

11808 WOLF RUN LANE
CLIFTON VA 20124

1050 SEVENTEENTH STREET, N.W., SUITE 600
WASHINGTON, D.C. 20036
202.466.6937 • FAX 202.466.6938
www.emord.com

May 22, 2007

**VIA EMAIL**
Arun Heble
Spirit Pharmaceuticals, LLC
225 Lincoln Highway
Suite 179
Fairless Hills PA 19030

Re:  Novelty, Inc.

Dear Mr. Heble:

We represent Novelty, Inc. before the DEA concerning Novelty's September 25, 2006 request for import of ephedrine.  We understand that an agent from DEA contacted you yesterday and stated that DEA would not process Novelty's most recent request for a LONO, made through your company, until Spirit responded in writing to DEA's April 10, 2007 letter.

Under applicable precedent, Novelty is the party aggrieved by DEA's denial and the one entitled to a hearing on the merits.  DEA has not responded to Novelty's November 2, 2006 letter to DEA stating its intention to pursue the LONO denial of October 10, 2006 and requesting a speedy issuance of the notice of suspension.

In its April 10, 2007 letter DEA stated that if Spirit "elected [to indicate in writing its desire to pursue the importation] or fail[ed] to respond to [DEA's] notice within five (5) days, DEA w[ould] order the suspension of the shipment pursuant to Title 21, United States Code, Section 971 (c)(1)."  We understand that Spirit did not respond within five days of that letter. Consequently, one would have expected DEA to issue the notice of suspension.  Our client informs us that DEA has not issued the suspension order.

Novelty requests that Spirit not seek a hearing for itself for this LONO denial. Novelty is the party aggrieved by the denial and is seeking an independent hearing on the merits, as is its right under the Due Process clause of the Fifth Amendment. Please feel free to share this letter with DEA.

Best regards,

Jonathan W. Emord
Andrea G. Ferrenz

Cc:    Mark Bledsoe
       Novelty, Inc.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NOVELTY, INC.,                    )
                                  )
      Plaintiff,             )
                                  )
v.                                )    Case No. 1:07-cv-00191-RMU
                                  )
KAREN TANDY, Administrator,       )
U.S. DRUG ENFORCEMENT             )
ADMINISTRATION,                   )
et al.,                           )
                                  )
      Defendants.            )

## EXHIBIT 3 TO

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NOVELTY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07-CV-00191 |
| | ) | (RMU) |
| | ) | |
| KAREN TANDY, in her official capacity; | ) | |
| UNITED STATES DRUG | ) | |
| ENFORCEMENT ADMINISTRATION; | ) | |
| ALBERTO GONZALES, in his official | ) | |
| capacity; UNITED STATES | ) | |
| DEPARTMENT OF JUSTICE; and the | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF DARRELL R. MEADOR

I, DARRELL R. MEADOR, pursuant to 28 U.S.C. § 1746, declare and say:

1.    I am a Staff Coordinator the Office of Enforcement Operations, Dangerous Drugs and Chemicals Section, at DEA Headquarters.  My responsibilities include the prevention, detection, and investigation of the diversion of listed chemicals from legitimate channels under the Controlled Substances Act.  This includes reviewing DEA Forms 486 (Import/Export Declarations) and answering questions from DEA field offices.  I have served in my current capacity at DEA headquarters since July 2004, and have been a Diversion Investigator since February 1986.  I was hired by DEA as a Diversion Investigator in February 1986 and attended the Basic Diversion Investigator

School at the FBI Academy in Quantico, Virginia. I have also received additional training at numerous classes administered both by the DEA and by non-DEA entities between 1989 and 2005. These courses familiarized me with matters involving chemical diversion to the illicit manufacture of methamphetamine, and the adverse environmental impact that results from this process. Prior to my current position, I was a Diversion Investigator assigned to the Nashville, Tennessee District Office. As part of my duties I conducted regulatory investigations involving manufacturers, distributors, pharmacies, practitioners, and other handlers of controlled substances. I was primarily responsible for preventing, detecting and investigating the diversion of controlled substances from legitimate channels to illicit traffic. I have conducted similar investigations related to manufacturers, distributors, importers and exporters of list I chemicals. I have also provided investigative assistance in criminal and civil actions involving the diversion of imported list I chemicals and chemicals diverted to the illicit market. The primary emphasis of most of these investigations has involved pseudoephedrine and ephedrine products. I have also worked in the regulatory process of List I chemical handlers to include pre-registrant investigations, regulatory investigations, and administrative actions taken against regulated firms.

