## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NOVELTY, INC.,            )
                                  )
       Plaintiff,         )
                                  )
       v.                   )     Case No. 1:07-CV-00191 (RMU)
                                  )
KAREN TANDY, Administrator,   )
UNITED STATES DRUG ENFORCEMENT )
ADMINISTRATION; et al.,       )
                                  )
                                  )
       Defendants.       )

### PLAINTIFF'S MOTION FOR LIMITED DISCOVERY OF DEFENDANT WITNESS DARRELL R. MEADOR

Plaintiff Novelty, Inc. (Novelty), by counsel and pursuant to Rules 26, 28, and 30 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and local rule 7, hereby seeks leave of Court to conduct limited discovery in the above-referenced case before the Fed.R.Civ.P. Rule 26(f) conference. The information sought cannot be obtained from any other source and is material to disposition of a pending motion for preliminary injunction and the underlying case. The production and deposition sought are narrowly tailored to avoid inquiry into deliberative processes and inter and intra agency communications and are aimed at retrieving precisely the factual information necessary to evaluation of matters now in issue in the pending motion. The government employee in question, Darrell R. Meador, is not a high official. The attached memorandum of law provides greater elucidation on the relevant facts and law.

In accordance with local rule 7, counsel for Novelty has apprised counsel for Defendants of Novelty's desire to conduct the limited discovery requested herein before

the rule 26(f) conference.  Counsel for the defendants opposes any discovery preceding

the rule 26(f) conference and has stated a desire to file an opposition to this motion.

A draft order and counsel's affidavit concerning the scope of testimony sought

pursuant to 28 C.F.R. §16.23(c) are also attached.

Respectfully submitted,

NOVELTY INC.

By: _____/s/_____
        Its Counsel
        Jonathan W. Emord (DC Bar 407414)
        Andrea G. Ferrenz (DC Bar 460512)

Emord & Associates, P.C.
11808 Wolf Run Lane
Clifton VA 20124
Phone: (202) 466-6937
Fax: (202) 466-6938
jemord@emord.com

Date submitted:  June 21, 2007

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NOVELTY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-CV-00191 (RMU) |
| | ) | |
| KAREN TANDY, Administrator, | ) | |
| UNITED STATES DRUG ENFORCEMENT | ) | |
| ADMINISTRATION; et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM IN SUPPORT OF MOTION FOR</u>
## <u>LIMITED DISCOVERY OF DEFENDANT WITNESS DARRELL R. MEADOR</u>

Plaintiff Novelty, Inc. (Novelty), by counsel and pursuant to Rules 26 and 30 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and local rule 7, hereby seeks leave of Court for the purpose of conducting carefully limited discovery before the Fed.R.Civ.P. Rule 26(f) conference in the above-referenced case.

The particular information sought cannot be obtained from any other source. The requests for information and the scope of the deposition prayed for are narrowly tailored to avoid inquiry into deliberative processes and inter and intra agency communications. The requested information is exclusively factual. The government employee in question, Darrell R. Meador, is not a high official. Through the deposition, Novelty aims to determine the factual basis for false factual assertions of criminality and of "gray marketing" that Meador has made in an affidavit filed with this Court. Those assertions are germane to a pending motion for preliminary injunction and to the underlying case, as explained in detail herein. Qualified government immunity does not apply here because the information sought is extremely limited and cannot be obtained from any other

source.  Accompanying this memo as Exhibit 3 is counsel's affidavit setting forth a

summary of the testimony sought in accordance with 28 C.F.R. § 16.23.

> **I.     The Information Sought Cannot Be Obtained from any Other Source**

Darrell R. Meador is the Staff Coordinator in the DEA Office of Enforcement

Operations at the Dangerous Drugs and Chemicals Section.  In an affidavit executed for

the Defendants and filed with this Court, Staff Coordinator Meador made the following

representations under penalty of perjury:

> After receiving the DEA Forms 486, Spirit's request for a LONO, and the AAA
> purchase orders, DEA determined that AAA intended to use the ephedrine HCl to
> manufacture "solid-dosage" or tablet form over-the-counter (OTC)
> pharmaceuticals for sale to the Plaintiff and one other company.  DEA obtained
> photographs of labels of these OTC pharmaceuticals and determined them to be
> "gray market" items.  DEA further obtained a list of Plaintiff's customers and
> determined that some of them (i.e., gas stations and convenience stores) were
> venues in states where the sale of these items is prohibited by state law.  For
> instance, according to the "Meth-Free Tennessee Act of 2005," which took effect
> in April 2005, "any immediate methamphetamine precursor may be dispensed
> only by a licensed pharmacy."  Tenn. Code Ann. § 39-17-431.  Kentucky has
> passed a similar measure which provides that "[a]ny nonprescription compound,
> mixture, or preparation contained [sic: containing] any detectable quantity of
> ephedrine . . . [its] salts or optical isomers . . . shall be dispensed, sold, or
> distributed only by a registered pharmacist, a pharmacy intern, or a pharmacy
> technician."  Ky. Rev. Stat. § 218A.1446.  These states exempt "gel-caps" and
> liquids from the type of products that must be sold only in pharmacies.  However,
> the products proposed to be manufactured by AAA and sold by Plaintiff are in
> tablet form.
>
> Based on Plaintiff's own customer list, which indicates an intention to violate
> state law, and Plaintiff's intention to sell to "gray market" retailers, DEA
> determined that authorizing the importation of ephedrine by Spirit constitutes a
> risk of diversion to the clandestine manufacture of a controlled substance.  For
> those reasons, the LONO request was denied and Spirit was so notified by letter
> dated October 10, 2006. . . . .

See Exhibit 1: Affidavit of Meador at paras. 17; 18.

Novelty has pending before this Court a motion for preliminary injunction.  That

motion asks the Court to order DEA to hold a hearing on DEA's denial of ephedrine

importer Spirit's request for a letter of no objection (LONO) to permit importation of ephedrine for inclusion in Novelty's cough and cold OTC products sold through convenience stores. The motion asks the Court to act pursuant to 21 USC 971. Novelty's system for distribution of those OTC products is closed and carefully monitored and controlled. Novelty does not sell solid dosage form ephedrine tablets in Tennessee or in Kentucky where it is illegal and has no intention of so doing. Indeed, Novelty prides itself on a computerized system of checks that precludes distribution of forms and dosages in states where those forms and dosages are unlawful. DEA has taken the position that the product in question is intended for unlawful sale in Tennessee and Kentucky and that it is intended for sale to "gray market" retailers (i.e., ones for which a demonstrable risk of diversion exists). Novelty performs background checks upon and polices the stores where its products are sold. Exhibit 2: Affidavit of Mark Bledsoe at ¶¶ 11-68. It has never received word from the DEA that its products have been diverted from these stores to the illicit methamphetamine trade. See Exhibit 2 at ¶ 13.

Because the false charges in the Meador affidavit of intent to violate the laws of Kentucky and Tennessee and to sell to "gray market" retailers have a direct bearing on a determination under Section 971 concerning whether Novelty may lawfully sell cough and cold remedies, Novelty has an immediate need to determine the documentary sources upon which Meador relied and the factual foundation for his charges. It is the Defendants' position that Novelty should not be granted a hearing on the merits in part because Defendant allegedly determined through investigation that Novelty is intent on violating the laws of Kentucky and Tennessee and is intent on selling its ephedrine products to "gray market" retailers. The Defendants cannot maintain that position before

this Court without evidentiary support, particularly in light of the affidavit of Novelty employee Bledsoe which contradicts that of Meador and supplies specific facts revealing that Novelty has not sold ephedrine in any unlawful form or dosage strength and has in place extensive security measures to prevent "gray market" sales. See Exhibit 2 at ¶¶ 11 -68.

In aid of justice and to ensure that a full record is before the Court in its action on these specific charges brought by Defendants, Novelty respectfully requests limited discovery (in the form of the attached document production request (Exhibit 3) and in the form of a deposition limited to two hours of DEA Staff Coordinator Meador).

Novelty cannot obtain the information upon which Meador relies for his position on the two salient allegations (Novelty is intent on breaking the laws of Kentucky and Tennessee governing ephedrine form and dose and Novelty is intent on selling its cough and cold remedies to "gray market" retailers) from any source other than Meador. There exists no alternative and less burdensome way to obtain that factual information. Meador alone knows the documentary sources upon which he relied for his statements on these two salient points in paragraphs 17 and 18 of his affidavit. He alone can explain any other non-documentary, factual premises upon which he relied for the statements made in paragraphs 17 and 18 of his affidavit. Novelty should be given the opportunity to discover those sources and factual premises to probe them and evaluate whether, indeed, they fail to provide any evidence sufficient to warrant the conclusions reached by Meador and, thus, fail to support the conclusion under 21 USC 971 that there exists a demonstrable risk of diversion to the methamphetamine trade.

## II. The Information Sought Is Factual and Not Related to Deliberative Processes

Novelty does not seek to probe any matters related to DEA policy-making or the thought processes of Meador or any other government official.  The documents Novelty requests are narrowly limited to those which support the factual assertions contained in paragraphs 17 and 18 of Meador's affidavit.  The deposition Novelty seeks is narrowly limited to probing Meador's reliance on those documentary sources and any other factual premises supporting factual assertions contained in paragraphs 17 and 18 of the Meador affidavit.  Novelty does not seek to depose a high government official; rather, the deposition is of an underling, the author of the affidavit used by the Defendants in their original "motion to dismiss or, in the alternative, for summary judgment".

### III.  Case Precedent Supports Grant of the Requested Motion

Federal Rule of Civil Procedure 26(b) states,

> Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.…

It has long been recognized that Rule 26 applies to employees of the federal government as well as to all other civil litigants.  E.g., United States v. Procter & Gamble Co., 356 U.S. 677, 681 (1958)(in civil action corporate defendant moved for discovery on grand jury transcript used by plaintiff federal government but was denied due to the long-established policy of secrecy of grand jury proceedings and lack of a compelling necessity to overcome that policy).

Defendant has stated its objection to any discovery in this matter beyond the scope of an administrative record that it has promised to produce on or before June 25,

2007 (which it has described as a compilation of documents pertaining to Plaintiff's

September 25, 2006 request for a LONO).  The law prefers complete disclosure,

however,  as the Supreme Court has stated:  "whatever their origins, these exceptions to

the demand for every man's evidence are not lightly created nor expansively construed,

for they are in derogation of the search [for] the truth."  Tuite v. Henry, 181 F.R.D. 175,

177 (1998 D.D.C.)(citing United States v. Nixon, 418 U.S. 683, 710 (1974); Miller v.

Pancucci, 171 F.R.D. 292, 300(C.D.Cal, 1992)("This balancing test has been moderately

pre-weighted in favor of disclosure")).

Only material concerning military or state secrets is granted an absolute privilege.

All other grounds are qualified privileges in which the court must weigh the

government's interest in protecting the material against the party's need for its release.[1]

Tuite v. Henry, 181 F.R.D. 175, 177 (D.D.C. 1998)(requesting party failed to

demonstrate that the information was unavailable from other sources or of sufficient

importance to overcome the law enforcement privilege).  Contrary to the facts and

circumstances in Tuite, the factual information sought by Novelty is critical to its ability

to disprove the allegations against it.  Tuite, 181 F.R.D. at 180("the information

contained in the report is of little use to plaintiff's in proving their allegations")(citing

Bouchard v. Bandy, 1992 U.S.Dist. LEXIS 17556 (E.D.Pa. Nov. 10, 1992)("Where, as

here, a plaintiff claims a civil rights violation, supervisory evaluation may be the best

evidence available of the state of mind of the defendant")(citations omitted)).

Moreover, whether the material sought is purely factual is a compelling factor in

determining whether a governmental privilege applies.  Waters v. United States Capitol

---

[1] This balancing test is not the same as the court's standard of review in a FOIA case where government assertion of an exemption to disclosure is not weighed against the requesting party's need for the information.  See Jupiter Painting Contracting Co v. United States, 87 F.R.D. 593, 597 (E.D.Pa. 1980)

Police Board, 218 F.R.D. 323, 324 (D.D.C. 2003)(investigative documents ordered

disclosed to requesting party in civil action).  The fact that Novelty is not a defendant in a

criminal case also weighs heavily in Novelty's favor.  Id.  As in the Waters case, the

material Novelty seeks is to some respect at the "very heart and soul" of its case and

"ha[s] great value for impeachment purposes."  Id.

       In this case, the information Novelty seeks is very precise: The factual support

upon which DEA Staff Coordinator Darrell R. Meador relies in support of paragraphs 17

and 18 of his affidavit on the following two salient points: that Novelty is intent on

breaking the laws of Kentucky and Tennessee governing ephedrine form and dose and

that Novelty is intent on selling its ephedrine containing cough and cold remedies to

"gray market" retailers.  There is no less burdensome or alternative way to obtain this

information because Meador is the source of the allegations and is the one who

presumably gathered the information in support of his affidavit.  Meador's charges in

paragraphs 17 and 18 of his affidavit are not protected by the deliberative process

privilege because they are statements of fact not related to policy-making or the thought

processes of government officials.  They are "relevant to the subject matter of the case"

and certainly "reasonably calculated to lead to the discovery of admissible evidence."

Federal Rule of Civil Procedure 26(b)(1).

### IV.    Good Cause Exists for Grant of the Requested Limited Discovery Before the Rule 26(f) Conference

       Fed.R.Civ.P. 26(f) requires a pre-trial conference before discovery begins, but the

Court can waive that requirement upon good cause shown.  OMG Fidelity v. Sirius

Technologies, 239 F.R.D. 300, 302 (N.D.N.Y. 2006)(granting plaintiff's request to have

expedited discovery because requests were not particularly onerous on defendant).  Good

cause depends upon the reasonableness of the request, particularly where the discovery is related to specific matter for which expedited discovery may be appropriate (i.e., time sensitive discovery).  Plaintiff Novelty's request is reasonable.  It focuses with laser precision on obtaining the evidence and facts upon which DEA Staff Coordinator relied to support his allegations in paragraphs 17 and 18 of his affidavit.  Even more precisely, it seeks to adduce his basis for charging Novelty with the intent to distribute solid form ephedrine containing capsules in two states where those forms are illegal, Kentucky and Tennessee.  It also seeks to adduce his basis for charging Novelty with the intent to distribute its ephedrine containing cough and cold remedies to "gray market" retailers.

The information sought is germane to Novelty's pending motion for preliminary injunction (and is in issue on the other pending motions in this case).  The Defendants not only intend to oppose the motion for preliminary injunction, they also intend to file a new motion to dismiss or, in the alternative, for summary judgment and oppose Plaintiff's Motion for Summary Judgment.  Unless they wish to abandon the aforementioned two salient points in argument, they will rely upon them in these latter pleadings.  Consequently, before the Court schedules its pre-trial conference, matters involving the information will be before the Court.  To ensure that the record is replete with this information and that neither the Court nor Novelty is deprived of information essential to a decision, the requested limited discovery should be authorized.

## IV.  Conclusion

For the foregoing reasons, Novelty respectfully requests leave to conduct limited discovery whereby it will seek to adduce via the attached document production request (Exhibit 1) and in a deposition not to exceed two hours in length the bases for DEA Staff

Coordinator Darrell R. Meador's charge that Novelty intends to distribute solid form ephedrine containing capsules in two states where those forms are illegal, Kentucky and Tennessee and the bases for his charge that Novelty intends to distribute its ephedrine containing cough and cold remedies to "gray market" retailers.

Respectfully submitted,

NOVELTY, INC.,

By: _____/s/_____
　　　　　Its Counsel
　　　　　Jonathan W. Emord (DC Bar 407414)
　　　　　Andrea G. Ferrenz (DC Bar 460512)

Emord & Associates, P.C.
11808 Wolf Run Lane
Clifton VA 20124
Phone: (202) 466-6937
Fax: (202) 466-6938
jemord@emord.com

Date submitted:  June 21, 2007

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NOVELTY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-CV-00191 (RMU) |
| | ) | |
| KAREN TANDY, Administrator, | ) | |
| UNITED STATES DRUG ENFORCEMENT | ) | |
| ADMINISTRATION; et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF PLAINTIFF'S COUNSEL JONATHAN W. EMORD PURSUANT TO 28 C.F.R. § 16.23(C) IN SUPPORT OF PLAINTIFF'S MOTION FOR LIMITED DISCOVERY OF DEFENDANT WITNESS DARRELL R. MEADOR

I, Jonathan W. Emord, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1. I am the attorney of record for Plaintiff Novelty, Inc. in the above-referenced proceeding.

2. On April 10, 2007, Defendants filed their, since withdrawn, Motion to Dismiss or in the Alternative for Summary Judgment.

3. Attached to that Motion was the affidavit of DEA Staff Coordinator Darrell R. Meador.

4. In his affidavit Mr. Meador charged that DEA had investigated Plaintiff Novelty after receipt of a September 25, 2006 request for a Letter of No Objection and had determined that Novelty intended to distributed solid form ephedrine containing capsules in two states where those forms are illegal, Kentucky and Tennessee.

5. Mr. Meador also charged that Novelty intended to distribute its ephedrine containing cough and cold remedies to "gray market" retailers.

6. Novelty seeks oral testimony from Mr. Meador in a deposition pursuant to Federal Rule of Civil Procedure 26 to adduce all facts concerning those statements in Mr. Meador's affidavit.

Jonathan W. Emord

6/21/07

Dated

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NOVELTY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-CV-00191 (RMU) |
| | ) | |
| KAREN TANDY, Administrator, | ) | |
| UNITED STATES DRUG ENFORCEMENT | ) | |
| ADMINISTRATION; et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

<u>**EXHIBIT 1 IN SUPPORT OF
PLAINTIFF'S MOTION FOR LIMITED DISCOVERY OF DEFENDANT
WITNESS DARRELL R. MEADOR**</u>

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NOVELTY, INC.,            )
           )
           )
         Plaintiff,    )
           )
       v.              )     Civil Action No. 1:07-CV-00191
           )     (RMU)
           )
KAREN TANDY, in her official capacity; )
UNITED STATES DRUG      )
ENFORCEMENT ADMINISTRATION;   )
ALBERTO GONZALES, in his official   )
capacity; UNITED STATES      )
DEPARTMENT OF JUSTICE; and the   )
UNITED STATES OF AMERICA,    )
           )
        Defendants.   )
_____ )

## DECLARATION OF DARRELL R. MEADOR

I, DARRELL R. MEADOR, pursuant to 28 U.S.C. § 1746, declare and say:

1.      I am a Staff Coordinator the Office of Enforcement Operations, Dangerous Drugs and Chemicals Section, at DEA Headquarters. My responsibilities include the prevention, detection, and investigation of the diversion of listed chemicals from legitimate channels under the Controlled Substances Act. This includes reviewing DEA Forms 486 (Import/Export Declarations) and answering questions from DEA field offices. I have served in my current capacity at DEA headquarters since July 2004, and have been a Diversion Investigator since February 1986. I was hired by DEA as a Diversion Investigator in February 1986 and attended the Basic Diversion Investigator

School at the FBI Academy in Quantico, Virginia.  I have also received additional training at numerous classes administered both by the DEA and by non-DEA entities between 1989 and 2005.  These courses familiarized me with matters involving chemical diversion to the illicit manufacture of methamphetamine, and the adverse environmental impact that results from this process.  Prior to my current position, I was a Diversion Investigator assigned to the Nashville, Tennessee District Office.  As part of my duties I conducted regulatory investigations involving manufacturers, distributors, pharmacies, practitioners, and other handlers of controlled substances.  I was primarily responsible for preventing, detecting and investigating the diversion of controlled substances from legitimate channels to illicit traffic.  I have conducted similar investigations related to manufacturers, distributors, importers and exporters of list I chemicals.  I have also provided investigative assistance in criminal and civil actions involving the diversion of imported list I chemicals and chemicals diverted to the illicit market.  The primary emphasis of most of these investigations has involved pseudoephedrine and ephedrine products.  I have also worked in the regulatory process of List I chemical handlers to include pre-registrant investigations, regulatory investigations, and administrative actions taken against regulated firms.

The following information is based on my personal knowledge and/or information gained in the course of my official duties.

2.     List I chemicals are legitimate chemicals that also may be used in the illicit manufacture of a controlled substance in violation of the Controlled Substances

2

Act, 21 U.S.C. § 802 (34), 21 CFR § 1310.02(a). Ephedrine and pseudoephedrine are List I chemicals which are commonly used to illegally manufacture methamphetamine, a Schedule II controlled substance. These chemicals have been specifically designated by the Administrator of the Drug Enforcement Administration (DEA Administrator) as two of the listed chemicals subject to the provisions of 21 CFR §§ 1309 and 1313. See 21 CFR § 1310.02 (a).

3.      Pursuant to 21 U.S.C. § 971 (c) and 21 CFR § 1313.41 (a), the DEA Administrator has the authority to suspend any importation or exportation of ephedrine or pseudoephedrine based on evidence that the chemical proposed to be imported or exported may be diverted to the clandestine manufacture of a controlled substance.

4.      Additionally, the 1988 United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances ("1988 U.N. Convention") requires that parties to the convention "take the measures they deem appropriate to prevent diversion of [listed substances, including ephedrine] used for the purpose of illicit manufacture of narcotic drugs to psychotropic substances, and shall co-operate with one another to this end."

5.      The 1988 U.N. Convention further states that parties "[c]ontrol all persons and enterprises engaged in the distribution of [listed chemicals], license such distributors, and "[r]equire that licensees obtain a permit for conducting [manufacture and distribution]." Art. 12, ¶ 8(b). Parties to the 1988 Convention are further obligated to

3

"[e]stablish and maintain a system to monitor international trade in [listed chemical] in order to facilitate the identification of suspicious transactions." Id. at ¶ 9(a). Parties are also obligated to notify the "competent authorities and services of the Parties concerned if there is reason to believe that the import, export or transit of a [listed chemical] is destined for the illicit manufacture of narcotic drugs or psychotropic substance." Id. at ¶ 9 (c). Though the 1988 U.N. Convention does not specifically mandate that parties adopt a permit system with respect to imports of listed chemicals, parties are obligated to cooperate to prevent diversion of listed chemicals used for the purpose of illicit manufacture of narcotic drugs or psychotropic substance.

6.    The United States has implemented a system by which every regulated person who imports a listed chemical that meets or exceeds the threshold quantities or is a listed chemical for which no threshold has been established, is required to notify the DEA Administrator of the importation not later than 15 days before the importation is to take place. *See* 21 CFR § 1313.12 (a). Unless the notice requirement is waived, the regulated person must complete a DEA Form 486 and deliver it to DEA not later than 15 days prior to the importation. *See* 21 U.S.C. § 971 (a); 21 CFR § 1313.12 (b). The DEA Form 486 must include, among other things, name and address information about the chemical importer and/or broker, the name and description of each listed chemical, the amount of chemical to be shipped, the proposed import date, the foreign port of exportation, and the United States Customs Port of Entry. *See* 21 CFR § 1313.13 (c).

7.      In addition to the declaration system described above, the United States has negotiated bilateral agreements with several countries which are the chief sources of bulk listed chemicals.  In the early 1990's, large shipments of ephedrine and pseudoephedrine, bound for a fictitious company in Mexico, had been seized by U.S. Customs agents at the Dallas/Fort Worth Airport on or before 1994.  The United States subsequently learned that other large shipments of ephedrine and pseudoephedrine were being shipped to this same fictitious company by companies located in the People's Republic of China, India, and the Czech Republic.  In an effort to control these shipments and prevent the chemicals from being diverted for the purpose of illicit manufacture of methamphetamine, the United States and the competent authorities in these countries developed a procedure for authorizing the exportation of List I chemicals to and through the United States.  This became known as the "LONO" process.

8.      Under the "LONO" process, the competent authorities of China, India, and the Czech Republic ("exporting nations") require that, prior to permitting the export of a List I chemical to and/or through the United States (and issuing a permit to the exporter), the United States must first issue a "LONO," or Letter of No Objection, to the competent authority of the exporting nation.  Normally, the LONO consists of a short letter which lists the (1) U.S. importer; (2) exporter; (3) the shipment's DEA control number; (4) name of chemical and quantity to be shipped; and (5) the importer reference number. The LONO further states that "the DEA has no objection to the proposed shipment at this time."  The LONO is sent to the competent authority of the exporting country and a copy is sent to the importer.  Pursuant to the terms and spirit of the 1988 U.N. Convention, the United States is required, prior to issuing the LONO, to investigate the intended

5

destination and uses of List I chemicals which are imported into and through the United

States. If, after investigating, the United States determines that the List I chemicals may

be diverted for the purpose of illicit manufacture of methamphetamine, under the terms

and spirit of the U.N. Convention, it is obligated to deny the LONO request based on the

same ground stated in 21 U.S.C. § 971 (c). *See* 1988 U.N. Convention, Art. 12, ¶¶ 1 and

8 (b). If the United States issues the LONO, the LONO serves to notify the exporting

country that, based on the evidence possessed by DEA at the time the LONO is issued,

that the shipment or export complies with 21 U.S.C. § 971.


9.    If, after receiving the completed DEA Form 486 and conducting its

investigation, DEA determines that the LONO will be denied, DEA will so notify the

regulated person seeking to import the listed chemical. At this point, DEA will provide

the regulated person with the option of either withdrawing or pursuing the importation. If

the regulated person elects to pursue the importation, DEA may suspend the importation

based on evidence that the chemical proposed to be imported may be diverted to the

clandestine manufacture of a controlled substance. *See* 21 U.S.C. § 971 (c); 21 CFR §

1313.41 (a). However, if the regulated person withdraws the LONO request, DEA will

take no further action. The denial of the LONO itself triggers no legal obligation except

to require the importer to contact DEA if it elects to pursue the importation.


10.    Currently, there is no statutory definition of "evidence that the chemical

proposed to be imported may be diverted to the clandestine manufacture of a controlled

substance." However, through prior adjudication, DEA and the courts have approved the

use of a "totality-of-the-circumstances test" to decide whether substantial evidence exists to suspend an importation of List I chemicals. *See PDK Laboratories, Inc. v. United States Drug Enforcement Administration*, 438 F.3d 1184, 1194 (D.C. Cir. 2006); *Indace, Inc., Suspension of Shipments*, 69 Fed. Reg. 67,951, 67,959 (Nov. 22, 2004).

11.    Moreover, the Attorney General considers the following factors to determine whether a regulated person, such as the Plaintiff, shall receive a registration to distribute List I chemicals. *See* 21 U.S.C. § 823 (h) which provides that the "Attorney General shall consider--

(1)    maintenance by the applicant of effective controls against diversion of listed chemicals into other than legitimate channels;

(2)    compliance by the applicant with applicable Federal, State, and local law;

(3)    any prior conviction record of the applicant under Federal or State laws relating to controlled substances or to chemicals controlled under Federal or State law;

(4)    any past experience of the applicant in the manufacture and distribution of chemicals; and

(5)    such other factors as are relevant to and consistent with the public health and safety."

12.    In considering whether "the chemical proposed to be imported may be diverted to the clandestine manufacture of a controlled substance," the Attorney General may consider the importer's "downstream" customers. This includes the person to whom the bulk chemicals are shipped and any other persons who may receive the chemicals

7

either in bulk or manufactured form. The type of retail establishment that will ultimately distribute the List I chemical products to member of the public is a substantial and weighty factor in determining the risk of diversion to clandestine manufacture.

13.    Numerous DEA orders have established that convenience stores and gas stations constitute the non-traditional retail or "gray market" for legitimate consumers of ephedrine products. *Wild West Wholesale*, 72 FR 4042, 4044 (2007); *Tri-County Bait Distributors*, 71 FR 52160, 52161 (2006); *D & S Sales*, 71 FR 37607, 37609 2006); *Branex, Inc.*, 69 FR 8682, 8690-92 (2004). Gray market products, which are labeled as asthma/cough/cold/allergy relief medications, are often marketed for "off-label" uses, such as weight loss or staying awake and are not typically found in most supermarkets and drug stores. DEA has found that there is a substantial risk of diversion of List I chemicals into the illicit manufacture of methamphetamine when these products are sold by non-traditional retailers. *Joy's Ideas*, 70 FR 33195, 33199 (2005) (finding that risk of diversion was "real, substantial and compelling"); *Jay Enterprises*, 70 FR 24620, 24621 (2005) (noting "heightened risk of diversion" should application be granted). DEA has adjudicated numerous cases in which it has determined that gray market retailers, such as gas stations and convenience stores, are "sources for the diversion of listed chemical products." *See Joey Enterprises*, 70 FR 76866, 76867 (2005); *TNT Distributors*, 70 FR 12729, 12730 (2005); *OTC Distribution Co.*, 68 FR 70538, 70541 (2003); *MDI Pharmaceuticals*, 68 FR 4233, 4236 (2003).

14.    DEA has determined that products sold in the non-traditional market pass through multiple layers of distribution. The products sold are typically stronger than those found in the traditional market and "have been disproportionately represented in clandestine lab seizures around the United States involving listed chemical products." DEA has also determined that many non-traditional retailers tend to knowingly sell large quantities of List I chemical products to "smurfers," methamphetamine traffickers and/or individuals who work for methamphetamine traffickers who attempt to buy out a store's entire stock of List I chemical products by going to the store at different times or on different days. *T. Young Associates*, 71 FR 60567, 60568 (2006); *K.V.M. Enterprises*, 67 FR 70968, 70969 (2002).

15.    Small capacity clandestine labs continue to dominate law enforcement seizures and environmental cleanups. Many small illicit laboratories operate with listed chemical products often procured legally or illegally, from non-traditional retailers of over-the-counter drug products, such as gas stations and small retail markets. Some retailers acquire product from multiple distributors to mask their acquisition of large amounts of listed chemicals. *SPA Dynamic Wholesalers*, 68 FR 61466, 61467 (2003).

16.    On September 25, 2006, DEA received two completed DEA Forms 486 from Spirit Pharmaceuticals, LLC ("Spirit"). On the forms, Spirit declared it intended to import two shipments of ephedrine hydrochloride ("ephedrine HCl"), with a net weight of 2200 kilograms. Spirit further requested that DEA issue a LONO to the competent authority of India in order to permit the import to take place and attached two purchase

orders from AAA Pharmaceutical, Inc. ("AAA"), the company to whom Spirit intended to transfer the ephedrine.

17.    After receiving the DEA Forms 486, Spirit's request for a LONO, and the AAA purchase orders, DEA determined that AAA intended to use the ephedrine HCl to manufacture "solid-dosage" or tablet form over-the-counter (OTC) pharmaceuticals for sale to the Plaintiff and one other company.  DEA obtained photographs of labels of these OTC pharmaceuticals and determined them to be "gray market" items.  DEA further obtained a list of Plaintiff's customers and determined that some of them (i.e. gas stations and convenience stores) were venues in states where the sale of these items is prohibited by state law.  For instance, according to the "Meth-Free Tennessee Act of 2005," which took effect in April 2005, "any immediate methamphetamine precursor may be dispensed only by a licensed pharmacy."  Tenn. Code Ann. § 39-17-431.  Kentucky has passed a similar measure which provides that "[a]ny nonprescription compound, mixture, or preparation contained any detectable quantity of ephedrine ... [its] salts or optical isomers ... shall be dispensed, sold, or distributed only by a registered pharmacist, a pharmacy intern, or a pharmacy technician."  Ky. Rev. Stat. § 218A.1446.  These states exempt "gel-caps" and liquids from the type of products that must be sold only in pharmacies.  However, the products proposed to be manufactured by AAA and sold by Plaintiff are in tablet form.

18.    Based on Plaintiff's own customer list, which indicates an intention to violate state law, and Plaintiff's intention to sell to "gray market" retailers, DEA

determined that authorizing the importation of ephedrine by Spirit constitutes a risk of diversion to the clandestine manufacture of a controlled substance. For those reasons, the LONO request was denied and Spirit was so notified by letter dated October 10, 2006. Spirit was informed that if it neglected to pursue to importation, its request would be considered withdrawn. Spirit did not respond to DEA's notification. Therefore, DEA has considered the matter to be withdrawn.

19.    In an abundance of caution, by letter dated April 10, 2007, DEA has notified Spirit a second time of its right to pursue the importation and/or to affirmatively withdraw the request for a LONO. If Spirit elects to pursue the request, DEA will order the suspension of the shipments pursuant to 21 U.S.C. § 971 (c) (1) and afford Spirit the opportunity for a hearing. If Spirit withdraws its importation request, DEA has no authority to act any further on the request. However, if Spirit elects to pursue the importation and requests a hearing, Plaintiff will have an opportunity at that point to petition the Administrative Judge for an opportunity to participate and/or intervene in the proceeding in accordance with the hearing procedures in subchapter II of chapter 5 of Title 5.

20.    DEA is aware that, by letter dated November 2, 2006, Plaintiff has sought to pursue Spirit's importation and has since requested a hearing on the denial of Spirit's LONO request. Unlike Spirit, Novelty is not a registered importer pursuant to 21 U.S.C. § 958 (c), and cannot import ephedrine itself. However, the decision on whether to grant Plaintiff a hearing is pending, based on Spirit's response to the second DEA letter. DEA

will notify Plaintiff as soon as it determines whether Spirit intends to pursue the importation.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that I have read the foregoing declaration and that the same is true and correct.

Darrell R. Meador
Staff Coordinator
Office of Enforcement Operations,
Dangerous Drugs and Chemicals
Section

Executed this _10_ day of April 2007 at Arlington, Virginia.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NOVELTY, INC.,                                )
                                       )
        Plaintiff,                          )
                                         )
        v.                                  )     Case No. 1:07-CV-00191 (RMU)
                                       )
KAREN TANDY, Administrator,                   )
UNITED STATES DRUG ENFORCEMENT )
ADMINISTRATION; et al.,                       )
                                       )
                                       )
        Defendants.                         )

<br>

## EXHIBIT 2 IN SUPPORT OF
## PLAINTIFF'S MOTION FOR LIMITED DISCOVERY OF DEFENDANT
## WITNESS DARRELL R. MEADOR

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NOVELTY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:07-CV-00191 (RMU) |
| | ) | |
| KAREN TANDY, Administrator, | ) | |
| U.S. Drug Enforcement Administration, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**AFFIDAVIT OF MARK BLEDSOE IN SUPPORT OF NOVELTY'S OPPOSITION TO**
**DEFENDANTS' MOTION AND NOVELTY'S CROSS MOTION**

I, Mark Bledsoe, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am the Director of Category Management for Novelty, Inc., located at 351 West Muskegon Drive, Greenfield, IN 46140 (hereinafter "Novelty").

2. I have been employed with Novelty, Inc. since February 1998. I have been the Director of Category Management for Novelty since June 2004.

3. Prior to being employed with Novelty I was employed as a Merchandiser for Sunoco for eight years, as a buyer for Stop N Go for six years, and as a District Manager for King Kwik for six years.

4. I have over 20 years of experience in the convenience store industry in the operations and marketing aspects of the business practice.

5. During the course of my employment in the convenience store industry, my operational responsibilities have included day to day supervision of eight to twelve convenience stores, category management for products and inventory, pricing negotiation with

vendors, recruitment of new product concepts and vendors, and development of store layouts and displays.

6. In my current position I am responsible for buying "standard" stock items for our inventory, negotiating prices with vendors, sourcing new vendors, and monitoring Novelty compliance with state and federal regulations governing List 1 products.   I also monitor the sales of List 1 products by dosage strength and formulation in compliance with state-specific List 1 product regulations.

**Novelty's Registration**

7. In approximately 1996 Novelty applied for and received a registration to distribute list 1 chemicals from the DEA.

8. Every year after 1996 to the present Novelty renewed its registration to distribute List 1 chemicals with DEA.

9. Novelty's current registration was awarded on September 20, 2006 and is valid through October 31, 2007.

10. Novelty, Inc. has sold over-the-counter products containing a combination of ephedrine and  guaifenesin (an expectorant) to convenience store retail locations in the United States.

**Novelty's Customers and Products**

11. Novelty distributes List 1 products to convenience stores exclusively.  It does not sell to distributors.  It sells directly to stores and has established relationships with each store. Its products are created by a contract manufacturer AAA Pharmaceuticals at Novelty's request and under Novelty's private label.  Novelty then transports and sells those products directly to its retail customers without any middle men, one of the critical

2

elements in its risk reduction program. Novelty's manufacture and distribution of its products is a "closed system" that meets all of DEA's documentation requirements and regulatory limitations to minimize the risk of diversion.

12. Novelty's List 1 product customers include many of the nation's largest and most well-respected store chains such as Circle K, The Pantry, Village Pantry, and Speedway.

13. Novelty has never received a DEA Warning Letter advising Novelty that any of its products have ever been found in or associated with clandestine manufacturing of illegal substances.

14. Novelty sells List 1 chemical products in some states that limit ephedrine content to 12.5 mg tablet form, in some states that limit ephedrine content to 25 mg tablet form, in some states that limit ephedrine content to 12.5 mg gel capsule form, and in some states that limit ephedrine content to 25 mg gel capsule form.

15. Novelty ensures that the ephedrine form and content sold in a state complies with that state's requirements.

16. Novelty does not manufacture List 1 chemical products for sale in a state that exceeds that state's allowable limits on dosage.

17. Novelty does not sell its List 1 chemical products, and has never sold those products, with any "off label" claims (such as for weight loss or staying awake).

18. In his affidavit, DEA witness Darrell Meador defines several types of conduct that he says create a risk of ephedrine diversion to the illicit methamphetamine trade and suggests that Novelty engages in that conduct. Meador Affidavit at ¶¶ 13-14. Those statements, as applied to Novelty, are false:

3

- Products are labeled as cough/cold relief medications but are "marketed for 'off label' uses, such as weight loss or staying awake." Meador Affidavit at ¶13. Novelty does not market its products for 'off label uses,' such as for weight loss or staying awake.

- "Products pass through multiple layers of distribution." Meador Affidavit at ¶14. This is false. Novelty's products do not pass through multiple layers of distribution. Novelty has a closed system of distribution, obtains the finished product from its contract manufacturer, warehouses the product in its own facilities, and ships the product by its own trucks and under the care of its own, security trained drivers.

- "Products sold are typically stronger than those found in the traditional market." Meador Affidavit at ¶14. Novelty's products are not stronger than those found in the traditional market. Novelty strictly complies with the dosage limitations of state and federal authorities. Novelty's dosage amounts are the same as those found in products sold in pharmacies, grocery stores, or "big box" stores such as Wal-Mart.

- "Products...have been disproportionately represented in clandestine lab seizures around the United States involving listed chemical products." Meador Affidavit at ¶14. Novelty has never been notified that its products were found in clandestine lab seizures.

- "Non-traditional retailers tend to knowingly sell large quantities of List 1 chemical products to 'smurfers,' methamphetamine traffickers and/or individuals who work for methamphetamine traffickers who attempt to buy

4

out a store's entire stock of List 1 chemical products by going to the store at different times or on different days." Meador Affidavit at ¶14. Novelty's distribution and sales system prevents its customers from purchasing large quantities of chemical products. Novelty enforces its policy regarding sales by the retailer to the consumer, this policy states; "no more than 2 packages per transaction and 1 transaction per day". This policy is far more stringent than the limit set in the Combat Methamphetamine Epidemic Act of 2005. (CMEA) (Limits ephedrine sales to 3.6 grams per day) Every display case containing Novelty's ephedrine products displays this policy, every log book provided to Novelty's retailers contains this policy on every page of the log book. (Novelty provides these log books to it's customers free of charge) Every training manual (Training required by the CMEA) provided to its customers contains this policy. (Novelty provides these training manuals to it's customers free of charge) .

19. Some of the stores to which Novelty sells its List 1 chemical products are located in Kentucky and Tennessee. Those states allow the tablet form of List 1 chemicals to be sold only in pharmacies. The laws of those states permit the gel capsule form of ephedrine to be sold in convenience stores, within dosage limitations. Novelty sells only its gel capsule form products in those states, and it does so in strict accordance with the laws of those states. The contrary statement made in the affidavit of Darrell Meador attached to the Defendants' Motion to Dismiss or in the alternative for Summary Judgment is utterly false. From the date Kentucky and Tennessee first adopted laws

prohibiting the tablet form of ephedrine to be sold in convenience stores, Novelty has never sold that form in those states.

20. Novelty submitted to DEA a customer list at DEA's request. The list does not distinguish (and was not required to distinguish) which form or dose amount of its List 1 products (tablets versus gel caps and 12.5 mg per dose versus 25 mg per dose) are sold by which customers on that list. DEA has never requested that Novelty identify which products are sold by which customers. All prior customer lists given to DEA when Novelty sought a LONO likewise did not distinguish tablet States from gel capsule states and were not required to distinguish in that way. Novelty has consistently adhered to the legal requirements in each state where its products are sold.

21. Some of our List 1 customers operate stores in several states. In some cases they have stores in states that do not permit List 1 products to be sold in convenience stores (such as Iowa). In some cases they have stores located in states that permit ephedrine in 25 mg tablet form (such as Indiana). In some cases they have stores located in states that permit ephedrine in 12.5 mg tablet form (such as Michigan). In some cases they have stores located in states that permit ephedrine in 25 mg gel capsule form (such as Kentucky). In some cases they have stores located in states that permit ephedrine sold in 12.5 mg gel capsule form (such as Texas). The LONO requested on September 25, 2006 included those customers. If Novelty had excluded Circle K from that customer list because they have stores in Ohio that by law cannot sell ephedrine, or because they have stores in Kentucky that by law must sell ephedrine in a gel capsule form, then the customer list would have been misleading, since it was Novelty's intent to sell 25 mg ephedrine tablets to Circle K's Indiana stores and to sell 12.5 mg tablets to its Michigan stores.

22. On or about February 3, 2006, I spoke with DEA employee Lisa R. Barnhill concerning our List 1 chemicals' products customer list. She asked for an explanation of the store or chains listed which had locations in states where sales in convenience stores were prohibited or restricted. I explained that the list does not identify which forms are sold to which customers or, in the case of some chains, does not identify by individual stores in states where sales by convenience stores are prohibited. I informed her of our policy on List 1 chemicals and sent her a copy of it via email, highlighting the sections describing our weekly monitoring of sales by product by State. Attachment A.

### List I Chemical Sales History

23. Because ephedrine is identified as a List 1 chemical by the Drug Enforcement Administration, Novelty, Inc. enforces a strict company-wide policy for all employees and associates governing the handling of ephedrine products.

24. The policy's formal objective is to ensure that the List 1 products held and distributed by Novelty, Inc. are guarded against risk of diversion at every point along the distribution chain up to, and including, the ultimate consumer sale.

25. Novelty, Inc.'s policy mandates that all associates who handle or have access to List 1 products be personally responsible for their actions in compliance. Each must read and sign the policy document acknowledging that he or she understands the provisions of the policy and will abide by the policy in its entirety.

26. In order to preserve the integrity of the inventory stock retained at Novelty, Inc.'s warehouses, all warehouse personnel with access to List 1 products are specially trained, must display employee ID badges indicating their specific position and security level

7

(i.e., OTC access authorization), and are subject to a zero tolerance policy for any act of non-compliance.

27. Prior to being hired, Novelty, Inc. conducts extensive criminal background checks and performs standard drug testing for all of its personnel, warehouse human resources, and contract drivers.

### List I Chemical Storage and Sales Procedures

28. The List 1 products area contained within the Novelty, Inc. warehouse is protected by a floor to ceiling chain link fence with two entry/exit gates, and a security system that electronically monitors all parts of the warehouse.

29. The warehouse is monitored by an ADT Focus® Fire & Security system twenty-four hours a day, employing motion detectors throughout the facility. The motion detectors are linked to automatic reporting devices that record the time and location of any potential security breach at the warehouses. Novelty personnel monitor the facility twenty-four hours a day and can be dispatched to the warehouse along with law enforcement on a moment's notice.

30. On receipt of a List 1 product shipment, Novelty, Inc.'s Receiver (B. Cheney) is responsible for checking the Bill of Lading and the Packing List to ensure that all of the information contained within, as well as the physical shipment, perfectly agrees with Novelty, Inc.'s Purchase Order.

31. The Receiver also checks to ensure that all documentation associated with the purchase and shipment of List 1 products contains both Novelty, Inc.'s and the supplier's DEA numbers.

32. If any of the receiving process components do not agree, the shipment is rejected in its entirety.

33. If the Receiver discovers a concealed shortage of a List 1 product, she will then assemble the following documentation and forward it to the Novelty, Inc. Compliance Officer, the Buyer, and Novelty, Inc.'s General Counsel:

  a.  Name of the manufacturer;

  b.  Item number and description;

  c.  Name of the carrier;

  d.  Condition of shrink wrap at time of delivery for pallet/box with shortage;

  e.  Purchase Order Number

  f.  Lot Number

  g.  All markings and identifiers on the box that contains a shortage of a List 1 product;

  h.  Photographs of all sides of the box that contains the shortage;

  i.  Condition of the box and its packaging at the time it was received;

  j.  Condition and arrangement of the product inside the box;

  k.  Photographs of the inside of the box (displaying contents);

  l.  Method of shortage detection;

  m.  Whether any/all of the other cases in the same shipment were checked for shortages.

34. The Novelty Receiving Supervisor (B. Cheney) must date-stamp the Packing Slip upon receipt of shipment, notes any discrepancies in the Vendor's paperwork, and sign to acknowledge compliance with all of the receiving requirements.

35. If the List 1 product shipment is accepted by the Receiver, it is immediately placed in the enclosed warehouse OTC area for sorting and labeling.

36. List 1 products are sorted according to the lot number assigned to each product and prepared for storage. This activity is conducted under the aforementioned surveillance.

37. All List 1 products must bear the following information:

- A barcoded license plate that contains the Lot Number, Item Number, and Case Pack;
- A Green label with the Item Number and the Lot Number;
- The expiration date of the product.

38. Once a List 1 product is received by the warehouse, it is entered into the Novelty computer tracking system with the information listed above. The product is then tagged and enclosed in the OTC area of the warehouse where it can only be accessed by authorized personnel bearing the appropriate clearance badges.

39. List 1 products are always kept separate from hazardous materials.

40. When a full case List 1 product is ordered by a Novelty salesperson, Novelty, Inc.'s Order Selector (C. Book) fills the order according to quantity ordered and applies a shipping label bearing the information of the route number.

41. The Order Selector records the date, the amount ordered, Lot number of the products shipped, and the route number to which the product is assigned.

42. The Shipping Auditor checks to ensure that all List 1 product cases are properly sealed, labeled, and sorted for route shipping and delivery.

43. The information regarding the status of the List 1 inventory in the Lot Track book is reported to Inventory Control at the end of each week.

44. Route Sales Professionals ("RSPs") receive the weekly load shipments of List 1 products to distribute to retail stores on their route. .

45. All delivery/route trucks must be secured and locked when not unloading for delivery.

46. All retail stores who purchase List 1 products from Novelty, Inc. also purchase other types of products stocked by Novelty, Inc.

47. Novelty, Inc. delivers all of its product inventory directly to the retail stores on Novelty trucks. Novelty's trained drivers ensure that all drop-off locations are legitimate business enterprises operating in a retail capacity and that the delivered cases are properly secured, locked, and kept behind the sales counters.

48. All purchasing transactions executed by Novelty, Inc. are recorded by an invoice filing system, with invoices signed by the purchaser. Payment is accepted either via invoice or upon delivery of the product.

49. Payment for purchases of List 1 products is never accepted in cash.

### Sales Limitations Policies

50. Novelty, Inc. requires that Novelty employees who negotiate the purchase of List 1 products obtain and maintain appropriate licensure, permits, and documents required to sell the products, including appropriate documentation required by FDA, DEA, and the State Boards of Pharmacy.

51. Novelty's employees who negotiate for manufacture of its List 1 chemical products are required to contract only with manufacturers licensed by DEA and all orders must be placed with the manufacturer through Novelty, Inc.'s Purchase Order System.

52. To ensure the validity and security of all List 1 product transactions, all Purchase Orders of List 1 products contain the DEA numbers of both the supplier and Novelty, Inc.

11

53. Novelty, Inc. only delivers List 1 products to retail vendors that have been screened and verified for compliance with federal and state registration and record keeping requirements.

54. Each List 1 product sale must be registered and verified in the Novelty, Inc. invoice system, which includes the listing of the business name, address, item(s), and quantity of product sold.

55. Novelty, Inc. does not sell any List 1 products to individuals or to vendors who are not established and verified Novelty, Inc. customers.

56. Because the states have enacted different legislation regulating the sale of List 1 products, all RSPs are required to review a memo explaining the different regulatory provisions pertaining to List 1 products in individual states and to sign the memo confirming that the RSP has read and understands the provisions.

57. In addition, all newly hired Novelty, Inc. employees are required to read and sign the same memo and participate in state specific training as part of their orientation.

58. Novelty, Inc. does not permit RSPs to sell more than one (1) full case of List 1 product type (brand and count) per transaction to any retail customer outlet. There are no exceptions to this rule.

59. Any RSP violation of Novelty, Inc.'s List 1 product policy is documented by one written warning. RSPs are terminated for any subsequent violations committed after the receipt of a written warning.

### Auditing and Other Security Measures

60. Novelty, Inc. conducts regular self audits for List 1 product inventories to ensure the security and accuracy of all Novelty warehouse stock.

61. JR Merlau is the Compliance Officer for Novelty, Inc. and is in charge of enforcing the List 1 products policy.

62. As part of standard Novelty, Inc. policy, the Compliance Officer does not have access to change inventory transactions.

63. The Compliance Officer's duties include monitoring and reporting all sales, transactions, or inventory inconsistencies resulting from possible diversion to senior management.

64. In order to avoid potential conflicts of interest, the Compliance Officer does not report to management in the Sales, Warehouse, or Inventory Control departments.

65. The Compliance Officer's duties also include monitoring and updating Novelty, Inc. staff and associates on all state laws and regulatory restrictions relating to List 1 products.

66. These regulatory updates and notices are communicated to the Sales and Delivery teams through memos and other Novelty, Inc. publications, including "Novelty News" and Novelty's "Order Guide."

67. The Compliance Officer is also responsible for reporting all deviations, suspicious transactions, and potential diversion risks to the Novelty, Inc. General Counsel if they are not resolved.

68. The General Counsel, in turn, is required to report all thefts and suspicious sales to the appropriate governmental agencies.

### September 25, 2006 Order

69. On September 25, 2006, Novelty, through its manufacturer AAA Pharmaceutical, Inc. ("AAA"), ordered 2,000 kilograms of ephedrine from its importer Spirit Pharmaceuticals LLC ("Spirit"). Attachment B. I authorized that purchase order on behalf of Novelty.

13

70. Spirit submitted a DEA Form 486 along with the purchase order from AAA and AAA's registration number. It also identified AAA's customer, Novelty. It requested a letter of no objection (LONO). Attachment B.

71. DEA responded on October 10, 2006 with a letter rejecting the LONO request for the two purchase orders. It did not identify the AAA customers in the letter. Attachment C..

72. Upon receipt of a copy of DEA's October 10, 2006 letter from Spirit via AAA, Novelty, by counsel, filed with DEA on November 2, 2006 a letter stating its intention to pursue the rejection and seek a hearing. Attachment D. Novelty appealed both shipments, not realizing that one shipment was for another AAA customer. I informed Spirit of the appeal.

73. I first learned that the October 10, 2006 letter from DEA rejecting the LONO request included a shipment to AAA intended for another AAA customer on April 16, 2007.

74. Novelty does not seek to contest the LONO denial for AAA's other customer's shipment of ephedrine.

75. Novelty's products to be manufactured from its September 25, 2006 Form 486 would restock its tablet product supplies.

76. Novelty will not sell the ephedrine intended for tablet production that is the subject of the September 25, 2006 Form 486 to any customer in a state where tablet sales through convenience stores are prohibited.

77. Novelty's electronic order filling system does not allow orders to be filled for List 1 chemicals in dosages or forms for states where those dosages or forms cannot be sold by convenience stores.

78. I am responsible for monitoring state laws and updating the order filling system with any changes.

79. Novelty does not sell List 1 chemicals to a customer in a state where state law does not permit sale of that form by that customer.

80. Spirit received DEA's letter dated April 10, 2006. Attachment E. In that letter DEA reiterated its rejection of the LONO and gave three options for a response. Id. Novelty informed Spirit that Novelty was pursuing the rejection of the hearing request and asked, in accordance with the letter's options, that Spirit do nothing so that DEA would issue the notice of suspension. Attachment F.

_Mark B. Bledsoe_

Mark Bledsoe

_5 · 22 · 07_

Date

15

# EXHIBIT 2'S
# ATTACHMENT A

**Andrea Ferrenz**

| | |
|---|---|
| **From:** | Mark Bledsoe [Mbledsoe@noveltyinc.com] |
| **Sent:** | Friday, February 03, 2006 1:46 PM |
| **To:** | lisa.r.barnhill@usdoj.gov |
| **Cc:** | Tejash Sheth |
| **Subject:** | Novelty |
| **Attachments:** | 9-7-05.doc |

Lisa,

It was a pleasure speaking with you today. I have attached our policy on List 1 chemicals and highlighted the area describing our weekly monitoring of sales by product by State. If I can be of further assistance please call.

<<9-7-05.doc>>

Mark Bledsoe

Director of Category Management

Novelty Inc.

(317) 462-3121

mbledsoe@noveltyinc.com

# EXHIBIT 2'S ATTACHMENT B

# SPIRIT PHARMACEUTICALS, LLC.

225 LINCOLN HIGHWAY, Suite 175, FAIRLESS HILLS, PA 19030
PH.# (215)943 4000  FAX.#(215)943 4039

## FACSIMILE TRANSMITTAL SHEET

To: Harry McFadden

Fax No.: 202-307-4792 (7503)

Tel.No. 202-307-4761

DEA

Date: 9.25-06

From: *ARUN HEBLE*

Pages: 1+5=6

Re: Ephedrine HCl — PO# 22773 for 2000 Kg

cc: AAA Pharmaceuticals — PO# 22774 for 200 Kg

◦ Urgent    ◦ For Review    ◦ Please Comment    ◦ Please Reply    ◦ Please Recycle

Dear Harry,

We are faxing you the following documents to request

a LONO for the above captioned listed chemical.

1.Completed DEA Form 486

2.Purchase order from the customer: A AA Pharmaceuticals Inc
Contact: Mr. Tej Shethi
Tel: 856-423-2700 x202

3.DEA registration of the customer.

Please call me if you have any questions.

Best regards,

Sincerely,

Arun R. Heble
Cell# 215-869-2493

IMPORT/EXPORT DECLARATION
Precursor and Essential Chemicals

U.S. Department of Justice
Drug Enforcement Administration

| | OMB Approval No. 1117-0023 |

SEE REVERSE FOR INSTRUCTIONS AND PRIVACY ACT.

**U.S. CUSTOMS CERTIFICATION**

Date of Departure/Arrival

Name of Carrier/Vessel

Date of Certification

Signature of Customs Official

1. CHECK ONE    [✓] IMPORT DECLARATION    [ ] EXPORT DECLARATION

1a. IMPORTER/EXPORTER (Name, Address, Telephone No. to include Area Code, Telex No. and where available FAX No.)

SPIRIT PHARMACEUTICALS, LLC.
225 LINCOLN HWY. SUITE 179
FAIRLESS HILLS, PA 19030
Ph.# 215-943-4600    DEA # 006065SRX

1b. BROKER OR FORWARDING AGENT, IF USED (Name, Address, Telephone No. to include Area Code, Telex No. and where available FAX No.)

EXPEDITORS INTERNATIONAL, INC.
870 ASHLAND AVE.
FOLCROFT, PA 19032
PH.# 610-534-2590

1c. I CERTIFY THAT THE 15-DAY ADVANCE NOTICE REQUIREMENT HAS BEEN WAIVED    [ ] Check if applicable

| 2. LISTED CHEMICALS TO BE IMPORTED/EXPORTED | | | |
|---|---|---|---|
| 2c. Name and Description of Chemical appearing on label or container | 2b. Name of Chemical as designated by Title 21 C.F.R. 1310.02 | 2c. Number of containers, size, net weight of each chemical (KG.) | 2d. Gross Weight of each item (KG.) |
| EPHEDRINE HCl | EPHEDRINE HCl | 25X80=2000KGS NET WT. | 27.5X80=2200KGS GROSS WT. |

P.O. # 22773
AAA PHARMACEUTICAL, INC

| 3a. [✓] FOREIGN  [ ] DOMESTIC PORT OF EXPORTATION (last U.S. Customs Port) AND APPROX. DEPARTURE DATE | 3b. [ ] FOREIGN  [✓] DOMESTIC PORT OF IMPORTATION (first U.S. Customs Port) AND APPROX. ARRIVAL DATE |
|---|---|
| MUMBAI, INDIA          OCTOBER 25,2006 | PHILADELPHIA, PA          OCTOBER 28, 2006 |

4a. MODE OF TRANSPORT; NAME OF VESSEL, CARRIER

BY AIR

4b. NAME OF ALL INTERMEDIATE CARRIERS

5a. NAME, ADDRESS, TELEPHONE, TELEX, and where available FAX NO. OF FOREIGN CONSIGNEE/CONSIGNOR

EMMELLEN BIOTECH PHARMACEUTICALS LTD.
501 SENTINEL, 5th FLOOR, CENTRAL AVE.RD.
HIRANANDANI GARDENS, POWAI, MUMBAI-400 076
PH # 011-91-22-56797200

5b. NAME, ADDRESS, TELEPHONE, TELEX, and where available FAX NO. OF ALL INTERMEDIATE CONSIGNEES

SIGNATURE OF AUTHORIZED INDIVIDUAL ( Print or Type Name below Signature)

(ARUN R. HEBLE)

| DATE | NAME OF FIRM |
|---|---|
| 09.25.06 | SPIRIT PHARMACEUTICALS, LLC.  DEA # 006065SRX |

Copy 1

DEA FORM — 486
(Rev 12-97)



Ordered By:
AAA Pharmaceutical, Inc.
157-160 West Jefferson Street
P.O. Box 22
Paulsboro, NJ 08066-0022

Phone: (856) 423-2700      Fax (856) 423-2699

# PURCHASE ORDER

Purchase Order Number:
22773

Date Issued:
Sep 25, 2006

Page:
1

To:  SPIR001

Spirit Pharmaceuticals, LLC
225 Lincoln Highway
Suite #179
Fairless Hills, PA 19030
DEA 006065SRX
Phone:(215) 943-4000      Fax:(215) 943-4030

Ship to:
157-160 West Jefferson Street
P.O. Box 22
Paulsboro, NJ 08066-0022

| Account No. | Terms |
|---|---|
|  | 1% 10, Net 30 Days |

Ship Via
FOB Delivered

| Item | Description | Units | Quantity | Unit Price | Extension |
|---|---|---|---|---|---|
| RAW01000 | L-Ephedrine Hydrochloride, USP | Kg | 2,000.00 |  |  |

FOR ALL SHIPMENTS:     Double-Stacked Pallets Will Be Returned at Seller's Expense.

FOR PHARMACEUTICAL     Items Shipped from Multiple Lots will be Returned at Seller's Expense; Items
RAW MATERIALS:          Must All be from the Same Lot. A Valid Certificate of Analysis for Each Raw
                        Material Must Accompany Shipment.

TOTAL

Authorized Signature

AAA PHARMACEUTICAL, INC
157-160 WEST JEFFERSON STREET

PAULSBORO          NJ    08066 - 0000



DOMESTIC CHEMICAL DIVERSION CONTROL REGISTRATION CERTIFICATE
UNITED STATES DEPARTMENT OF JUSTICE
DRUG ENFORCEMENT ADMINISTRATION
WASHINGTON, D.C. 20537

| DEA REGISTRATION NUMBER | THIS REGISTRATION EXPIRES | FEE PAID |
|---|---|---|
| 001253AAW | 06-30-2007 | PAID |

| BUSINESS ACTIVITY | ISSUE DATE |
|---|---|
| CHEMICAL MANUFACTURER | 06-06-2006 |

AAA PHARMACEUTICAL, INC
157-160 WEST JEFFERSON STREET

PAULSBORO          NJ          08066-0000

Sections 304 and 1008 of the Controlled Substances Act
of 1970, as amended, provide that the Attorney General
may revoke or suspend a registration to manufacture,
distribute, import or export a List 1 chemical.

THIS CERTIFICATE IS NOT TRANSFERABLE ON CHANGE OF OWNERSHIP, CONTROL, LOCATION, OR BUSINESS ACTIVITY,
AND IT IS NOT VALID AFTER THE EXPIRATION DATE.

Form DEA-511 (7/05)

# EXHIBIT 2'S
# ATTACHMENT C



**U. S. Department of Justice**
Drug Enforcement Administration

---

*www.dea.gov*                                    Washington, D.C.  20537

Mr. Arun R. Heble
Spirit Pharmaceuticals, LLC                      OCT 1 0 2006
225 Lincoln Hwy, Suite 179
Fairless Hills, PA 19030

Dear Mr. Heble:

Reference is made to your request for the Drug Enforcement Administration (DEA) to issue a Letter of No-Objection (LONO) to the competent authority in the country of export for the following proposed importations:

| | |
|---|---|
| Date of DEA-486 | September 25, 2006 |
| Listed Chemical | Ephedrine  2000 Kg |
| Date of proposed importation | October 28, 2006 |
| DEA Control # | 5042393 |
| PO # | 22773 |

| | |
|---|---|
| Date of DEA-486 | September 25, 2006 |
| Listed Chemical | Ephedrine  200 Kg |
| Date of proposed importation | October 28, 2006 |
| DEA Control # | 5042394 |
| PO # | 22774 |

This letter is written confirmation that it is DEA's intent not to issue a LONO in the referenced importation matter.  DEA has thoroughly reviewed the proposed utilization of the planned Listed Chemical importation.  DEA has grounds to believe that the proposed importation may be subject to diversion to the illicit market by the downstream distribution system and, as such is declining to sign a LONO for this importation.

There are three options available to you as the registered importer:

1. withdraw the request for a LONO and cancel the Import Declaration (DEA Form 486) by FAXING the request to OED at (202)307-7464;

2. take no action, and 30 days from the date of this notice DEA will deem your lack of further contact as a request to withdraw the Import Declaration and LONO request;

3. indicate in writing, within the 30 days, your desire to pursue the importation further.

If you desire to pursue the importation further, DEA will order the suspension of the shipment pursuant to Title 21, United States Code, Section 971 (c)(1). DEA will send you a notice of the suspension. The notice of suspension will list the legal and factual basis supporting the suspension. Upon ordering the suspension of shipment, in accordance with Title 21, United States Code, Section 971 (c)(2), an administrative hearing will be held as long as you request the hearing, in writing within 30 days from the day you are served with the notice of suspension. If you request a hearing, it will be held not later that 45 days after your request is made, unless you specifically request the hearing be held at a later time.

If you have any questions, please feel free to contact Staff Coordinator Darrell Meador, Office of Enforcement Operations, Dangerous Drugs and Chemicals Section, at (202) 307-4948.

Sincerely,

Alan G. Santos, Chief
Office of Enforcement Operations
Dangerous Drugs and Chemicals Section

cc: DEA Philadelphia Division
    Attn: DPM Ann Carter

# EXHIBIT 2'S
# ATTACHMENT D

 & Associates, P.C.

1800 ALEXANDER BELL DRIVE, SUITE 200
RESTON, VA 20191
1050 SEVENTEENTH STREET, N.W., SUITE 600
WASHINGTON, DC 20036
202.466.6937 • FAX 202.466.6938
www.emord.com

November 2, 2006

**VIA UPS**
Alan G. Santos
Office of Enforcement Operations, Dangerous Drugs and Chemicals Section
Drug Enforcement Administration
U.S. Department of Justice
950 Pennsylvania Ave.
Washington, D.C. 20530-0001

Linden Barber
Office of the Chief Counsel
Drug Enforcement Administration
2401 Jefferson Davis Highway
Alexandria, VA 22301

*Re: PO # 2273 and PO # 22774*

Dear Mr. Santos and Mr. Barber:

Our client, Novelty Inc. ("Novelty") intends to pursue the following importations:

| | |
|---|---|
| Date of DEA-486 | September 25, 2006 |
| Listed Chemical | Ephedrine 2000 Kg |
| Date of proposed importation | October 28, 2006 |
| DEA Control # | 5042393 |
| PO # | 22773 |

| | |
|---|---|
| Date of DEA-486 | September 25, 2006 |
| Listed Chemical | Ephedrine 200 Kg |
| Date of proposed importation | October 28, 2006 |
| DEA Control # | 5042393 |
| PO # | 22774 |

In an October 10, 2006 letter to Spirit Pharmaceuticals, LLC ("Spirit"), DEA stated that "it is [the agency]'s intent not to issue a LONO" in the above importations. Novelty is an eventual purchaser for the above importations and a party adversely affected and aggrieved by the LONO rejection. Pursuant to option three in the October 10, 2006 letter, Novelty is providing notice of its intent to pursue importation.

We ask that DEA proceed quickly in issuing a suspension notice for the above importations. The importation refusals are causing Novelty to suffer substantial economic damages.

Sincerely,

Jonathan W. Emord
Andrea G. Ferrenz
Katie Bond

# EXHIBIT 2'S ATTACHMENT E



**U. S. Department of Justice**
Drug Enforcement Administration

---

*www.dea.gov*

Washington, D.C. 20537

Mr. Arun R. Heble
Spirit Pharmaceuticals, LLC
225 Lincoln Hwy, Suite 179
Fairless Hills, PA 19030

APR 1 0 2007

Dear Mr. Heble:

Reference is made to your request for the Drug Enforcement Administration (DEA) to issue a Letter of No-Objection (LONO) to the competent authority in the country of export for the following proposed importations:

|  |  |
|---|---|
| Date of DEA-486 | September 25, 2006 |
| Listed Chemical | Ephedrine 2000 Kg |
| Date of proposed importation | October 28, 2006 |
| DEA Control # | 5042393 |
| PO # | 22773 |

|  |  |
|---|---|
| Date of DEA-486 | September 25, 2006 |
| Listed Chemical | Ephedrine 200 Kg |
| Date of proposed importation | October 28, 2006 |
| DEA Control # | 5042394 |
| PO # | 22774 |

This letter is written confirmation that it is DEA's intent not to issue a LONO in the referenced importation matter. DEA has thoroughly reviewed the proposed utilization of the planned Listed Chemical importation. DEA has grounds to believe that the proposed importation may be subject to diversion to the illicit market by the downstream distribution systems and, as such is declining to sign a LONO for this importation. We previously contacted you by letter dated October 10, 2006. At that time, you were informed that in order to pursue the requested importation, you would have to contact the agency. Because we received no correspondence within the required 30 days, we have considered your request to be withdrawn. At this time, however, we are re-contacting you to make certain that your intent is that you do not wish to pursue the import requests. There are now two options available to you as the registered importer:

1. Within five (5) days of receiving this notice, affirmatively withdraw the request for a LONO and cancel the planned importation by notifying DEA in writing of your intent to cancel the proposed importation. Send the letter via facsimile to OED at 202-307-7464;

2. Indicate in writing, within five (5) days from the date of this notice, your desire to pursue the

importation further. If you elect this option or fail to respond to this notice within five (5) days, DEA will order the suspension of the shipment pursuant to Title 21, United States Code, Section 971 (c)(1).

In the event DEA orders the suspension of the shipment, DEA will send you a notice of the suspension. The notice of the suspension will list the legal and factual basis supporting the suspension. Upon ordering the suspension of shipment, in accordance with Title 21, United States Code, Section 971 (c)(2), an administration hearing will be held as long as you request the hearing, in writing within 30 days from the day you are served with the notice of suspension. If you request a hearing, it will be held not later than 45 days after your request is made, unless you specifically request the hearing be held at a later time.

If you have any questions, please feel free to contact Staff Coordinator Darrell Meador, Office of Enforcement Operations, Dangerous Drugs and Chemicals Section, at (202) 307-4948.

Sincerely,

Alan G. Santos, Chief
Office of Enforcement Operations
Dangerous Drugs and Chemicals Section

cc:    DEA Philadephia Divison
Attn: Acting DPM Kurt Dittmer

# EXHIBIT 2'S
# ATTACHMENT F



**Emord** & Associates, P.C.

11808 WOLF RUN LANE
CLIFTON VA 20124

1050 SEVENTEENTH STREET, N.W., SUITE 600
WASHINGTON, D.C. 20036
202.466.6937 • FAX 202.466.6938
www.emord.com

May 22, 2007

**VIA EMAIL**
Arun Heble
Spirit Pharmaceuticals, LLC
225 Lincoln Highway
Suite 179
Fairless Hills PA 19030

Re: Novelty, Inc.

Dear Mr. Heble:

We represent Novelty, Inc. before the DEA concerning Novelty's September 25, 2006 request for import of ephedrine. We understand that an agent from DEA contacted you yesterday and stated that DEA would not process Novelty's most recent request for a LONO, made through your company, until Spirit responded in writing to DEA's April 10, 2007 letter.

Under applicable precedent, Novelty is the party aggrieved by DEA's denial and the one entitled to a hearing on the merits. DEA has not responded to Novelty's November 2, 2006 letter to DEA stating its intention to pursue the LONO denial of October 10, 2006 and requesting a speedy issuance of the notice of suspension.

In its April 10, 2007 letter DEA stated that if Spirit "elected [to indicate in writing its desire to pursue the importation] or fail[ed] to respond to [DEA's] notice within five (5) days, DEA w[ould] order the suspension of the shipment pursuant to Title 21, United States Code, Section 971 (c)(1)." We understand that Spirit did not respond within five days of that letter. Consequently, one would have expected DEA to issue the notice of suspension. Our client informs us that DEA has not issued the suspension order.

Novelty requests that Spirit not seek a hearing for itself for this LONO denial. Novelty is the party aggrieved by the denial and is seeking an independent hearing on the merits, as is its right under the Due Process clause of the Fifth Amendment. Please feel free to share this letter with DEA.

Best regards,

Jonathan W. Emord
Andrea G. Ferrenz

Cc:     Mark Bledsoe
        Novelty, Inc.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NOVELTY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-CV-00191 (RMU) |
| | ) | |
| KAREN TANDY, Administrator, | ) | |
| UNITED STATES DRUG ENFORCEMENT | ) | |
| ADMINISTRATION; et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

ORDER

Following the Court's consideration of Plaintiff's Motion for Limited Discovery of Defendant Witness Darrell Meador and exhibits thereto and Defendants' Opposition, it is hereby ORDERED that Plaintiff's Motion is GRANTED:

Defendants shall produce Darrell R. Meador within 30 days of this order for a deposition not to exceed two hours in length for Plaintiff's questioning concerning the factual bases for Meador's charge that Plaintiff Novelty intends to distribute solid form ephedrine containing capsules in two states where those two forms are illegal and the bases for his charge that Novelty intends to distribute its ephedrine containing cough and cold remedies to "gray market" retailers; and

Defendants shall respond to Plaintiff's request for production of documents attached to Plaintiff's Motion within 15 days of this order.

_____
RICARDO M. URBINA
UNITED STATES DISTRICT JUDGE

Dated: