# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NOVELTY, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:07-CV-00191 (RMU) |
| ) | |
| KAREN TANDY, in her official capacity; ) | |
| UNITED STATES DRUG ) | |
| ENFORCEMENT ADMINISTRATION; ) | |
| ALBERTO GONZALES, in his official ) | |
| capacity; UNITED STATES ) | |
| DEPARTMENT OF JUSTICE; and the ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT; and IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; and IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ARTHUR R. GOLDBERG
Assistant Director
Federal Programs Branch

AMY E. POWELL
Attorney (NY Bar)
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W. Rm. 7322
Washington, D.C. 20530
Telephone: (202) 514-9836
Facsimile: (202) 616-8202
Email: amy.powell@usdoj.gov

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY AND REGULATORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . 2

    The Chemical Diversion and Trafficking Act . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Importation Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    Letters of No Objection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

I.    THIS COURT LACKS JURISDICTION OVER FINAL
    ACTIONS OF DEA UNDER THE CDTA . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    A.    Section 877 Commits Review of Final Decisions to the
        Exclusive Jurisdiction of the Courts of Appeals . . . . . . . . . . . . . . . . . . . . . 13

    B.    The Suspension Order is a Final Determination Within the
        Meaning of Section 877 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    C.    The Other Alleged Acts Challenged by Novelty Should Also
        be Reviewed in the Court of Appeals . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    D.    Because Exclusive Jurisdiction over Final Actions has been
        Committed to the Court of Appeals, it Should Also Have
        Exclusive Jurisdiction over any non-final actions . . . . . . . . . . . . . . . . . . . . 19

II.    PLAINTIFF DOES NOT CHALLENGE A "FINAL AGENCY
    ACTION" WITHIN THE MEANING OF THE APA . . . . . . . . . . . . . . . . . . . . . 21

    A.    Challenge to Non-Final Agency Action is Barred . . . . . . . . . . . . . . . . . . . . 22

    B.    In Counts III and IV, Plaintiff Challenges a General Agency
        Practice, Not Final Agency Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

C.    In Counts I and II, Plaintiff Challenges the Refusal to Issue a
      LONO for Spirit Pharmaceuticals, which is also not Final
      Agency Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

III.  DEA'S HEARING PROCEDURES ARE CONSISTENT WITH
      SECTION 971 AND WITH DUE PROCESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

      A.  Novelty is Not Entitled to a Hearing under Section 971(c). . . . . . . . . . . . . . . . . . . 29

          1.    The Statute Requires a Hearing for those Regulated
                Persons to Whom an Order Applies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

          2.    DEA Reasonably Determined that Novelty is Not a
                Person to Whom an Order Applies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

          3.    Even under the Analysis in PDK Labs, Novelty is Not
                a Person to Whom an Order Applies . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

      B.  The Due Process Clause Does Not Entitle Novelty to a Hearing . . . . . . . . . . . 33

          1. Novelty Was Not Deprived of a Property Interest . . . . . . . . . . . . . . . . . . . . . 34

          2. Novelty Was Not Deprived of a Liberty Interest . . . . . . . . . . . . . . . . . . . . 36

          3. Novelty Was Not Deprived of Due Process . . . . . . . . . . . . . . . . . . . . . . . . . 38

IV.   DEA REASONABLY DENIED SPIRIT'S LONO REQUEST AND
      SUSPENDED THE SHIPMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

          A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

          B.    The Decision to Refuse the LONO and to Suspend
                the Shipment is Supported by Substantial Evidence . . . . . . . . . . . . . . . 40

V.    THE APA DOES NOT REQUIRE NOTICE-AND-COMMENT
      RULEMAKING FOR LONO PROCEDURES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

          A.    The Court Should Defer to the Agency's Choice of
                Adjudication over Rulemaking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

          B.    LONO Procedures are Exempt from Rulemaking
                Requirements Because they are Purely Procedural Rules . . . . . . . . . . . 48

C.    LONO Procedures are Exempt from Rulemaking
Requirements Because they Involve a Foreign Relations
Function . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

VI.    PLAINTIFF HAS NOT MET THE STANDARD FOR
A PRELIMINARY INJUNCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

A.    A Preliminary Injunction is an Extraordinary Remedy . . . . . . . . . . . . . 51

B.    Plaintiff Has Not Demonstrated Irreparable Harm . . . . . . . . . . . . . . . . 52

C.    Other Factors Weigh Against an Injunction in this Matter . . . . . . . . . . 54

# TABLE OF AUTHORITIES

## CASES

Al-Fayed, 254 F.3d at 303 ........................................................................... 52

American Farm Bureau v. EPA, 121 F. Supp. 2d 84 (D.D.C. 2000) .................................. 20, 21

American Hosp. Ass'n v. Bowen, 834 F.2d 1037 (D.C. Cir. 1987) ............................................ 48

American Meat Inst. v. Bergland, 459 F. Supp. 1308 (D.D.C. 1978) ........................................ 48

American Portland Cement Alliance v. EPA, 101 F.3d 772
    (D.C. Cir. 1996) ........................................................................... 27

Appalachian Power Co v. EPA, 208 F.3d 1015 (D.C. Cir. 2000) ............................................ 49

Bd. of Regents of State Colleges v. Roth, 408 U.S. 564 (1972) ............................................ 34

Bell & Howell: Mamiya Co. v. Masel Supply, 719 F.2d 42 (2d Cir. 1983) ............................ 53

Bennett v. Spear, 520 U.S. 154 (1997) ................................................................ passim

Bernard v. United Township High School District No. 30,
    5 F.3d 1090 (7th Cir. 1993) ........................................................................... 37

Boivin v. US Airways, Inc., 297 F. Supp. 2d 110 (D.D.C. 2003) ............................................ 51

Camp v. Pitts, 411 U.S. 138 (1973) ........................................................................... 26, 40

Center for Auto Safety v. National Highway Traffic Safety Admin.,
    452 F.3d 798 (D.C. Cir. 2006) ........................................................................... 25

Chemical Waste Management, Inc. v. U.S. EPA, 873 F. 2d 1477
    (D.C. Cir. 1989) ........................................................................... 39

Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971) ................................ 40

CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738
    (D.C. Cir.1995) ........................................................................... 52, 53

Clifford v. Pena, 77 F.3d 1414 (D.C. Cir. 1996) ........................................................ 39

Cmty. Nutrition Inst. v. Young, 818 F.2d 943 (D.C. Cir. 1987) ............................................ 25

Cobell v. Kempthorne, 455 F.3d 301 (D.D.C. 2006) ...................................... 52

Columbia Hosp. for Women Found. v. Bank of Tokyo-Mitsubishi, Ltd.,
    15 F.Supp.2d 1 (D.D.C. 1997), aff'd, 159 F.3d 636 (D.C.Cir. 1998) ............ 52

CropLife Am. v. EPA, 329 F.3d 876 (D.C. Cir. 2003) ................................. 25

Cutler v. Hayes, 818 F.2d 879 (D.C. Cir. 1987) ..................................... 20, 21

Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine
    Workers of Am., 412 F.2d 165 (D.C. Cir.1969) ................................. 52

Dist. Intown Prop. Ltd. P'ship v. Dist. of Columbia, 198 F.3d 874
    (D.C. Cir. 1999) ............................................................ 22

Doe v. DEA, 484 F.3d 561 (D.C. Cir. 2007) ...................................... passim

Doe v. Gonzalez [sic], 2006 WL 1805685 (D.D.C. June 29, 2006) ................... passim

Dorfmann v. Boozer, 414 F.2d 1168 (D.C. Cir. 1969) ............................... 51

Experience Works, Inc. v. Chao, 267 F. Supp. 2d 93 (D.D.C. 2003) ................ 51

FCC v. National Citizens Comm. for Broadcasting, 436 U.S. 775 (1978) ............ 47

FCC v. Schreiber, 381 U.S. 279 (1965) ........................................... 30

Fl. Power & Light Co. v. EPA, 145 F.3d 1414 (D.C. Cir. 1998) .................... 48

Fla. Mun. Power Agency v. Fed. Energy Reg. Comm., 315 F.3d 362
    (D.C. Cir.), cert. denied, 540 U.S. 946 (2003) .............................. 40

Florida Power & Light v. Lorion, 470 U.S. 729 (1985) ............................ 26

Fund for Animals v. Frizzell, 530 F.2d 982 (D.C. Cir. 1975) ..................... 53

Furlong v. Shalala, 156 F.3d 384 (2d Cir. 1998) ................................. 35

Gen. Teamsters Local Union No. 174 v. Nat'l Labor Relations Bd.,
    723 F.2d 966 (D.C. Cir. 1983) ............................................... 40

Gonzales v. Oregon, 546 US 243 (2006) .......................................... 14

Griffith v. Federal Labor Relations Authority, 842 F.2d 487
    (D.C. Cir. 1988) ............................................................ 35

-v-

Hemp Indus. Ass'n v. DEA, 333 F.3d 1082 (9th Cir. 2003) ..................................... 18

Industrial Safety Equipment Ass'n, Inc. v. E.P.A., 837 F.2d 1115
    (D.C. Cir. 1988) ..................................................................... 35

International Union, UMW v. FMSHA, 920 F.2d 960 (D.C. Cir. 1990) .................... 47

International Union, United Mine Workers of America v. U.S.
    Department of Labor, 358 F.3d 40 (D.C. Cir. 2004) ................................. 19, 20

JEM Broadcasting Co. v. FCC, 22 F.3d 320 (D.C. Cir. 1994) ................................... 48

Jamison v. FTC, 628 F. Supp. 1548 (D.D.C. 1986) ..................................................... 20

Kartseva v. Dep't of State, 37 F.3d 1524 (D.C. Cir. 1994) .................................. 36, 37

Kelly Kare, Ltd. v. O'Rourke, 930 F.2d 170 (2d Cir.),
    *cert. denied*, 502 U.S. 907 (1991). ................................................. 34

Kentucky Dept. of Corrections v. Thompson, 490 U.S. 454 (1988) ........................... 35

Lanvin, Inc. v. Colonia, Inc., 739 F. Supp. 182 (S.D.N.Y.1990) ............................... 54

LeBoeuf, Lamb, Greene & MacRae, LLP. v. Abraham, 180 F.Supp.2d 65
    (D.D.C. 2001) ...................................................................... 52

Lincoln v. Vigil, 508 U.S. 182 (1993) ........................................................................... 46

MD Pharm., Inc. v. Drug Enforcement Admin., 133 F.3d 8 (D.C. Cir. 1998) ......... 40

Mast Industries, Inc. v. Regan, 596 F. Supp. 1567 (CIT 1984) ................................. 50

Matthews v. Eldridge, 424 U.S. 319 (1976): (1) ....................................................... 34

Mimiya Hosp., Inc. SNF v. U.S. Dept. of Health and Human Services,
    331 F.3d 178 (1st Cir. 2003) ..................................................... 33

Molycorp, Inc. v. EPA, 197 F.3d 543 (D.C. Cir. 1999) ............................................. 25

Moore v. Agency for Intern. Development, 80 F.3d 546 (D.C. Cir. 1996) ................. 37

Motor Veh. Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,
    463 U.S. 29 (1983) ................................................................. 40

Mylan Pharmaceuticals, Inc. v. Shalala, 81 F.Supp.2d 30 (D.D.C. 2000) ........... 53, 54

National City Mortg. Co. v. Navarro, 220 F.R.D. 102 (D.D.C. 2004) ........................................ 45

Newdow v. Bush, 355 F. Supp. 2d 265 (D.D.C. 2005) ................................................ 53

Norton v. Southern Utah Wilderness Alliance, 124 S. Ct. 2373 (2004) ........................... 23, 24

Novelty v. Tandy, 2006 WL 2375485 (August 15, 2006) ................................... 18

O'Donnell v. Barry, 148 F.3d 1126 (D.C. Cir 1998) ....................................... 36

Orange v. Dist. of Columbia, 59 F.3d 1267 (D.C. Cir. 1995) ................................. 33

Oregon v. Ashcroft, 368 F.3d 1118 (9th Cir. 2004) ......................................... 14, 18

PDK Laboratories, Inc. v. DEA, 362 F.3d 786 (D.C. Cir. 2004) ........................... passim

PDK Laboratories, Inc., v. DEA, 438 F.3d 1184 (D.C. Cir. 2006) ........................ passim

PDK Labs, Inc. v. Reno, 134 F. Supp. 2d 24 (D.D.C. 2001) ............................... passim

PDK Labs v. Ashcroft, 338 F.Supp.2d 1 (DDC 2004) ....................................... passim

Pension Benefit Guaranty Corp. v. LTV Corp., 496 U.S. 633 (1990) ........................ 39

Phillip v. Fairfield Univ., 118 F.3d 131 (2d Cir.1997) ....................................... 52

Piecnick v. Commonwealth of Pennsylvania, 36 F.3d 1250 (3d Cir. 1994) ................... 37

Reckitt & Collman, Ltd v. DEA, 375 F.2d 22 (D.C. Cir. 1986) ............................... 18

Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod.
    Safety Comm'n, 324 F.3d 726 (D.C. Cir. 2003) ........................................ 23

Richardson v. Perales, 402 U.S. 389 (1971) ............................................ 40

Roth v. King, 449 F.3d 1272 (D.C. Cir. 2006) ......................................... 35

SEC v. Chenery Corp., 332 U.S. 194 (1947) ......................................... 5, 46

Seafarers Intern. Union of North America, v. U.S., 891 F.Supp. 641
    (D.D.C. 1995), .................................................................. 39

Serono Labs., Inc. v. Shalala, 158 F.3d 1313 (D.C. Cir. 1998) ........................... 52

Shalala v. Guernsey Memorial Hospital, 514 U.S. 87 (1995) ............................. 47

Skidmore v. Swift & Co., 323 U.S. 134 (1944) ......................................................... 30

Southern Cal. Edison Co. v. FERC, 770 F.2d 779 (9th Cir. 1985) ............................ 48

Steckman v. DEA, No. Civ. A.H-97-1334, 1997 WL 588871
(S.D. Tex. Sept. 16, 1997) ................................................................... 14

Tarpeh-Doe v. United States, 904 F.2d 719 (D.C. Cir. 1990) ............................... 34, 35

Telecommunications Research & Action Center v. FCC, 750 F.2d 70
(D.C. Cir. 1984) ................................................................... 19, 20, 21

Tough Traveler, Ltd. v. Outbound Prods., 60 F.3d 964 (2d Cir. 1995) ..................... 53

Trifax Corp. v District of Columbia, 314 F.3d 641 (D.C. Cir. 2003) ................... 36, 38

U.S. v. Mead, 533 U.S. 218 (2001) ........................................................... 30

U.S. v. W.R. Grace & Co., 429 F.3d 1224 (9th Cir. 2005) ................................. 30

Vt. Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519 (1978) ............................. 49

Washington Legal Clinic for the Homeless v. Barry, 107 F.3d 32 ......................... 34

Wilderness Soc'y v. Norton, 434 F.3d 584 (D.C. Cir. 2006) .............................. 25

Wisc. Gas. Co. v. Federal Energy Regulatory Comm'n, 758 F.2d 669
(D.C. Cir. 1985) ................................................................... 53

## STATUTES

The Administrative Procedure Act, 5 U.S.C. § 701 et seq. ................................passim

The Combat Methamphetamine Epidemic Act of 2005, P.L. 109-177,
tit. VII, 120 Stat. 256 (March 9, 2006) ........................................... 3, 5

The Controlled Substances Act, 21 U.S.C. § 801 et seq......................................passim

The Domestic Chemical Diversion Control Act of 1993,
Pub. L. No. 103-200, 107 Stat. 2333 ............................................... 3

The Chemical Diversion and Trafficking Act of 1988,
Pub.L. No. 100-690, tit. VI ....................................................... 3

The Combat Methamphetamine Epidemic Act of 2005, P.L. 109-177,

tit. VII, 120 Stat. 256 (March 9, 2006) ........................................................................ 4

5 U.S.C. § 551(13) ........................................................................................... 22, 23

5 U.S.C. § 553(b) ............................................................................................ 48, 49

5 U.S.C. § 555(e) ................................................................................................... 38

21 U.S.C. § 877 ................................................................................................ passim

21 U.S.C. § 958 ....................................................................................................... 31

21 U.S.C. § 960(d)(2) ............................................................................................... 3

21 U.S.C. § 965 ................................................................................................ passim

21 U.S.C. § 971 ................................................................................................ passim

22 U.S.C. § 2291 ...................................................................................................... 7

## REGULATIONS

21 C.F.R. § 1309 ..................................................................................................... 31

21 C.F.R. § 1313.12, *et seq* .............................................................................. passim

28 C.F.R. § 0.100(b) ................................................................................................. 4

## MISCELLANEOUS

175 Cong. Rec. 31383-31389, 31402-03, 31600 ...................................................... 7

**INTRODUCTION**

Congress has charged the Drug Enforcement Administration ("DEA") with administering a complex regulatory scheme designed to control the manufacture and distribution of controlled substances and their precursor chemicals, including ephedrine, a key ingredient in methamphetamine. Among other responsibilities, the DEA is authorized to suspend imports of listed chemicals, including ephedrine, upon finding that the chemical may be diverted to the illicit manufacture of a controlled substance. Under various treaty obligations, the DEA's regulation of imports of listed chemicals must be coordinated with a multitude of foreign legal regimes, including some which require the importing nation to approve each importation. The United States has negotiated bilateral agreements with several nations whereby the United States will issue letters of no objection, or "LONOs," regarding shipments that comply with applicable U.S. law. A LONO denial does not trigger any legal obligations unless the importer chooses to pursue the importation to a suspension order.

Plaintiff, Novelty, Inc. ("Novelty"), a downstream distributor of over-the-counter ephedrine products, claims generally that the DEA has adopted an arbitrary and capricious rule denying LONOs to importers who sell to convenience store distributors, and that this alleged rule should be subject to notice-and-comment rulemaking. Perhaps in recognition of the original complaint's failure to identify any discrete agency action, the Amended Complaint adds challenges to the denial of a specific LONO to Novelty and to the denial of Novelty's request for a hearing. Now that DEA has entered final orders on those issues, it is clear that only the Court of Appeals has jurisdiction under the applicable judicial review statute, 21 U.S.C. § 877. Plaintiff claims that the action is brought under the Administrative Procedure Act ("APA"), but that statute only authorizes challenges

1

to final, discrete agency actions, and outside the recent final orders (clearly reviewable in the Court of Appeals), the plaintiff has otherwise refused to challenge discrete and final agency actions. Finally, in no event could DEA be required to undertake notice-and-comment rulemaking to promulgate a procedure for notifying foreign governments of compliance with U.S. law, as required by international agreements. Accordingly, defendants move to dismiss the Amended Complaint, or in the alternative, for summary judgment, and oppose plaintiff's motion for summary judgment.

Plaintiff also has moved for a preliminary injunction, claiming an emergency on two issues. Specifically, plaintiff requests that the Court order DEA to issue a suspension order against a third party, Spirit Pharmaceuticals ("Spirit"), blocking an importation of ephedrine, and further requests that the Court order DEA to hold a hearing in which Novelty may participate. By plaintiff's count, these two issues have been pending before the agency since last November. The first issue is now moot because DEA issued a suspension order blocking this shipment. Because it is readily apparent that there is no likelihood whatsoever of irreparable harm and very little likelihood of success on the merits, the motion for a preliminary injunction should be denied.

## STATUTORY AND REGULATORY BACKGROUND

<u>The Chemical Diversion and Trafficking Act</u>

Methamphetamine is "a powerful and highly addictive synthetic stimulant." *PDK Laboratories, Inc., v. DEA*, 438 F.3d 1184 (D.C. Cir. 2006) ("*PDK II*"); *Wild West Wholesale*, 72 Fed. Reg. 4042, 4043 (DEA 2007). One of the principal ingredients is the chemical ephedrine, which is also used for, and can be obtained from, *inter alia*, prescription and nonprescription drugs. *Id.  See also* Decl. of Darrell Meador, dated April 10, 2007, attached hereto as Exhibit A, ¶ 2 ("Meador Decl.").

The Chemical Diversion and Trafficking Act of 1988, Pub.L. No. 100-690, tit. VI, subtit. A,

2

102 Stat. 4312 ("the CDTA"), was the first comprehensive attempt to combat the growing methamphetamine problem. The CDTA, as amended, imposes extensive reporting requirements on companies doing business in "listed chemicals," including two critical methamphetamine ingredients, ephedrine and pseudoephedrine. *See id.*, codified at 21 U.S.C. §§ 802 (34)(C), (K) 830(b), 971(d). This statute also imposes criminal penalties on individuals who import a listed chemical with "reasonable cause to believe, that [it] will be used to manufacture a controlled substance." *See* 21 U.S.C. § 960(d)(2).

Most significant to this litigation, the CDTA authorizes the Drug Enforcement Administration ("DEA") to "order the suspension of any importation or exportation of a listed chemical . . . on the ground that the chemical may be diverted to the clandestine manufacture of a controlled substance." *See* 21 U.S.C. § 971(c)(1). Subsequent enactments further restricted access to the chemicals used to manufacture methamphetamine by, *inter alia*, imposing additional reporting requirements on all transactions in drug products containing the listed chemicals and imposing stiffer penalties on violations. *See, e.g.*, Domestic Chemical Diversion Control Act of 1993, Pub. L. No. 103-200, 107 Stat. 2333; Combat Methamphetamine Epidemic Act of 2005, P.L. 109-177, tit. VII, 120 Stat. 256 (March 9, 2006). In order to allow the DEA to make a determination as to whether or not it should exercise this power, Congress required that "[e]ach regulated person who imports . . . a listed chemical shall notify the Attorney General of the importation . . . not later than 15 days before the transaction is to take place." 21 U.S.C. § 971(a). In the 2006 amendments to the Act, Congress imposed more detailed notice requirements, *id*. § 971(d), (h), and clarified that the discretionary power to suspend shipments is "without regard to the form of the chemical that may be diverted, including the diversion of a finished drug product to be manufactured from bulk chemicals to be transferred," *id*. § 971(c)(1); *cf. PDK Laboratories, Inc. v. DEA*, 362 F.3d 786, 797-

3

98 (D.C. Cir. 2004) ("*PDK I*") (finding ambiguity in earlier version of the statute).  *See generally*

The Combat Methamphetamine Epidemic Act of 2005, P.L. 109-177, tit. VII, 120 Stat. 256 (March

9, 2006) ("the CMEA").

The statute, as amended, further provides that "a regulated person to whom [a suspension

order] applies . . . is entitled to an agency hearing on the record." 21 U.S.C. § 971(c)(2).  Judicial

review of such decisions, as well as review of all other "final determinations, findings and

conclusions of the Attorney General," is in the United States Court of Appeals for the District of

Columbia or in the circuit where the plaintiff's principal place of business is located.  *See* 21 U.S.C.

§§ 877, 965; *see, e.g., Doe v. Gonzalez [sic]*, 2006 WL 1805685 (D.D.C. June 29, 2006).  By its

terms, section 877 applies only to decisions made under subchapter I of the Act (the CSA).  Section

965, however, renders section 877 (and other sections of part E of subchapter I) applicable to

subchapter II as well (including the CDTA).  *See PDK Labs, Inc. v. Reno*, 134 F. Supp. 2d 24, 29

n.3 (D.D.C. 2001).

Importation Regulations

The Attorney General has delegated his regulatory authority to regulate controlled substances

and listed chemicals to the DEA.  *See* 21 U.S.C. § 871(a); 28 C.F.R. § 0.100(b).  Section 821

authorizes the Attorney General to "promulgate rules and regulations . . . relating to the registration

and control of the manufacture, distribution, and dispensing of controlled substances and to listed

chemicals."  In accordance with this authority, the DEA has promulgated regulations on importation

of listed chemicals that closely track the language of the statute.  *See generally* 21 U.S.C. § 971; 21

C.F.R. § 1313.12, *et seq*.  Subject to specific exceptions, a regulated person who imports a listed

chemical must notify the DEA of the importation using DEA Form 486, not later than 15 days before

the transaction is to take place.  *See* 21 C.F.R. § 1313.12(a).  All international transactions involving

4

listed chemicals are subject to a notice requirement, and regulated persons are urged to provide advance notification as far in advance of the 15 days as possible "[i]n order to facilitate an international transaction." *Id*. § 1313.32-33. Regulations specify the contents and procedures of Form 486. *Id*. § 1313.13-14. An interim final rule published April 9, 2007 revised DEA Form 486 and amended the reporting requirements to comply with the Combat Methamphetamine Epidemic Act of 2005, P.L. 109-177, tit. VII, 120 Stat. 256 (March 9, 2006). *See Implementation of the Combat Methamphetamine Epidemic Act of 2005; Notice of Transfers Following Importation or Exportation*, 72 Fed. Reg. 17401 (April 9, 2007).

The DEA may "suspend any importation . . . of [any listed chemical] based on evidence that the chemical proposed to be imported . . . may be diverted to the clandestine manufacture of a controlled substance." 21 C.F.R. § 1313.41(a). The Administrator must provide "written notice of such suspension . . . contain[ing] a statement of the legal and factual basis for the order." *Id.* The DEA has not promulgated detailed regulations on what constitutes a risk of diversion within the meaning of section 971(c)(1) or 21 C.F.R. § 1313.41(a). *See* Meador Decl. ¶ 10. Instead, the agency has exercised its discretion to proceed on a case-by-case basis, applying a "totality of the circumstances" test and developing law within the context of the individual adjudications contemplated by section 971(c)(2), a practice previously upheld by the D.C. Circuit. *See id.*; *PDK II*, 438 F.3d at 1194-95; *see also SEC v. Chenery Corp.*, 332 U.S. 194, 202-03 (1947).

In applying this "totality of the circumstances" test, a "substantial and weighty"– indeed, often controlling – factor is the type of retail establishment that will ultimately distribute the List I chemical products to the public. *See* Meador Decl. ¶¶ 10-15; Administrative Record for Suspension Order at 0056-0057 (certified June 25, 2007) (hereinafter "AR"). Numerous DEA investigations and adjudications in a variety of contexts have determined that convenience stores and gas stations

5

constitute the non-traditional retail or "gray market" for both legitimate and illegitimate consumers of ephedrine products. *See id.* ¶¶ 13-15. The products sold there are typically stronger than those found in the traditional market, are often sold for off-label uses, and are disproportionately represented in lab seizures. *Id.* Non-traditional retailers are also more likely to sell large quantities to so-called "smurfers," individuals who work for methamphetamine traffickers and buy large quantities of over-the counter drug products. *See id.*

If a regulated person to whom an order applies wishes to challenge the import suspension of a listed chemical, he or she must file a written request for a hearing within 30 days. *See* 21 C.F.R. §§ 1313.41(b), 1313.54. The purpose of the hearing is "to receiv[e] factual evidence regarding the suspension of shipments." *Id.* § 1313.52. The hearing is a formal adjudication governed by the Administrative Procedure Act, the CDTA, and the procedures for administrative hearings under the Controlled Substances Act in 21 C.F.R. §§ 1316.41-67. *See* 21 C.F.R. § 1313.51.

Letters of No Objection

The 1988 U.N. Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances requires that parties to the convention "take the measures they deem appropriate to prevent diversion of [listed substances, including ephedrine,] used for the purpose illicit manufacture of narcotic drugs or psychotropic substances, and . . . cooperate with one another to this end." U.N. Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, opened for signature Dec. 20, 1988, Art. 12, ¶ 1, 28 I.L.M. 493 (1989). Parties to the 1988 Convention are further obligated to "[e]stablish and maintain a system to monitor international trade in [listed chemicals] in order to facilitate the identification of suspicious transactions." *Id.* at ¶ 9(a). Parties are also obligated to notify the "competent authorities and services of the Parties concerned if there is reason to believe that the import, export or transit of a [listed chemical] is destined for the illicit

6

manufacture of narcotic drugs or psychotropic substance." *Id.* at ¶ 9(c). The Senate provided its advice and consent on November 21, 1989, 175 Cong. Rec. 31383-31389, 31402-03, 31600, the President signed it on February 13, 1990, and the United States formally ratified the treaty on February 20, 1990. Congress has explicitly incorporated the convention into legislation; a congressional statement of policy states that "International narcotics control programs should include, as priority goals, the suppression of the illicit manufacture of and trafficking in narcotic and psychotropic drugs . . . and precursor chemical diversion." *See* 22 U.S.C. § 2291.

Although a permit system for importing and exporting such substances is not explicitly required by the Convention, many countries have developed a system which requires approval by the importing country before allowing the export. *See* Meador Decl. ¶ 8; *see also Presidential Determination on the Major Methamphetamine Precursor Chemical Exporting and Importing Countries*, No. 2007-14, available at www.state.gov/p/inl/rls/rpt/81222.htm (February 28, 2007) (describing international efforts to control precursor chemicals in major ephedrine-exporting countries, including that China and India both require approval from the importing country).[1] Accordingly, some countries now require that the importing country approve an importation before they will issue an export permit. *Id.* The United States does not issue import permits *per se*, but has informally negotiated bilateral agreements whereby the DEA instead provides importers and the exporting nation with a "letter of no objection," or LONO, when it elects not to suspend a shipment from one of these nations. Meador Decl. ¶¶ 7-8. The exporting nation is obligated not to permit the

---

[1]    These changes are the result of international incidents of diversion and an initiative by the International Narcotics Control Board. *See* Meador Decl. ¶ 8-10; *PDK Labs v. Ashcroft*, 338 F. Supp. 2d 1, 4 (D.D.C. 2004) .

7

export without a LONO, and the U.S. is obligated to refuse to issue a LONO if it finds that the chemicals may be diverted for the purpose of illicit manufacture of methamphetamine. *Id.*

Several nations have requested the issuance of such letters, including India, China and the Czech Republic. Meador Decl. ¶¶ 7-8; *see also Presidential Determination on the Major Methamphetamine Precursor Chemical Exporting and Importing Countries*, No. 2007-14, available at www.state.gov/p/inl/rls/rpt/81222.htm (February 28, 2007). "India has a system of letters of no objection for the export of pseudoephedrine and ephedrine and will not authorize exports until the receiving government approves the import." *Presidential Determination on the Major Methamphetamine Precursor Chemical Exporting and Importing Countries*, No. 2007-14, available at www.state.gov/p/inl/rls/rpt/81222.htm (February 28, 2007).[2]

The LONO process, however, adds no legal rights or obligations to section 971, which only allows the DEA to suspend shipments if it finds a risk of diversion. Meador Decl. ¶ 8. Normally, the LONO consists of a short letter which describes the requested transaction and states that "the DEA has no objection to the proposed shipment at this time." *Id.* The standard for refusing to issue a LONO is simply whether or not the shipment complies with section 971. *Id.* DEA issues LONOs in order to comply with its treaty obligations by cooperating with other signatories and providing assurance to the exporting nation that U.S. law is not being violated. *Id.* ¶¶ 6-8.

Accordingly, when persons wish to import a listed chemical from one of these nations, they submit a DEA Form 486 and request a LONO. *See* Meador Decl. ¶ 9. If DEA finds no problems with the importation, it issues a LONO and the importation goes forward. If DEA finds that there

---

[2]    Plaintiff complains that defendants have not submitted copies of these informal international agreements, but do not dispute the content thereof. Meador's description is corroborated by both this Presidential directive describing foreign requirements (which includes a direction for its eventual publication in the federal register) and by prior caselaw.

is a risk of diversion, it is statutorily authorized to suspend the shipment with no further action or investigation, subject to a post-suspension hearing if the importer requests it. *See* 21 U.S.C. § 971; 21 C.F.R. § 1313.41(a). In the past, however, DEA has first refused to issue a LONO in order to give the importer a chance to withdraw the request. Meador Decl. ¶ 9. An importer is free to pursue the request and to risk an order of suspension. *Id.* When DEA refuses to issue a LONO before issuing a suspension order, the importer is still free to pursue the importation in the same manner contemplated by section 971; it need only to inform DEA that it wished to do so. *Id.* The LONO refusal adds no substantive obligations or rights to the importer's obligations under section 971. *Id.*

Procedural Background

Novelty is an Indiana corporation that distributes commercial goods, including over-the-counter pharmaceuticals, to convenience stores throughout the United States. Am. Compl. ¶ 1. As such, Novelty sells products to the sort of nontraditional retailer that the DEA has found to be at risk of ephedrine diversion in many contexts. *See* Meador Decl. ¶¶ 12-18; AR 0057-58. In September 2006, an importer called Spirit Pharmaceuticals, LLC ("Spirit") submitted two DEA Forms 486 and requested a LONO for two shipments of ephedrine from India. *See* Am. Compl. ¶ 17; Meador Decl. ¶ 16; AR 0003-0006. Novelty does not appear on those forms. *Id.* This shipment was intended for sale to AAA Pharmaceuticals, Inc., a drug manufacturer. *See id.* Further investigation revealed that AAA Pharmaceuticals intended to resell some portion of these products to Novelty. *See* Am. Compl. ¶ 18; Meador Decl. ¶¶ 16-17; AR 0007-0008.

The DEA investigated the type of drug being manufactured and the customer lists of both AAA and Novelty. Meador Decl. ¶¶ 17-18. DEA requested, and AAA and Novelty provided, photographs of the labels of the products to be manufactured and a customer list. *Id.* ¶ 17; AR 0007-0016. Based on these factors, the DEA determined that there was a risk of diversion because the

9

record indicated that "solid dosage" products were being sold to gray market retailers, including retailers in those states where it is illegal for non-pharmacies to sell such products. Meador Decl. ¶ 17.[3]  On October 10, 2006, the DEA declined to issue the LONO for this shipment. AR 0021-0022.  By letter to Spirit Pharmaceuticals, DEA stated that it had "thoroughly reviewed the proposed utilization of the planned Listed Chemical importation," and found that "the proposed importation may be subject to diversion to the illicit market by the downstream distribution system." *Id*. That letter did not include an order of suspension.  Instead, the DEA informed Spirit of its options: that it was free to pursue the importation, but that if the importer did not contact the DEA, Spirit's import notification would be considered withdrawn. *Id*.; Meador Decl. ¶ 18.  Spirit took no action, and the DEA considered its request withdrawn.  Meador Decl. ¶ 18.

On April 10, 2007, DEA contacted Spirit Pharmaceuticals again in order to make certain that Spirit had a full opportunity to pursue the importation and that DEA was not ignoring an active request. *See* Meador Decl. ¶ 19.  Spirit Pharmaceuticals was told that it must take affirmative action to withdraw the application or the DEA would issue a suspension order.  AR 0028-0029.  In the April 10 letter, Spirit was given five days to respond.  *Id*.[4]  This action was taken out of an abundance of caution, in order to make certain that a final suspension order would be issued if necessary.  *Id*.; Meador Decl. ¶ 19.  Because Spirit did not formally respond to that letter, DEA initiated the suspension process.  Before issuing the order, DEA further investigated the shipment

---

[3]     Plaintiff now maintains that it had no intention to sell the products manufactured by AAA to the customers listed in those states.  This dispute is material only to the substantive motion for summary judgment on Count II of the Amended Complaint, and is discussed in more detail in Part IV below.  The relevant question is, of course, whether DEA's final conclusion was reasonable and supported by substantial evidence under the APA.

[4]     DEA did not, obviously, promise to act within five days.  Spirit indicated verbally its intent to respond.  When Spirit did not follow through, DEA initiated the process necessary to suspend the shipment.  Meador Decl. ¶ 23.

by examining the affidavit submitted by Novelty in this matter. Meador Decl. ¶ 23. A suspension order issued to Spirit on June 22, 2007. AR 0056-0057. Under applicable DEA regulations, Spirit has thirty days in which to respond to the suspension order before it becomes a final order. *See* 21 CFR §§ 1313.47, 1313.57.

Prior to filing this lawsuit, Novelty requested the opportunity to pursue the importation and then orally requested a hearing, AR 0025-0026; Meador Decl. ¶ 28, apparently under 21 U.S.C. § 971(c)(2), which allows a "person to whom an order applies" to request a hearing in writing to challenge the denial of a suspension order.[5] As of the plaintiff's most recent filing, that request was still pending because Novelty is not a registered importer and because no suspension order had been issued under section 971(c)(1). The statute and regulations only provide for a hearing on a suspension order. Accordingly, no section 971(c) hearing can be had prior to the issuance of a suspension order. At that time, DEA was waiting for Spirit's response to the second DEA letter. Novelty had not been denied a hearing at that time, and the DEA had not yet determined whether Novelty was a person to whom an order applied. After an order was entered, DEA treated Novelty's request to "pursue [the] importation" of Spirit as a request for a hearing. *Id.* ¶ 27. On June 25, 2007, DEA concluded that Novelty is not a person to whom the order applies under regulations and applicable precedent. AR 0060-61.

Novelty filed a complaint on February 8, 2007, while its request for a hearing was still pending, and later filed the Amended Complaint on May 18, 2007. Although the original Complaint was somewhat vague as to whether plaintiff challenged the refusal to issue a LONO to Spirit

---

[5] Novelty could not in any case "pursue the importation" because it is not a registered importer. Even if its legal claims are wholly true, the most Novelty would be entitled to is a hearing under section 971(c), not an independent right to act as an importer as its letter seems to request.

Pharmaceuticals or the denial of a hearing to Novelty under section 971(c)(2), the Amended Complaint has added two causes of action challenging both of those actions. Count I of the Amended Complaint alleges that Novelty has been deprived of a liberty interest – "selling and distributing its Ephedrine products" – without due process of law in violation of the Fifth Amendment. Am. Compl. ¶¶ 34-40. Count II alleges that DEA acted arbitrarily and capriciously in violation of the APA by denying a LONO to Spirit Pharmaceuticals. Am. Compl. ¶¶ 41-51.

Counts III and IV are more general challenges not applicable to the Spirit matter. These counts are premised on the belief that "DEA's LONO procedure and criteria are legislative rules that define Novelty's, and all similarly situated parties', rights to import, and obligations concerning import of, Ephedrine." Am. Compl. ¶ 53. Count III alleges that DEA violated the APA by "imposing the LONO procedure and criteria against Novelty" and by "denying importation of all Ephedrine destined for sale in convenience stores serviced by Novelty," without compliance with the notice-and-comment requirements" of the APA. *Id*. ¶¶ 59-60. Finally, plaintiff alleges that DEA's prohibition on imports of Ephedrine-containing [over-the-counter] products for convenience store sale on the uncorroborated basis that all convenience stores are sources of diversion to the illicit drug trade constitutes arbitrary and capricious action in violation of the APA." Am. Compl. Intro. According to Count IV, "DEA refuses to issue LONO's for any importer whose OTC Ephedrine containing products are to be sold through convenience stores but issues LONO's to importers whose OTC Ephedrine products are to be sold through pharmacies and grocery stores." *Id*. ¶ 63. The prayer for relief seeks extensive declaratory relief including a finding that the denial of Novelty's request for a hearing was unconstitutional, that the denial of a LONO was arbitrary and capricious, and that "the LONO procedure and criteria for Ephedrine imports" are "invalid" and "void" because arbitrary and capricious and imposed without notice and comment. *Id*. ¶ 65. Novelty also seeks

12

injunctive relief ordering DEA to hold a hearing and preventing "DEA's enforcement of the unlawful LONO procedure and criteria." *Id.* ¶¶ 66-67.

Plaintiff moved for summary judgment on each of these issues on May 23, 2007. Three weeks later, plaintiff moved for a preliminary injunction on Count I, seeking a suspension order and a hearing. Defendant moves to dismiss each Count or moves in the alternative for summary judgment and opposes the motion for a preliminary injunction.

## **ARGUMENT**

### I.     THIS COURT LACKS JURISDICTION OVER FINAL ACTIONS OF DEA UNDER THE CDTA

Section 877 of Title 21 of the U.S. Code vests the courts of appeals with exclusive jurisdiction over any challenge to a final agency decision under the CSA and CDTA. Longstanding D.C. Circuit doctrine holds further that the circuit court should also have jurisdiction over any non-final action that might affect the future jurisdiction of the court. Because DEA now has issued a final order in the Spirit matter, any challenge to that order is reviewable only in the Court of Appeals.

### A.     Section 877 Commits Review of Final Decisions to the Exclusive Jurisdiction of the Courts of Appeals

The Controlled Substance Act ("CSA") provides courts of appeals with exclusive jurisdiction over disputes arising under it:

> All final determinations, findings, and conclusions of the Attorney General under this subchapter shall be final and conclusive decisions of the matters involved, except that any person aggrieved by a final decision of the Attorney General may obtain review of the decision in the United States Court of Appeals for the District of Columbia or for the circuit in which his principal place of business is located upon petition filed with the court and delivered to the Attorney General within thirty days after notice of the decision. Findings of fact by the Attorney General, if supported by substantial evidence, shall be conclusive.

21 U.S.C. § 877. While the language of Section 877 references Subchapter I of the CSA, this

13

Section is incorporated into Subchapter II as well, which includes section 971. 21 U.S.C. § 965.

The exclusive jurisdiction of the courts of appeals over such disputes is well-established. *See Doe v. DEA*, 484 F.3d 561, (D.C. Cir. 2007) (finding court of appeals had exclusive jurisdiction over review of import permit denial); *Oregon v. Ashcroft*, 368 F.3d 1118, 1120 (9th Cir. 2004) (finding court of appeals had original jurisdiction over challenge to interpretive rule issued by Attorney General), *aff'd sub nom Gonzales v. Oregon*, 546 U.S. 243 (2006); *Steckman v. DEA*, No. Civ. A.H-97-1334, 1997 WL 588871 at *1-2 (S.D. Tex. Sept. 16, 1997) (finding that district court had no subject matter jurisdiction over CSA-related claim because the only proper forum was in the court of appeals). In an opinion recently affirmed by the D.C. Circuit, Judge Kollar-Kotelly performed a lengthy analysis of Section 877 and concluded that "Section 877 . . . seems to explicitly vest exclusive jurisdiction in the courts of appeals over any CSA-based agency determination that could properly be before a federal court." *Doe v. Gonzalez [sic]*, No. 06-966, 2006 WL 1805685 at *22 (D.D.C. June 29, 2006), *aff'd sub nom Doe v. DEA*, 484 F.3d at 568-70.

B.    The Suspension Order is a Final Determination Within the Meaning of Section 877

The suspension order issued against Spirit Pharmaceuticals is a final determination within the meaning of section 877. It is final because it is the culmination of agency action that sets legal rights. Moreover, it is clearly a determination under section 971(c), which is subject to the exclusive jurisdiction provision of 877. *See* 21 U.S.C. § 965.

As described in Part II, only a suspension order creates legal rights and obligations because a LONO request is merely an intermediate step in the process of notifying the DEA about an importation. Even if plaintiffs are correct that the LONO refusal is somehow not a determination under section 971, it is clear that the LONO decision has now culminated in a final action under

14

section 971 and is therefore reviewable only in the court of appeals.[6]

In *PDK Labs, Inc. v. Reno*, 134 F. Supp. 2d 24 (D.D.C. 2001), the district court exercised jurisdiction over a challenge to DEA's refusal to issue a LONO and the denial of a hearing, finding that the decision was not final under 21 U.S.C. § 877, stating that "[a]t best, DEA's letter is considered as its final interpretation of § 971(c), as a opposed to a final action under the CDTA," *id.* at 29, but nonetheless exercising jurisdiction under the APA.[7]   This rationale, however, was expressly rejected by the D.C. Circuit in *Doe v. DEA*, 484 F.3d at 568-70.  The district court in *Doe* had declined to explicitly decide whether the import permit denial at issue in that case (similar in some ways to a LONO refusal) was a final agency action, but held that "if the DEA's . . . determination meets the standards necessary to satisfy the 'final agency action' requirement under the APA, 5 U.S.C. § 704, . . . it seems certain to meet the 'final determinations, findings and conclusions' criteria of 21 U.S.C. § 877, thereby triggering the United States Court of Appeals for the District of Columbia's exclusive jurisdiction over Plaintiff's CSA-based claims." *Doe*, at *19. The D.C. Circuit opinion, wholly ignored by the plaintiff, rejected the argument that a decision is not a final determination under section 877 simply because it failed to comply with procedural

---

[6]    The suspension order does not technically become final until 30 days after it is issued. Thus, there is still some opportunity for Spirit to seek a hearing and for Novelty to participate. Assuming that Spirit is unwilling to do so, that 30 days expires before the parties finish this briefing cycle.  If Spirit requests a hearing, much of this litigation becomes moot because DEA will not oppose any attempt by Novelty to participate in such a hearing.

[7]    This is the first of four published decisions in the PDK matter.  In chronological order, the other published opinions are: *PDK Labs v. DEA*, 362 F.3d 786 (D.C. Cir. 2004) (reviewing PDK's petition for review of suspension order after the district court remanded to the agency) (*"PDK I"*); *PDK Labs v. Ashcroft*, 338 F. Supp. 2d 1 (D.D.C. 2004) (granting summary judgment for PDK on the same issues dealt with preliminarily in the first district court opinion); *PDK Labs v. DEA*, 438 F.3d 1184 (D.C. Cir. 2006) (denying PDK's petition for review of suspension order after *PDK I* remanded to the agency) ("*PDK II*").

requirements of the CSA and explicitly overruled *PDK Labs*. *See Doe v. DEA*, 484 F.3d at 569.[8]

In the event that some portion of the district court decisions in *PDK* remain good law, those decisions are readily distinguishable because DEA now has issued a final suspension order. The *PDK*'s court's rationale suggests that the Court was concerned that DEA was not going to take final action under the CDTA and was somehow abusing the LONO process to avoid section 971(c). The Court found, that the LONO refusal was a "de facto suspension" without entry of an order under 971 and "circumvented the formal process created by Congress." *Id.* at 29, 36. In the present case, DEA has taken care to ensure that the LONO process is not segregated from the 971 process in any way. The LONO request is merely a procedural step in notifying the DEA under section 971, not an independent requirement or standard. Meador Decl. ¶¶ 8-9. Thus, in the present case, there is no similar risk of avoiding final agency action (or judicial review) because, as of June 22, 2007, a suspension order has been issued. AR 0056-59; Meador Decl ¶ 24.[9]

C.    The Other Alleged Acts Challenged by Novelty Should Also be Reviewed in the Court of Appeals

Insofar as Novelty challenges other actions of DEA, they are necessarily actions under section

---

[8]    Plaintiff misleadingly quotes the government's disagreement with the *PDK* Court's jurisdictional reasoning in its brief to suggest that DEA is somehow flouting Judge Kennedy's decision. *See* Pl. Motion Summ. J. at 3-4. That is not true. As defendants' original brief made clear, DEA disagrees with Judge Kennedy's analysis of what constitutes a "final determination" within the meaning of section 877 and a "final agency action" under the APA. Disagreement over the definition of a final agency action does not constitute a violation of a court order.

[9]    In *PDK Labs*, once the agency issued the actual suspension order against the importer, the order was challenged only upon a petition for review in the court of appeals. *See PDK I*, 362 F.3d 786; *PDK II*, 438 F.3d 1184. It is abundantly clear that a suspension order is a final determination under section 971. In *PDK I* and *PDK II*, the plaintiff was a drug manufacturer (one step removed from the importer), and was granted a hearing in accordance with the district court's earlier decision. Thus, the suspension orders at issue in *PDK I* and *PDK II* were not final until after the hearing. Here, where Novelty has been formally denied a hearing on the suspension order, there is no pending agency action and the suspension order itself is final.

16

971. Section 971 is the basis for the DEA's authority to suspend shipments; this is basis of DEA's enforcement authority. *See* 21 U.S.C. § 971; Meador Decl. ¶¶ 8-9. Under *Doe v. DEA*, DEA's alleged failure to follow procedures does not remove its decisions from the exclusive jurisdiction provision of section 877. *See* 484 F.3d at 569.

The refusal to issue a LONO for Spirit Pharmaceuticals and the denial of a hearing should only be reviewed by the Court of Appeals because they are both decisions arising under the CDTA. To begin, it makes no sense to sever the LONO and hearing denial from the suspension order itself, which is clearly only reviewable in the Court of Appeals. The same facts are involved. The same legal standard applies. Meador Decl. ¶¶ 8-9 . Moreover, DEA has clarified that the LONO request is meant to be only an intermediate procedural step in pursuit of an importation under section 971. The denial of a hearing alleged in Count I, is a denial that plaintiff claims violates section 971, and a denial that defendant claims is justified under section 971. Plaintiff's decision to frame that denial as a constitutional violation does not make the denial any less a final decision under the CDTA. Even under the *PDK* court's reasoning that a LONO denial was a <u>de facto</u> suspension order, that order necessarily arises under the CDTA and is thus covered by the exclusive jurisdiction provision of section 877, regardless of whether proper procedures were followed. *Id.*

Novelty was apparently unaware of the recent *Doe* decision, but cites a district court case in another jurisdiction for the proposition that section 877 applies to a "quasi-judicial determination that resolves disputed facts in a specific case after some level of administrative proceedings" and for which there is an administrative record. *See* Pls. Motion for Summ. J. at 16. That is a puzzling description because, even if true, it clearly applies to the decisions to deny Novelty a LONO, the issuance of a suspension order, and the denial of a hearing. In each of those decisions, DEA made

17

a finding of fact or law in a specific case, and there is a record of its decisionmaking process.[10] Thus, even under plaintiff's interpretation of section 877, Counts I and II of the Amended Complaint belong in the court of appeals.

Even a cursory review of the caselaw, however, reveals that the phrase "final determinations, findings, and conclusions of the Attorney General" is broader than quasi-judicial decisions in specific cases. *See, e.g., Oregon v. Ashcroft*, 368 F.3d 1118, 1120 (9th Cir. 2004) (vacating district court order that exercised jurisdiction over Attorney General directive interpreting CSA); *Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1085 (9th Cir. 2003) (interpretive rule issued pursuant to CSA is a final determination); *Reckitt & Collman, Ltd v. DEA*, 375 F.2d 22, 23 (D.C. Cir. 1986) (petition for review of DEA order classifying buprenorphine as a narcotic).[11]

For the same reasons, Counts III and IV should only be reviewed in the Court of Appeals. Insofar as those counts challenge final agency action at all (which defendants do not concede), it is necessarily final action under the CDTA. The general rule regarding convenience stores that Novelty alleges to exist in Counts III and IV has been developed as an important factor in evaluating the risk of diversion within the context of agency decisionmaking under the CSA and the CDTA. *See*

---

[10]    That record was not provided to the Court with the previous motion to dismiss because plaintiff had not challenged those specific decisions and because final action was still pending.

[11]    The case cited by plaintiff is its ongoing litigation against DEA in the Southern District of Illinois, *see Novelty v. Tandy*, 2006 WL 2375485, at *1 (August 15, 2006), where the court ruled that an interpretive letter clarifying the security requirements applicable to Novelty was not a final determination under section 877 because it did not comply with procedural requirements and there was no administrative record. *Id*. That decision has been directly rejected by the D.C. Circuit in *Doe v. DEA*, which explained that "this court's jurisdiction under a direct review statute has never depended on agency compliance with procedural requirements" and that "lack of a comprehensive administrative record is not sufficient cause to narrow the scope of 21 U.S.C. § 877." 484 F.3d at 569.

Meador Decl. ¶¶ 10-15.[12]  Moreover, DEA has repeatedly denied that there is a general DEA rule "requiring" a LONO or forbidding issuance of LONOs for ephedrine that will distributed at convenience stores.  Insofar as such "rules" exist at all, they can only exist under the CDTA.  DEA has invoked no other enforcement mechanism or statutory interpretation.  Even if plaintiff is entirely correct that the rules were adopted without appropriate procedural protections, the rules are nonetheless final determinations under section 877.  *See Doe*, 484 F.3d at 569.

D.    Because Exclusive Jurisdiction over Final Actions has been Committed to the Court of Appeals, it Should Also Have Exclusive Jurisdiction over any non-final actions

Plaintiff seeks to avoid the exclusive jurisdiction of the circuit court by framing the challenged action as a something other than a "final decision" of the DEA under the CDTA. Longstanding D.C. Circuit doctrine, however, precludes jurisdiction in the district court over actions that would affect the future jurisdiction of the circuit court.  Thus, even assuming that plaintiff is correct that DEA has informally adopted a general rule in violation of the APA, the propriety of such an action should only be reviewed in the court of appeals because its formal adoption in an adjudication or rulemaking would clearly fall within the jurisdiction of the court of appeals.  *See International Union, United Mine Workers of America v. U.S. Department of Labor*, 358 F.3d 40, 42 (D.C. Cir. 2004) ("[W]e have the authority to compel agency action unreasonably withheld or delayed if the putative agency action, once forthcoming, would be reviewable in this Court.").

In *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) ("*TRAC*"), the D.C. Circuit held that where the Communications Act committed exclusive

---

[12]    Although the Vienna Convention and bilateral agreements may confer an additional mandate to create LONO procedures, the LONO procedures are implemented exclusively within the context of the CDTA because that is the basis of the DEA's enforcement authority.  *See* Meador Decl. ¶¶ 8-9.

jurisdiction to review final FCC action to the court of appeals, a petition alleging unreasonable delay and seeking a writ of mandamus to compel FCC action was also subject to its exclusive jurisdiction. 750 F.2d at 78-79. Because unreasonable agency delay could, as a practical matter, defeat appellate review of final agency orders, the *TRAC* court reasoned that the court of appeals had exclusive jurisdiction to hear suits seeking relief that might affect the circuit court's future jurisdiction, even where the agency had not issued a final order. *Id*. at 76. The *TRAC* court determined that the district court lacked concurrent jurisdiction to hear the petition for mandamus based upon the well-established principle that where Congress by statute vests jurisdiction with a particular court, it cuts off original jurisdiction in other courts in all cases covered by the statute. *Id*. at 77.

Cases decided after *TRAC* have utilized a two-part test to determine whether jurisdiction to review agency action lies in the district court or in the court of appeals: (1) does the statute commit review of agency action to the court of appeals and (2) does the action seek relief that might affect the circuit court's jurisdiction? *See, e.g., Am. Farm Bureau v. EPA*, 121 F. Supp. 2d 84, 91 (D.D.C. 2000); *Jamison v. FTC*, 628 F. Supp. 1548, 1550 (D.D.C. 1986) (holding that *TRAC* governed request for injunction where the statute committed review of FTC action to the appellate court and future review was implicated); *see also Inter. Union, United Mine Workers of Am. v. U.S. Dep't of Labor*, 358 F.3d at 42-43. The second prong is broadly construed to favor appellate review. *Id*. However, where a statute contains no "single, overarching provision governing judicial review," but instead subjects "discrete agency actions" to specialized review provisions, actions taken under sections silent as to appellate review are "directly reviewable in a district court . . . , for courts of appeals have only such jurisdiction as Congress has chosen to confer upon them." *Cutler v. Hayes*, 818 F.2d 879, 888 n. 61 (D.C. Cir. 1987) (holding that district court had jurisdiction to review

alleged FDA inaction in the implementation of new drug regulations because no statutory provision committed direct review to the court of appeals).

Section 877 meets the first requirement. It is framed quite broadly, applying to all "final determinations, findings, and conclusions of the Attorney General" and then describing that category of review in the next sentence as "final decisions." Section 965 ensures that this language applies to all "administrative and judicial proceedings" of Subchapter II (including the CDTA) to the same extent as Subchapter I. This is clearly not a list of "discrete agency actions" but language intended to confer broad jurisdiction over agency action. *See Doe v. DEA*, 484 F.3d at 569-70; *see also Cutler*, 818 F.2d at 888 n.61. Furthermore, the plaintiff's claims could affect the future jurisdiction of the court of appeals. In particular, agency inaction in rulemaking, as alleged in Count III of the Complaint, could defeat the future jurisdiction of the court (such as unreasonable delay). *See* Am. Compl. ¶¶ 52-60; *see TRAC*, 750 F.2d at 76. As in *TRAC*, there is no final order and any such order could be indefinitely defeated if the agency truly is withholding action unreasonably. *Id.*

Less obviously, Count IV falls within the *TRAC* rationale as well. It alleges that the agency has adopted an arbitrary *de facto* rule preventing importation of ephedrine for eventual sale in convenience stores. This alleged rule was developed in the context of individual agency investigations and adjudications, *see* Meador Decl. ¶¶ 10-15, the final orders of which are clearly subject to the jurisdiction of the court of appeals. *See, e.g., PDK II*, 438 F.3d at 1186. Were this Court to rule upon the merits of such a "rule," it would be making precisely the same decision reserved for the court of appeals in individual adjudications. An injunction preventing its application, as requested by plaintiff, Am. Compl. ¶ 69, would prevent the court of appeals from reviewing its application in any particular case. Therefore, a ruling in this case would "affect the future jurisdiction" of the court of appeals. *See American Farm Bureau*, 121 F. Supp. 2d at 91.

21

II.     PLAINTIFF DOES NOT CHALLENGE A "FINAL AGENCY ACTION" WITHIN THE
        MEANING OF THE APA

        Plaintiff has failed to challenge a discrete and final agency action, a fundamental prerequisite

to a challenge under the APA.[13]   Accordingly, even if plaintiff's claims are not within the ambit of

section 877, the plaintiff has nonetheless failed to state a claim under the APA, and the complaint

should be dismissed.

A.      Challenge to Non-Final Agency Action is Barred

        The APA does not subject to judicial review every act of an agency, but rather limits its cause

of action to review of "[a]gency action made reviewable by statute and final agency action for which

there is no other adequate remedy in a court." 5 U.S.C. § 704; *see also id.* § 702.   Agency action is

defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent

or denial thereof, or failure to act." *Id*. § 551(13); *see also id.* § 701(b)(2).   The categories of agency

action, moreover, are not amorphous—they are specifically defined and involve "circumscribed,

discrete" acts.   *Norton v. Southern Utah Wilderness Alliance*, 124 S. Ct. 2373, 2378 (2004)

("*SUWA*"); *see* 5 U.S.C. § 551(4), (6), (8), (10), (11) (defining "rule," "order," "license," "sanction,"

and "relief").   In addition, it is well-established that for agency action to be "final" such that it may

be reviewed under the APA, it must "mark the consummation of the agency's decision-making

---

[13]     Plaintiff is correct that the D.C. Circuit does not consider finality to be a condition of the
APA's waiver of sovereign immunity, but the extended discussion of the differences between a
12(b)(1) and a 12(b)(6) motion is entirely academic because this is a motion in the alternative for
summary judgment.   To the extent that the Court finds it necessary to rely upon factual materials
outside the Complaint to determine, for example, whether plaintiff has challenged a final agency
action, defendants request, in the alternative, that the Court consider this motion as one for
summary judgment.   Motions for summary judgment should be granted when "there is no
genuine issue as to any material fact," and the defendant is "entitled to judgment as a matter of
law."   *See* Fed. R.Civ. P. 56(b); *Dist. Intown Prop. Ltd. P'ship v. Dist. of Columbia*, 198 F.3d
874, 878 (D.C. Cir. 1999).

process—it must not be of a merely tentative or interlocutory nature," and the action "must be one

by which rights or obligations have been determined, or from which legal consequences will flow."

*Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks and citations omitted); *see also*

*Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C.

Cir. 2003).[14]

B.     In Counts III and IV, Plaintiff Challenges a General Agency Practice, Not Final Agency
       Action

       Counts III and IV of the Amended Complaint do not purport to challenge the October 10,

2006 refusal to issue a LONO regarding Spirit Pharmaceuticals' planned importation or the recently

issued suspension order.  *See* Am. Compl. ¶¶ 52-64.  Indeed, plaintiff has intentionally segregated

these claims from any specific conduct of DEA, and plaintiff has not challenged any "rule, order,

license, sanction, [or] relief."  *See* 5 U.S.C. § 551(13).  Instead, plaintiff claims that there is a general

practice by which DEA "requires" a LONO but refuses to issue LONOs for certain importations;

plaintiff unilaterally labels this practice a "rule."  *See* Am. Compl. ¶¶ 11, 14, 53, 63.  The DEA,

however, has not issued a formal rule defining what constitutes a risk of diversion; instead the DEA

makes an individualized determination on every importation based upon a totality of the

circumstances. Meador Decl. ¶ 10.  Plaintiff does not attempt to challenge every single LONO

decision ever made (nor would plaintiff have standing to do so); instead, plaintiff has reached its own

conclusion about what constitutes a risk of diversion under 21 C.F.R. § 1313.41(a) and challenges

that so-called "rule."

---

[14]     This limitation applies regardless of the type of claim brought.  Thus, it is well settled that
even an APA claim challenging "unreasonable delay" pursuant to 5 U.S.C. § 706(1), "can
proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it
is required to take."  *Norton v. Southern Utah Wilderness Alliance ("SUWA")*, 124 S.Ct. 2373,
2379 (2004), *cert. granted and cause remanded*, 124 S.Ct. 2870 (2004) (emphasis in original).

The problems with this approach are at least twofold. First, there is no such rule, and plaintiffs cannot realistically maintain otherwise. The LONO process is simply a procedural part of the risk-of-diversion decision made under section 971(c). Meador Decl. ¶ 9; Part II.C, *infra*. Moreover, there is no formal rule governing the myriad circumstances which could create a "risk of diversion;" instead, the DEA proceeds in adjudications using a totality of the circumstances test. *Id*. ¶ 10. Although convenience stores are certainly considered to be a greater risk, there is currently no hard-and-fast rule that would prohibit importation for sale in convenience stores. *Id*. This approach is also documented in other caselaw on the issue, including *PDK II*, where the Circuit Court exercised exclusive jurisdiction over a petition for review of a final DEA decision on a suspension order. *See PDK II*, 438 F.3d at 1194-95 ("an agency is not necessarily required to define [an open-ended] term in its initial general regulation-or indeed . . . obliged to issue a comprehensive definition all at once. Rather, in fleshing out the contours of vague statutory terms, agencies are entitled to proceed case by case.") (internal citations omitted). Certainly, one weighty factor taken into account in these adjudications is whether the ephedrine products will be sold in stores and locations with a high risk of diversion. *See* Meador Decl. ¶¶ 10-15; AR 0057. Although the DEA may apply such broad principles in any given specific adjudication, each individual adjudication applies a multifactor test. *Id*. ¶ 10. The DEA is not bound by such findings in the future if the totality of the circumstances test yields a reason to depart from such principles. These adjudications mark the consummation of the agency decisionmaking process and set legal rights, *see Bennett v. Spear*, 520 U.S. at 178; thus only specific, circumscribed, and discrete adjudications may be challenged. *See SUWA*, 124 S. Ct. at 2378.

Second, even if plaintiff's generalization were entirely correct and the DEA has adopted a *de facto* rule refusing to issue LONOs for importers that sell to convenience stores, plaintiff still has

not identified a discrete, concrete agency action that it is challenging. Plaintiff's ability to generalize about agency decisions refusing to issue LONOs does not in itself render those decisions a *de facto* agency "rule" subject to APA review. Such decisions are not final, nor do any "rights and obligations" flow from the plaintiff's interpretation of a collection of such decisions. *See Bennett v. Spear*, 520 U.S. at 178. The actual adjudications on suspension orders determine the rights of the parties, *see* Meador Decl. ¶ 9; 21 C.F.R. § 1313.54, but in Counts III and IV, plaintiff has not challenged any specific, final adjudication, only what the plaintiff believes is the general agency practice in issuing LONOs.

In a handful of cases, the D.C. Circuit has found policy statements and other expressions of agency policy to constitute *de facto* rules and therefore final agency action reviewable under the APA:

> "In determining whether an agency has issued a binding norm or merely" an unreviewable "statement of policy, we are guided by two lines of inquiry." *See Wilderness Soc'y v. Norton*, 434 F.3d 584, 595 (D.C. Cir. 2006). One line of analysis considers the effects of an agency's action, inquiring whether the agency has "(1) impose[d] any rights and obligations, or (2) genuinely [left] the agency and its decisionmakers free to exercise discretion." *CropLife Am. v. EPA*, 329 F.3d 876, 883 (D.C. Cir. 2003) (citation and internal quotation marks omitted). The language used by an agency is an important consideration in such determinations. *See Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987) (per curiam). The second line of analysis looks to the agency's expressed intentions. *CropLife Am.*, 329 F.3d at 883. This entails a consideration of three factors: "(1) the [a]gency's own characterization of the action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency." *Molycorp, Inc. v. EPA*, 197 F.3d 543, 545 (D.C. Cir. 1999).

*Center for Auto Safety v. National Highway Traffic Safety Admin.*, 452 F.3d 798, 806-07 (D.C. Cir. 2006). In those cases, however, it is clear that the plaintiffs were challenging some explicit statement of policy, not a rule deduced by an erstwhile litigant from the agency's collected

interlocutory letters. Simply put, the Amended Complaint points to no action whereby the agency intends to impose any rights or obligations.[15]

C.    In Counts I and II, Plaintiff Challenges the Refusal to Issue a LONO for Spirit Pharmaceuticals, which is also not Final Agency Action

The Amended Complaint does challenge the specific decision refusing to issue a LONO for Spirit Pharmaceuticals and the denial of a hearing to Novelty. Those actions are more discrete than those challenged in Counts III and IV, but they were not final at the time the Amended Complaint was filed because denial of a LONO is never final agency action that fixes legal obligations. DEA recognizes that final actions are now at issue. In the event, however, that the Court decides that the LONO denial does not arise under the CDTA, that action is not final agency action under the APA.

Plaintiff's Complaint incorrectly and insupportably characterizes the LONO process as an independent requirement for the importation of ephedrine. In fact, the refusal of a LONO does not affect any entity's legal rights and obligations under section 971(c); it is not a substantive legal requirement at all. *See* Meador Decl. ¶¶ 8-9. The process of requesting a LONO is identical to the process by which one notifies the DEA of an importation under section 971. *See* Meador Decl. ¶ 9. The only intermediate step added by the LONO process is that the DEA can refuse to issue the LONO before suspending a shipment and give the importer a chance to withdraw the notice of

---

[15]    The impropriety of plaintiff's approach is underscored by its failure to challenge an action for which a record could readily be compiled. Review under the APA is ordinarily limited to the administrative record. 5 U.S.C. § 706; *see Florida Power & Light v. Lorion*, 470 U.S. 729, 743-44 (1985) (a reviewing court's task is to apply the appropriate APA standard of review to the agency decision "based on the record the agency presents to the reviewing court"); *Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"). If the Court finds that the plaintiff can challenge the alleged "rule" in this case, it will be necessary to compile an administrative record for an amorphous rule that has developed over time in many individual adjudications, *see, e.g.*, Meador Decl. ¶¶ 12-15 (collecting cases); AR 0057 (same), a difficult proposition at best.

importation. *Id.* In such cases, the notice is deemed withdrawn in the absence of further action by the importer. *Id.* Such a procedural device is of no moment in determining whether or not the LONO refusal has legal effect. The importer's rights and obligations are identical before and after the refusal notice is sent except for the requirement that the importer contact the DEA again to keep its notice in place. *Id.*[16] An agency's characterization of its own actions, although not dispositive, is entitled to some deference. *See American Portland Cement Alliance v. EPA*, 101 F.3d 772, 776 (D.C. Cir. 1996). The DEA here did not indicate that the LONO refusal was final action triggering any substantive rights. Although the DEA indicated that it would in fact suspend the shipment if Spirit chose to pursue the shipment, it is the suspension, not the LONO refusal, that triggers legal obligations. *See* 21 U.S.C. § 971(c); Meador Decl. ¶ 9.[17] If DEA had treated the notification as withdrawn as stated in its October 2006 letter, a withdrawal by Spirit ended the matter, not DEA.

Plaintiff argues that the LONO process is a supplement to 971(c) because section 971 is simply a "notice" requirement, whereas the LONO process requires an importer to affirmatively contact DEA again. Pls. Summ. J. Br. 20-21. That description supports defendants' argument that the LONO requirement is a mere step in the notification process. Notice to the DEA under section

---

[16]    The original LONO refusal sent to Spirit Pharmaceuticals comports with this model. *See* Compl. and attachments; Meador Decl. ¶18. The DEA notified Spirit that it would need to take an additional procedural step in order to pursue its importation; specifically, Spirit would have to "indicate in writing, within the 30 days, [its] desire to pursue the importation further." *Id.* This procedural step of notifying the DEA that it wishes to pursue the importation is not an "appeal" as the plaintiff claims. *See* Compl. ¶ 12. The standard for suspending a shipment is the same as for refusing to issue the LONO, and the DEA form is still the basis for decisionmaking. *See* Meador Decl. ¶ 9.

[17]    To claim that DEA legally "requires a LONO" is a bit like claiming that one is legally required to walk past a cash register in order to exit a grocery store. One is legally required to <u>pay</u> before leaving a grocery store with groceries, and the store generally requires its customers to pay at the cash register. But walking past the cash register is not itself a substantive requirement to purchase groceries.

971 is clearly itself an affirmative act by the importer, including a written submission. The only additional "step" required by the LONO process is that the importer contact DEA again. The importer need not appeal the LONO decision, provide new information, or meet a new standard; it need only contact the DEA and indicate a desire to pursue the shipment. Meador Decl. ¶¶ 9-10.

The defendant therefore respectfully disagrees with the previously described opinion in *PDK Labs, Inc. v. Reno*, 134 F. Supp.2d 24 (D.D.C. 2001), where the court exercised jurisdiction over a challenge to the refusal of a LONO and the denial of a hearing thereon, finding that the decision was not final for the purposes of the exclusive jurisdiction of the Courts of Appeal, *see* 21 U.S.C. § 877, 134 F. Supp. 2d at 29.[18] Even assuming that some portion of *PDK Labs* is good law in the wake of *Doe v. DEA*, 484 F.3d 561, there is ample reason to depart from this approach. The *PDK* Court seems not to have considered the argument that if the letter was non-final for the purposes of section 877, it was also non-final for the purposes of the APA. The letter sent to PDK (denying it a hearing on the LONO decision) also stated that it was a final decision, thus creating a stronger argument in that case than in this one that it was a final action of some sort. *See id.* Moreover, subsequent decisions have eroded the basis of the district court's approach in *PDK*. The D.C. Circuit never directly reviewed the question of the district court's jurisdiction, but later exercised its exclusive jurisdiction over a petition for review in the same case after further (and final) agency action. *See generally PDK II*, 438 F.3d 1184.

Finally, superseding agency actions clarify that the original LONO refusal was not intended to be final agency action. *See* Meador Decl. ¶ 19. It was indeed "merely tentative or interlocutory

---

[18]    The Court ultimately found that PDK, a drug manufacturer, was entitled to a hearing and remanded to the agency for that purpose. *PDK Labs, Inc. v. Reno*, 134 F. Supp.2d at 29; *see also PDK Labs, Inc. v. Ashcroft*, 338 F. Supp. 2d 1, 8 (D.D.C. 2004) (converting preliminary injunction into summary judgment).

in nature" and not intended to set anyone's legal rights.  *See Bennett v. Spear*, 520 U.S. at 178.  The recent measures ensure that the LONO refusal itself is treated by the agency as an interlocutory measure, and that the agency exercises all due care in the exercise of its authority under section 971. There is still the potential for additional agency action if Spirit requests a hearing.  It is, however, abundantly clear that the LONO refusal itself is not what determined plaintiff's rights.

Accordingly, the Amended Complaint should be dismissed because it fails to challenge a final agency action within the meaning of the APA.

III.   DEA'S HEARING PROCEDURES ARE CONSISTENT WITH SECTION 971 AND WITH DUE PROCESS

On June 25, 2007, DEA formally denied Novelty's request for a hearing on the suspension order issued June 22, 2007.  AR 0056-61.  Count I of the Amended Complaint alleges that the denial of a hearing to Novelty is inconsistent with the Due Process Clause.  Although there is no cause of action in the Amended Complaint alleging that such decision is inconsistent with the statute, the introductory paragraph and the plaintiff's brief both state that the decision to deny Novelty a hearing is also inconsistent with section 971(c).  Bearing in mind that plaintiff has an obligation to clearly state in the complaint all claims that it intends to pursue, defendants will nonetheless respond as though both claims were raised.

A.  Novelty is Not Entitled to a Hearing under Section 971(c)

1.   The Statute Requires a Hearing for those Regulated Persons to Whom an Order Applies

Section 971(c)(2) states that "[u]pon written request . . . , a regulated person to whom an order applies under paragraph one is entitled to an agency hearing on the record" (emphasis added). Paragraph one states that the "Attorney General may order the suspension of any importation or exportation of a listed chemical . . . on the ground that the chemical may be diverted to the

29

clandestine manufacture of a controlled substance." Thus, in order to determine who is entitled to a hearing, the relevant question is to whom a suspension order applies.

DEA has been delegated the authority to interpret this language, *see* 21 U.S.C. § 821, but has not formally promulgated a regulation specifying who is a person entitled to a hearing. *See* 21 C.F.R. § 1313.52. Even in the absence of formal regulations, an agency's interpretation of a statute that it is charged with administering is entitled to some deference, in accordance with its power to persuade. *See, e.g., U.S. v. W.R. Grace & Co.*, 429 F.3d 1224, 1237 (9th Cir. 2005) ("Even if full-blown *Chevron* deference is not due because of the informal nature of the interpretation, we will still accord a modified level of respect."). *See also U.S. v. Mead*, 533 U.S. 218, 234 (2001) ("Chevron did nothing to eliminate *Skidmore*'s holding that an agency's interpretation may merit some deference whatever its form."); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Moreover, special deference is ordinarily due to the agency's adoption of procedural rules. *See FCC v. Schreiber*, 381 U.S. 279, 290-92 (1965) (noting that "administrative agencies 'should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties'").

2.    DEA Reasonably Determined that Novelty is Not a Person to Whom an Order Applies

In light of the fact that Novelty is a downstream customer of an importer, DEA reasonably determined that Novelty was not a person to whom an order applies. First, the plain language of the statute applies only to an order under paragraph (c)(1); such an order applies only to an "importation or exportation." Because only a registered importer may effectuate an importation, the intent of Congress is quite clear that suspension orders should only "apply" to importers. *See* 21 U.S.C. § 958 (registration requirement for importation).

At the very least, DEA's interpretation is reasonable. Should the Court find ambiguity in the term "person to whom an order applies," DEA has reasonably determined that Congress did not intend imports to go forward without the express participation of the importer. DEA's interpretation has been applied fairly and consistently in order to ensure that registered importers are responsible for importations.[19] It is consistent with other portions of the statute. For example, section 971(c)(1) states: "From and after the time when [DEA] provides written notice of the order … to the regulated person, the regulated person may not carry out the transaction." The applicable language refers to just one person, the importer (or exporter), and not the whole array of downstream customers. And the language refers to "the transaction" and not a whole series of downstream sales. A downstream customer, *i.e.*, a person that is not registered as an importer, has no legal authority to "carry out the transaction." Finally, section § 971(d) provides for issuance of a suspension order when an importer updates its notification to DEA with new information about new transferees; the statute explicitly requires notice of a suspension order only to the importer. *See* § 971(d)(2)(B). There is no possible principled reason why Congress would require issuance of a notice only to importers where the problem is the updated notification, but would require issuance of a notice to downstream customers where the original notification is at issue.

Plaintiff's interpretation, in which any downstream customer could seek a hearing and pursue an importation without the importer's participation, effectively circumvents the distinctive requirements for importers. If the importer is unwilling to write a letter saying it would like to pursue the importation, the importer truly has become no more than a nominal conduit for the

---

[19]     Importers submit the notification to DEA, 21 U.S.C. § 971; 21 C.F.R. § 1313.12, maintain a unique registration with requirements applicable only to importers, 21 U.S.C. § 958; 21 C.F.R. § 1309, and are otherwise responsible for importations, 21 C.F.R. §§ 1313.12-17.

31

customer and the differing requirements for importers serve no purpose.  Moreover, plaintiff's interpretation creates the possibility that DEA will be forced to hold wholly unnecessary hearings because the importer really is no longer interested in selling to the downstream customer.

The defendants recognize, of course, that one district court has previously rejected the argument that only an importer is entitled to a hearing.  In *PDK Labs*, the Court held that PDK, a manufacturer one step removed from the importer, was entitled to a hearing under section 971(c)(2). *See* 134 F. Supp. 2d at 30, 36. That decision has since been overruled on jurisdictional grounds.  *See Doe v. DEA*, 484 F.3d at 568-70.  The *PDK* court believed that Congress had intentionally used the term "regulated person" instead of "importer or exporter" in section 971(c)(2), without addressing the full phrase "regulated person to whom an order applies <u>under paragraph one</u>" and analyzing paragraph one.  The court held that because an order affected the downstream customers greatly, the order "applies" to them under the statute.  This is a considerable expansion of the term "applies," and does not address the reasoning described above.

Moreover, the *PDK* court relied heavily on *Yi Heng Enterprises Development Co*, 64 Fed. Reg. 2234 (1999), *see* 134 F. Supp. 2d at 30, which is distinguishable because those orders (originating in China) were to be transshipped through California on their way to Yi Heng's customer in Columbia.  The ALJ determined that title to the chemicals, while still in China, had actually been transferred from Yi Heng to the Columbia customer, and concluded that the Columbia customer was therefore also an importer.  Moreover, both importers had requested a hearing. Thus, the question of whether someone other than an importer could obtain a hearing was never addressed; the DEA simply found that there were two importers to whom the order applied.

    3.    <u>Even under the Analysis in PDK Labs, Novelty is Not a Person to Whom an Order Applies</u>

Assuming that some portion of *PDK Labs* is still good law, DEA correctly decided that *PDK Labs* is distinguishable. Novelty is a step further removed from the importation than the plaintiff in *PDK Labs*. The notification to DEA lists the transferee as AAA Pharmaceuticals, a drug manufacturer who is analogous to PDK. AR 0003-0006. AAA then intended to resell the manufactured products to Novelty. AR 0007-0008. Only through further investigation was it revealed that one of AAA's customers was Novelty. *Id.* The expansion of the hearing requirement to any downstream regulated person affected by a suspension order is a considerable expansion of Judge Kennedy's reasoning in *PDK Labs*. DEA would be faced with an insurmountable task of adjudicating each and every downstream customer's issues in each and every suspension. Retail establishments are also "regulated persons" pursuant to the statute. Accordingly, under Novelty's reasoning, any one of Novelty's thousands of customers could receive an independent hearing regardless of whether Spirit, AAA, or even Novelty was interested in pursuing the importation.

B.    The Due Process Clause Does Not Entitle Novelty to a Hearing

The Due Process Clause of the Fifth Amendment prohibits the deprivation "of life, liberty, or property, without due process of law." To establish a Due Process violation, a plaintiff must prove that (1) it was deprived of a protected liberty or property interest (2) without due process of law, normally consisting of notice and an opportunity to be heard commensurate with the circumstances. *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972); *Orange v. Dist. of Columbia*, 59 F.3d 1267, 1273 (D.C. Cir. 1995); *Mimiya Hosp., Inc. SNF v. U.S. Dept. of Health and Human Services*, 331 F.3d 178, 181 (1st Cir. 2003); *see also Trifax Corp. v District of Columbia*, 314 F.3d 641 (D.C. Cir. 2003). Once the plaintiff has established a the deprivation of a protected interest, the Court inquires as to whether or not the plaintiff received the process due under the circumstances, balancing the three factors set forth by the Supreme Court in *Matthews v.*

33

*Eldridge*, 424 U.S. 319, 335 (1976):  (1) the private interest affected by official action; (2) the cost-benefit analysis, weighing the risk of erroneous deprivation versus the added value of additional process; and (3) the public interest.

    1. Novelty Was Not Deprived of a Property Interest

    To determine whether a person has a property interest deserving protection under the due process clause, the Court should look to the substantive law underlying the asserted interest.  A property interest does not arise from an "abstract need or desire" or from a "unilateral expectation." *See Board of Regents v. Roth*, 408 U.S. 564, 577 (1972).  Rather, it must be grounded in a "legitimate claim of entitlement" found elsewhere.  *Id.*  "Property interests flow not from the Constitution itself, but from 'existing rules or understandings that stem from an independent source such as state law.'"  *Kelly Kare, Ltd. v. O'Rourke*, 930 F.2d 170, 175 (2d Cir.) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)), *cert. denied*, 502 U.S. 907 (1991).

    Novelty has no unqualified right to obtain list I chemicals from a third-party importer free from government regulation.  Novelty may argue that its property interest arises from the registration and notification scheme established by the CDTA.  As discussed above, however, the purpose of the CDTA is to prevent diversion of list I chemicals, not to create a private entitlement to the unrestricted import of those chemicals.  To be sure, a property interest may be grounded in a statute or regulations that create substantive limitations on the discretion of agency decisionmakers. *Washington Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 36 (citing *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983)).  Those limitations must, however, consist of specific directives that mandate a particular outcome.  *Tarpeh-Doe v. United States*, 904 F.2d 719, (D.C. Cir. 1990) (citing *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 462 (1988)); *see also Roth v. King*, 449 F.3d 1272, 1285 (D.C. Cir. 2006).

In the case of the CDTA, the legislative and regulatory scheme does not provide Novelty any entitlement to obtain ephedrine generally or to reap the benefits of a particular importation of ephedrine. It is "quite clear that legislative provision of procedural safeguards cannot in itself create a property interest for purposes of due process analysis." *Griffith v. Federal Labor Relations Authority*, 842 F.2d 487, 495 (D.C. Cir. 1988) (citing *Olim*, 461 U.S. at 250-51). In any event, section 971(c)(1) grants DEA extensive discretion to suspend an importation on the ground that the chemical may be diverted to the clandestine manufacture of a controlled substance. *See PDK II*, 438 F.3d at 1191-92 (emphasizing broad delegation of authority and broad discretion inherent in section 971). Moreover, Novelty's alleged "entitlement" is bounded by the discretion of the importer, who must submit the notification to DEA and request a hearing under the statute. As such, the CDTA does not "sufficiently restrict the decisionmaker's discretion to generate a protected interest implicating the due process clause." *Tarpeh-Doe*, 904 F.2d at 723.[20]

The district court in *PDK Labs* did find a due process violation but not based on deprivation of a property interest. That Court dismissed the argument at the preliminary injunction stage, finding that "[s]ection 971 does not sufficiently limit official discretion to restrict importation so as to create an entitlement of an entity to import chemicals." *See* 338 F. Supp. 2d at 9-10; 134 F. Supp. 2d at 32-33.

2. Novelty Was Not Deprived of a Liberty Interest

---

[20]    *See also Industrial Safety Equipment Ass'n, Inc. v. E.P.A.*, 837 F.2d 1115, 1122 (D.C. Cir. 1988) (manufacturers of certified asbestos protection respirators not deprived of an interest in property where agencies published guide recommending other products, but did not repeal certification of manufacturers' products); *Furlong v. Shalala*, 156 F.3d 384, 394 (2d Cir. 1998) ("[W]hen a benefit is denied, and that action results from an exercise of official discretion, entitlement to the benefit occurs only when official discretion is so narrowly confined as virtually to guarantee conferral of the benefit."); *Griffiths*, 842 F.2d at 500 (holding that language "conjur[ing] up broad grant of discretion" insufficient to establish entitlement).

Novelty's assertion that it has been deprived of a liberty interest is no more availing. The courts have recognized that, in some limited circumstances, a liberty interest may be deprived as a result of a continuing stigma or disability arising from government action. *O'Donnell v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir 1998). However, "a showing of reputational harm alone cannot suffice to demonstrate that a liberty interest has been infringed." *Id.* at 1141. The harm must "occur[] in conjunction with, or flow[] from, some tangible change in status." *Id*. Thus, in *O'Donnell*, the Court considered a claim made by a deputy chief of police that his demotion impaired his ability to find employment as a chief of police in a major city. Although the court acknowledged that O'Donnell "may well have suffered some stigma in the job market as a result of his demotion," he had fallen far short of showing that his ability to pursue his chosen profession had been seriously affected or destroyed. Id. A plaintiff may also demonstrate deprivation of a liberty interest by showing that some significant government action had the "broad effect of largely precluding" the plaintiff from pursuing a business. *Kartseva v. Dep't of State*, 37 F.3d 1524, 1528 (D.C. Cir. 1994) (holding that employee's allegation that she was fired after defendant ruled that she was ineligible to work on contract because of security concerns was sufficient to state claim against Department for deprivation of a liberty interest). In such a case, the "key inquiry" is whether "the government, by attacking personal or corporate reputation, [has] achieved in substance an alteration of status that, if accomplished through formal means, would constitute a deprivation of liberty." *See Trifax Corp. v. District of Columbia,* 314 F.3d 641, 644 (D.C. Cir. 2003). Plaintiffs claiming "broad preclusion" must show that "the government has seriously affected, if not destroyed, their ability to obtain employment or contracts in their field." *Id.* (internal citations and alterations omitted).

In the present case, Novelty's liberty interest claim should be dismissed because the complaint does not allege the type of change in legal status that must accompany a claim for a

deprivation of liberty based on a government-imposed stigma or reputational injury.  *See also Moore v. Agency for Intern. Development*, 80 F.3d 546, 548 (D.C. Cir. 1996) (holding that defamation must also impair the legal protections of an individual to constitute deprivation of liberty.).  The LONO denial and suspension order apply only to this shipment.  Even presuming the analysis applied will more broadly affect Novelty's ability to gain access to ephedrine products, this is simply not the sort of injury that gives rise to a due process claim because it results in no change in legal status.  Novelty's complaint also fails to allege that the company has been effectively precluded from pursuing its business as a distributer of novelty items.  *See Kartseva*, 37 F.3d at 1529; *see also Bernard v. United Township High School District No. 30*, 5 F.3d 1090 (7th Cir. 1993) (affirming dismissal where school district had merely interfered with plaintiff's efforts to market one particular drawing, but did not prevent him from selling other prints); *Piecnick v. Commonwealth of Pennsylvania*, 36 F.3d 1250 (3d Cir. 1994) (affirming dismissal where there was not substantial interference with plaintiff's ability to pursue his chosen occupation).

In *PDK Labs*, the Court ultimately determined that PDK had been deprived of a liberty interest because the LONO denial threatened PDK's "core business" (75% of its revenues).  *See* 338 F.Supp.2d at 9-10 (citing *Kartseva*, 37 F.3d at 1528).  Novelty can show nowhere near the sort of deprivation that *PDK* showed.  By its own admission, Novelty "distributes and sells a wide array of commercial goods to convenience stores throughout the United States, including sunglasses, lighters, key chains, plush toys, and OTC pharmaceuticals."  Am. Compl. ¶1.  According to the amended complaint, pharmaceuticals account for approximately 15% of Novelty's annual revenue, but it is unclear whether all of this revenue comes from ephedrine products or whether its "revenue" is gross or net.  *Id*.  The Affidavit of Tom Green submitted in conjunction with plaintiff's motion asserts, somewhat ambiguously, that "10-15% of Novelty's total annual revenue" is derived from sales of

37

"those OTC products."  ¶ 10.   Again, it is unclear whether that revenue percentage is gross or net, whether there are any current opportunities to purchase ephedrine on the domestic spot market, whether there are any opportunities to replace that revenue with other products, or whether Novelty has any current or future plans to restructure its business.  Even assuming a total loss of 15% of Novelty's net income – a stretch given the facts in the Amended Complaint, Novelty still has not been wholly precluded from engaging in its business, the sale of novelty items.  Nothing in the complaint or affidavit  could possibly be cobbled together to show that DEA has "seriously affected, if not destroyed" Novelty's "ability to obtain . . . contracts in their field."  *See Trifax Corp.,* 314 F.3d at 644.

### 3.   Novelty Was Not Deprived of Due Process

Even if Novelty was deprived of a liberty or property interest, existing procedures are more than adequate under the circumstances.  Novelty is not even claiming a right to a "pre-deprivation" hearing, most likely because allowing a company that DEA believes to be at risk of diversion to continue importing ephedrine would clearly pose a grave risk to the interests identified by Congress. Novelty nonetheless insists upon a formal agency adjudication as its post-deprivation hearing.  The procedures currently in place are more than adequate to protect whatever interest Novelty has shown. First, in the event that Novelty can find an importer willing to do business with Novelty, Novelty can fully participate in the formal or informal hearing that results.   Meador Decl. ¶ 27.

Second, in the absence of a formal adjudication, Novelty may proceed as any person interested by agency action and submit a request to the Administrator in writing.  *See* 5 U.S.C. § 555(e).  This would entitle Novelty to be heard and compel the Administrator to formally respond. Novelty has given no reason that a full hearing before a hearing officer is necessary.  A simple chance to be heard and present one's arguments is often more than sufficient in the administrative

38

context.  *See, e.g.,  Pension Benefit Guaranty Corp. v. LTV Corp.,* 496 U.S. 633 (1990); *Seafarers Intern. Union of North America,* v. U.S., 891 F.Supp. 641, 645 (D.D.C. 1995), *aff'd sub nom Clifford v. Pena*, 77 F.3d 1414 (D.C. Cir. 1996); *cf. Chemical Waste Management, Inc. v. U.S. EPA*, 873 F. 2d 1477 (D.C. Cir. 1989) (holding, in essence, that a right to a "hearing" does not automatically translate to a full adjudicatory hearing.)  Third, even if Spirit is unwilling to pursue the importation and the paper hearing is somehow insufficient, DEA's suspension order is subject to judicial review as soon as it becomes final.  Judicial review is of course limited to record review, but it is nonetheless a post-deprivation opportunity for plaintiff to be heard and to present arguments that the agency decision was not supported by substantial evidence.  *See* 21 U.S.C. § 877.  There is no principled reason why a post-deprivation agency hearing should be required to satisfy the due process clause when post-deprivation judicial review is available regardless.

IV.   **DEA REASONABLY DENIED SPIRIT'S LONO REQUEST AND SUSPENDED THE SHIPMENT**

Despite plaintiff's argument that it is entitled to an agency hearing on this very issue, Novelty has also moved for summary judgment on the question of whether Spirit's LONO request was properly denied.

A.   <u>Standard of Review</u>

In order to suspend a shipment, DEA must determine that the shipment "may be diverted to the clandestine manufacture of a controlled substance."  21 U.S.C. § 971(c)(1).  This is a broad delegation of discretionary authority.  *See PDK II*, 438 F.3d at 1192.  DEA applies a totality-of-the-circumstances test, previously upheld by the D.C. Circuit, in determining whether a shipment "may be diverted."  *See* Meador Decl. ¶ 10; *PDK II*, 438 F.3d at 1194 (upholding suspension order based on series of warning letters).  The Court reviews such a determination under the substantial evidence

test. *See, e.g., PDK II*, 438 F.3d at 1193. Substantial evidence "requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." *Fla. Mun. Power Agency v. Fed. Energy Reg. Comm.*, 315 F.3d 362, 365-66 (D.C. Cir.), *cert. denied*, 540 U.S. 946 (2003); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). Under either the "arbitrary and capricious"standard or the "substantial evidence" standard, the scope of review is narrow and a court must not substitute its judgment for that of the agency. *Motor Veh. Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Gen. Teamsters Local Union No. 174 v. NLRB*, 723 F.2d 966, 971 (D.C. Cir. 1983). *See also Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). As long as an agency has "examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made," courts will not disturb the agency's action. *MD Pharm., Inc. v. DEA.*, 133 F.3d 8, 16 (D.C. Cir. 1998).

B.    The Decision to Refuse the LONO and to Suspend the Shipment is Supported by Substantial Evidence

The October 10, 2006 LONO refusal was based on two primary grounds: (1) the sale of typical gray market products to typical gray market retailers, and (2) the intended sale of products in states where such sales are prohibited. Meador Decl. ¶ 18. First, Novelty sells primarily to convenience stores, which are at a greater risk than pharmacies for diversion. As explained in the Meador declaration and in the suspension order, these stores have repeatedly been found to have a higher risk of diversion than other retail outlets in a variety of contexts. *See* Meador Decl. ¶¶ 12-15; AR 0057. *See, e.g., Wild West Wholesale*, 72 Fed. Reg. 4042, 4044 (DEA 2007); *Tri-County Bait*

40

*Distributors*, 71 Fed. Reg. 52160, 52161 (2006); D&S *Sales*, 71 Fed. Reg. 37607, 37609 (DEA

2007);[21] In a recent order, DEA explained this risk factor in detail:

> While combination ephedrine products have a legitimate medical use as a bronchodilator to treat asthma, DEA orders have established that convenience stores and gas stations constitute the non-traditional retail market for legitimate consumers of products containing ephedrine. . . .

> DEA orders thus establish that the sale of certain list I chemical products by non-traditional retailers is an area of particular concern in preventing diversion of these products into the illicit manufacture of methamphetamine. *See, e.g., Joey Enterprises*, 70 FR 76866, 76867 (2005). As *Joey Enterprises* explains, "[w]hile there are no specific prohibitions under the Controlled Substances Act regarding the sale of listed chemical products to [gas stations and convenience stores], DEA has nevertheless found that [these entities] constitute sources for the diversion of listed chemical products." *Id. See also TNT Distributors*, 70 FR 12729, 12730 (2005) (special agent testified that "80 to 90 percent of ephedrine and pseudoephedrine being used [in Tennessee] to manufacture methamphetamine was being obtained from convenience stores"); *OTC Distribution Co.*, 68 FR 70538, 70541 (2003) (noting "over 20 different seizures of [gray market distributor's] pseudoephedrine product at clandestine sites," and that in eight month period distributor's product "was seized at clandestine laboratories in eight states, with over 2 million dosage units seized in Oklahoma alone."); *MDI Pharmaceuticals*, 68 FR 4233, 4236 (2003) (finding that "pseudoephedrine products distributed by [gray market distributor] have been uncovered at numerous clandestine methamphetamine settings throughout the United States and/or discovered in the possession of individuals apparently involved in the illicit manufacture of methamphetamine").

*Wild West Wholesale*, 72 Fed. Reg. at 4044. Thus, DEA has exercised its expert judgment in finding

consistently that sales to convenience stores constitute a higher risk of diversion to illicit

manufacture of controlled substances.[22]

---

[21]    This conclusion is also supported by the string of state governments which have outlawed sale of such ephedrine products by non-traditional retailers.

[22]    The same caselaw corroborates Meador's explanation that sale to convenience stores are a substantial <u>factor</u> in finding a risk of diversion. Unlike a formal rule forbidding sale to convenience stores, the use of a risk factor means that DEA can consider mitigating factors. If the Court agrees with plaintiffs that the use of this risk factor constitutes a final formal rule that may be challenged here, the "rule" is supported by substantial evidence for the same reasons given in this section.

In addition to a string of DEA precedent supporting this risk factor through specific examples and studies, the Meador Declaration and the suspension order offer specific reasons for finding convenience stores and gas stations to be at greater risk. Each of these reasons is supported specifically by the DEA caselaw above. First, such products may pass through multiple layers of distribution. At a minimum, they are more likely to be redistributed after reaching the retail customer. Meador Decl. ¶ 14. This latter concern does in fact apply to Novelty. Second, such products are different from, and sometimes stronger than, those found in the traditional market. AR 0057; Meador Decl. ¶ 14. The products being manufactured by Novelty were deemed to be typical gray market products based on the dosage of ephedrine and typical distribution. AR 0058. Third, non-traditional retailers often sell these products for off-label uses. Meador Decl. ¶ 13. Novelty's insistence that it does not market its products for off-label uses in no way means that its customers do not. Finally, it has been repeatedly found that products from non-traditional retailers are disproportionately represented in clandestine lab seizures and are more likely to sell to smurfers. Meador Decl. ¶¶ 13-15 (collecting cases). Novelty simply has no way of knowing whether its customers are knowingly selling large quantities to smurfers. That Novelty has not been formally informed yet of any specific seizures of its products does not mean that its products never find their way to methamphetamine labs.[23] Accordingly, at both the LONO stage and the suspension order stage, DEA found a risk of diversion based on the fact that Novelty sells typical gray market products to typical gray market retailers, both of which carry a high risk of diversion.

Because DEA need only prove that some portion of a shipment "may be diverted," the reasoning above constitutes substantial evidence supporting the agency's decision. However, in

---

[23]     DEA has revoked the registration of importers even without specific evidence that their products had been diverted. *See, e.g., Joy's Ideas*, 70 Fed. Reg. at 33196.

denying the LONO, DEA found other indicators that Spirit's import could be diverted. DEA relied in part on the indication in Novelty's submission that it intended to sell the manufactured products in states where such sales are illegal. When Mr. Meador contacted Novelty in the course of his investigation, he requested both photographs of the labels of the products being manufactured for this shipment and a list of the intended customers, a list which referenced the purchase order from AAA pharmaceuticals. AR 0007-0016; Meador Decl. ¶¶ 17, 20. That list included customers in states where it is illegal to sell the tablet-form products that were being manufactured by AAA. AR 0007-0016; Meador Decl. ¶¶ 17, 20. Thus, Meador quite reasonably concluded that Novelty intended to sell the AAA products in those stores. Meador Decl. ¶¶ 17, 20. Novelty now claims that it submitted an overinclusive customer list, including customers who do not purchase the products manufactured from the AAA purchase at issue. Novelty also claims that DEA should have known that its submission was overinclusive because of an alleged telephone conversation between plaintiff and another DEA employee regarding a previous, unidentified submission by Novelty in connection with another matter, nearly a year prior to this submission. DEA examined the affidavit of Mark Bledsoe prior to issuance of the suspension order. ¶ 20. While Novelty does not attach any sales records to back up its claims that it has not sold such products in those states, DEA elected not to rely on the possibility of state law violations in issuing its final order in light of Bledsoe's sworn assurances that Novelty does not intend to sell those items in those states. *Id*. Accordingly, the suspension order is based solely on risk factors associated with gray market sales and the conclusion that Novelty is selling typical gray market products to gray market customers. AR 0056-0059.

DEA, after consideration of the facts alleged in the Bledsoe affidavit, found no reason to believe that Novelty's policies significantly reduce the risks associated with gray market retailers. Meador Decl. ¶¶ 20-22. Plaintiff describes many aspects of its business that it considers to be

relevant to the determination of a risk of diversion.  Most of these are wholly irrelevant to DEA's findings.  Protections against theft, for example, do not mitigate the risk of sales to non-traditional retailers.[24]  DEA's findings were based on what is likely to happen after ephedrine products are sold to retail outlets.  Plaintiff's good faith efforts to reduce diversion are admirable but do not reduce the risks associated with these customers.[25]

Those of Novelty's policies which are arguably relevant provide little protection against the specific risks associated with gray market sales.  For example, Novelty limits sales to its retail customers to one <u>case</u> of ephedrine per transaction without further limitation on time period and without describing how many dosage units are in a case or how often purchases are made.  AR 0058. The limitation on sales to final customers is also not terribly meaningful given the types of products at issue.  The policy limits individual sales to two packages per transaction or one transaction per day, or in the case of these products, 48 dosage units to a single customer per day.  AR 0008-0010; Meador Decl. ¶ 21.  Even assuming that Novelty's sales records back that up, given DEA's description of how smurfers operate, buying maximum amounts of ephedrine products at multiple stores, this is hardly a meaningful limitation.  *See* Meador Decl. ¶ 14.  Novelty does not provide any additional evidence that could mitigate DEA's findings.[26]

---

[24]    DEA has had some disagreement with Novelty in the past over adequate security measures within its system.  Novelty's challenge to DEA guidelines are at issue in the ongoing litigation in the Southern District of Illinois.  DEA did not, however, rely on these measures or that dispute in anyway in finding a risk of diversion here.

[25]    *See, e.g., Joy's Ideas*, 70 Fed. Reg. at 33198 ("[E]ven the most sincere efforts by [the distributor] to self-regulate her customers cannot guarantee that current and/or future customers will not be obtaining precursor chemicals from other distributors, as well as from [this distributor], and then resell them for illicit purposes.).

[26]    For example, Novelty attaches no sales records to show the quantities of products they sell and whether those quantities meet or exceed expected demands for these products in the respective communities.  In the past, DEA has estimated typical legitimate sales in an area based

In short, as in *PDK II*, the agency has identified specific risk factors in the evidence presented to it, considered possible mitigating factors, and acted consistently with precedent to suspend the shipment. DEA relied on its considerable expertise and experience to find that Novelty intended to sell typical gray market products to typical gray market retailers, both of which are uniquely at risk of diversion.[27]

## VI. THE APA DOES NOT REQUIRE NOTICE-AND-COMMENT RULEMAKING FOR LONO PROCEDURES

The plaintiff contends that formal notice-and-comment rulemaking is required for both (1) the LONO procedure and (2) the criteria for the issuance of LONOs. This position is apparently premised on the erroneous belief that the LONO procedure constitutes a "legislative rule[]" subject to the rulemaking requirements of the APA. *See* Am. Compl. ¶ 25. Even if plaintiff is correct, the Court should defer to the agency's decision to proceed through individual adjudications rather than

---

on estimates of typical legitimate demand. *See Wild West Wholesale*, 72 Fed. Reg. at 4043; *Joy's Ideas*, 70 Fed. Reg. t 33197. Generally speaking, a very low percentage of legitimate sale occurs at such stores. *Wild West Wholesale*, 72 Fed. Reg. at 4042.

[27] Plaintiff has recklessly accused Mr. Meador of knowingly making misrepresentations and has requested sanctions against defendants and undersigned counsel. Pls. Summ. J. Br. 13. However, not only were Mr. Meador's statements factually correct to the best of his knowledge, the conclusions he drew were reasonable and supported by substantial evidence. When Mr. Meador requested a customer list for a specific import of ephedrine, plaintiff provided a customer list that references that importation. Meador Decl. ¶¶ 17, 20; AR 0007-0016. It is illegal to sell the products being manufactured by AAA to some of the customers on that list. Meador Decl. ¶ 17. Thus, it reasonably appeared to Meador that plaintiff, perhaps inadvertently, intended to sell some products in states where it is illegal to do so. Moreover, plaintiff's "request" for sanctions does not begin to comport with the requirements of Rule 11. *See* Fed. R. Civ. P. 11(c)(1)(A). Instead, plaintiff has dropped a footnote in summary judgment brief without prior consultation and without any legal or factual support.

Lastly, as plaintiff's counsel is well aware, the defendants' original motion was withdrawn due to the filing of an amended complaint by the plaintiff, rendering the motion moot. *See, e.g., National City Mortg. Co. v. Navarro*, 220 F.R.D. 102, 106 (D.D.C. 2004) (Urbina, J.). The same facts appear in the refiled motion to dismiss because defendants and defendants' counsel are confident that the conclusions drawn from them are supported by substantial evidence.

rulemaking.  Moreover, the agency is allowed to adopt even formal rules without the rulemaking

process when the rule falls within one of the APA exceptions.  The LONO procedure itself clearly

falls within the exceptions for procedural rules and for foreign relations.

A.    The Court Should Defer to the Agency's Choice of Adjudication over Rulemaking

Under section 553 of the APA, an agency is required to provide notice of a proposed

rulemaking in the Federal Register and an opportunity to comment on the proposed rule.  *Lincoln*

*v. Vigil*, 508 U.S. 182, 195 (1993).  However, an agency is almost never required to undertake rule-

making where another form of decisionmaking is available.  Justice Murphy's decision in *SEC v.*

*Chenery Corp.*, 332 U.S. 194 (1947), contains the classic articulation of the rationale behind this rule

of judicial deference to the agency's choice of appropriate procedural tools:

> Not every principle essential to the effective administration of a statute can or should
> be cast immediately into the mold of a general rule.
>
>     * * *
>
>    . . . problems may arise in a case which the administrative agency could not
> reasonably foresee, problems which must be solved despite the absence of a relevant
> general rule.  Or the agency may not have had sufficient experience with a particular
> problem to warrant rigidifying its tentative judgment into a hard and fast rule.  Or the
> problem may be so specialized and varying in nature as to be impossible of capture
> within the boundaries of a general rule.  In those situations, the agency must retain
> power to deal with the problems on a case-to-case basis if the administrative process
> is to be effective.
>
>     * * *
>
>    . . . the choice made between proceeding by general rule or by individual, ad hoc
> litigation is one that lies primarily in the informed discretion of the administrative
> agency.

*Id.* at 202-03.  Subject to due process constraints on imposing new law on parties to an adjudication,

which are not relevant here, this principle has been consistently reaffirmed by the courts.  *See, e.g.,*

*FCC v. National Citizens Comm. for Broadcasting*, 436 U.S. 775, 808-09 n. 29 (1978) ("The

Commission has substantial discretion as to whether to proceed by rulemaking or adjudication . . . ."); *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87 (1995); *International Union, UMW v. FMSHA*, 920 F.2d 960, 964 (D.C. Cir. 1990).

This is precisely a situation where the agency has chosen to proceed through individual adjudications. In making the determination of risk of diversion, the DEA offers formal hearings to any importer to whom an order of suspension applies. The determination of whether a risk of diversion exists is made using a "totality of the circumstances" test previously upheld by the D.C. Circuit in *PDK II*, 438 F.3d at 1194-95. The plaintiff challenges only the LONO procedures, as if these determinations were somehow separate and distinct from the section 971 process. The LONO simply certifies for the benefit of the exporting nation that the importation appears to comply with U.S. law, *i.e.*, the DEA does not plan to suspend it under section 971. *See* Meador Decl. ¶¶ 8-9. Because a LONO decision, simply one procedural part of the 971 decision, is made in the context of an individual adjudication, the court should defer to the agency's choice of procedural tools.

Plaintiff's reason that rulemaking is mandatory seems to be that the agency has not complied with the adjudication requirement of section 971(c). *See* Pl. Summ. J. Br. 25. Even if true, that is clearly not a reason to require notice and comment rulemaking. After all, no amount of notice and comment would salvage a rule that violated the statute. Nor is it a meaningful response to the publicly documented fact that treating convenience store sales as a significant risk factor is a long-standing DEA practice, developed and applied in the context of individual adjudications. The D.C. Circuit has already held that DEA is free to develop the definitional content of a risk of diversion in individual adjudications. *See PDK II*, 438 F.3d at 1194-95.

B.    LONO Procedures are Exempt from Rulemaking Requirements Because they are Purely Procedural Rules

The APA exempts "rules of agency organization, procedure, or practice" from its notice and comment requirement.  5 U.S.C. § 553(b)(A).  The purpose of the procedural rule exemption "is to ensure that agencies retain latitude in organizing their internal operations." *American Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1047 (D.C. Cir. 1987) (internal quotations omitted). The exception applies to "technical regulation of the form of agency action and proceedings," *Southern Cal. Edison Co. v. FERC*, 770 F.2d 779, 783 (9ᵗʰ Cir. 1985) (internal quotations omitted), and matters that "relate to and deal with methods of operation." *American Meat Inst. v. Bergland*, 459 F. Supp. 1308, 1314 (D.D.C. 1978). The "critical feature" of the exception "is that it covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency."  *JEM Broadcasting Co. v. FCC*, 22 F.3d 320, 326 (D.C. Cir. 1994) (internal quotations omitted); *see also Fl. Power & Light Co. v. EPA*, 145 F.3d 1414, 1420 (D.C. Cir. 1998).

The LONO procedure easily meets this test.  The LONO procedure is simply a method of informing the exporting nation whether a substantive standard has been met; it is not a substantive standard itself.  *See* Meador Decl. ¶¶ 8-9.  A LONO refusal triggers no legal obligations other than an obligation to contact the agency if the importer wishes to pursue the importation.  *Id*.  This is precisely a situation where the only effect of the rule is to "alter the manner in which the parties present themselves or their viewpoints to the agency." *See JEM Broadcasting Co.*, 22 F.3d at 326.

Plaintiff cites a number of inapposite cases in which agencies adopted a substantive rule directly affecting the rights and obligations of the parties without notice and comment or adjudicative proceedings.  In most of these cases, the agency claimed that it was exempt from the rulemaking requirement because it was issuing a mere interpretive rule, an issue wholly inapplicable here.  In *Appalachian Power Co v. EPA*, 208 F.3d 1015, 1024 (D.C. Cir. 2000), for example, the court found

that an interpretive rule was in fact a legislative rule because it broadened the monitoring obligations imposed on industry beyond those required by the formal regulation. It is difficult to reason how that is analogous to the LONO process. Even under plaintiff's description of the LONO process, the LONO is a burdensome procedural hurdle, not a substantive obligation. In any event, the issue is wholly distinguishable from the rule at issue in *Appalachian Power*, which involved a dispute about whether a clearly substantive interpretive rule was broader than a clearly substantive formal rule.

C.  LONO Procedures are Exempt from Rulemaking Requirements Because they Involve a
    Foreign Relations Function

Even if the Court deems the LONO procedure to be a substantive requirement, it is exempt from notice and comment under the APA because it involves foreign relations functions of the United States. The APA provides an exception to notice-and-comment rulemaking for rules involving a "foreign affairs function of the United States." 5 U.S.C. § 553(a)(1). The foreign affairs exception applies to cases, such as this one, involving the implementation of the President's foreign policy. It appears in the original version of the APA, passed in 1946. *See* 60 Stat. 238 (1946). In interpreting the APA, the Supreme Court has relied on the Attorney General's Manual on the APA. *See Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 546 (1978) (recognizing the manual as "a contemporaneous interpretation . . . given some deference by this Court because of the role played by the Department of Justice in drafting the legislation"). The Manual states that "[i]t is clear that . . . the [foreign affairs exception] is not limited to strictly diplomatic functions, because the phrase 'diplomatic function' was employed in [a] January 6, 1945 draft . . . and was discarded in favor of the broader and more generic phrase 'foreign affairs function.'" *Att'y Gen.'s Manual on the APA* 27 (1947). In *Mast Industries, Inc. v. Regan*, 596 F. Supp. 1567, 1583 (CIT 1984), for example, the Court held that interim regulations defining limitations in bilateral trade agreements or

unilaterally imposed restrictions on textile imports "clearly and directly involve a foreign affairs function and are exempt from the prior notice and comment provisions of the APA" because such regulations "go directly to the purpose of the trade agreements."

The LONO procedure is the implementation of international agreements, including the 1988 Vienna Convention and the informal bilateral agreements negotiated with exporting nations.  *See* Meador Decl. ¶¶ 7-9; *Presidential Determination on the Major Methamphetamine Precursor Chemical Exporting and Importing Countries*, No. 2007-14, available at www.state.gov/p/inl/rls/rpt/81222.htm (February 28, 2007).  The purpose of the LONO is to comply with the Vienna Convention by providing assurance to the exporting nation, and the use of LONOs was specifically negotiated with the competent authorities in the exporting nations to accommodate differences in the legal systems.  *Id.*  This is even more clearly a foreign affairs function than the unilateral import quotas at issue in *Mast Industries*.  *See* 596 F. Supp. at 1583.  Judicial intervention to modify the process could render the United States in breach of such agreements or incapable of enforcing its obligations under the Vienna Convention.  As a practical matter, it is necessary for the United States to have some process whereby it notifies countries that require such notice that a shipment is in compliance with U.S. law.  *See* Meador Decl. ¶ 8-9.  Without such a procedure in place, it would be illegal under, for example, Indian law, to export ephedrine to the United States. *Presidential Determination on the Major Methamphetamine Precursor Chemical Exporting and Importing Countries*, No. 2007-14, available at www.state.gov/p/inl/rls/rpt/81222.htm (February 28, 2007).  The LONO procedure is clearly and directly a foreign affairs function of the United States, and is accordingly exempt from notice and comment rule-making.[28]

---

[28]     Plaintiff argues that international treaties cannot be used to violate U.S. law.  U.S. law, however, specifically exempts rules implicating foreign affairs from notice and comment.

VI.    PLAINTIFF HAS NOT MET THE STANDARD FOR A PRELIMINARY INJUNCTION

Four months after filing suit, Novelty has not discovered any new facts, but has discovered

a so-called emergency and moved for a preliminary injunction on two issues.  Specifically, plaintiff

requests that the Court order DEA to issue a suspension order against a third party, Spirit

Pharmaceuticals ("Spirit"), blocking an importation of ephedrine, and further requests that the Court

order DEA to hold a hearing on that suspension order in which Novelty may participate.  The first

issue is moot because DEA has now issued the suspension order. DEA opposes the motion on the

second issue because plaintiff cannot demonstrate any irreparable harm given its long delay and

because plaintiff cannot demonstrate a likelihood of success on the merits.

A.    A Preliminary Injunction is an Extraordinary Remedy

Preliminary injunctive relief pursuant to Federal Rule of Civil Procedure 65 is "an

extraordinary measure, and . . . the power to issue such exceptional relief 'should be sparingly

exercised.'" *Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 96 (D.D.C. 2003) (quoting

*Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969)) (internal quotes omitted); *accord*

*Boivin v. US Airways, Inc.*, 297 F. Supp. 2d 110, 116 (D.D.C. 2003) ("It frequently is observed that

a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless

the movant, by a clear showing, carries the burden of persuasion") (quoting *Mazurek v. Armstrong*,

520 U.S. 968, 972 (1997) ( per curiam)) (emphasis in original).  "[I]n considering a plaintiff's

request for a preliminary injunction a court must weigh four factors: (1) whether the plaintiff has a

substantial likelihood of success on the merits; (2) whether the plaintiff would suffer irreparable

injury were an injunction not granted; (3) whether an injunction would substantially injure other

interested parties; and (4) whether the grant of an injunction would further the public interest." *Al-*

*Fayed*, 254 F.3d at 303; *accord Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317 (D.C. Cir. 1998).

51

"The usual role of a preliminary injunction is to preserve the status quo pending the outcome of litigation." *Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir.1969); *Cobell v. Kempthorne*, 455 F.3d 301, 314 (D.D.C. 2006). "Where an injunction is mandatory-that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act-the moving party must meet a higher standard than in the ordinary case." *Columbia Hosp. for Women Found. v. Bank of Tokyo-Mitsubishi*, Ltd., 15 F.Supp.2d 1, 4 (D.D.C. 1997) (citation omitted), aff'd, 159 F.3d 636 (D.C.Cir. 1998); *see also Phillip v. Fairfield Univ.*, 118 F.3d 131, 133 (2d Cir.1997). In such a case, "the moving party must meet a higher standard than in the ordinary case by showing 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from the denial of the injunction." *See LeBoeuf, Lamb, Greene & MacRae, LLP. v. Abraham*, 180 F. Supp. 2d 65, 71 (D.D.C. 2001) (Urbina, J.).

B.    <u>Plaintiff Has Not Demonstrated Irreparable Harm</u>

"The basis of injunctive relief in the federal courts has always been irreparable harm." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir.1995) (citing *Sampson v. Murray*, 415 U.S. 61, 88 (1974)). In order for a plaintiff to meet its burden of demonstrating irreparable harm sufficient to warrant the entry of preliminary injunctive relief, the injury complained of must be both certain and great; it must be actual and not theoretical. Injunctive relief "will not be granted against something merely feared as liable to occur at some indefinite time." *Wisc. Gas. Co. v. Federal Energy Regulatory Comm'n*, 758 F.2d 669, 764 (D.C. Cir. 1985) (citation omitted). Instead, the party seeking injunctive relief must show that "[t]he injury complained of [is] of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm." <u>Id.</u> (citations and internal quotations omitted). It is a "well known and indisputable principle[]" that a vague or speculative harm cannot constitute "irreparable harm" sufficient to justify injunctive

relief.  Id.  A plaintiff's failure to meet its burden of establishing irreparable harm is sufficient, in itself, to deny emergency relief.  *CityFed Fin. Corp.*, 58 F.3d at 747.

Moreover, delay in seeking injunctive relief is a reason in itself to conclude that there is no danger of irreparable harm.  Because irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction," *Bell & Howell: Mamiya Co. v. Masel Supply*, 719 F.2d 42, 45 (2d Cir. 1983), quoting 11 C. Wright & A. Miller, Federal Practice and Procedure § 2948, at 431 (1973), any delay by a plaintiff in seeking preliminary relief is a relevant factor when considering whether the plaintiff has met his burden to show irreparable harm.  "[T]he failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury."  *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) (internal quotation marks and citation omitted); *see also Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) ("An unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm."); *Mylan Pharmaceuticals, Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (delay "militates against a finding of irreparable harm")*; Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (plaintiffs had waited 44 days until after final regulations were issued although they had notice of a public comment period); *Lanvin, Inc. v. Colonia, Inc.*, 739 F. Supp. 182, 192 (S.D.N.Y.1990) (denying preliminary injunction after seven-month delay).

In the present case, plaintiff alleges that it faces irreparable reputational harm, stemming from the LONO denial.  Since the LONO denial was made October 10, 2006, it is telling that Novelty has only now discovered the injury to its reputation.  Much shorter delays have been grounds for finding a lack of irreparable harm.  *See, e.g., Mylan Pharmaceuticals, Inc. v. Shalala,* 81 F. Supp. 2d at 44 (noting that a 2-month delay would militate against finding irreparable harm).  While the affidavit

53

of Todd Green asserts that a loss of access to ephedrine will result in "significant changes" to

Novelty's business and a loss of up to 15% of total revenues, he does not even allege any imminence

of this threat to the business. Those numbers are clearly an absolute worst case scenario because the

Amended Complaint asserts that pharmaceuticals make up 15% of Novelty's business. It is,

however, impossible to infer this worst case scenario. No document indicates whether that revenue

percentage is gross or net, nor whether the business could replace those revenues, nor whether there

is any current or future plan in effect to restructure the business or fire employees. The case is

obviously distinguishable from *PDK Labs*, where the preliminary injunction issued in part because

the district court found a threat of "imminent devastation" of 75% of the plaintiff's "core business;"

the plaintiff in *PDK* had already changed its business practices and had scheduled imminent layoffs.

*See* 134 F. Supp. 2d at 36-37. Novelty has alleged no such facts.

C.    Other Factors Weigh Against an Injunction in this Matter

For the many reasons given above, plaintiff cannot demonstrate a likelihood of success on

the merits. With respect to the third and fourth factors for consideration of a preliminary injunction,

the impact on DEA's responsibility to counteract the diversion of listed chemicals to the manufacture

of controlled substances, and the public interest in preventing chemicals from being diverted to the

manufacture of a highly destructive drug, weigh heavily in favor of caution. A hearing for Novelty

prior to ultimate resolution of the propriety of such a hearing invites hearing requests from 1000s

of similarly affected downstream customers of Novelty and other dealers in ephedrine.

Accordingly the motion for a preliminary injunction should be denied.

## CONCLUSION

For the foregoing reasons, defendants respectfully request the Amended Complaint be

dismissed and that plaintiff's motions be denied.

Dated: June 25, 2007                           Respectfully Submitted,

                                               PETER D. KEISLER
                                               Assistant Attorney General

                                               JEFFREY A. TAYLOR
                                               United States Attorney

                                               ARTHUR R. GOLDBERG
                                               Assistant Director
                                               Federal Programs Branch


                                               /s _____
                                               AMY E. POWELL
                                               Attorney (NY Bar)
                                               U.S. Department of Justice
                                               Civil Division, Federal Programs Branch
                                               20 Massachusetts Avenue, N.W. Rm. 7322
                                               Washington, D.C. 20530
                                               Telephone: (202) 514-9836
                                               Facsimile: (202) 616-8202
                                               Email: amy.powell@usdoj.gov

                                               *Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NOVELTY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07-CV-00191 |
| | ) | (RMU) |
| | ) | |
| KAREN TANDY, in her official capacity; | ) | |
| UNITED STATES DRUG | ) | |
| ENFORCEMENT ADMINISTRATION; | ) | |
| ALBERTO GONZALES, in his official | ) | |
| capacity; UNITED STATES | ) | |
| DEPARTMENT OF JUSTICE; and the | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF DARRELL R. MEADOR

I, DARRELL R. MEADOR, pursuant to 28 U.S.C. § 1746, declare and say:

1.      I am a Staff Coordinator the Office of Enforcement Operations, Dangerous Drugs and Chemicals Section, at DEA Headquarters.  My responsibilities include the prevention, detection, and investigation of the diversion of listed chemicals from legitimate channels under the Controlled Substances Act.  This includes reviewing DEA Forms 486 (Import/Export Declarations) and answering questions from DEA field offices.  I have served in my current capacity at DEA headquarters since July 2004, and have been a Diversion Investigator since February 1986.  I was hired by DEA as a Diversion Investigator in February 1986 and attended the Basic Diversion Investigator

School at the FBI Academy in Quantico, Virginia.  I have also received additional training at numerous classes administered both by the DEA and by non-DEA entities between 1989 and 2005.  These courses familiarized me with matters involving chemical diversion to the illicit manufacture of methamphetamine, and the adverse environmental impact that results from this process.  Prior to my current position, I was a Diversion Investigator assigned to the Nashville, Tennessee District Office.  As part of my duties I conducted regulatory investigations involving manufacturers, distributors, pharmacies, practitioners, and other handlers of controlled substances.  I was primarily responsible for preventing, detecting and investigating the diversion of controlled substances from legitimate channels to illicit traffic.  I have conducted similar investigations related to manufacturers, distributors, importers and exporters of list I chemicals.  I have also provided investigative assistance in criminal and civil actions involving the diversion of imported list I chemicals and chemicals diverted to the illicit market.  The primary emphasis of most of these investigations has involved pseudoephedrine and ephedrine products.  I have also worked in the regulatory process of List I chemical handlers to include pre-registrant investigations, regulatory investigations, and administrative actions taken against regulated firms.

The following information is based on my personal knowledge and/or information gained in the course of my official duties.

2.    List I chemicals are legitimate chemicals that also may be used in the illicit manufacture of a controlled substance in violation of the Controlled Substances

Act, 21 U.S.C. § 802 (34), 21 CFR § 1310.02(a).  Ephedrine and pseudoephedrine are

List I chemicals which are commonly used to illegally manufacture methamphetamine, a

Schedule II controlled substance.  These chemicals have been specifically designated by

the Administrator of the Drug Enforcement Administration (DEA Administrator) as two

of the listed chemicals subject to the provisions of 21 CFR §§ 1309 and 1313.  *See* 21

CFR  § 1310.02 (a).


3.    Pursuant to 21 U.S.C. § 971 (c) and 21 CFR § 1313.41 (a), the DEA

Administrator has the authority to suspend any importation or exportation of ephedrine or

pseudoephedrine based on evidence that the chemical proposed to be imported or

exported may be diverted to the clandestine manufacture of a controlled substance.


4.    Additionally, the 1988 United Nations Convention Against Illicit Traffic

in Narcotic Drugs and Psychotropic Substances ("1988 U.N. Convention") requires that

parties to the convention "take the measures they deem appropriate to prevent diversion

of [listed substances, including ephedrine] used for the purpose of illicit manufacture of

narcotic drugs to psychotropic substances, and shall co-operate with one another to this

end."


5.    The 1988 U.N. Convention further states that parties "[c]ontrol all persons

and enterprises engaged in the distribution of [listed chemicals], license such distributors,

and "[r]equire that licensees obtain a permit for conducting [manufacture and

distribution]." Art. 12, ¶ 8(b).  Parties to the 1988 Convention are further obligated to

"[e]stablish and maintain a system to monitor international trade in [listed chemical] in order to facilitate the identification of suspicious transactions." *Id.* at ¶ 9(a). Parties are also obligated to notify the "competent authorities and services of the Parties concerned if there is reason to believe that the import, export or transit of a [listed chemical] is destined for the illicit manufacture of narcotic drugs or psychotropic substance." *Id.* at ¶ 9 (c). Though the 1988 U.N. Convention does not specifically mandate that parties adopt a permit system with respect to imports of listed chemicals, parties are obligated to cooperate to prevent diversion of listed chemicals used for the purpose of illicit manufacture of narcotic drugs or psychotropic substance.

6.     The United States has implemented a system by which every regulated person who imports a listed chemical is required to notify the DEA Administrator of the importation not later than 15 days before the importation is to take place. *See* 21 CFR § 1313.12 (a). Unless the notice requirement is waived, the regulated person must complete a DEA Form 486 and deliver it to DEA not later than 15 days prior to the importation. *See* 21 U.S.C. § 971 (a); 21 CFR § 1313.12 (b). The DEA Form 486 must include, among other things, name and address information about the chemical importer and/or broker, the name and description of each listed chemical, the amount of chemical to be shipped, the proposed import date, the foreign port of exportation, and the United States Customs Port of Entry. *See* 21 CFR § 1313.13 (c).

7.     In addition to the declaration system described above, the United States has negotiated bilateral agreements with several countries which are the chief sources of

4

bulk listed chemicals.  In the early 1990's, large shipments of ephedrine and

pseudoephedrine, bound for a fictitious company in Mexico, had been seized by U.S.

Customs agents at the Dallas/Fort Worth Airport on or before 1994.  The United States

subsequently learned that other large shipments of ephedrine and pseudoephedrine were

being shipped to this same fictitious company by companies located in the People's

Republic of China, India, and the Czech Republic.  In an effort to control these shipments

and prevent the chemicals from being diverted for the purpose of illicit manufacture of

methamphetamine, the competent authorities in these countries developed a procedure for

authorizing the exportation of List I chemicals to and through the United States.  This

became known as the "LONO" process.

            8.        Under the "LONO" process, the competent authorities of China, India, and

the Czech Republic ("exporting nations") require that, prior to permitting the export of a

List I chemical to and/or through the United States (and issuing a permit to the exporter),

the United States must first issue a "LONO," or Letter of No Objection, to the competent

authority of the exporting nation.  Normally, the LONO consists of a short letter which

lists the (1) U.S. importer; (2) exporter; (3) the shipment's DEA control number; (4)

name of chemical and quantity to be shipped; and (5) the importer reference number.

The LONO further states that "the DEA has no objection to the proposed shipment at this

time."  The LONO is sent to the competent authority of the exporting country and a copy

is sent to the importer.  Pursuant to the terms and spirit of the 1988 U.N. Convention, the

United States is required, prior to issuing the LONO, to investigate the intended

destination and uses of List I chemicals which are imported into and through the United

States. If, after investigating, the United States determines that the List I chemicals may

be diverted for the purpose of illicit manufacture of methamphetamine, under the terms

and spirit of the U.N. Convention, it is obligated to deny the LONO request based on the

same ground stated in 21 U.S.C. § 971 (c). *See* 1988 U.N. Convention, Art. 12, ¶¶ 1 and

8 (b). If the United States issues the LONO, the LONO serves to notify the exporting

country that, based on the evidence possessed by DEA at the time the LONO is issued,

that the shipment or export complies with 21 U.S.C. § 971.


9.      If, after receiving the completed DEA Form 486 and conducting its

investigation, DEA determines that the LONO will be denied, DEA will so notify the

regulated person seeking to import the listed chemical. At this point, DEA will provide

the regulated person with the option of either withdrawing or pursuing the importation. If

the regulated person elects to pursue the importation, DEA may suspend the importation

based on evidence that the chemical proposed to be imported may be diverted to the

clandestine manufacture of a controlled substance. *See* 21 U.S.C. § 971 (c); 21 CFR §

1313.41 (a). However, if the regulated person withdraws the LONO request, DEA will

take no further action. The denial of the LONO itself triggers no legal obligation except

to require the importer to contact DEA if it elects to pursue the importation. DEA intends

to issue a suspension order whenever it is clear that the importer still seeks the

importation.


10.      Currently, there is no statutory definition of "evidence that the chemical

proposed to be imported may be diverted to the clandestine manufacture of a controlled

substance." However, through prior adjudication, DEA and the courts have approved the use of a "totality-of-the-circumstances test" to decide whether substantial evidence exists to suspend an importation of List I chemicals. *See PDK Laboratories, Inc. v. United States Drug Enforcement Administration*, 438 F.3d 1184, 1194 (D.C. Cir. 2006); *Indace, Inc., Suspension of Shipments*, 69 Fed. Reg. 67,951, 67,959 (Nov. 22, 2004).

11.     Moreover, the Attorney General considers the following factors to determine whether a regulated person, such as the Plaintiff, shall receive a registration to distribute List I chemicals. *See* 21 U.S.C. § 823 (h) which provides that the "Attorney General shall consider--

(1)     maintenance by the applicant of effective controls against diversion of listed chemicals into other than legitimate channels;

(2)     compliance by the applicant with applicable Federal, State, and local law;

(3)     any prior conviction record of the applicant under Federal or State laws relating to controlled substances or to chemicals controlled under Federal or State law;

(4)     any past experience of the applicant in the manufacture and distribution of chemicals; and

(5)     such other factors as are relevant to and consistent with the public health and safety."

12.     In considering whether "the chemical proposed to be imported may be diverted to the clandestine manufacture of a controlled substance," the Attorney General may consider the importer's "downstream" customers. This includes the person to whom

the bulk chemicals are shipped and any other persons who may receive the chemicals either in bulk or manufactured form. The type of retail establishment that will ultimately distribute the List I chemical products to member of the public is a substantial and weighty factor in determining the risk of diversion to clandestine manufacture.

13.    Numerous DEA orders have established that convenience stores and gas stations constitute the non-traditional retail or "gray market" for legitimate consumers of ephedrine products. *Wild West Wholesale*, 72 FR 4042, 4044 (2007); *Tri-County Bait Distributors*, 71 FR 52160, 52161 (2006); *D & S Sales*, 71 FR 37607, 37609 2006); *Branex, Inc.*, 69 FR 8682, 8690-92 (2004). Gray market products, which are labeled as asthma/cough/cold/allergy relief medications, are often sold or marketed for "off-label" uses, such as weight loss or staying awake and are not typically found in most supermarkets and drug stores. DEA has found that there is a substantial risk of diversion of List I chemicals into the illicit manufacture of methamphetamine when these products are sold by non-traditional retailers. *Joy's Ideas*, 70 FR 33195, 33199 (2005) (finding that risk of diversion was "real, substantial and compelling"); *Jay Enterprises*, 70 FR 24620, 24621 (2005) (noting "heightened risk of diversion" should application be granted). DEA has adjudicated numerous cases in which it has determined that gray market retailers, such as gas stations and convenience stores, are "sources for the diversion of listed chemical products." *See Joey Enterprises*, 70 FR 76866, 76867 (2005); *TNT Distributors*, 70 FR 12729, 12730 (2005); *OTC Distribution Co.*, 68 FR 70538, 70541 (2003); *MDI Pharmaceuticals*, 68 FR 4233, 4236 (2003).

14.    DEA has determined that products sold in the non-traditional market may pass through multiple layers of distribution.  At a minimum, "gray market" products are more likely to be "redistributed" even after they have reached the retail customer. Accordingly, it is not a "closed system" in the manner that controlled substances are handled.

Generally, DEA has also found that "gray-market" products are typically different than and sometimes stronger than those found in the traditional market and "have been disproportionately represented in clandestine lab seizures around the United States involving listed chemical products."  DEA has also determined that many non-traditional retailers tend to knowingly sell large quantities of List I chemical products to "smurfers," methamphetamine traffickers and/or individuals who work for methamphetamine traffickers who attempt to buy out a store's entire stock of List I chemical products by going to the store at different times or on different days. *T. Young Associates*, 71 FR 60567, 60568 (2006); *K.V.M. Enterprises*, 67 FR 70968, 70969 (2002).

15.    Small capacity clandestine labs continue to dominate law enforcement seizures and environmental cleanups.  Many small illicit laboratories operate with listed chemical products often procured legally or illegally, from non-traditional retailers of over-the-counter drug products, such as gas stations and small retail markets.  Some retailers acquire product from multiple distributors to mask their acquisition of large amounts of listed chemicals. *SPA Dynamic Wholesalers*, 68 FR 61466, 61467 (2003).

16.    On September 25, 2006, DEA received two completed DEA Forms 486 from Spirit Pharmaceuticals, LLC ("Spirit"). On the forms, Spirit declared it intended to import two shipments of ephedrine hydrochloride ("ephedrine HCl"), with a net weight of 2200 kilograms. Spirit further requested that DEA issue a LONO to the competent authority of India in order to permit the import to take place and attached two purchase orders from AAA Pharmaceutical, Inc. ("AAA"), the company to whom Spirit intended to transfer the Ephedrine.

17.    After receiving the DEA Forms 486, Spirit's request for a LONO, and the AAA purchase orders, DEA determined that AAA intended to use the ephedrine HCl to manufacture "solid-dosage" or tablet form over-the-counter (OTC) pharmaceuticals ("AAA Products") for sale to the Plaintiff and one other company. DEA obtained photocopies of labels of these OTC pharmaceuticals from AAA and determined them to be "gray market" items. I then requested that AAA provide, or cause to provide, Novelty's customer list (list of retail outlets) which contain the customers to whom Novelty would be distributing the above described AAA products. Pursuant to my request to AAA, I then received from Novelty, by letter dated October 5, 2006, a list which Novelty claimed contained its "current customer list." ("current customer list"). This letter, which immediately followed my request to AAA to provide (or cause to provide) a list of Novelty's customers that would be receiving the AAA products, also referenced the same AAA Pharmaceutical Purchase Order #22773 ("AAA Purchase Order #22773") which contained the "gray-market" products described above.

After examining the current customer list provided by Novelty, DEA determined that some of Novelty's customers (i.e. gas stations and convenience stores) were venues in states where the sale of these items is prohibited by state law. For instance, according to the "Meth-Free Tennessee Act of 2005," which took effect in April 2005, "any immediate methamphetamine precursor may be dispensed only by a licensed pharmacy." Tenn. Code Ann. § 39-17-431. Kentucky has passed a similar measure which provides that "[a]ny nonprescription compound, mixture, or preparation contained any detectable quantity of ephedrine … [its] salts or optical isomers … shall be dispensed, sold, or distributed only by a registered pharmacist, a pharmacy intern, or a pharmacy technician." Ky. Rev. Stat. § 218A.1446. These states exempt "gel-caps" and liquids from the type of products that must be sold only in pharmacies. However, the products proposed to be manufactured by AAA and sold by Plaintiff are in tablet form.

18.    Therefore, based on Plaintiff's current customer list, which, on its face, indicated an apparent intention to violate state law, and Plaintiff's intention to sell to "gray market" retailers, DEA determined that authorizing the importation of ephedrine by Spirit constitutes a risk of diversion to the clandestine manufacture of a controlled substance. For those reasons, the LONO request was denied and Spirit was so notified by letter dated October 10, 2006. Spirit was informed that if it neglected to respond to the notification, its request would be considered withdrawn. Spirit did not respond to DEA's notification. Therefore, DEA considered the matter to be withdrawn.

19.    In an abundance of caution, by letter dated April 10, 2007, DEA notified

Spirit a second time of its right to pursue the importation and/or to affirmatively

withdraw the request for a LONO.  If Spirit elected to pursue the request, DEA would

have ordered the suspension of the shipments pursuant to 21 U.S.C. § 971 (c) (1) and

afford Spirit the opportunity for a hearing.  If Spirit withdrew its importation request,

DEA would have no authority to act any further on the request.

20.    Before a suspension order was issued, I examined the Affidavit of Mark

Bledsoe ("Bledsoe affidavit"), previously submitted in this litigation because it appeared

to contain information relevant to the LONO request.  In that affidavit, Mr. Bledsoe states

that Novelty previously explained to DEA that its current customer list did "not identify

which forms [of List I chemicals] are sold to which customers or, in the case of some

chains, [did] not identify by individual stores in states where sales of convenience stores

are prohibited." *See* Affidavit of Mark Bledsoe, ¶ 22.  Novelty claims this occurred

during a conversation with a DEA employee on February 3, 2006.  However, at that time,

DEA had not received the current customer list from Novelty pertaining to AAA

Purchase Order #22773.  Moreover, this alleged conversation would have occurred

approximately eight months *before* DEA requested Novelty's current customer list and

approximately seven months before Spirit submitted its LONO request.  Also, when

Novelty submitted its current customer list to DEA by letter dated October 5, 2006, it

specifically referenced AAA Purchase Order #22773 but did not attach any explanation

to place DEA on notice that some of the customers on the list allegedly *would not* be

receiving the AAA products contained in that purchase order.

Despite Novelty's failure to limit its customer list to those businesses which would be receiving products manufactured pursuant to AAA Purchase Order #22773 or to inform DEA prior of its failure at the time the "current customer list" was presented to DEA, DEA considered the Bledsoe affidavit prior to drafting an Order to Suspend the Shipment of 2,000 kilograms of Ephedrine Hydrochloride by Spirit Pharmaceuticals, LLC (DEA Control No. 5042393, Purchase Order No. 22773) ("Suspension Order"). Given Mr. Bledsoe's sworn statement which promises that Novelty will comply with all applicable state laws, DEA, in drafting the Suspension Order, did not rely on previous information which tended to show Novelty intended to sell "gray market" products to stores in states where such sales are prohibited.

21. The affidavit also states that it imposes a policy on retailers which permits them to sell "no more than 2 packages per transaction and 1 transaction per day." Given that Novelty has sought to distribute packages containing 24 dosage units each, this would limit retailers to selling 48 dosage units to a single customer per day. This regime, in DEA's view, would not prevent the practice of "smurfing" as described in ¶ 14 above.

22. The Bledsoe affidavit describes in some detail Novelty's "closed" system of distribution. However, nothing in that system appears to reduce the risks described above. The decision to deny the LONO and issue the Suspension order was not based on any risk addressed by this system.

23.    To the best of my knowledge and belief, as of the date and time this affidavit was signed, Spirit had not responded in writing to DEA's April 10, 2007, letter, despite numerous verbal promises to do so. As a result, DEA initiated the process necessary to formally suspend the shipment. This included reviewing the information contained in the Bledsoe affidavit, considering all prior information received regarding the shipment, and drafting the Suspension Order. The Suspension Order was then placed through a "vetting" process which requires it to be reviewed by a number of DEA divisions and personnel and ultimately presented to the DEA Deputy Administrator.

24.    Accordingly, DEA suspended the shipment by Order dated June 22, 2007, for the reasons stated in the Suspension Order.

25.    Within 30 days after receiving the Suspension Order, Spirit may file with the DEA a written request for a hearing in the form set forth in Section 1316.47, Title 21, Chapter 2, CFR. (See Section 1313.54(a)). The Deputy Administrator shall then cause a hearing to be held for the purpose of receiving factual evidence regarding the issues involved in the suspension of the shipment within 45 days of the date of Spirit's request, unless Spirit requests an extension of time. (See Section 1313.52). Should Spirit decline to file a request for a hearing or should it file and fail to appear at the hearing, it shall be deemed to have waived the hearing and the Deputy Administrator may cancel the hearing, if scheduled. (See Sections 1313.54(a) and (b)) Pursuant to Title 21 CFR § 1313.57, DEA may then enter a Final Order in this matter without a hearing.

26.    Spirit may also file with the DEA a written notice that it will withdraw the import declaration that is the subject of this suspension order. If Spirit withdraws the import declaration, these proceedings will be terminated.

27.    If Spirit elects to pursue the importation and requests a hearing, Plaintiff will have an opportunity at that point to petition the Administrative Judge for an opportunity to participate and/or intervene in the proceeding in accordance with the hearing procedures in subchapter II of chapter 5 of Title 5.

28.    DEA is aware that, by letter dated November 2, 2006, Plaintiff previously sought to pursue Spirit's importation and has since requested a hearing on the denial of Spirit's LONO request. Unlike Spirit, Novelty is not a registered importer pursuant to 21 U.S.C. § 958 (c), and cannot import ephedrine itself. The request for a hearing was pending until a Suspension order issued because the statute only provides for a hearing on an order. By letter dated June 25, 2007, DEA denied Novelty's request for an independent hearing. Novelty is not a person to whom an order applies within the meaning of section 971(c), 21 C.F.R. §1313.41 (b), or the relevant case law.

15

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that I have read the foregoing declaration and that the same is true and correct.

Darrell R. Meador
Staff Coordinator
Office of Enforcement Operations,
Dangerous Drugs and Chemicals
Section

Executed this 25th day of June, 2007 at Arlington, Virginia.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NOVELTY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07-CV-00191 (RMU) |
| | ) | |
| KAREN TANDY, in her official capacity; | ) | |
| UNITED STATES DRUG | ) | |
| ENFORCEMENT ADMINISTRATION; | ) | |
| ALBERTO GONZALES, in his official | ) | |
| capacity; UNITED STATES | ) | |
| DEPARTMENT OF JUSTICE; and the | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**LOCAL RULE 7(h) STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS
NO GENUINE ISSUE**

Pursuant to Local Rule 7(h), defendants hereby submit the following statement of facts as

to which there is no genuine issue:

**Background**

1.    Methamphetamine is "a powerful and highly addictive synthetic stimulant." One of the

principal precursor chemicals is the List I chemical ephedrine, which is also used for, and can

be obtained from, *inter alia*, prescription and nonprescription drugs.  *PDK Laboratories,*

*Inc., v. DEA*, 438 F.3d 1184 (D.C. Cir. 2006); *Wild West Wholesale*, 72 Fed. Reg. 4042, 4043

(DEA 2007); *see also* Decl. of Darrell Meador, dated June 25, 2007,  ¶ 2 ("Meador Decl.").

2.    The Chemical Diversion and Trafficking Act of 1988, Pub.L. No. 100-690, tit. VI, subtit. A,

102 Stat. 4312, authorizes the Drug Enforcement Agency ("DEA") to "order the suspension of any importation or exportation of a listed chemical . . . on the ground that the chemical may be diverted to the clandestine manufacture of a controlled substance."  *See* 21 U.S.C. § 971(c)(1); *see also* 21 C.F.R. § 1313.12 *et seq*.

3. The DEA has not promulgated detailed regulations on what constitutes a risk of diversion within the meaning of section 971(c)(1) or 21 C.F.R. § 1313.41(a).  Meador Decl. ¶ 10. Instead, the agency has exercised its discretion to proceed on a case-by-case basis, applying a "totality of the circumstances" test and developing law within the context of the individual adjudications contemplated by section 971(c)(2), a practice previously upheld by the D.C. Circuit.  *See id.*; *PDK II*, 438 F.3d at 1194-95.

4. In applying this "totality of the circumstances" test, a "substantial and weighty" factor is the type of retail establishment that will ultimately distribute the List I chemical products to the public. *See* Meador Decl. ¶¶ 10-15. Numerous DEA investigations and adjudications in a variety of contexts have determined that convenience stores and gas stations constitute the non-traditional retail or "gray market" for both legitimate and illegitimate consumers of ephedrine products.  *See id.;* AR 0057 (both collecting cases).  Accordingly, the DEA has consistently found that such retailers are at higher risk of diversion than traditional outlets, a finding supported by a string of case law, statistical evidence, and specific examples.  AR 0057; Meador Decl. ¶¶10-15; *see, e.g., Joy's Ideas*, 70 FR 33195 (DEA 2005).

5. The 1988 U.N. Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances requires that parties to the convention "take the measures they deem appropriate to prevent diversion of [listed substances, including ephedrine,] used for the purpose illicit

manufacture of narcotic drugs or psychotropic substances, and . . . cooperate with one another to this end."  U.N. Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, opened for signature Dec. 20, 1988,  Art. 12, ¶ 1, 28 I.L.M. 493 (1989).  Parties to the 1988 Convention are further obligated to "[e]stablish and maintain a system to monitor international trade in [listed chemical] in order to facilitate the identification of suspicious transactions." *Id*. at ¶ 9(a).  Parties are also obligated to notify the "competent authorities and services of the Parties concerned if there is reason to believe that the import, export or transit of a [listed chemical] is destined for the illicit manufacture of narcotic drugs or psychotropic substance." *Id.* at ¶ 9 (c).

6.    Although a permit system for importing and exporting such substances is not explicitly required by the Convention, many countries have developed a system which requires approval by the importing country before allowing the export. *See* Meador Decl., ¶ 8; *see also Presidential Determination on the Major Methamphetamine Precursor Chemical Exporting and Importing Countries*, No. 2007-14, available at www.state.gov/p/inl/rls/rpt/81222.htm (February 28, 2007) (describing international efforts to control precursor chemical in major ephedrine-exporting countries, including that China and India both require approval from the importing country). Accordingly, some exporting countries now require that the importing country approve an importation before they will issue an export permit. *Id.*   The United States does not issue import permits *per se*, but has negotiated bilateral agreements whereby the DEA instead provides importers and the exporting nation with a "letter of no objection," or LONO, when it elects not to suspend a shipment from one of these nations.  Meador Decl. ¶ 8.  The exporting nation is obligated

3

not to permit the export without a LONO, and the U.S. is obligated to deny the LONO if it finds that the chemicals may be diverted for the purpose of illicit manufacture of methamphetamine. *Id.*; *see also Presidential Determination on the Major Methamphetamine Precursor Chemical Exporting and Importing Countries*, No. 2007-14, available at www.state.gov/p/inl/rls/rpt/81222.htm (February 28, 2007)

7.    Several nations have requested the issuance of such letters, including India, China and the Czech Republic. Meador Decl. ¶ 8; *see also Presidential Determination on the Major Methamphetamine Precursor Chemical Exporting and Importing Countries*, No. 2007-14, available at www.state.gov/p/inl/rls/rpt/81222.htm (February 28, 2007).

8.    The DEA intends, however, that the LONO process add no legal rights or obligations to section 971, which only allows the DEA to suspend shipments if it finds a risk of diversion. Meador Decl. ¶ 8. Normally, the LONO consists of a short letter which describes the requested transaction and states that "the DEA has no objection to the proposed shipment at this time." *Id.*

9.    Accordingly, when persons wish to import a listed chemical from one of these nations, they submit DEA Form 486 and request a LONO. *See* Meador Decl. ¶ 9. If the DEA finds no problems with the importation, the DEA issues a LONO and the import goes forward. If DEA believes that there is a risk of diversion, the DEA is statutorily authorized to simply suspend the shipment with no further action or investigation, subject to a post-suspension hearing if the importer requests it. *See* 21 U.S.C. § 971; 21 C.F.R. § 1313.41(a). Generally, however, the DEA simply refuses to issue the LONO and gives the importer a chance to withdraw the request. Meador Decl. ¶ 9. An importer is then free to pursue the request and

4

risk an order of suspension.  *Id.*  The importer is still free to pursue the importation in the same manner contemplated by section 971(c); it need only inform the DEA that it wishes to do so.  *Id*.  It is DEA's intention to issue a suspension order whenever it is clear that the importer still seeks the importation.  *Id*.

10.    Darrell Meador is the Staff Coordinator for the Office of Enforcement Operations, Dangerous Drugs and Chemicals Section, at DEA Headquarters.   Meador Decl. ¶ 1.  His responsibilities include the prevention, detection, and investigation of the diversion of listed chemicals from legitimate channels under the Controlled Substances Act.  *Id*.  This and other positions and training have given him substantial experience in matters involving investigations of chemical diversion to the illicit manufacture of methamphetamine.  *Id*.

**Novelty and Spirit Pharmaceuticals**

10.    Novelty, Inc. is an Indiana corporation that distributes many kinds of commercial goods, including over-the-counter pharmaceuticals, to convenience stores throughout the United States.  Am. Compl. ¶ 1.  As such, Novelty distributes ephedrine products to the sort of nontraditional retailer that the DEA has found to be at risk of ephedrine diversion in many contexts.  *See* Meador Decl. ¶¶ 12-18; AR 0058.

11.    In September 2006, an importer called Spirit Pharmaceuticals, LLC, submitted two DEA Forms 486 and requested a LONO for two shipments of ephedrine from India.  *See* Am. Compl. ¶¶ 17-18; Meador Decl. ¶ 16; AR 0003-0006.  This shipment was intended for sale to AAA Pharmaceuticals, Inc., a drug manufacturer.  *See* Am. Compl. ¶¶ 17-18; Meador Decl. ¶ 16; AR 0003-0006.

12.    The DEA investigated the type of drug being manufactured and the prospective customers

of both AAA and its customers. Meador Decl. ¶¶ 17-18; AR 0007-0023. AAA Pharmaceuticals intended to resell the products created from one of these shipments to Novelty. *See* Am. Compl. ¶¶ 17-18; Meador Decl. ¶ 16; AR 0007-0008. On October 10, 2006, the DEA declined to issue the LONO for this shipment. Am. Compl. ¶ 17 and attachments; AR 0021-0022. By letter to Spirit Pharmaceuticals, DEA stated that it had "thoroughly reviewed the proposed utilization of the planned Listed Chemical importation," and found that "the proposed importation may be subject to diversion to the illicit market by the downstream distribution system." Compl. ¶ 17 and attachments; AR 0021-0022. The letter did not include an order of suspension. Instead, the DEA informed Spirit of its options: that it was free to pursue the importation, but that if the importer did not contact the DEA, the notification would be considered withdrawn. Compl. ¶ 17 and attachments; Meador Decl. ¶ 18; AR 0021-0022.

13. DEA based its conclusion on its findings that Novelty sold typical gray market products to typical gray market customers and on Novelty's apparent intention to sell tablet-form products in states where it was illegal to do so. Meador Decl. ¶¶ 17-18 ; AR 11-16. The latter conclusion was based on (1) information received indicating that the shipment of ephedrine was being used to manufacture only tablet form products and (2) Novelty's customer list, received in response to DEA's request for a customer list pertaining to this particular shipment. Meador Decl. ¶ 17; AR CITE 0007-0016.

14. Spirit withdrew its notification to DEA by default. Meador Decl. ¶ 18. No suspension order was issued at that time.

15. On April 10, 2007, DEA contacted Spirit Pharmaceuticals in order to make certain that Spirit

6

had a full opportunity to pursue the importation.  *See* Meador Decl. ¶ 19; AR 0028-0029.

Spirit Pharmaceuticals was informed that it must now take affirmative action to withdraw

the application or the DEA would issue a suspension order.  *Id*.  Spirit was given five days

to respond.  *Id*.

16.    Spirit did not respond to the April 10, 2007 letter.  Accordingly, DEA initiated the process

necessary to suspend the shipment.  Meador Decl. ¶ 23.  On June 22, 2007, DEA issued a

suspension order to Spirit pharmaceuticals.  AR 0056-57.  In the suspension order, DEA

found, *inter alia*, that:

- Spirit Pharmaceuticals, LLC was initially registered with DEA as an importer of ephedrine on November 8, 2004.

- On September 25, 2006, Spirit filed a 15-day advance notice Import Declaration for the importation of 2000 kilograms of ephedrine.  Spirit identified AAA Pharmaceutical, Inc. on the import request as the cutomer.

- AAA was contacted by telephone to ascertain the product to be manufactured as well as the customer.  The AAA representative stated that the ephedrine was to be manufactured into tablets, packaged, and sold to Novelty.

- Novelty provided DEA a list of customer names and addresses.

- Ephedrine and pseudoephedrine are List 1 chemicals that are distributed for legitimate uses.  They are also, however, methamphetamine precursor chemicals used by traffickers in the illicit manufacture of methamphetamine because they are readily available in over-the-counter drug products.

- DEA final orders have established common circumstances surrounding the

7

diversion of pseudoephedrine and ephedrine, including sales in non-traditional outlets, known as "gray market" retail outlets. These retailers purchase and sell ephedrine products in quantitties that exceed what would be necessary to meet legitimate demand.

- These OTC products are usually marked in brands that are not well-known nor widely advertised and are often packaged and displayed in ways not found in large traditional retail outlets. These products, which are distributed by these non-traditional retail establishments, are often sold to persons for use in the illicit manufacture of methamphetamine.

- The legitimate market for ephedrine in gray market retail outlets is even smaller than the already low demand in the gray market for pseudoephedrine.

- AAA manufactures and Novelty distributes OTC products containing ephedrine that are gray market products.

- Novelty's customers are gray market retail outlets.

- The proposed importation of ephedrine may be diverted to the clandestine manufacture of controlled substances.

17.    Prior to issuing the suspension order, DEA personnel examined the Bledsoe affidavit submitted in conjunction with this matter.   Meador Decl. ¶ 20; AR 0039-0054.  Based on the sworn representation that Novelty does not intend to sell tablet-form ephedrine products in states where it is illegal to do so, DEA elected to accept those statements absent other information and not to rely upon that basis in issuing the suspension order.  Meador Decl. ¶ 20; AR 0056-0059.

18.    Novelty has requested to be allowed to pursue Spirit's importation and has since requested

a hearing.  Meador Decl. ¶ 28; AR 0025-0026.  The DEA denied this request by letter dated

June 25, 2007.  AR 0060-61.  If Spirit requests a hearing, DEA will not oppose an attempt

by Novelty to participate in that hearing.

19.    Novelty is not a registered importer.  Meador Decl. ¶ 28.

## DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF UNCONTESTED MATERIAL FACTS

### Novelty Business Overview

1.    Not disputed, but immaterial.

2.    Not disputed, but immaterial.

3.    Not disputed, but immaterial.

4.    The first sentence is not disputed, but immaterial.  The second sentence is likely immaterial

and is not wholly supported by the record.  The cited affidavit states only that 25-50

employees would lose their jobs if 15% of total revenues were lost.  In contrast, the Green

affidavit and the Amended Complaint also indicate that 10-15% of total revenues are

attributable to OTC pharmaceuticals (apparently, but not clearly) referring to ephedrine and

pseudoephedrine products.  *See* Pls. Ex. 1, ¶ 10.  No document indicates whether that

revenue percentage is gross or net, nor whether the business could replace those revenues,

nor whether there is any current or future plan in effect to restructure the business or fire

employees.

5.    Not disputed, but immaterial.

6.    Not disputed, but immaterial.

7.    Not disputed.

8.    Not disputed.

9.    Not disputed.

**List I Chemical Products**

10.    Not disputed, except to observe that no document indicates whether those revenue percentages are gross or net.  Also, this fact is immaterial.

11.    No fact in the record describes or supports a finding of the "legitimate retail supply needs" of Novelty's customers.  Moreover, Novelty has not provided information sufficient to conclude that Novelty could not purchase ephedrine on the domestic spot market.  The Green affidavit only states that at some point in the past, Novelty could not locate a "commercially reasonable rate," without defining that term or describing whether Novelty could still make a profit off such products.  Also, this fact is immaterial.

12.    Defendants dispute that Mr. Green has personal knowledge or expertise sufficient to predict his customers' future behavior or to conclude that the described loss would be irreparable.  Otherwise, these statements are immaterial.

13.    Undisputed, except to observe that the record does not support a conclusion that Novelty will necessarily lose 15% of its total revenues; nor does the record indicate any imminent loss, nor describe any current or future plans to restructure the business or fire employees.  Also, this statement is immaterial.

14.    Undisputed, except to observe that the record does not support a conclusion that Novelty will necessarily lose 15% of its total revenues; nor does the record indicate any imminent loss, nor describe any current or future plans to restructure the business or fire employees.  Also,

10

this statement is immaterial.

**Novelty's List 1 Chemical Sales Policies**

15 - 20.    Not disputed, except to observe that the affidavit does not indicate actual compliance with these policies, only that the policies exist.  Moreover, neither Mr. Bledsoe nor any other Novelty employee has control over the products after they are sold by Novelty.  Also, these facts are immaterial.

**Novelty's Customers and Products**

21.    Defendants do not dispute the first five sentences but deny that they are material, but observes that Novelty may have used other manufacturers as well.  The sixth sentence is ambiguous because the terms "closed system" and "regulatory limitations" are not defined.  Defendants deny that the plaintiffs have minimized the risk of diversion for the reasons identified in the suspension order.  AR 0056-59.

22.    Not disputed, except to observe that the term "well-respected" is not defined and is inherently ambiguous.  Also, these facts are immaterial.

23.    Undisputed, except to observe that not receiving a DEA Warning Letter does not mean that Novelty's products have never been used in illegal drug manufacturing.  Moreover, defendant observes that Novelty does not claim that it has no knowledge of its products ever being used in such labs, only that it has never been formally notified.

24.    Not disputed.

25.    Undisputed, but defendants note that there is some evidence on the record tending to show that plaintiff may have intended to sell certain ephedrine products in states where it was illegal to do so.  *See* Meador Decl. ¶¶ 17-18, 20; AR 8-16.  Given the sworn affidavit by

11

plaintiff to the contrary, Bledsoe Aff. ¶¶ 15, 21, 53, DEA will not dispute the statement in

paragraph 25 unless other evidence is discovered.  Moreover, DEA has accepted this

statement and has not relied on its previous conclusion of Novelty's intent to violate state

law in subsequent decisions, rendering this fact immaterial.  Meador Decl. ¶ 20; AR 0056-59.

26.     Not disputed, except to observe that plaintiff has no knowledge to justify a claim that its

products have never been sold or marketed for off-label uses, only that Novelty has never

intentionally made off-label claims itself.  Also, this statement is immaterial.

27.     The first sentence is undisputed and immaterial, but defendants aver that Novelty's products

are more likely to be redistributed after sale to a retail customer.  Meador Decl. ¶ 14.  The

second and third sentences are undisputed but immaterial.  The third sentence is undisputed,

but defendants repeat and incorporate their response to paragraph 25.  The fourth sentence

is undisputed but immaterial.  The fifth sentence is undisputed, but defendants repeat and

incorporate their response to paragraph 23.  The last sentence is ambiguous because it does

not define the terms "large quantities" or "its customers" or qualify the statement by

transactions permitted by Novelty specifically.  For example, Novelty's policies cannot

possibly limit the total amount of ephedrine bought by consumers because such consumers

are not limited to Novelty products.  Nor can Novelty's policies prevent the purchase of large

amounts of ephedrine over time.  Moreover, defendants dispute any inference that Novelty's

policies would prevent purchases of large amounts of ephedrine products overall.   See AR

0056-59; Meador Decl. ¶¶ 10-15, 20-22.

28.     The first three sentences are undisputed but immaterial.  The fourth and sixth sentences are

undisputed, but defendants repeat and incorporate their response to paragraph 25.  The fifth

sentence mischaracterizes the statements of Darrell Meador, which speak for themselves, and is therefore disputed.  Meador Decl. ¶¶ 17, 20.

29.  The first sentence is undisputed.  The second, third and fourth sentences are somewhat ambiguous and possibly misleading.  Defendants aver that DEA requested a customer list for a specific shipment of ephedrine and that DEA received information that such particular shipment was being used to manufacture only tablet form ephedrine.  Meador Decl. ¶ 17; AR 0008.  The fifth sentence is undisputed, but defendants repeat and incorporate their response to paragraph 25.

30.  Defendants dispute the first three sentences and deny that these facts are material.  The alleged conversation could not have been about the customer list because the conversation was about 9 months prior to the submission of the list.  Meador ¶ 20.  Moreover, plaintiff does not identify the document that the conversation was alleged about.  *Id*.  The fourth sentence is undisputed, but defendants repeat and incorporate their response to paragraph 25.  The fifth sentence is undisputed but immaterial.  The last sentence is unsupported by the record; Novelty's policy against violation of state law in no way puts DEA "on notice" that Novelty will never in the future violate that policy.  *See* Meador Decl. ¶ 20.

**September 25, 2006 Order**

31.  Disputed.  Plaintiff's characterization of the purchase is wholly unsupported by the record, which indicates that AAA Pharmaceuticals ordered 2000 kilograms of ephedrine from Spirit Pharmaceuticals and that Novelty placed an order with AAA Pharmaceuticals.  AR 0003-0006.  Novelty's submission to the Court is identical.

32.  The first and third sentences are undisputed.  The second sentence is disputed.  Plaintiff's

statement is wholly unsupported even by its own submission to the Court. Neither the DEA

Form 486 nor the purchase order identify Novelty as a purchaser. AR 0003-0006. Rather,

the identity of Novelty was revealed by additional inquiry. AR 0007-0008.

33.    Undisputed.

34.    The first sentence is undisputed, except insofar as it states that the letter requested a hearing.

The letter states only that Novelty intends to "pursue importation." AR 0025-0026. The

second sentence is disputed only insofar as it characterizes Novelty's actions as an "appeal,"

a characterization wholly unsupported by the record or the law. AR 0025-0026.

35.    Undisputed.

36.    Undisputed.

37.    Undisputed.

38-40. Undisputed, but defendants repeat and incorporate their response to paragraph 25.

41.    The first sentence is undisputed. The second sentence is an inaccurate description of DEA's

April 10, 2006 letter, but immaterially so; the letter offered Spirit two options, but the letter

can speak for itself. AR 0028-0029. The third sentence is an inaccurate description of

Novelty's letter, which demanded that Spirit not request a hearing; the letter can speak for

itself. The third sentence is, however, immaterial.


Dated: June 25, 2007                        Respectfully Submitted,

                                            PETER D. KEISLER
                                            Assistant Attorney General

                                            JEFFREY A. TAYLOR
                                            United States Attorney

14

ARTHUR R. GOLDBERG
Assistant Director
Federal Programs Branch


/s_____
AMY E. POWELL
Attorney (NY Bar)
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W. Rm. 7322
Washington, D.C. 20530
Telephone: (202) 514-9836
Facsimile: (202) 616-8202
Email: amy.powell@usdoj.gov

*Attorneys for Defendant*

15

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| NOVELTY, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07-CV-00191 (RMU) |
| | ) | |
| KAREN TANDY, in her official capacity; | ) | |
| UNITED STATES DRUG | ) | |
| ENFORCEMENT ADMINISTRATION; | ) | |
| ALBERTO GONZALES, in his official | ) | |
| capacity; UNITED STATES | ) | |
| DEPARTMENT OF JUSTICE; and the | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**[PROPOSED] ORDER**

This matter is before the Court on defendants' Motion to Dismiss, or in the Alternative

for Summary Judgment, Plaintiff's Motion for Summary Judgment and Plaintiff's Motion for a

Preliminary Injunction.  Upon due consideration of the parties' submissions, it is hereby:

ORDERED that, defendants' motion to dismiss for lack of jurisdiction, is GRANTED;

and it is further

ORDERED that defendants' alternative motion for summary judgment is DISMISSED as

moot; and it is further

ORDERED that, plaintiff's motions for summary judgment and for a preliminary

injunction are DENIED.

SIGNED and ENTERED this ___ day of _____, 2007.

_____

U.S. DISTRICT JUDGE RICARDO M. URBINA