The following information is based on my personal knowledge and/or information gained in the course of my official duties.

2.    List I chemicals are legitimate chemicals that also may be used in the illicit manufacture of a controlled substance in violation of the Controlled Substances

2

Act, 21 U.S.C. § 802 (34), 21 CFR § 1310.02(a).  Ephedrine and pseudoephedrine are

List I chemicals which are commonly used to illegally manufacture methamphetamine, a

Schedule II controlled substance.  These chemicals have been specifically designated by

the Administrator of the Drug Enforcement Administration (DEA Administrator) as two

of the listed chemicals subject to the provisions of 21 CFR §§ 1309 and 1313.  See 21

CFR  § 1310.02 (a).

3.      Pursuant to 21 U.S.C. § 971 (c) and 21 CFR § 1313.41 (a), the DEA

Administrator has the authority to suspend any importation or exportation of ephedrine or

pseudoephedrine based on evidence that the chemical proposed to be imported or

exported may be diverted to the clandestine manufacture of a controlled substance.

4.      Additionally, the 1988 United Nations Convention Against Illicit Traffic

in Narcotic Drugs and Psychotropic Substances ("1988 U.N. Convention") requires that

parties to the convention "take the measures they deem appropriate to prevent diversion

of [listed substances, including ephedrine] used for the purpose of illicit manufacture of

narcotic drugs to psychotropic substances, and shall co-operate with one another to this

end."

5.      The 1988 U.N. Convention further states that parties "[c]ontrol all persons

and enterprises engaged in the distribution of [listed chemicals], license such distributors,

and "[r]equire that licensees obtain a permit for conducting [manufacture and

distribution]."  Art. 12, ¶ 8(b).  Parties to the 1988 Convention are further obligated to

3

"[e]stablish and maintain a system to monitor international trade in [listed chemical] in order to facilitate the identification of suspicious transactions." Id. at ¶ 9(a). Parties are also obligated to notify the "competent authorities and services of the Parties concerned if there is reason to believe that the import, export or transit of a [listed chemical] is destined for the illicit manufacture of narcotic drugs or psychotropic substance." Id. at ¶ 9 (c). Though the 1988 U.N. Convention does not specifically mandate that parties adopt a permit system with respect to imports of listed chemicals, parties are obligated to cooperate to prevent diversion of listed chemicals used for the purpose of illicit manufacture of narcotic drugs or psychotropic substance.

6.    The United States has implemented a system by which every regulated person who imports a listed chemical that meets or exceeds the threshold quantities or is a listed chemical for which no threshold has been established, is required to notify the DEA Administrator of the importation not later than 15 days before the importation is to take place. See 21 CFR § 1313.12 (a). Unless the notice requirement is waived, the regulated person must complete a DEA Form 486 and deliver it to DEA not later than 15 days prior to the importation. See 21 U.S.C. § 971 (a); 21 CFR § 1313.12 (b). The DEA Form 486 must include, among other things, name and address information about the chemical importer and/or broker, the name and description of each listed chemical, the amount of chemical to be shipped, the proposed import date, the foreign port of exportation, and the United States Customs Port of Entry. See 21 CFR § 1313.13 (c).

7.    In addition to the declaration system described above, the United States has negotiated bilateral agreements with several countries which are the chief sources of bulk listed chemicals. In the early 1990's, large shipments of ephedrine and pseudoephedrine, bound for a fictitious company in Mexico, had been seized by U.S. Customs agents at the Dallas/Fort Worth Airport on or before 1994. The United States subsequently learned that other large shipments of ephedrine and pseudoephedrine were being shipped to this same fictitious company by companies located in the People's Republic of China, India, and the Czech Republic. In an effort to control these shipments and prevent the chemicals from being diverted for the purpose of illicit manufacture of methamphetamine, the United States and the competent authorities in these countries developed a procedure for authorizing the exportation of List I chemicals to and through the United States. This became known as the "LONO" process.

8.    Under the "LONO" process, the competent authorities of China, India, and the Czech Republic ("exporting nations") require that, prior to permitting the export of a List I chemical to and/or through the United States (and issuing a permit to the exporter), the United States must first issue a "LONO," or Letter of No Objection, to the competent authority of the exporting nation. Normally, the LONO consists of a short letter which lists the (1) U.S. importer; (2) exporter; (3) the shipment's DEA control number; (4) name of chemical and quantity to be shipped; and (5) the importer reference number. The LONO further states that "the DEA has no objection to the proposed shipment at this time." The LONO is sent to the competent authority of the exporting country and a copy is sent to the importer. Pursuant to the terms and spirit of the 1988 U.N. Convention, the United States is required, prior to issuing the LONO, to investigate the intended

5

destination and uses of List I chemicals which are imported into and through the United

States. If, after investigating, the United States determines that the List I chemicals may

be diverted for the purpose of illicit manufacture of methamphetamine, under the terms

and spirit of the U.N. Convention, it is obligated to deny the LONO request based on the

same ground stated in 21 U.S.C. § 971 (c). *See* 1988 U.N. Convention, Art. 12, ¶¶ 1 and

8 (b). If the United States issues the LONO, the LONO serves to notify the exporting

country that, based on the evidence possessed by DEA at the time the LONO is issued,

that the shipment or export complies with 21 U.S.C. § 971.

9.      If, after receiving the completed DEA Form 486 and conducting its

investigation, DEA determines that the LONO will be denied, DEA will so notify the

regulated person seeking to import the listed chemical. At this point, DEA will provide

the regulated person with the option of either withdrawing or pursuing the importation. If

the regulated person elects to pursue the importation, DEA may suspend the importation

based on evidence that the chemical proposed to be imported may be diverted to the

clandestine manufacture of a controlled substance. *See* 21 U.S.C. § 971 (c); 21 CFR §

1313.41 (a). However, if the regulated person withdraws the LONO request, DEA will

take no further action. The denial of the LONO itself triggers no legal obligation except

to require the importer to contact DEA if it elects to pursue the importation.

10.      Currently, there is no statutory definition of "evidence that the chemical

proposed to be imported may be diverted to the clandestine manufacture of a controlled

substance." However, through prior adjudication, DEA and the courts have approved the

use of a "totality-of-the-circumstances test" to decide whether substantial evidence exists to suspend an importation of List I chemicals. *See PDK Laboratories, Inc. v. United States Drug Enforcement Administration*, 438 F.3d 1184, 1194 (D.C. Cir. 2006); *Indace, Inc., Suspension of Shipments*, 69 Fed. Reg. 67,951, 67,959 (Nov. 22, 2004).

11.     Moreover, the Attorney General considers the following factors to determine whether a regulated person, such as the Plaintiff, shall receive a registration to distribute List I chemicals. *See* 21 U.S.C. § 823 (h) which provides that the "Attorney General shall consider--

(1)     maintenance by the applicant of effective controls against diversion of listed chemicals into other than legitimate channels;

(2)     compliance by the applicant with applicable Federal, State, and local law;

(3)     any prior conviction record of the applicant under Federal or State laws relating to controlled substances or to chemicals controlled under Federal or State law;

(4)     any past experience of the applicant in the manufacture and distribution of chemicals; and

(5)     such other factors as are relevant to and consistent with the public health and safety."

12.     In considering whether "the chemical proposed to be imported may be diverted to the clandestine manufacture of a controlled substance," the Attorney General may consider the importer's "downstream" customers.  This includes the person to whom the bulk chemicals are shipped and any other persons who may receive the chemicals

either in bulk or manufactured form. The type of retail establishment that will ultimately distribute the List I chemical products to member of the public is a substantial and weighty factor in determining the risk of diversion to clandestine manufacture.

13.    Numerous DEA orders have established that convenience stores and gas stations constitute the non-traditional retail or "gray market" for legitimate consumers of ephedrine products. *Wild West Wholesale*, 72 FR 4042, 4044 (2007); *Tri-County Bait Distributors*, 71 FR 52160, 52161 (2006); *D & S Sales*, 71 FR 37607, 37609 2006); *Branex, Inc.*, 69 FR 8682, 8690-92 (2004). Gray market products, which are labeled as asthma/cough/cold/allergy relief medications, are often marketed for "off-label" uses, such as weight loss or staying awake and are not typically found in most supermarkets and drug stores. DEA has found that there is a substantial risk of diversion of List I chemicals into the illicit manufacture of methamphetamine when these products are sold by non-traditional retailers. *Joy's Ideas*, 70 FR 33195, 33199 (2005) (finding that risk of diversion was "real, substantial and compelling"); *Jay Enterprises*, 70 FR 24620, 24621 (2005) (noting "heightened risk of diversion" should application be granted). DEA has adjudicated numerous cases in which it has determined that gray market retailers, such as gas stations and convenience stores, are "sources for the diversion of listed chemical products." *See Joey Enterprises*, 70 FR 76866, 76867 (2005); *TNT Distributors*, 70 FR 12729, 12730 (2005); *OTC Distribution Co.*, 68 FR 70538, 70541 (2003); *MDI Pharmaceuticals*, 68 FR 4233, 4236 (2003).

14.    DEA has determined that products sold in the non-traditional market pass through multiple layers of distribution.  The products sold are typically stronger than those found in the traditional market and "have been disproportionately represented in clandestine lab seizures around the United States involving listed chemical products." DEA has also determined that many non-traditional retailers tend to knowingly sell large quantities of List I chemical products to "smurfers," methamphetamine traffickers and/or individuals who work for methamphetamine traffickers who attempt to buy out a store's entire stock of List I chemical products by going to the store at different times or on different days. *T. Young Associates*, 71 FR 60567, 60568 (2006); *K.V.M. Enterprises*, 67 FR 70968, 70969 (2002).

15.    Small capacity clandestine labs continue to dominate law enforcement seizures and environmental cleanups.  Many small illicit laboratories operate with listed chemical products often procured legally or illegally, from non-traditional retailers of over-the-counter drug products, such as gas stations and small retail markets.  Some retailers acquire product from multiple distributors to mask their acquisition of large amounts of listed chemicals. *SPA Dynamic Wholesalers*, 68 FR 61466, 61467 (2003).

16.    On September 25, 2006, DEA received two completed DEA Forms 486 from Spirit Pharmaceuticals, LLC ("Spirit").  On the forms, Spirit declared it intended to import two shipments of ephedrine hydrochloride ("ephedrine HCl"), with a net weight of 2200 kilograms.  Spirit further requested that DEA issue a LONO to the competent authority of India in order to permit the import to take place and attached two purchase

9

orders from AAA Pharmaceutical, Inc. ("AAA"), the company to whom Spirit intended to transfer the ephedrine.

17.    After receiving the DEA Forms 486, Spirit's request for a LONO, and the AAA purchase orders, DEA determined that AAA intended to use the ephedrine HCl to manufacture "solid-dosage" or tablet form over-the-counter (OTC) pharmaceuticals for sale to the Plaintiff and one other company.  DEA obtained photographs of labels of these OTC pharmaceuticals and determined them to be "gray market" items.  DEA further obtained a list of Plaintiff's customers and determined that some of them (i.e. gas stations and convenience stores) were venues in states where the sale of these items is prohibited by state law.  For instance, according to the "Meth-Free Tennessee Act of 2005," which took effect in April 2005, "any immediate methamphetamine precursor may be dispensed only by a licensed pharmacy."  Tenn. Code Ann. § 39-17-431.  Kentucky has passed a similar measure which provides that "[a]ny nonprescription compound, mixture, or preparation contained any detectable quantity of ephedrine ... [its] salts or optical isomers ... shall be dispensed, sold, or distributed only by a registered pharmacist, a pharmacy intern, or a pharmacy technician."  Ky. Rev. Stat. § 218A.1446.  These states exempt "gel-caps" and liquids from the type of products that must be sold only in pharmacies.  However, the products proposed to be manufactured by AAA and sold by Plaintiff are in tablet form.

18.    Based on Plaintiff's own customer list, which indicates an intention to violate state law, and Plaintiff's intention to sell to "gray market" retailers, DEA

determined that authorizing the importation of ephedrine by Spirit constitutes a risk of

diversion to the clandestine manufacture of a controlled substance. For those reasons, the

LONO request was denied and Spirit was so notified by letter dated October 10, 2006.

Spirit was informed that if it neglected to pursue to importation, its request would be

considered withdrawn. Spirit did not respond to DEA's notification. Therefore, DEA

has considered the matter to be withdrawn.


19.    In an abundance of caution, by letter dated April 10, 2007, DEA has

notified Spirit a second time of its right to pursue the importation and/or to affirmatively

withdraw the request for a LONO. If Spirit elects to pursue the request, DEA will order

the suspension of the shipments pursuant to 21 U.S.C. § 971 (c) (1) and afford Spirit the

opportunity for a hearing. If Spirit withdraws its importation request, DEA has no

authority to act any further on the request. However, if Spirit elects to pursue the

importation and requests a hearing, Plaintiff will have an opportunity at that point to

petition the Administrative Judge for an opportunity to participate and/or intervene in the

proceeding in accordance with the hearing procedures in subchapter II of chapter 5 of

Title 5.


20.    DEA is aware that, by letter dated November 2, 2006, Plaintiff has sought

to pursue Spirit's importation and has since requested a hearing on the denial of Spirit's

LONO request. Unlike Spirit, Novelty is not a registered importer pursuant to 21 U.S.C.

§ 958 (c), and cannot import ephedrine itself. However, the decision on whether to grant

Plaintiff a hearing is pending, based on Spirit's response to the second DEA letter. DEA

will notify Plaintiff as soon as it determines whether Spirit intends to pursue the importation.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that I have read the foregoing declaration and that the same is true and correct.

Darrell R. Meador
Staff Coordinator
Office of Enforcement Operations,
Dangerous Drugs and Chemicals
Section

Executed this _10_ day of April 2007 at Arlington, Virginia.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NOVELTY, INC., | ) |
| | ) |
|       Plaintiff, | ) |
| | ) |
| v. | )    **Case No. 1:07-cv-00191-RMU** |
| | ) |
| KAREN TANDY, Administrator, | ) |
| U.S. DRUG ENFORCEMENT | ) |
| ADMINISTRATION, | ) |
| et al., | ) |
| | ) |
|       Defendants. | ) |

<u>**EXHIBIT 4 TO**</u>

<u>**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**</u>

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NOVELTY, INC.,<br><br>                    Plaintiff,<br><br>          v.<br><br>KAREN TANDY, in her official capacity;<br>UNITED STATES DRUG<br>ENFORCEMENT ADMINISTRATION;<br>ALBERTO GONZALES, in his official<br>capacity; UNITED STATES<br>DEPARTMENT OF JUSTICE; and the<br>UNITED STATES OF AMERICA,<br><br>                    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 1:07-CV-00191 (RMU) |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ARTHUR R. GOLDBERG
Assistant Director
Federal Programs Branch

AMY E. POWELL
Attorney (NY Bar)
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W. Rm. 7322
Washington, D.C. 20530
Telephone: (202) 514-9836
Facsimile: (202) 616-8202
Email: amy.powell@usdoj.gov

## TABLE OF CONTENTS

PAGE(S)

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY AND REGULATORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    I.      PLAINTIFF DOES NOT CHALLENGE A FINAL AGENCY
           ACTION WITHIN THE MEANING OF THE APA . . . . . . . . . . . . . . . . . . . . . 11

          A.     Challenge to Non-Final Agency Action is Barred by
                Sovereign Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

          B.     Plaintiff Challenges a General Agency Practice, Not a
                Final Agency Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

          C.     If Plaintiff Intended to Challenge the Specific Refusal to
                Issue a LONO for Spirit Pharmaceuticals, Plaintiff still has
                not Challenged a Final Agency Action . . . . . . . . . . . . . . . . . . . . . . . . . 17

              1.     A LONO Refusal Is Not Final Agency Action . . . . . . . . . . . . . 17

              2.     Pending Agency Actions in the Spirit Importation
                   Prove a Lack of Finality and Ripeness . . . . . . . . . . . . . . . . . . . . 20

  II.    IF PLAINTIFF CAN IDENTIFY A FINAL AGENCY ACTION,
        SECTION 877 DEPRIVES THIS COURT OF JURISDICTION . . . . . . . . . . . . . . . . 22

          A.     Section 877 Commits Review of Final Orders to the
                Exclusive Jurisdiction of the Courts of Appeals . . . . . . . . . . . . . . . . . . 22

          B.     Because Exclusive Jurisdiction over Final Actions has
                 been Committed to the Court of Appeals, it Should
                 Also Have Exclusive Jurisdiction Here . . . . . . . . . . . . . . . . . . . . . . . . 24

 III.    THE APA DOES NOT REQUIRE NOTICE-AND-COMMENT
        RULEMAKING FOR LONO PROCEDURES . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

          A.     The Court Should Defer to the Agency's Choice of
                Adjudication over Rulemaking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

B.    LONO Procedures are Exempt from Rulemaking
Requirements Because they are Purely Procedural Rules . . . . . . . . . . . 29

C.    LONO Procedures are Exempt from Rulemaking
Requirements Because they Involve a Foreign Relations Function . . . . . 30

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

a LONO is the same as the standard for suspending a shipment. *Id.* DEA issues LONOs in order to comply with its treaty obligations by cooperating with other signatories and providing assurance to the exporting nation that U.S. law is not being violated. *Id.* ¶¶ 6-8.

Accordingly, when persons wish to import a listed chemical from one of these nations, they submit a DEA Form 486 and request a LONO. *See* Meador Decl. ¶ 9. If the DEA finds no problems with the importation, it issues a LONO and the importation goes forward. If the DEA finds that there is a risk of diversion, it is statutorily authorized to suspend the shipment with no further action or investigation, subject to a post-suspension hearing if the importer requests it. *See* 21 U.S.C. § 971; 21 C.F.R. § 1313.41(a). Generally, however, the DEA first refuses to issue a LONO in order to give the importer a chance to withdraw the request. Meador Decl. ¶ 9. An importer is then free to pursue the request and risk an order of suspension. *Id.* When the DEA refuses to issue a LONO before issuing a suspension order, the importer is still free to pursue the importation in the same manner contemplated by section 971(c); it need only inform the DEA that it wishes to do so. *Id.* The LONO refusal adds no substantive obligations or rights to the importer's obligations under section 971. *Id.*

Procedural Background

Novelty, Inc. ("Novelty") is an Indiana corporation that distributes commercial goods, including over-the-counter pharmaceuticals, to convenience stores throughout the United States. Compl. ¶ 1. As such, Novelty is the sort of nontraditional retailer that the DEA has found to be at risk of ephedrine diversion in many contexts. *See* Meador Decl. ¶¶ 12-18. In September 2006, an importer called Spirit Pharmaceuticals, LLC ("Spirit") submitted two DEA Forms 486 and requested a LONO for two shipments of ephedrine from India. *See* Compl. ¶¶ 18-19; Meador Decl. ¶ 16. This shipment was intended for sale to AAA Pharmaceuticals, Inc., a drug manufacturer. *See* Compl.

8

¶¶ 18-19; Meador Decl. ¶ 16.   AAA Pharmaceuticals intended to resell some portion of these products to Novelty. *See* Compl. ¶¶ 18-19; Meador Decl. ¶ 16.

The DEA investigated the type of drug being manufactured and the customer lists of both AAA and Novelty. Meador Decl. ¶¶ 17-18. Based on these factors, the DEA determined that there was a risk of diversion because "solid dosage" products were being sold to gray market retailers, including retailers in those states where it is illegal for non-pharmacies to sell such products. *Id.* On October 10, 2006, the DEA declined to issue the LONO for this shipment. Compl. ¶ 18 and attachments. By letter to Spirit Pharmaceuticals, DEA stated that it had "thoroughly reviewed the proposed utilization of the planned Listed Chemical importation," and found that "the proposed importation may be subject to diversion to the illicit market by the downstream distribution system." Compl. ¶ 18 and attachments. That letter did not include an order of suspension. Instead, the DEA informed Spirit of its options: that it was free to pursue the importation, but that if the importer did not contact the DEA, the notification would be considered withdrawn. Compl. ¶ 18 and attachments; Meador Decl. ¶ 18. Spirit took no action, and the DEA considered its request withdrawn. Meador Decl. ¶ 18. Therefore, no suspension order was issued. *Id.*

On April 10, 2007, DEA contacted Spirit Pharmaceuticals again in order to make certain that Spirit had a full opportunity to pursue the importation. *See* Meador Decl. ¶ 19. Spirit Pharmaceuticals was told that it must now take affirmative action to withdraw the application or the DEA would issue a suspension order. *Id.* In the April 10 letter, Spirit was given five days to respond.

Prior to filing this lawsuit, Novelty requested the opportunity to pursue Spirit's importation and then requested a hearing, apparently under 21 U.S.C. § 971(c)(2), which allows a "person to

whom an order applies" to request a hearing to challenge the denial of a suspension order.  *See*
Meador Decl. ¶ 20.   That request is still pending because Novelty is not a registered importer and
because currently no suspension order has been issued under 971(c)(1).  The decision on whether
to grant Plaintiff a hearing is pending based on Spirit's response to the second DEA letter.  The DEA
will notify Plaintiff as soon as it determines whether Spirit intends to pursue the importation  *Id.*
It is unclear whether Spirit will seek a hearing in which Novelty could intervene or whether, under
applicable precedent, Novelty is a person to whom a suspension order applies and could request a
hearing in its own right.

On February 8, 2007, while its request for a hearing was still pending, Novelty filed this
Complaint.  Although the Complaint is somewhat vague, it appears that plaintiff does not purport
to challenge the refusal to issue a LONO to Spirit Pharmaceuticals; nor does it challenge the denial
of a hearing to Novelty under section 971(c)(2).  Although the Complaint mentions the denial of a
LONO to Spirit Pharmaceuticals, *see* ¶ 18, the allegedly unlawful actions are "DEA's LONO
procedure and criteria," *see* ¶¶ 24-36; moreover, the relief sought does not relate to that specific
importation.  *See* ¶¶ 37-38.  The Complaint alleges that DEA has "adopted the requirement of a
LONO as a condition precedent for lawful import of Ephedrine to the United States without
following the familiar notice-and-comment rule-making procedures specified in the Administrative
Procedure Act."  ¶ 14.  In Count I, plaintiff alleges that "DEA's LONO procedure and criteria are
legislative rules that define Novelty's, and all similarly situated parties', rights to import, and
obligations concerning import of, Ephedrine."  Plaintiff further alleges that DEA violated the APA
by "imposing the LONO procedure and criteria against Novelty" and by "denying importation of all

Ephedrine destined for sale in convenience stores serviced by Novelty," without compliance with the notice-and-comment procedures" of the APA. ¶¶ 31-32.

Count II alleges that "DEA violated the APA by establishing an arbitrary and capricious substantive rule categorically prohibiting import of [over-the-counter] ephedrine for convenience store sales." According to plaintiff, "DEA refuses to issues LONO's for any importer whose OTC Ephedrine containing products are to be sold through convenience stores but issues LONO's to importers whose OTC Ephedrine products are to be sold through pharmacies and grocery stores." ¶ 35.

The Complaint seeks declaratory relief, including a declaration that "the LONO procedure and criteria for Ephedrine imports are legislative rules DEA failed to adopt pursuant to notice-and-comment rule-making as required by the APA" and that "DEA's allowance of LONO's for pharmacy and grocery store sale of OTC Ephedrine and disallowance of LONO's for convenience store sale of OTC Ephedrine are arbitrary and capricious agency actions in violation of the Administrative Procedure Act." ¶ 37. It further seeks an injunction against "enforc[ement of] the LONO procedure and criteria for Ephedrine imports." ¶ 38.

## ARGUMENT

I.  PLAINTIFF DOES NOT CHALLENGE A FINAL AGENCY ACTION WITHIN THE MEANING OF THE APA

Plaintiff has failed to challenge a final agency action, a fundamental prerequisite to the waiver of sovereign immunity contained in the APA. Federal courts are courts of limited jurisdiction, and the law presumes that "a cause lies outside this limited jurisdiction." *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *Gen. Motors Corp. v. Envtl. Prot.*

the question of the district court's jurisdiction, but later exercised its exclusive jurisdiction over a

petition for review in the same case after further (and final) agency action. *See generally PDK II*,

438 F.3d 1184. More recently, another D.C. district court decision noted that "[d]espite the

seemingly clear language and intent of section 877, district courts have occasionally struggled with

actions that do not necessarily appear to be 'final determinations, findings, and conclusions' of the

DEA," citing *PDK* as an example. *See Doe v. Gonzalez [sic]*, 2006 WL 1805685, *18 (D.D.C. June

29, 2006). Judge Kollar-Kotelly ultimately rejected the approach taken in *PDK*. The Court declined

to explicitly decide whether the import permit denial at issue in that case (similar in some ways to

a LONO refusal) was a final agency action but held that "if the DEA's . . . determination meets the

standards necessary to satisfy the 'final agency action' requirement under the APA, 5 U.S.C. § 704,

. . . it seems certain to meet the 'final determinations, findings and conclusions' criteria of 21 U.S.C.

§ 877, thereby triggering the United States Court of Appeals for the District of Columbia's exclusive

jurisdiction over Plaintiff's CSA-based claims." *Id.* at *19. Thus, the *PDK* approach, in which some

agency action may be final for the purposes of the APA but not final for the purposes of § 877, is,

at best, suspect, and most likely, incorrect.

2.    Pending Agency Actions in the Spirit Importation Prove a Lack of Finality and
      Ripeness

The original LONO refusal sent to Spirit Pharmaceuticals does not constitute final agency

action for two additional reasons. First, it has been superseded by subsequent agency action.

Second, the plaintiff has a pending request to participate in the Spirit matter. Out of "an abundance

of caution," the DEA elected to make certain that Spirit actually intended to withdraw its notice of

importation and request for a LONO. *See* Meador Decl. ¶ 19. Accordingly, the DEA has

recontacted Spirit, which now has five days to decide whether to affirmatively withdraw the

20

application or receive a suspension order. *Id.* If Spirit affirmatively withdraws its request for a LONO, the DEA has no further authority to act on the notice of importation. If Spirit chooses to pursue the importation or again declines to act, the DEA will issue a suspension order under section 971, and a hearing will be available to Spirit. *See* Meador Decl. ¶ 19. If Spirit pursues the matter to a hearing, the outcome of that adjudication is clearly a "final decision" reviewable only in the Courts of Appeals. *See* 21 U.S.C. § 877.

It is therefore clear that the original LONO refusal was not intended to be final agency action. *See* Meador Decl. ¶ 19. It was indeed "merely tentative or interlocutory in nature" and not intended to set anyone's legal rights. *See Bennett v. Spear*, 520 U.S. at 178. The recent notification to Spirit ensures that the LONO refusal itself is treated by the agency as an interlocutory measure, and that the agency exercises all due care in the exercise of its authority under section 971.

Moreover, "a final agency action can nonetheless be unripe for judicial review if further proceedings affecting the agency action take place or judicial consideration of the issue would benefit greatly from a more concrete setting." *See Isenbarger v. Farmer*, 463 F. Supp. 2d 13, 20 (D.D.C. 2006) (internal quotation marks omitted); *see also Toca Producers v. FERC*, 411 F.3d 262, 266 (D.C. Cir. 2005) (declining to review a final agency action because pending agency proceedings could provide relief to petitioners)*; Pfizer, Inc. v. Shalala*, 182 F.3d 975, 980 (D.C. Cir. 1999); *see generally Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). This is precisely such a case. If Spirit actually wants to pursue the importation, the agency will hold a formal hearing pursuant to 971(c)(2), and Novelty may petition the Administrative Law Judge for the opportunity to participate. Plaintiff could thus seek relief from the challenged action. The gravamen of the plaintiff's Complaint, whether the sale of ephedrine products in Novelty stores constitutes a risk of diversion, is a question

that the agency should have a full opportunity to consider and rule upon based on the facts before

it. Judicial resources are conserved if either plaintiff is afforded relief or if Spirit affirmatively

withdraws its request.

Accordingly, the Complaint should be dismissed for lack of subject matter jurisdiction

because it fails to challenge a final agency action within the meaning of the APA.


II.     IF PLAINTIFF CAN IDENTIFY A FINAL AGENCY ACTION, SECTION 877
        DEPRIVES THIS COURT OF JURISDICTION

Even assuming that plaintiff has challenged a final agency action within the meaning of the

APA, 21 U.S.C. § 877 vests the courts of appeals with exclusive jurisdiction over any challenge to

a final agency decision.   Longstanding D.C. Circuit doctrine holds further that the Circuit Court

should also have jurisdiction over any non-final action that might affect the future jurisdiction of the

court. These two prongs of analysis ensure that any final decision arguably at issue in this case is

reviewable only in the Court of Appeals.

A.      Section 877 Commits Review of Final Orders to the Exclusive Jurisdiction of the Courts
        of Appeals

The Controlled Substance Act ("CSA") provides courts of appeals with exclusive jurisdiction

over disputes arising under it:

> All final determinations, findings, and conclusions of the Attorney General under this
> subchapter shall be final and conclusive decisions of the matters involved, except that
> any person aggrieved by a final decision of the Attorney General may obtain review
> of the decision in the United States Court of Appeals for the District of Columbia or
> for the circuit in which his principal place of business is located upon petition filed
> with the court and delivered to the Attorney General within thirty days after notice
> of the decision. Findings of fact by the Attorney General, if supported by substantial
> evidence, shall be conclusive.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NOVELTY, INC.,                              )
                                           )
      Plaintiff,                      )
                                           )
      v.                              )    Case No. 1:07-CV-00191 (RMU)
                                           )
KAREN TANDY, Administrator,                 )
UNITED STATES DRUG ENFORCEMENT )
ADMINISTRATION; et al.,                     )
                                           )
                                           )
      Defendants.                    )

ORDER

Following the Court's consideration of Plaintiff's Motion for Preliminary

Injunction and exhibits thereto and Defendants' Opposition, it is hereby

ORDERED that Plaintiff's Motion for Preliminary Injunction is GRANTED;

ORDERED that Defendants shall issue a Notice of Suspension pursuant to 21

U.S.C. § 971 to Plaintiff on the September 25, 2006 request for a Letter of No Objection

(LONO) no later than fifteen (15) days after court's order on this motion; and

ORDERED that Defendants shall hold an administrative hearing no later than

forty-five (45) days after the notice of suspension is issued, or at another date mutually

agreed upon by the parties.


                             _____
                             RICARDO M. URBINA
                             UNITED STATES DISTRICT JUDGE

Dated: